HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STORMANS, INCORPORATED, doing
business as RALPH'S THRIFTWAY;
RHONDA MESLER; and MARGO
THELEN,

                Plaintiffs,

        v.

MARY SELECKY, ACTING SECRETARY
OF THE WASHINGTON STATE
DEPARTMENT OF HEALTH, et al,

                Defendants.

Case No. C07-5374RBL

ORDER GRANTING PRELIMINARY
INJUNCTION

THIS MATTER comes before the Court on Plaintiffs' Motion for Preliminary Injunction.  Plaintiffs are two pharmacists and one corporate pharmacy.  They seek to enjoin the enforcement of regulations making it sanctionable for a pharmacy to permit a pharmacist-employee to refuse to fill a lawful prescription because of religious or moral objections.  Specifically, they ask the Court to enjoin enforcement of provisions contained within certain regulations as applied to "Plan B" contraceptives, also known as the "morning after" pill.

Plaintiffs' faith informs them that life begins at conception, when an egg from the female is fertilized by the sperm from the male.  Plan B prevents the fertilized egg from adhering to the wall of the uterus, one result attained when the morning after pill is administered within 72 hours after unprotected sex.  Plaintiffs believe that it is wrong to terminate that life.  They claim a right of conscience to refuse to dispense Plan B, and to instead refer the patient to a nearby pharmacy that will dispense the drug.  This practice is known as "refuse and refer."

Defendants are appointed government officials in Washington state who fall into two categories. One group is charged with the promulgation, interpretation and enforcement of the recently adopted regulations, WAC 246-863-095 and 246-869-010.  The other group of defendants is responsible for enforcing the Washington Law Against Discrimination, RCW 49.60 et. seq.

The Court has granted a motion to intervene [Dkt. #50] allowing participation by seven individuals: five women who claim to have been affected by the conduct of pharmacists opposed to Plan B contraceptives and two HIV positive individuals who express concerns about access to vital medicines they need to survive.

The Court has reviewed the materials submitted by the parties and participated in extensive oral argument with counsel and for the following reasons **GRANTS** limited relief as more particularly described in the body of this Order.

<u>**FACTUAL BACKGROUND**</u>

**I.      Regulating Authority.**

The Washington State Board of Pharmacy (the "Board") regulates the practice of pharmacies and pharmacists in the State of Washington pursuant to RCW 18.64 et. seq.  The Board is charged with enforcing all laws placed under its jurisdiction, establishing the qualifications of pharmacists, and promulgating "rules for the dispensing, distribution, wholesaling, and manufacture of drugs and devices and the practice of pharmacy for the protection and promotion of the public health, safety and welfare." RCW 18.64.005.  Pharmacies are required to be licensed under RCW 18.64.020.  The Board is authorized to take disciplinary action against a pharmacy license per RCW 18.64.165.  The Uniform Disciplinary Act provides procedures for disciplining health care providers, including pharmacists, who violate standards of professional conduct.  RCW 18.130 et. seq.

**II.     Existing Laws Regarding Discrimination and Conscience.**

Beginning as early as 1957, the people of Washington have been subject to a comprehensive law against discrimination.  RCW 49.60 et. seq.  In an exercise of the police power for the protection of the public welfare, health, and peace of the people, the legislature recognized and codified a right to be free from discrimination because of race, creed, color, national origin, or sex.  RCW 49.60.010 and .030.  This law is known as the Washington Law Against Discrimination (WLAD).

In 1987, the state Legislature adopted the Health Care Access Act.  RCW 70.47 et. seq.  In 2002, the people, by referendum, passed amendments aimed at further improving the health of low-income children and adults by expanding access to basic health care.  RCW 70.47.002.  One group targeted to benefit from the act was low-income pregnant women.  RCW 70.47.010(2)(c).  As a part of the Health Care Access Act, the legislature expressed the recognition "that every individual possesses a fundamental right to exercise their religious beliefs and conscience."  RCW 70.47.160(1).  The Legislature further acknowledged that "in developing public policy, conflicting religious and moral beliefs must be respected."  RCW 70.47.160(1).  Accordingly, the Legislature provided that "no individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion."  RCW 70.47.160(2)(a).  No person may be discriminated against in employment or professional privileges because of such objections.  RCW 70.47.160(2)(a).  The right of conscience, however, is not intended to result in a patient being denied timely access to any service included in the basic health plan.  RCW 70.47.160(2)(b).

An identical right of conscience was included within the Insurance Reform Act adopted by the Legislature in 1995.  RCW 48.43.065.

**III.    Development of Regulations.**

According to the Final Significant Analysis for Rule Concerning Pharmacists' Professional Responsibilities (WAC 246-863-095) and Pharmacies' Responsibilities (WAC 246-869-010) (Exh. K to Decl. of Kristen Waggoner, Dkt. #11), in 2004, the media began reporting incidents occurring nationwide in which pharmacists refused to dispense prescriptions for moral, religious and personal reasons.  Since 2004, complaints were filed with the Board of Pharmacy (Board) concerning some pharmacists refusing to fill prescriptions.  In 2005, the Board began to receive calls and emails inquiring into the Board's position on pharmacists refusing to dispense drugs and devices for moral or ethical objections.  Board staff concluded that Washington State Pharmacy laws and rules were silent on the issue.

The Washington State Pharmacy Association (WSPA) informed the Board that it had formed an ad hoc committee to develop its position on the issue and requested an opportunity to present the Committee's findings to the Board.  WSPA made its presentation to the Board in January of 2006,

1    recommending that pharmacists be allowed to refuse to fill a prescription on religious or moral grounds but

2    that the pharmacist "respect the autonomy of the patient, and not impede the patient's right to seek the

3    service being requested."  (Exh. D to Decl. of Kristen Waggoner, Dkt. #11).  Consistent with RCW

4    70.47.160(2)(a) and RCW 48.43.065, the proposed rule would have permitted the "refuse and refer"

5    response to a lawful prescription.

6          Planned Parenthood and the Northwest Women's Law Center also made presentations to the Board

7    (March 2006), advocating against the right of a pharmacist or pharmacy to "refuse and refer" based on

8    religious objection to Plan B.  (Exh. D to Decl. of Lisa Salmi, Dkt. #45).  In April 2006, the Board filed a

9    notice to initiate the rulemaking process in order to examine a pharmacist's responsibilities to dispense

10   lawful prescribed drugs or devices.  (Exh. K to Decl. of Kristen Waggoner, Dkt. #11).  The Board has

11   acknowledged that while issues of access and conscience applied to several types of medications, public

12   attention and comment during the rulemaking process focused on Plan B and other prescription birth

13   control products.[1]

14         On April 17, 2006, in a letter directed to the Pharmacy Board, the Washington State Human Rights

15   Commission offered its opinion on the subject of the right of conscience and access to Plan B:

16              It is the position of the WSHRC that allowing pharmacists to discriminate,
             based on their personal religious beliefs, against women and others trying to
17           fill lawful prescriptions would be discriminatory, unlawful, and against good
             public policy and the public interest.  It is also WSHRC's position that
18           allowing a practice of 'refuse and refer' as a means of addressing this issue,
             allows and perpetuates discriminatory behavior.
19

20   (Exh. J to Decl. of Kristen Waggoner, Dkt. #11).  The Commission further opined that the Washington

21   Law Against Discrimination (WLAD) would be violated if the pharmacy/pharmacist (a) refused to stock

22   Plan B, (b) refused to dispense Plan B and instead referred to a nearby pharmacy, or (c) refused to dispense

23   Plan B and instead referred the request to another pharmacist working in the same store on the same shift.

24   The Commission also suggested that the Board of Pharmacy itself would violate the WLAD if it adopted a

25   regulation that included the right of conscience.  *Id.*

26   _____

27        [1]Plan B was available only by prescription from 2003 to late 2006.  In December 2006, the U.S. Food and Drug
     Administration approved Plan B for over-the-counter distribution (stocked behind the counter) for women 18 and older.  Plan B
28   remains available to women under 18 by prescription only.  No party has suggested that the FDA's decision in any way changes
     the issues currently before this Court.

The Board reviewed Washington laws related to conscience clauses and discrimination.  It also referred to regulations adopted in other states.  Ultimately, on June 1, 2006, The Board unanimously voted to pursue a draft rule that allowed a pharmacist to refuse to dispense a medication but required that no pharmacy or pharmacist obstruct a patient's effort to obtain lawfully prescribed drugs or devices.  (Exh. C to Decl. of Kristen Waggoner).

Reaction to the Board action was immediate.  That same day, Governor Gregoire sent a letter to the Chairman of the Pharmacy Board stating her strong opposition to the draft rule.  The Governor emphasized that "no one should be denied appropriate prescription drugs based on the personal, religious or moral objection of individual pharmacists." (Exh. E to Decl. of Kristen Waggoner, Dkt. #11).  At a press conference later that week the Governor acknowledged that she could remove the entire Board with the legislature's consent but she would prefer not to take such a drastic step.  (Exh. F to Decl. of Kristen Waggoner, Dkt. #11).

On August 28, 2006, Governor Gregoire submitted to the Board an alternative rule that required pharmacies to dispense lawfully prescribed drugs and prevented pharmacists from refusing to dispense a medicine or medical device for religious or moral reasons.  (Exh. G to Decl. of Kristen Waggoner, Dkt. #11).  The Board voted to reconsider its position on a conscience clause.  On April 2, 2007, the Board voted unanimously in favor of adopting the substantive provisions of the rule proposed by the Governor. The regulations adopted by the Board became effective on July 26, 2007.  They provide as follows:

> WAC 246-863-095
> Pharmacist's professional responsibilities.
>
> (1) A pharmacist's primary responsibility is to ensure patients receive safe and appropriate medication therapy.
>
> (2) A pharmacist shall not delegate the following professional responsibilities:
>
> (a) Receipt of a verbal prescription other than refill authorization from a prescriber.
>
> (b) Consultation with the patient regarding the prescription, both prior to and after the prescription filling and/or regarding any information contained in a patient medication record system provided that this shall not prohibit pharmacy ancillary personnel from providing to the patient or the patient's health care giver certain information where no professional judgment is required such as dates of refills or prescription price information.

(c) Consultation with the prescriber regarding the patient and the patient's prescription.

(d) Extemporaneous compounding of the prescription, however, bulk compounding from a formula and IV admixture products prepared in accordance with chapter 246-871 WAC may be performed by a pharmacy technician when supervised by a pharmacist.

(e) Interpretation of data in a patient medication record system.

(f) Ultimate responsibility for all aspects of the completed prescription and assumption of the responsibility for the filled prescription, such as: Accuracy of drug, strength, labeling, proper container and other requirements.

(g) Dispense prescriptions to patient with proper patient information as required by WAC 246-869-220.

(h) Signing of the poison register and the Schedule V controlled substance registry book at the time of sale in accordance with RCW 69.38.030 and WAC 246-887-030 and any other item required by law, rule or regulation to be signed or initialed by a pharmacist.

(i) Professional communications with physicians, dentists, nurses and other health care practitioners.

(j) Decision to not dispense lawfully prescribed drugs or devices or to not distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies.

(3) Utilizing personnel to assist the pharmacist.

(a) The responsible pharmacist manager shall retain all professional and personal responsibility for any assisted tasks performed by personnel under his or her responsibility, as shall the pharmacy employing such personnel. The responsible pharmacist manager shall determine the extent to which personnel may be utilized to assist the pharmacist and shall assure that the pharmacist is fulfilling his or her supervisory and professional responsibilities.

(b) This does not preclude delegation to an intern or extern.

(4) It is considered unprofessional conduct for any person authorized to practice or assist in the practice of pharmacy to engage in any of the following:

(a) Destroy unfilled lawful prescription;

(b) Refuse to return unfilled lawful prescriptions;

(c) Violate a patient's privacy;

(d) Discriminate against patients or their agent in a manner prohibited by state or federal laws; and

(e) Intimidate or harass a patient.

WAC 246-869-010
Pharmacies' responsibilities.

(1) Pharmacies have a duty to deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies, or provide a therapeutically equivalent drug or device in a timely manner consistent with reasonable expectations for filling the prescription, except for the following or substantially similar circumstances:

(a) Prescriptions containing an obvious or known error, inadequacies in the instructions, known contraindications, or incompatible prescriptions, or prescriptions requiring action in accordance with WAC 246-875-040.

(b) National or state emergencies or guidelines affecting availability, usage or supplies of drugs or devices;

(c) Lack of specialized equipment or expertise needed to safely produce, store, or dispense drugs or devices, such as certain drug compounding or storage for nuclear medicine;

(d) Potentially fraudulent prescriptions; or

(e) Unavailability of drug or device despite good faith compliance with WAC 246-869-150.

(2) Nothing in this section requires pharmacies to deliver a drug or device without payment of their usual and customary or contracted charge.

(3) If despite good faith compliance with WAC 246-869-150, the lawfully prescribed drug or device is not in stock, or the prescription cannot be filled pursuant to subsection (1)(a) of this section, the pharmacy shall provide the patient or agent a timely alternative for appropriate therapy which, consistent with customary pharmacy practice, may include obtaining the drug or device. These alternatives include but are not limited to:

(a) Contact the prescriber to address concerns such as those identified in subsection (1)(a) of this section or to obtain authorization to provide a therapeutically equivalent product;

(b) If requested by the patient or their agent, return unfilled lawful prescriptions to the patient or agent; or

(c) If requested by the patient or their agent, communicate or transmit, as permitted by law, the original prescription information to a pharmacy of the patient's choice that will fill the prescription in a timely manner.

(4) Engaging in or permitting any of the following shall constitute grounds for discipline or other enforcement actions:

(a) Destroy unfilled lawful prescription.

(b) Refuse to return unfilled lawful prescriptions.

ORDER
Page - 7

(c) Violate a patient's privacy.

(d) Discriminate against patients or their agent in a manner prohibited by state or federal laws.

(e) Intimidate or harass a patient.

## IV.   Agency Interpretation of Regulations.

In a post-adoption letter interpreting the new regulations to Washington's pharmacists and pharmacy owners, the Board acknowledged that the regulations responded to the perceived need to "define standards of patient care and professional conduct when a pharmacist's personal objections conflicted with the patient's access to legally prescribed medications."  (Exh. B to Decl. of Rima Alaily, Dkt. #50-4).  In resolving the issue, the Board took a pro-patient position.  To the pharmacy, no right of conscience was allowed because under the Board's interpretation of the regulations, "the pharmacy business must meet the patient's needs onsite unless one or more of the exceptions described in the rule are present."[2]  *Id*.  Stated another way, the Board informed the regulated public that "the rule does not allow a pharmacy to refer a patient to another pharmacy to avoid filling the prescription due to moral or ethical objections."  *Id*.  A narrow right of conscience was allowed to the pharmacist, if the pharmacist worked with another pharmacist on shift who would dispense the medication in place of the conscientious objector.  *Id*.

## V.   Response to the Regulations.

The regulations became effective on July 26, 2007.  This lawsuit was filed on the prior day.  Plaintiff Rhonda Mesler alleges that she will be fired from her position as pharmacy manager because her employer cannot afford to hire another pharmacist to work with her.  Only by hiring a second pharmacist to work side-by-side with Ms. Mesler will her employer be able to comply with 246-869-010.[3]  (Decl. of Rhonda Mesler, Dkt. #12).  Plaintiff, Margo Thelen, was also informed that her employer could not hire another pharmacist to work with her or remain on call.  She was told that her employer could not

---

[2]The exceptions are:  "National or state emergencies; potentially fraudulent prescriptions; unavailability of the drug despite a good faith effort to comply with the Board's rule on adequate stock; lack of equipment or expertise to store a particular pharmaceutical; lack of payment."

[3]During the Board meeting of December 14, 2006, Board member Donna Dockter, RPh expressed concern that the then-draft rule was impractical in today's market "where in most situations there is only one pharmacist on staff at a given time." (Exh. O to Decl. of Lisa Salmi, Dkt. #45).

1  accommodate her religious beliefs and that "it would not work" for her to remain employed there.  In

2  order to find a job where there would be two or more pharmacists on duty, she found employment with a

3  hospital some distance away for less money.  (Decl. of Margo Thelen, Dkt. #13).

4      Prior to the adoption of the regulations, Storman's Stores had been the object of a boycott

5  organized by persons protesting Storman's refusal to stock Plan B.  Both the store and the pharmacy

6  manager were investigated by the Board for allegedly failing to maintain an adequate stock of medicines.

7  (Decl. of Kevin Stormans, Dkt. #14).  The Board initiated an additional investigation in response to

8  allegations that Storman's Inc. has violated WAC 246-869-010 by not stocking Plan B.  (Def. Amended

9  Notice of New Investigation, Dkt. #84).

10 **VI.   Intervenors.**

11      The intervenors are persons concerned about access to lawful medications in Washington.  Two

12 intervenors, Judith Billings and Dr. Jeffrey Schouten, are HIV-positive and both have prominent leadership

13 positions in matters of policy affecting the HIV-community.  Ms. Billings has been diagnosed with AIDS

14 since 1995.  Dr. Schouten is HIV-positive but does not disclose for how long.  He treats persons with

15 HIV but does not indicate whether he receives treatment related to HIV.  Neither Dr. Schouten nor Ms.

16 Billings claims that he or she has ever been denied access to HIV- or AIDS-related therapies in the State

17 of Washington.  They do express the concern that some patient in the future "might face denial or

18 harassment when attempting to fill prescriptions."  *See generally*, Declaration of Judith Billings, Dkt. #51

19 and Declaration of Jeffrey Schouten, M.D., Dkt. #53.

20      The remaining five intervenors are women of child bearing age who provide personal accounts of

21 their attempts to obtain Plan B and/or express their support for the subject regulations.  Rhiannon

22 Andreini needed access to Plan B in late 2005 while visiting her parents in the Edmonds/Mukilteo area.

23 The pharmacist at the Albertson's grocery store was friendly at first but turned "cold" and "appeared

24 disapproving" when she asked for Plan B.  The store did not carry Plan B and the pharmacist suggested

25 she try a nearby Bartell Drug Store.  He indicated generally where the store was located but did not

26 provide detailed directions.  Ms. Andreini was upset and cut her visit short by two days to return to

27 Bellingham and a pharmacy with which she was familiar.  Declaration of Rhiannon Andreini, Dkt. #52.

28

1    Molly Harmon presented a prescription for Plan B to a pharmacist at Bartell Drugs in the

2    University Village shopping center in Seattle sometime in 2003.  The pharmacist told Ms. Harmon that

3    Plan B was not a form of birth control and that she would provide Ms. Harmon with information about

4    available forms of birth control.  Ms. Harmon was extremely upset and asked to speak to the head

5    pharmacist who apologized and filled Ms. Harmon's prescription.  Declaration of Molly Harmon,

6    Dkt. #54.

7    Catherine Mossman has used Plan B on two occasions, once following a sexual assault.  In both

8    instances, she chose to obtain Plan B from Planned Parenthood because she has "heard numerous accounts

9    of pharmacists who refuse to fill emergency contraception prescriptions or otherwise act in a hostile or

10   harassing manner to those seeking such prescriptions."  Declaration of Catherine Mossman, Dtk, #55.

11   Emily Schmidt has not used Plan B but has participated in a Planned Parenthood testing program

12   designed to identify pharmacists who were and were not stocking and willing to distribute Plan B.  In the

13   Wenatchee area, Ms. Schmidt could obtain Plan B at two of five pharmacies.  At two pharmacies the

14   pharmacist indicated an unwillingness to dispense Plan B.  The record does not indicate why the fifth

15   pharmacy did not have Plan B.  Declaration of Emily Schmidt, Dkt. #56.

16   Finally, Tami Garrard has never used Plan B.  She, like the others, would like to participate in this

17   litigation "to help ensure that . . . all women in Washington, can get timely access to emergency

18   contraception to prevent an unintended pregnancy without harassment or hostility."  Declaration of Tami

19   Garrard, Dkt. #57.

20                                              **DISCUSSION**

21   **I.      Preliminary Injunction Standard.**

22   The standard for granting a preliminary injunction balances the plaintiff's likelihood of success on

23   the merits against the hardship to the parties.  To prevail on a motion for preliminary injunction, a party

24   must demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury;

25   or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in

26   the moving party's favor.  These alternatives do not represent separate tests but rather represent extremes

27   of a single continuum.  The greater the relative hardship to the moving party, the less probability of

28   success must be shown.  *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.

1  2003).

2         A party seeking preliminary injunctive relief in a First Amendment context can establish irreparable

3  injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment

4  claim. *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005).

5  **II.      Nature of the Claims.**

6         Plaintiffs contend that the enforcement of the subject regulations violates their right to freely

7  exercise their religion as guaranteed under the First Amendment to the United States Constitution.   They

8  also assert that the regulations violate the Equal Protection Clause of the Fourteenth Amendment and the

9  Due Process Clause of the Fourteenth Amendment.  In addition, plaintiffs allege that the regulations are

10  invalid because they conflict with federal anti-discrimination law and are therefore preempted under the

11  Supremacy Clause of the Constitution.

12         Those defendants affiliated with the Human Rights Commission argue that, as to them, there is no

13  case or controversy ready for resolution.  Citing a lack of ripeness, they ask the Court to deny plaintiffs'

14  motion.

15  **III.     Ripeness.**

16         The HRC defendants challenge the timing of plaintiffs' action as to them and assert that no case or

17  controversy exists under the ripeness doctrine.  These defendants point out that the HRC has taken no

18  action nor stated any intent to take action against the plaintiffs.  They also claim that the HRC has adopted

19  no agency policy or directive that has any force of law.  They argue that the April 2006 letter from the

20  Executive Director of the HRC to the Executive Director of the Pharmacy Board did not constitute a

21  threat to prosecute pharmacists, pharmacies or even the Board, and that even if it was a threat, it could

22  not be actualized until an investigation and conciliation process had occurred.  The HRC defendants ask

23  that the motion for preliminary injunction be denied as to them.

24         Ripeness is peculiarly a question of timing intended to prevent courts, through avoidance of

25  premature adjudication, from entangling themselves in abstract disagreements.  *New Mexico for Bill

26  Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).  Here, the HRC Executive Director wrote

27  a letter which plaintiffs perceive to be a threat to prosecute them, and others like them, for discriminating

28  on the basis of sex.  Regarding the threat of prosecution, courts in this circuit look to three factors when

1  determining ripeness: (1) whether plaintiffs have articulated a concrete plan to violate the law in question;

2  (2) whether the prosecuting authorities have communicated a specific threat to initiate proceedings; and

3  (3) the history of past prosecutions or enforcement under the challenged statute. *Thomas v. Anchorage*

4  *Equal Rights Comm.*, 220 F.3d 1134, 1139 (9th Cir. 2000), *cert. denied*, 531 U.S. 1143 (2001).

5      Plaintiffs argue that the April 2006 letter was "official" and that its continued presence on the HRC

6  website is intended as a direct threat to pharmacists, and to the pharmacies who employ them, that the

7  anti-discrimination laws of the State of Washington will be enforced against them if they refuse to dispense

8  Plan B to a qualified patient.

9      The Court is convinced that the controversy before it is much more than a mere abstraction.  All

10 plaintiffs have refused to obey the law.  By posting the April 2006 letter on its website the HRC has

11 continued to express its intent to pursue those who violate the WLAD.  Significantly, the HRC does not

12 disavow an intention to enforce the WLAD against plaintiffs.  The history of the HRC is to aggressively

13 pursue violators of the WLAD.  Nothing in the HRC's words or deeds related to this issue suggest they

14 will act differently here.  Under these circumstances, the Court is convinced that the matter is ripe for

15 resolution and plaintiffs' action is not premature.  *See Canatella v. State of Cal.*, 304 F.3d 843, 852 (9th

16 Cir. 2002) (as amended on denial of rehearing).

17     Beyond the threat of HRC enforcement, this matter is ripe for the additional reason that

18 enforcement as to individual pharmacists will apparently be accomplished, not by direct agency action but,

19 indirectly, by pressuring pharmacies to either accommodate or terminate objecting pharmacists.

20 Accommodation appears to result only by a pharmacy hiring a second pharmacist, at an estimated cost of

21 $80,000 annually, to work side-by-side with the objecting pharmacist.[4]  It is not speculation for the Court

22 to observe that such accommodation presents more than a *de minimis* expense and therefore constitutes an

23 undue hardship on the employer.[5]  No employer can be expected to accommodate in this manner.  Given

24 the evidence now before this Court, termination is the outcome that any Board member could reasonably

25

26      [4]According to the "Final Significant Analysis" concerning these regulations, the estimated cost to hire an additional
27 pharmacist is $80,000 annually.  (Exh. K, p. 5, to Decl. of Kristen Waggoner, Dkt. #11).

28      [5]To require more than a *de minimis* cost be incurred by an employer imposes an undue hardship on an employer and
relieves that employer from the obligation to accommodate religious practices or beliefs. *TWA v. Hardison*, 432 U.S. 63, 81-84
(1977).

ORDER
Page - 12

1    have expected when promulgating these regulations.  According to Margo Thelen, the regulations have

2    already resulted in her termination.  Rhonda Mesler advises the Court that she too will be terminated if

3    these regulations are enforced against her employer.  Given the organized effort to pursue objecting

4    pharmacies and pharmacists in this and other states, it is inconceivable to the Court that these regulations

5    would not be enforced against offenders sooner than later.  *See Vandersand v. Wal Mart*, 2007 U.S. Dist.

6    LEXIS 55250 (C.D.Ill., 2007), and Decl. of Kevin Stormans, Dkt. #14.

7    **IV.    Free Exercise of Religion, Under the First Amendment.**

8          The principle that government may not enact laws that suppress religious belief or practice is so

9    well understood that few violations are recorded in United States Supreme Court opinions.  *Church of the*

10   *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993).  The Free Exercise Clause of the

11   First Amendment provides that "Congress shall make no law respecting an establishment of religion, or

12   prohibiting the free exercise thereof . . .."  The First Amendment has been made applicable to the states

13   through the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Religion

14   means all aspects of religious observance and practice, as well as belief, whether or not they are acceptable

15   to others.  *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981).

16         State laws intending to discriminate against individuals because of their religious practices and

17   beliefs are subject to strict scrutiny.  The state must demonstrate in such cases that the laws serve a

18   compelling state interest and are narrowly tailored to advance that compelling interest.  *Lukumi*, 508 U.S.

19   at 533.  In contrast, if the law is neutral on the subject of religion and is of general applicability, it need not

20   be justified by a compelling governmental interest even if the law has the incidental effect of burdening a

21   particular practice.  *Employment Div. Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990).

22   Neutrality and general applicability are interrelated.  Failure to satisfy one requirement is a likely indication

23   that the other has not been satisfied.  *Lukumi*, 508 U.S. at 531.

24         **A.    Neutrality.**

25         The Court will first examine whether the regulations are intended to be neutral as to religion.  To

26   determine the object of a law, the Court must first look to the text to see whether the law discriminates

27   against religious practice on its face.  A law lacks facial neutrality if it refers to a religious practice without

28   a secular meaning discernable from the language or context.  *Lukumi*, 508 U.S. at 533.  A review of the

ORDER
Page - 13

1  subject ordinances reveals no mention of religion or any intention to burden the religious practices of

2  others.  The ordinances are facially neutral.

3       The Court's inquiry does not end with a review of the text of the applicable law.  The Free

4  Exercise Clause, like the Establishment Clause, extends beyond facial discrimination.  The Clause "forbids

5  subtle departures from neutrality," *Gillette v. United States*, 401 U.S. 437, 452 (1971) and "covert

6  suppression of particular religious beliefs," *Bowen v. Roy*, 476 U.S. 693, 703 (1986).  "The Free Exercise

7  Clause protects against government hostility which is masked, as well as overt."  *Lukumi*, 508 U.S. at 534.

8  According to Justice Harlan, "the Court must survey meticulously the circumstances of governmental

9  categories to eliminate, as it were, religious gerrymanders."  *Walz v. Tax Comm'n of New York City*, 397

10  U.S. 664, 696 (1970).

11       Relevant evidence in the inquiry includes, at a minimum, the historical background of the decision

12  under challenge, the specific series of events leading to the enactment of the subject law(s), and the

13  legislative or administrative history, including contemporaneous statements made by members of the

14  decision-making body.  *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252,

15  267-68 (1977).  In addition, the effect of a law in its real operation is strong evidence of its object and

16  purpose.  *Lukumi*, 508 U.S. at 535.

17       Although a law targeting religious beliefs as such is never permissible, *McDaniel v. Paty*, *supra*,

18  435 U.S. at 626, *Cantwell v. Connecticut, supra*, 310 U.S. at 303-04, if the object of a law is to infringe

19  upon or restrict practices because of their religious motivations, the law is not neutral, and it is invalid

20  unless it is justified by a compelling interest and is narrowly tailored to advance that interest.  *Lukumi*, 508

21  U.S. at 533.

22       What then is the object of the regulations that are at the heart of this dispute?  Defendants frame

23  the issue in terms of timely access to all medications lawfully prescribed.  Plaintiffs see the regulations in

24  far more nefarious terms.  They claim the object of the regulations is to eliminate from the practice of

25  pharmacy, or at least a significant segment of the practice, those pharmacists who, for religious reasons,

26  object to the delivery of lawful medications, specifically Plan B.

27       Defendants argue that plaintiffs cannot establish a free exercise claim because the challenged

28  regulations are facially neutral and apply generally to all pharmacies, regardless of the religious beliefs of

1   their owners or employees.  It is argued that the final regulations represent the Board's best judgment

2   about how to deal with its overriding concerns for the health and safety of all patients who need valid

3   prescriptions filled in a timely fashion.  (Def. Selecky et al memo 10:12-15, Dkt. #43).  They point to a

4   potential conflict between the interests of pharmacists and those related to the health of the patients.  The

5   interest in having prescriptions filled promptly and patients treated fairly are, to defendants, compelling

6   interests that outweigh any alleged harm to plaintiffs.  (Def. Selecky et al memo 10:16-22, Dkt. #43).

7        Defendants further assert that the regulations are not specific to Plan B or any other prescription

8   medication.  Defendants argue that pharmacies must ensure the timely delivery of all valid prescriptions to

9   patients and that pharmacists are not required to dispense any medication in violation of their religious

10   beliefs.  (Def. Selecky et al memo 7:5-11, Dkt. #43).  To the extent adherence to these regulations creates

11   conflicts between a pharmacy and its pharmacist(s), the defendants say such conflicts should be resolved

12   according to the tenets of the WLAD.  If the employer cannot accommodate the objecting pharmacist by

13   hiring another pharmacist to work with him/her, then "at most, . . . the regulations may require a licensed

14   pharmacist to occasionally fill a prescription for a medication whose intended use offends the pharmacist's

15   religious beliefs."  (Def. Selecky et al memo 9:17-19, Dkt. #43).

16        Plaintiffs argue that all relevant evidence touching on the enactment of the regulations makes clear

17   that the regulations are about Plan B and the target of the regulations is any pharmacist or pharmacy who

18   objects to Plan B for religious reasons.  Plaintiffs maintain that the very press release announcing the

19   adoption of the rules acknowledged that they "were sparked by complaints that some pharmacists and

20   pharmacies refused to fill prescriptions for emergency contraceptives - also known as morning after pills

21   or Plan B."  (Exh. I to Decl. of Kristen Waggoner, Dkt. #11).

22        Plaintiffs assert that all who participated, formally or informally, in the development of these rules

23   knew the process was about Plan B and the right of conscience.

24        In a letter evaluating issues relating to the Board's rulemaking effort, the HRC identified, from its

25   perspective, the object of the rulemaking process:

26            The WSHRC understands that the Board of Pharmacy (the Board) is
             currently dealing with issues arising from some pharmacists in the state
27            refusing to fill or desiring to deny filling some legal prescriptions for
             emergency contraception and other prescriptions for women, based on the
28            pharmacists' asserted religious and moral beliefs . . ..  As we understand it,
             the drug at the center of this issue is Plan B, an emergency contraceptive.

(Exh. J to Decl. of Kristen Waggoner, pp. 1-2, 12, Dkt. #11).

The prominent role played by Planned Parenthood and the Northwest Women's Law Center, in both the rulemaking process before the Board and in the Governor's ad hoc effort to develop an alternative approach to the Board's draft rule allowing conscience, offers further proof to the plaintiffs that Plan B and religious objection were the focus of the rulemaking process. (Plaintiffs' Reply Brief 7:17-8:19, Dkt. #66).

Finally, plaintiffs cite the Governor's words and deeds as evidence of the narrow objective of these regulations. The Governor immediately expressed her opposition to any rule that allowed a pharmacist to refuse to fill a prescription based on conscience. She convened a group of stakeholders including the Board of Pharmacy, the University of Washington School of Pharmacy, the Washington State Pharmacy Association, the Department of Health and representatives from Planned Parenthood and the Northwest Women's Law Center to draft an alternative rule eliminating conscience as a basis for refusing to fill a lawful prescription. The Governor also threatened to replace the members of the Board unless they reversed course on this issue. Plaintiffs ask the Court to take a common sense view of this evidence and conclude that the Governor's focus was on Plan B and her target was pharmacists who oppose that drug on religious grounds.

The evidence thus far presented to the Court strongly suggests that the overriding objective of the subject regulations was, to the degree possible, to eliminate moral and religious objections from the business of dispensing medication. Defendants argue that the objective was to keep pharmacists from imposing their religious or personal views upon the treating public. Defendants deny that there is any affirmative duty imposed upon the pharmacist other than to do what he or she was trained to do. In actual operation, however, the regulations appear designed to impose a Hobson's choice for the majority of pharmacists who object to Plan B: dispense a drug that ends a life as defined by their religious teachings, or leave their present position in the State of Washington. The evolution of these regulations, as currently described to the Court, convinces the Court that these regulations targeted the religious practices of some citizens and are therefore not neutral.

### B.    General Application.

The Court next considers whether the regulations are applied generally.

> The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause.

*Lukumi*, 508 U.S. at 543.  The Supreme Court instructs that the essence of the test on general applicability of a law is that "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542-43.  Intervenors take this to mean that in evaluating general applicability, courts examine the law's means and the law's ends: if the means fail to match the ends, the statute likely targets religious conduct and is therefore not generally applicable.  Applying the test as thus articulated, the Court is persuaded that, when viewed in context, the totality of the evidence supports the conclusion that the subject regulations are not laws of general applicability.

From the very beginning of this issue, it appears that the focus of the debate has been on Plan B and on religious objection to dispensing that drug.  All who have participated in the formulation of these regulations have fixed their attention and crafted their response to that issue.  Media coverage of the controversy has centered on Plan B.  Defendants' efforts to broaden the perspective by articulating a concern for universal or unfettered access to all lawfully prescribed drugs are unconvincing.  First, as to Plan B, there has been no evidence presented to the Court that access is a problem.  It is available at all but a few licensed pharmacies in Washington state and can be accessed through physicians offices, certain government health centers, hospital emergency rooms, Planned Parenthood and the internet.  (Decl. of Kristen Waggoner, para. 3, Dkt. #11).  A survey of approximately 135 pharmacies conducted by the Board during the rulemaking process (October 2006) revealed that of the 121 respondents, 93 typically stocked emergency contraceptives while 28 did not.  Of those who did not, 18 cited low demand and three relied on an "easy alternative source."  Only two pharmacies said they did not stock emergency contraceptives because of religious or personal reasons.  (Exh. A to Decl. of Kristen Waggoner, Dkt. #11).

The Court has been presented no evidence establishing that anyone in the State of Washington, including intervenors, has ever failed to obtain Plan B within the 72-hour window of effectiveness because one or more pharmacists/pharmacies refused to fill a lawful prescription for Plan B or refused to stock and/or dispense Plan B as an over-the-counter drug.

In contrast, in a letter to the Governor, the Chief Executive Officer of the Washington State Pharmacy Association touted the wide-spread accessibility of Plan B throughout Washington due, in large part, to the efforts of pharmacists and their innovative, pharmacy-based program which is a national model of collaboration in an effort to improve public health.  (Exh. E to Decl. of Kristen Waggoner, Dkt. #11). The Court accepts the letter as some evidence that as of June 5, 2006, the WSPA did not see access to Plan B as a significant issue.

The fact that the Pharmacy Board initially proposed a draft rule permitting a pharmacist/pharmacy to not fill a lawful prescription for reasons of conscience is some further evidence, within the focused debate over Plan B, that the Board did not view access to Plan B as a current problem.  At a minimum, to the Board,  the problem was not of such gravity that a health care provider's right of conscience had to be sacrificed.

Expanding the inquiry beyond Plan B, there is some evidence to support defendants' claim that the regulations are about optimal access to all medicines, not just emergency contraceptives.  The Governor's various messages on the subject were not limited to Plan B and the "Final Significant Analysis" prepared for these regulations briefly mentions HIV as another condition requiring timely drug therapy.  (Exh. K to Decl. of Kristen Waggoner, Dkt. #11).  Beyond these limited factors, however, the history of these regulations thus far presented to the Court is directed entirely at Plan B.

As in the case of Plan B, the evidence presented to the Court does not suggest that access to HIV medicines is a problem.  Neither of the two intervenors who are either HIV-positive or have AIDS have been refused medications by a pharmacist, for religious reasons or otherwise.  (Decl. of Judith Billings, Dkt. #51 and Decl. of Jeffrey Schouten, Dkt. #53).  A review of complaints referred to the Board from 1995 to 2007 does not indicate a problem with access to HIV-related medications, or any other medications for that matter.  No one has been identified as having been denied access to HIV medicines

because a pharmacist refused to dispense them.[6]  It is certainly plausible that some pharmacist in the State of Washington could, as intervenors fear, deny distribution of needed HIV-medicine because of personal disdain for a homosexual lifestyle.  No party to this lawsuit has attempted to defend such conduct as Free Exercise of Religion and in the context of the case before it, this Court will not opine on such a hypothetical situation.

To summarize, the evidence presented to the Court does little to support the argument that expanded access to all medications was the "end" which these regulations were written to achieve. Nevertheless, for purposes of further analysis, the Court will, for the time being, accept defendants broader expression of an end result they aspired to attain.  That "end" will be more thoroughly tested against the chosen "means" adopted by the regulators.

The exemptions incorporated into these regulations do not appear designed to materially change the system by which medicines are delivered in Washington state.  They excuse a pharmacy from filling a lawful prescription for logistical reasons such as a national or state emergency or the lack of expertise or specialized equipment needed to deal with a particular medicine.  They also excuse the pharmacy/pharmacist from filling a lawful prescription whenever, in the exercise of professional judgment, an obvious or known error in the prescription is detected or other inadequacies or contraindications are present.  A potentially fraudulent prescription likewise does not have to be filled.

Finally, the regulations exempt pharmacies/pharmacists from filling legal prescriptions where the medicine is not in stock despite good faith compliance with regulations advising pharmacies to maintain an adequate stock of medicines.

These exemptions all reflect legitimate, time-honored reasons for not filling a prescription immediately upon presentation by a patient.  Their inclusion within the regulations reflects the Board's intention to continue, as usual, the basic means and methods by which pharmacies and pharmacists stock and dispense drugs in the State of Washington.  As for the vast majority of drugs legally available to the public, market conditions will continue to guide the decision whether or not to stock.  The means adopted

---

[6]The one example where a pharmacist did refuse to dispense hypodermic needles to a young man because of his appearance, seemingly would not run afoul of these regulations which protect a pharmacist's ability to refuse to fill a prescription due to suspected or potential fraud (WAC 246-869-010(a)(d)).  The individual was diabetic and needed the needles for insulin shots.

by the Board to accomplish its desired outcome thus does nothing to increase access to lawful prescription medicines generally.  Rather, the enforcement mechanism of the new law appears aimed only at a few drugs and the religious people who find them objectionable.

The Court next turns its attention to the conduct the rulemakers determined to be sanctionable under the regulations.  Both the Pharmacy regulation and the Pharmacist regulation focus on the same list of five proscribed actions:

1)     Destroying unfilled lawful prescriptions;

2)     Refusing to return lawful prescriptions;

3)     Violating a patient's privacy;

4)     Discriminating against patients or their agent in a manner prohibited by state or federal laws; and

5)     Intimidating or harassing a patient.

Under the Pharmacist's regulation (WAC 246-863-095) such conduct is described as unprofessional and presumably sanctionable under the Uniform Disciplinary Act, RCW 18.130 et. seq.  The Pharmacies' regulation prohibits the same activity by threatening "discipline or other enforcement actions."  WAC 246-869-010.

No party now before this Court objects to those provisions which condemn actions described in Sections 1, 2, 3 or 5 above.  It is the catch-all use of the anti-discrimination law to prevent "refuse and refer" with respect to Plan B that plaintiffs seek to enjoin.  The Court is therefore focused principally on Plan B and those pharmacists and/or pharmacies that refuse to stock or dispense that drug.  Currently, the Court has no evidence before it which explains the Board's chosen reliance on state and federal anti-discrimination laws to define when refusal to dispense is or is not allowed.  These laws come with their own exemptions that hint towards at least some potential to further limit the subject regulations' ability to increase access to lawful medicines.  For example, the WLAD excludes small employers and religious/sectarian organizations from the definition of "employer," seemingly inoculating such entities from discrimination claims.  *See* RCW 49.60.040.  While this definition does not appear to impact entities involved in public accommodation, such as pharmacies, the unexplored nature of the interplay between the WLAD and the instant regulations leads to serious questions about the Board's choice of weapons.  The

Board clearly chose not to require pharmacies or pharmacists to dispense lawful medications without delay every time they are requested. Instead they chose to invoke the laws against discrimination. At oral argument, questions posed by the Court touching on the obligation of a pharmacy operated by a Catholic hospital to dispense Plan B or other contraceptives went unanswered. The Court's expressed doubts about enforcement action directed at religious hospitals, particularly in light of established statutory protections for such institutions, while unchallenged at this point in the proceeding, at least suggest the new regulations are underinclusive and therefore not generally applicable.

The evidence now before the Court convinces it that the "means" used by the rulemakers do not square with the "end" currently espoused by the defendants. The regulations do not appear to the Court to be of general application. Rather, the regulations appear to target religious practice in a way forbidden by the Constitution. The regulations are neither neutral as to religion nor are they generally applicable. Because the regulations appear to intentionally place a significant burden on the free exercise of religion for those who believe life begins at conception, the regulations must be subjected to strict scrutiny analysis.

### C.    Strict Scrutiny.

Defendants argue that even if strict scrutiny applies, the regulations are justified by a compelling interest and are narrowly tailored to accomplish their intended purpose. They assert that the Board has a compelling interest in ensuring that all parties are treated equally and respectfully by pharmacies and their employees. (Def. Selecky et al memo 15:5-6, Dkt. #43). They rely on two interests served by the regulations as written: (1) promoting health by ensuring access to Plan B (and other medications) in a timely manner and (2) preventing sex discrimination. (Def. Selecky et al memo, pp. 10, 15-16, Dkt. #43 and Def. Friedt et al memo, p. 11, Dkt. #46).

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases. *Lukumi*, 508 U.S. at 546. Although promoting the health, welfare and peace of the people might ordinarily present a compelling state interest

1  for First Amendment analysis, the Court has previously indicated why the regulations do not advance the

2  cause of general access to Plan B and other medicines as advocated by defendants.

3  　　　The evidence provided by the parties, including the intervenors, convinces the Court that the

4  interests promoted by the regulations have more to do with convenience and heartfelt feelings than with

5  actual access to certain medications.  Patients understandably may not want to drive farther than the

6  closest pharmacy and they do not want to be made to feel bad when they get there.  These interests are

7  certainly legitimate but they are not compelling interests of the kind necessary to justify the substantial

8  burden placed on the free exercise of religion.  While it is obviously conceivable that a patient in need of

9  Plan B could ultimately be denied access to the drug during its time of effectiveness, that eventuality is just

10 as likely to occur for reasons that are wholly acceptable under the regulations: lack of money, the drug is

11 not in stock, no one has previously requested it, or the store is closed on Sunday.  In short, lack of access

12 to Plan B has thus far not been demonstrated, and the concerns that have been expressed about availability

13 are not compelling.

14 　　　Nor is preventing discrimination on the basis of gender, within the context of this case, a

15 compelling state interest.  The United States Supreme Court has recognized that reasonable people

16 disagree over when life begins, and the refusal to participate in an act that one believes terminates a life

17 has nothing to do with gender or gender discrimination.  *Bray v. Alexandria Women's Clinic*, 506 U.S.

18 263, 271-74 (1993).  Federal and state law provide a clear right to health care providers to not participate

19 in abortion procedures.  *See, e.g.,* 42 U.S.C. §300a - 7(c)(i) and RCW 9.02.150.  Washington's legislature

20 has, on separate occasions, conferred upon health care providers, including pharmacists, a fundamental

21 right to not participate in a health care service to which they have a moral or religious objection.  Whether

22 or not Plan B acts as an abortifacient or terminates a pregnancy, to those who believe that life begins at

23 conception, the drug is designed to terminate a life.  The Supreme Court's ruling and reasoning in *Bray*

24 applies with equal vitality here.  The plaintiffs' objection to Plan B is not about gender, it is about the

25 sanctity of life as defined by their religious teachings.

26 　　　On the evidence now before it, the Court cannot say that the subject regulations advance a

27 compelling state interest and they are narrowly tailored to accomplish their announced purpose.

28

The evidence before the Court causes it to conclude that plaintiffs have demonstrated that, as to their constitutional right to free exercise of religion, the criteria for imposition of a preliminary injunction have been met. The facts presented show, to the Court's satisfaction, a likelihood of success on the merits and the possibility of irreparable injury. In reaching this conclusion, the Court has attempted to compare the facts of this case, not just against the platitudes enunciated by established precedent but also to the facts and circumstances of prominent cases providing to this Court both binding and persuasive guidance.

In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) the Controlled Substances law at issue was adopted by the Oregon legislature without a thought being given to the religious practices of some who might use hallucinogenic drugs in their ceremonies. The sole purpose of the law was to prevent the illicit use and abuse of mind-altering, addictive drugs while preserving legitimate uses taken under the care of a doctor. The law was applied to all persons who did not have a medical prescription for the drug. The exemption for medical use was wholly consistent with the general purpose of preventing addiction to drugs. The law was facially neutral, of general application and the legislative history revealed no intent to target religion. That is not this case.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the regulations adopted by the City were intentionally targeted only at the practice of sacrificing animals in a religious ceremony performed by the Santeria church. The laws were not neutral on their face and were certainly not applied generally to similar activities of others, whether secular or religious in nature. Although this case does not present such extensive gerrymandering in order to further the intent to target religious practices, the ultimate objective of the subject regulations may be similar to *Lukumi*. *Smith* and *Lukumi* represent the two extremes when analyzing laws for neutrality or general applicability.

Applying these same precedents, the Third Circuit speaking through then-Circuit Judge Alito explained:

> A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated.

*Blackhawk v. Commonwealth of Pennsylvania*, 381 F.3d 202 (3rd Cir. 2004). In *Blackhawk*, the Court was confronted with a Game and Wildlife permit fee that was obviously adopted with no intent to target

1   religious practices.  The exemptions to the fee requirement, however, benefitted secular activities but not

2   religious conduct of a similar kind.  The Court concluded that the fee requirement was not generally

3   applicable because its exemptions allowed zoos and "nationally recognized circuses" to keep animals in

4   captivity without paying a fee but required a fee from those keeping animals for religious purposes.  Strict

5   scrutiny analysis therefore applied.

6         In the case now before the Court, the extent and impact of exempted conduct allowed by the

7   subject regulations and the WLAD has not been fully developed.  Nevertheless, the evidence that has been

8   introduced suggests that secular reasons for delaying or denying access to lawfully prescribed medicines

9   undermine the stated purpose of the law to a degree similar to the plaintiffs' conduct that is religiously

10  motivated.

11        Following oral argument, Defendant-Intervenors directed the Court's attention to a recent Third

12  Circuit opinion, *Anspach v. City of Philadelphia, Department of Public Health,* 2007 WL 2743446 (CA 3

13  Pa. Sept. 21, 2007).  There, the Court faced issues of Due Process and Free Exercise of Religion arising

14  out of a city health center acceding to the request of a 16-year-old unemancipated daughter to be provided

15  an emergency contraceptive.  The district court dismissed the action, and the appellate court affirmed.

16  With respect to plaintiffs' (parents and daughter) claim that their right to free exercise of religion was

17  abridged by the conduct of health center personnel, the Court reiterated the requirement that, in order to

18  establish a substantial burden on religious expression, plaintiffs must allege state action that is either

19  compulsory or coercive in nature.  This statement of law is neither new nor remarkable.  Government

20  compulsion either to do or refrain from doing an act forbidden or required by one's religion is the evil

21  prohibited by the Free Exercise Clause.  According to the Court, the concept is a simple one:  the state

22  may not compel an individual to act contrary to his religious beliefs.  *Id.* at *15, citing *Arnold v. Bd. of

23  Educ.,* 880 F.2d 305, 314 (11th Cir. 1989).  Since no compulsion or coercion was imposed upon the young

24  woman, there was no violation of the right to freely exercise one's religion.

25        Here, the situation is much different.  By seemingly intentionally creating an immutable conflict

26  between a pharmacy that cannot refuse and a pharmacist that cannot dispense, the regulations impose

27  more than incidental effects having the tendency to coerce individuals into acting contrary to their

28  religious beliefs.  At this stage in the proceedings, the evidence suggests that the burden on the religious

practices of plaintiffs is intentional not incidental, and substantial not minimal.

Finally, the Court considered a case arising out of the same national controversy reflected in the case at bar.  In *Menges v. Blagojevich*, 451 F. Supp. 2d 992 (D.C. Ill, 2006), the District Court was called upon to resolve motions to dismiss brought by defendants state officials against complaints filed by certain state pharmacists and by third-party plaintiff Walgreen Pharmacy.  Like the case here, the plaintiffs were pharmacists who had either lost their jobs or were threatened with termination over their refusal to dispense Plan B.  Walgreen's claimed that the regulation requiring a pharmacy to dispense emergency contraceptive upon request without delay forced it to terminate objecting pharmacists who previously were protected by Walgreen's "Referral Pharmacist Policy."  The policy allowed Walgreen pharmacists nationwide to decline to fill a prescription based on moral or religious objections as long as the prescription could be filled by another pharmacist or at a nearby pharmacy.

Accepting as true the factual allegations of the Amended Complaint and Third Party Complaint, and drawing all inferences in the light most favorable to the plaintiffs, the Court held that the pharmacists stated a claim for Free Exercise Clause violations as well as Title VII federal preemption.  Walgreen's request for declaratory judgment that its policy complied with state law was barred by the Eleventh Amendment.

As in the case at bar, plaintiffs alleged specific expressions of religious animus issued by state officials during the process of enacting the subject laws.  Like the Washington regulations, the Illinois law directly compelled the pharmacy, not the pharmacist, to dispense the drug.  Unlike the Washington law, however, the Illinois law was directed only at emergency contraceptives, not all lawful prescriptions.

The factual similarities between this case and *Menges* appear to be substantial.  Although the Court's decision in that case was compelled by a different standard of review than that which guides this Court, the fact that a Free Exercise violation was stated by the allegations in the *Menges* Complaint is persuasive authority which is supportive of the Court's conclusion here.

## CONCLUSION

On the issue of Free Exercise of Religion alone, the evidence before the Court convinces it that plaintiffs, individual pharmacists, have demonstrated both a likelihood of success on the merits and the possibility of irreparable injury.  The Court cannot afford protection to individual pharmacists without

1    including pharmacies within the ambit of the injunctive relief to be afforded.  Therefore, the Court

2    **GRANTS** the Plaintiffs' Motion for Preliminary Injunction as follows:

3            The defendants are enjoined from enforcing WAC 246-863-095 (4)(d) and
             WAC 246-869-010 (4)(d) (the anti-discrimination provisions) against any
4            pharmacy which, or pharmacist who, refuses to dispense Plan B but instead
             immediately refers the patient either to the nearest source of Plan B or to a
5            nearby source for Plan B.

6    This injunction will remain in place pending trial of this matter or until further proceedings result in a

7    modification or dissolution of this preliminary injunction.

8            No bond will be required.  See *Borbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000).

9            The Court has, for the time being, left unresolved the question of whether the corporate plaintiff is

10   a "person" or whether the right of free exercise of religion is a "purely personal" constitutional guarantee

11   unavailable to corporations.  Given the Court's interpretation of the enforcement mechanism built into the

12   subject regulations, it is necessary to extend the injunction to corporate pharmacies as well as to

13   individuals operating pharmacies in order to provide the needed protection for pharmacists.  For that

14   reason, it is not necessary for the Court to resolve these questions at this time.

15           Given the Court's analysis of the facts of this case under the Free Exercise clause, it is not

16   necessary at this time to evaluate plaintiffs' remaining theories: Equal Protection, Due Process or Title VII

17   and preemption.  Those theories will be addressed at trial.

18           As the Court looks forward to trial of the merits several factual and legal issues are of continuing

19   interest.

20           1.      Are there patients who have failed to access Plan B within the 72-hour "window of

21   effectiveness" due to the conduct of Washington pharmacies/pharmacists opposed to Plan B for moral or

22   religious reasons?

23           2.      Did the Board intend that the subject regulations be enforced against religiously-affiliated

24   health care facilities?

25           3.      Should one or more questions of state law be certified to the Washington State Supreme

26   Court to include, for example; a) does the fundamental right of health care providers to refuse to perform

27   services as to which they have a religious objection extend beyond the basic health care and insurance

28   systems, b) does the State Board of Pharmacy have the power to take away protections previously

bestowed by the Legislature upon pharmacists as health care providers, and c) does the statutory right of conscientious objection extend to pharmacies that are one component of a larger "health care facility" such as a hospital?  (The parties should confer immediately and inform the Court whether the certification process should be invoked in this case.)

**IT IS SO ORDERED.**

DATED this 8th day of November, 2007.


RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 27