1

2

3

4

5

6

7

The Honorable Ronald B. Leighton

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

8   STORMANS, INCORPORATED, et al.,

9                        Plaintiffs,

10        vs.

11  MARY SELECKY, Secretary of the Washington
    State Department of Health, et al.,

12

13                       Defendants,

14        and

15  JUDITH BILLINGS, et al.,

16                       Defendant-Intervenors.

17

NO.  C07-5374 RBL

**CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR
SUMMARY JUDGMENT**

18

19

20

21

22

23

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT (C07-5374 RBL)
*119578 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    A.    The Board begins to consider conscientious objections to Plan B and
            initially supports referral. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    B.    Opposed to the Board's position on conscientious objections, Planned
            Parenthood asks the Governor to intervene. . . . . . . . . . . . . . . . . . .5

    C.    The Board agrees with the State Pharmacy Association on protecting
            conscience rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    D.    The Governor considers an emergency order or executive order and
            contacts the Human Rights Commission to intervene. . . . . . . . . . . .6

    E.    The Board hears public testimony. . . . . . . . . . . . . . . . . . . . . . . . .6

    F.    Staff members prepare three draft rules. . . . . . . . . . . . . . . . . . . . .7

    G.    The Governor pressures the Board to reject conscientious objections . . . .8

    H.    The Board votes to in favor of referrals for conscientious objections. . . . .8

    I.    The Governor threatens to remove Board members and prepares a new
          draft regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    J.    The Governor's Office holds "stakeholder meetings" to discuss the
         Governor's draft regulation. . . . . . . . . . . . . . . . . . . . . . . . . . .10

    K.    The Board passes the Governor's regulation. . . . . . . . . . . . . . . . .10

    L.    Stormans, Incorporated remains under investigation by the Board. . . . .11

    M.    Thelen lost her pharmacy position and Mesler's remains in jeopardy. . .12

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

PLAINTIFFS' RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT (C07 5374 RBL) - i
*119587 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
3700 First Interstate Center
999 Third Avenue
Seattle, WA 98104-4006
206·682·0565  Fax: 206·625·1052

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

I.    Summary Judgment Should Be Denied Because There Are Material
      Factual Disputes Over Plaintiffs' Free Exercise Claims. . . . . . . . . . . . .14

      A.    The Ninth Circuit's preliminary injunction ruling does not
            preclude this Court from addressing the merits of the free
            exercise claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

      B.    There are material factual disputes over whether the
            Regulations  are neutral and generally applicable. . . . . . . . . . . . .18

            1.    The Regulations are not neutral because, in both their
                  operation, and effect, they target conscientious
                  objections to Plan B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

                  a.    The burden falls almost exclusively on
                        conscientious objectors. . . . . . . . . . . . . . . . . . . . . .19

                  b.    The Government interprets the Regulations
                        in a way that favors secular conduct. . . . . . . . . . . 22

                  c.    The Regulations proscribe more religious
                        conduct than necessary. . . . . . . . . . . . . . . . . . . . .24

            2.    The Regulations are not neutral because the events
                  preceding their enactment show that they were directed
                  at conscientious objections. . . . . . . . . . . . . . . . . . . . . . . .25

            3.    The Regulations are not generally applicable because they
                  categorically favor secular reasons over conscientious
                  reasons for declining to dispense Plan B. . . . . . . . . . . . . .26

            4.    The Regulations are not generally applicable because
                  they allow for "individualized governmental assessment
                  of the reasons for the relevant conduct." . . . . . . . . . . . . .30

            5.    The Regulations are not neutral because they are
                  unevenly enforced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

            6.    Defendants' Reliance on *American Life League v. Reno*
                  is misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      C.    The Regulations cannot survive strict scrutiny. . . . . . . . . . . . . .34

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
3700 First Interstate Center
999 Third Avenue
Seattle, WA  98104-4006
206•682•0565  Fax  206•625•1052

II.    There Are Material Factual Disputes Regarding Plaintiffs' Title VII
       Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

       A.    The Regulations Conflict with Title VII and Therefore
             Fail Under the Supremacy Clause. . . . . . . . . . . . . . . . . . . . . . .36

             1.    Congress expressed its intent that Title VII have
                   preemptive effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

             2.    The Regulations conflict with Title VII. . . . . . . . . . . . . .40

       B.    Legislative Immunity and Exhaustion of Remedies Fail
             as a Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.   Summary Judgment Should Be Denied Because There Are Material
       Factual Disputes Over Plaintiffs' Fourteenth Amendment Claims. . . . . .42

       A.    Fundamental Right Not to be Coerced into Taking Human Life. .42

             1.    Right of Conscientious Objection to Military Service. . .43

             2.    The Right of Conscientious Objection to Abortion. . . . . 45

             3.    The Right of Conscientious Objection to Assisted
                   Suicide Laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

             4.    The Right of Conscientious Objection to State
                   Executions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

             5.    The Right of Conscientious Objection in Foreign
                   and International Law. . . . . . . . . . . . . . . . . . . . . . . . . . 48

             6.    The Right of Conscientious Objection in the
                   U.S. Medical Community. . . . . . . . . . . . . . . . . . . . . . . . 49

       B.    The Conscience Regarding Human Life is Central to Liberty. . . 50

       C.    Plaintiffs Refuse to Stock, Sell and Dispense Plan B Because
             of Conscience. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
3700 First Interstate Center
999 Third Avenue
Seattle, WA 98104-4006
206·682·0565  Fax: 206·625·1052

**INTRODUCTION**

1

2      The central question in this case is whether WAC 246-869-010 and WAC 246-863-095

3 (the "Regulations") impermissibly target pharmacists and pharmacies with conscientious ob-

4 jections to dispensing Plan B. Since this Court entered a preliminary injunction two and a half

5 years ago, the factual landscape has changed dramatically, and extensive discovery has pro-

6 duced abundant new evidence of impermissible targeting.

7      As the summary judgment evidence shows, the Governor and the state Human Rights

8 Commission ("HRC"), working closely with Planned Parenthood and its allies, pressured the

9 Board of Pharmacy into rejecting its initial vote in favor of protecting pharmacies and pharma-

10 cists with conscientious objections to Plan B. Instead, the Board issued Regulations requiring

11 pharmacies to fill every prescription regardless of conscientious objections—thus knowingly

12 forcing some pharmacies or pharmacists to dispense Plan B in violation of their religious be-

13 liefs. At the same time, however, the Regulations created broad exemptions for those with a

14 wide variety of business, commercial, or convenience reasons for declining to dispense a drug.

15 The Regulations thus have the impermissible effect of burdening conscientious objectors and

16 almost no others.

17      Rather than engaging the merits of Plaintiffs' claims, Defendants try to avoid trial by

18 grossly overstating the legal effect of the Ninth Circuit Court of Appeals' decision on the pre-

19 liminary injunction, treating it as if it is the law of the case. But the Ninth Circuit has repeatedly

20 held that decisions on a preliminary injunction "do not constitute law of the case," and the par-

21 ties "are free to litigate the merits"—especially where, as here, the parties have engaged in ad-

22 ditional discovery. *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3

23 (9th Cir. 1985).

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 1
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   On the merits, Defendants blithely ask this Court to focus only on the face of the Regu-

2   lations, rather than how they operate in practice. But the fact that the Regulations do not men-

3   tion conscientious objections on their face says little about how the Regulations operate in the

4   real world or the Board's object in passing them. At the final public hearing in March 2007, the

5   Board's current Chair and then Vice-Chair identified the true object and effect of the Regula-

6   tions. Without mentioning any other drugs or the so-called "personal" objections Defendants

7   trumpet today, he wrote:

8   > I would vote for WAC 246-863-095 and WAC 246-869-010 as they are currently writ-
   > ten. I might be willing to consider an amendment that strengthened these rules, but I
9   > would most definitely be opposed to any language that weakened these rules. Assuming
   > that these two rules pass as written, if I am the reviewing board member for any subse-
10  > quent case involving unprofessional conduct for refusing to fill a legal prescription for
   > *moral or religious grounds*, please be advised that I will recommend prosecuting the
11  > pharmacy or pharmacist involved to *the full extent of the law.*

12  Waggoner Decl., Ex. 1.[1]

13   The Board has already begun to make good on its promise, initiating an enforcement

14   action against Plaintiff Ralph's Thriftway. As Defendants are well aware, the owners of

15   Ralph's cannot, because of their deeply-held religious beliefs, stock or dispense Plan B. And

16   Ralph's is the only pharmacy the Board has ever investigated for a decision not to stock a

17   medication. If the Board has its way, Ralph's owners will be forced to close their pharmacy

18   unless they agree to sell a drug that they sincerely believe terminates human life.[2]

19   The Regulations have had a similarly devastating effect on Plaintiff pharmacists Mesler

20   and Thelen. Thelen was forced to leave her job and has no guarantees that her new employer

21

22   [1] Hereinafter, "Ex." refers to exhibits attached to the Declaration of Kristen K. Waggoner in support of the Con-
solidated Response to State Defendants' and Defendant-Intervenors' Motions for Summary Judgment.
[2] Plan B's manufacturer continues to warn patients that the drug can prevent implantation of a fertilized egg. Ex. 5
23   (Fuller Dep. 67:2-12) While many debate at what point human life begins (and thus has moral value), Plaintiffs
adhere to view, widely held by Christians and many others, that human life begins at the moment of fertilization.
Ex. 2-4.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 2
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  will continue to allow her to decline to dispense Plan B if the Regulation is not overturned.

2  Without the Court's intervention, Mesler will be terminated from her position as a pharmacy

3  manager. The Regulations mean these women will likely be forced to leave their professions

4  because they will not dispense one drug out of over 10,000 on the market.

5       Perhaps the saddest part of this story is how needless this conflict is. People of many

6  different beliefs, or no beliefs, live in Washington. Conscience protections provide some give

7  in the joints of the body politic, allowing people of contradictory beliefs to live in society with

8  one another. Most other states have solved this societal conundrum by providing protections

9  for pharmacists, without incident. Here, Plaintiffs have agreed to refer customers to other

10 pharmacies should they wish to fill a Plan B prescription, yet Defendants have rejected this

11 compromise—without any evidence that anyone in Washington has ever been unable to access

12 Plan B in a timely fashion. Plaintiffs do not seek to push anyone else to share their beliefs. All

13 Plaintiffs ask is to be let alone; the Constitution requires no less.

## FACTUAL BACKGROUND

### A.   The Board begins to consider conscientious objections to Plan B and initially supports referral.

In April 2005, two events prompted the Washington Board of Pharmacy ("Board") to begin considering conscientious objections to Plan B. First, Illinois Governor Rod Blagojevich issued an emergency order requiring pharmacists to dispense emergency contraception despite their religious beliefs. The Board's Executive Director, Steve Saxe, forwarded a news report about the Illinois order to the rest of the Board. Saxe noted that the Board had taken a different position, with staff advising pharmacists that they could refer patients to nearby providers. Ex. 6 (Saxe Dep., Ex. 213).

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 3
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax. 206•625•1052

1    Second, around that time, Planned Parenthood and Northwest Women's Law Center[3]

2  ("NWWLC") (collectively referred to as "Planned Parenthood") contacted the Governor's Of-

3  fice and the Board about pharmacist conscience rights. Ex. 7, 8 (Hulet Dep., 52:10-53:17,

4  77:19-78:12), Ex. 30 (Saxe Dep., 125:20-126:23).  Planned Parenthood asked specifically about

5  "the morning after pill and contraceptives," and expressed concern about a "pharmacist's right

6  to refuse to fill a prescription for moral/religious views." Ex. 7, 9.  Planned Parenthood insisted

7  that pharmacists be required to fill Plan B prescriptions immediately without referral, despite

8  any conscientious objections. Ex. 8 (Hulet Dep., 76:15-84:18), Ex. 10 (Hulet Dep., Ex. 213).

9  Planned Parenthood asked the Governor to urge the Board to take a leadership role with the

10  Board to change its position. *Id.* Christina Hulet, the Governor's health care policy advisor,

11  then talked with Saxe. Saxe reminded Hulet that the Board had not received any formal com-

12  plaints, and that the Board supported referrals. Ex. 9.

13    Not satisfied with the Board's response, Planned Parenthood sent a letter in early Au-

14  gust urging the Board to issue "formal guidance" prohibiting "refusals of contraception, includ-

15  ing emergency contraception, even if the pharmacist states the denial is because of personal

16  religious, ethical, or moral objections to contraception." Ex. 11 (8/05 letter) p. 4. Saxe also pre-

17  pared a memo to the Board on "Pharmacist Conscientious Refusal to Dispense." The memo

18  addressed "the issue of emergency contraception," noting that Board staff recommended ac-

19  commodating conscience by permitting referrals. Ex. 12.

20    The Board discussed conscience rights at its August 10, 2005, meeting. Planned Parent-

21  hood and Hulet attended. The purpose of the meeting was to ensure the Board agreed with the

22  staff position, which urged referrals by conscientious objectors. Ex. 13. At the meeting, Saxe

23

---

[3] NWWLC has changed its name to Legal Voice. Legal Voice and Planned Parenthood represent Intervenors.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 4
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax 206•625•1052

1   told the Board that staff had received calls regarding "a pharmacist's right to refuse to dispense

2   Plan B for "conscience reasons." Ex. 14. The Board explained it would continue to support re-

3   ferrals for reasons of conscience. Ex 14. At this point, all discussions had focused solely on

4   conscientious objections to Plan B. Ex. 30 (Saxe Dep., 92:17-93:9, 119:15-21).

**B.   Opposed to the Board's position on conscientious objections, Planned Par-
enthood asks the Governor to intervene.**

Planned Parenthood would not take no for an answer. A Planned Parenthood executive

(Elaine Rose) met personally with the Governor to discuss "pharmacists refusing to dispense

emergency contraception." Ex. 16. Rose worked with Governor Gregoire directly for 12 years

when Gregoire was the Attorney General. Ex. 17 (Rose Dep., 8:22-25, 26:14-24). At her urg-

ing, the Governor agreed to do two things in advance of the Board's January meeting: (1) write

a letter opposing referrals, and (2) appoint a former Planned Parenthood board member (Rose-

mary Duffy) to the Board. Ex. 17 (Rose Dep., 105:10-25); Ex. 18.

**C.   The Board agrees with the State Pharmacy Association on protecting con-
science rights.**

At the January Board meeting, the State Pharmacy Association came out in strong sup-

port of conscience rights. In a written and oral report, the State Pharmacy Association urged

the Board to affirm a pharmacist's right of conscience and a pharmacist's right to refer patients

to nearby pharmacies. Ex. 19, 20, pp. 5-7. Commenting on reports from other states, the Asso-

ciation also said that lecturing patients, destroying prescriptions, or refusing to provide refer-

rals because of opposition to Plan B would constitute unprofessional conduct. *Id.* The Board

agreed on all counts, and voted to begin the rulemaking process to clarify that the Board would

discipline pharmacists for such unprofessional conduct. Ex. 20, pp 5-7.

During the March 2006 meeting, Planned Parenthood made a presentation focusing on

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 5
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

a "pharmacist's ability to refuse to fill a lawful prescription based on a conscience conflict," and specifically on emergency contraception. Ex. 11 (3/06 letter), Ex. 21, pp 6-9. At this point, aside from the unprofessional conduct of destroying prescriptions or lecturing patients, discussion continued to focus on conscientious objections to dispensing Plan B.

**D.    The Governor considers an emergency order or executive order and contacts the Human Rights Commission to intervene.**

The Governor's health advisor (Hulet) also began to investigate whether the Board or Governor could issue an emergency order requiring conscientious objectors to dispense Plan B. Ex. 8 (Hulet Dep., 161:23-163:11), Ex. 22. The Assistant Attorney General who advises the Board (Joyce Roper) told Hulet that such orders must be "necessary to protect public, health, safety and welfare." Roper and Hulet agreed that there was insufficient evidence to support a problem of access to Plan B, thus precluding an order. Ex. 22.

The Governor's Office and Planned Parenthood also contacted the Human Rights Commission ("HRC"). Ex. 23. The HRC's Executive Director (Marc Brenman) called Saxe to tell him that "any law that allowed pharmacists to refuse to fill would be considered a Human Rights violation." Ex. 24. As Brenman put it: "religious belief [was not] a reason to discriminate against women." Ex. 24. In consultation with Planned Parenthood and other HRC members, Brenman sent a formal letter to the Board. The 16-page letter threatened the Board, pharmacists, and pharmacies with liability under the Washington's Law Against Discrimination for any refusal to dispense emergency contraception—even referrals to another onsite pharmacist. Ex. 25, 26.

**E.    The Board hears public testimony.**

That same month, the Board held two public hearings or "workshops." Most of the public testimony in the rulemaking process occurred at these workshops. Ex. 27, 30 (Saxe Dep.,

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 6
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

129:24-130:25). The vast majority of discussion focused on Plan B and whether a pharmacist should retain a right of conscience. Ex 15 (Boyer Dep., 133:10-134:1), Ex. 27. And throughout the regulatory process, the Board never identified a single incident in which a patient was unable to gain timely access to Plan B—whether due to reasons of conscience or otherwise. *See e.g.,* Ex. 5 (Fuller Dep., 198:15-199:5).

**F.      Staff members prepare three draft rules.**

Staff members of the Board then prepared a first draft of the rules ("April draft"). Ex. 30 (Saxe Dep., 201:12-22). The April draft departed sharply from previous Board practice and the State Pharmacy Association's recommendation. It permitted refusals for certain clinical, professional judgment, or business reasons. But the draft specifically required a pharmacist with an objection to fill a prescription unless another onsite pharmacist could fill it without delay. Referrals for reasons of conscience were prohibited. In an email to the Governor's Senior Staff, the Governor's General Counsel explained: "Bottom line: the [draft] rule does what we want it to do." Ex. 29.

On May 2, 2006, the Board met again and considered two more drafts prepared by the staff ("May draft #1" and "May draft #2"). Ex. 31. May draft #1 tracked the April draft closely, providing that the prescription still must be filled onsite without delay, even if a pharmacist had a conscientious objection. (This position was advocated by Planned Parenthood.) Ex. 31. May draft #2, by contrast, protected conscientious objection by allowing pharmacists to refer patients to a nearby pharmacy. Ex. 31. In light of the two new drafts, the Board continued to discuss conscience issues and requested that staff provide more research on conscience rights. Ex. 32. The Board indicated it would vote on the drafts in June 2006. Ex. 31.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 7
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206·682·0565 Fax  206·625·1052

**G.     The Governor pressures the Board to reject referrals for conscientious objections.**

Between May and June, the Governor's health advisor (Hulet) and others from the Governor's Office continued to urge the Board to adopt rules prohibiting referrals for reasons of conscience. Planned Parenthood sent Hulet a "reliable vote count" in anticipation of the Board's vote and asked the Governor to call the "undecided" Board members. Ex. 34. Upon advice of counsel, the Governor declined to do so; but she sent a second letter insisting that prescriptions be filled onsite without delay and without regard for the "personal, religious, or moral objection of individual pharmacists." Ex. 35. Hulet followed up with calls and emails to Saxe to make sure the Board was aware of the Governor's position. Ex. 33.

**H.     The Board votes to in favor of referrals for conscientious objections.**

At the June 1 meeting, the Board considered the two May drafts, and reviewed "Washington laws related to conscience clauses and discrimination." Ex. 37, p. 5. Although the Board had discussed conscientious objections to Plan B at five board meetings, this was the first time the Board voted on a rule. The Board voted to reject May draft #1 despite the Governor's and Planned Parenthood's vigorous support for it. The Board then revised May draft #2. The revised version (the "June Rule") protected conscientious objection by permitting pharmacists to provide timely alternatives including referral, but also prohibited pharmacists from obstructing a patient's access to medication ("June Rule"). Ex. 38. The Board voted *unanimously* in favor of the June Rule. Ex 37.

**I.     The Governor threatens to remove Board members and prepares a new draft regulation.**

The Governor and Planned Parenthood strongly opposed the June Rule and immediately responded. The Governor's staff met with Planned Parenthood the very next morning. Ex. 39. Governor Gregoire told her staff to broaden the approach "beyond abortion" and to develop

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax 206•625•1052

1   a "massive coalition of stakeholders to develop and present our own rule to the board." Ex. 39.

2   That same day, the Governor sent a letter to each Board member "strongly oppos[ing] the draft

3   pharmacist refusal rules recommended by the Washington State Board of Pharmacy...." Ex.

4   40. Within days, her staff had evaluated several legal and political options—including an

5   emergency rule, executive order, and the termination of board members. Ex. 41, Ex. 8 (Hulet

6   Dep., 216:15-219:8, 242-243:25).

7        At a press conference the same week, the media reported that the Governor said the

8   Board "had made a mistake," "[i]t's time that it's corrected," and the Governor herself would

9   "help them get the right answer." Ex. 42. In response to questions, she confirmed that she

10  could remove the Board members and said she would consider all of her "options." Ex. 42. The

11  Department of Health and Board staff circulated media reports of the Governor's threat and

12  Board members were clearly aware of it. Ex. 8 (Hulet Dep., 222:9-225:23); Ex. 15 (Boyer Dep.

13  71:11-73:17); Ex. 30 (Saxe Dep., 213:6-214:6).

14       On June 7, Planned Parenthood sent a proposed regulation to the Governor. Ex. 43.

15  This draft, which was substantially similar to the April and May drafts rejected by the Board,

16  prohibited referrals for reasons of conscience. Hulet circulated this draft to Saxe and the State

17  Pharmacy Association, which opposed it. Before approving the draft in mid-June, the Governor

18  asked Hulet to assure her that it was "clean enough" on conscience issues for the Governor's

19  "advocates" (Planned Parenthood, NARAL and NWWLC). Ex. 44. *See also* Ex. 30 (Saxe

20  Dep., 229). The Department of Health Staff and Saxe tried to persuade Board Chair Asaad

21  Awan to convince the Board to reconsider. But Awan was reluctant to do so. Ex. 30 (Saxe

22  Dep., 217); Ex. 62.

23

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

**J.      The Governor's Office holds "stakeholder meetings" to discuss the Governor's draft regulation.**

Upon learning that the Governor was attempting to reverse the Board's vote, Board member Donna Dockter asked if she and Professor Downing could meet with the Governor. On July 19, 2006, Dockter and Downing met with the Governor and argued that pharmacies needed flexibility to refer patients for business reasons *and* conscientious reasons, so long as the pharmacist could ensure timely delivery. Ex. 45, 46. The Governor agreed that some business exemptions should be included. Ex. 45; Ex. 8 (Hulet Dep., 276:9-278:8).

Hulet then hosted several meetings with Planned Parenthood, NWWLC, the State Pharmacy Association, Downing, and Dockter to consider the exemptions that should be added to the Governor's draft. The only pharmacists present—Dockter, Downing, and the Executive Director of the State Pharmacy Association (Rod Shafer)—advocated for referrals and exemptions for both business and conscientious reasons. Ex. 8 (Hulet Dep., 259:12-260:2), Ex. 46. But Planned Parenthood rejected any protections for conscience.  Hulet testified that Planned Parenthood agreed to permit a non-exhaustive list of business exemptions to be included in the regulation in exchange for the State Pharmacy Association foregoing its demand to preserve conscience rights, and the Governor agreed. Ex 8 (Hulet Dep., 276:9-278:8, 285:11-287:17). The Governor's final draft included broad exemptions for a wide variety of business reasons, but no protections for reasons of conscience. Ex. 8, (Hulet Dep. 276:9-278:8), Ex. 30 (Saxe Dep. 229:17-230:9).

**K.      The Board passes the Governor's regulation.**

At the Board's August 31 meeting, Hulet presented the Governor's draft regulation. The regulation required pharmacies to dispense drugs "consistent with reasonable expectations for filling the prescription," subject to broad exceptions for a variety of business reasons. In addi-

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   tion, the Governor's letter explained that pharmacists could still exercise "professional judg-

2   ment" to determine reasonable exceptions for other reasons. Ex. 47. Under no circumstances

3   could a pharmacist or pharmacy decline to refer a patient for reasons of conscience. The Board

4   adopted the Governor's regulation by a 6-1 vote. Ex.48; Ex. 8 (Hulet Dep., 311-312:1).

5        After this vote, and in preparation for final approval, the Board attempted to gather evi-

6   dence in support of the Governor's rule, still focusing exclusively on conscientious objections

7   to Plan B. Board staff prepared a Small Business Economic Impact Statement, drafted a guid-

8   ance document, and conducted a survey of pharmacies focusing on conscientious objections to

9   Plan B. The survey confirmed that Plan B was widely available in Washington. Ex. 49. Board

10  staff confirmed this.  Ex. 30 (Saxe Dep., 106:12-15); Ex. 5 (Fuller Dep, 120:18-24), Ex. 8

11  (Hulet Dep. , 64:9-65:18; 101:4-106:1); Ex. 36 (Downing Dep., 38-40, 119).

12  .    To guarantee final approval of the regulation, the Governor also took the highly unusual

13  step of asking her "advocates"—Planned Parenthood, NWWLC and NARAL—to interview

14  several applicants for positions on the Board. Ex. 8 (Hulet Dep., 308:13-309:2), Board Chair

15  Awaan, who was applying for a second term, testified that his interview focused almost exclu-

16  sively on the pharmacy refusal issue. Ex. 51 (Awan Dep., 11:5-13:7, 14:20-24). The Governor

17  declined to reappoint Awaan and instead selected the two new candidates recommended by

18  Planned Parenthood and NWWLC. Ex. 54. These two members, along with the other member

19  recommended by Planned Parenthood and appointed by the Governor in 2006 (Duffy), voted in

20  favor of the Governor's final Regulations. Ex. 50.

21  **L.    Stormans, Incorporated remains under investigation by the Board.**

22       Stormans, Incorporated, a fourth-generation family owned business, found itself in the

23  cross-hairs of this conflict since May 2006.  Stormans operates Ralph's Thriftway, a grocery

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206·682·0565 Fax: 206·625·1052

1    store and pharmacy in Olympia.  The Stormans family believes life begins at fertilization and

2    Plan B's manufacturer warns that the drug can terminate life by preventing implantation.

3    While Ralph's has received very few requests for Plan B (and none before the Board started

4    the rulemaking process), Ralph's has provided customers with a list of nearby pharmacies

5    where they could purchase the drug.  There are 33 pharmacies within 5 miles of Ralph's that

6    stock and dispense Plan B.  Ex. 2.

7         In the Summer of 2006, the Board began an investigation of Ralph's pharmacy man-

8    ager.  In January 2007, the Board initiated a new investigation against Ralph's.  When this law-

9    suit was filed, the investigation had concluded and the Board had referred the matter to its legal

10   counsel for final review.  After the lawsuit was filed, the Board began a new investigation

11   against Ralph's.  This investigation is enjoined pursuant to this Court order.  Ex. 2.

12        **M.    Thelen lost her pharmacy position and Mesler's remains in jeopardy.**

13      Plaintiffs Mesler and Thelen have been significantly harmed by the Regulations. Mesler has

14   practiced in Washington State throughout her 17-year career and currently serves as a phar-

15   macy manager.  Ex. 3.  Thelen has worked as a licensed pharmacist for over 35 years.  Ex. 4.

16   Both pharmacists informed their employers that they could not dispense Plan B for religious

17   and moral reasons when they were hired.  Both are also the only pharmacists on duty during

18   their shifts.  With their employers' permission, Mesler and Thelen have referred the few pa-

19   tients seeking Plan B to nearby pharmacies.  *Id.*  After the Regulations were passed, both em-

20   ployers told Mesler and Thelen that they would not be able to accommodate them by hiring a

21   second pharmacist to work at the same time.  Ex. 3, 4.  Mesler will likely lose her job if the

22   Regulations stand.  Ex. 3.  Thelen has already lost hers.  For the time being, Thelen's new em-

23   ployer has agreed to try to accommodate her religious convictions, but this accommodation is

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 12
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  not guaranteed. If Thelen's supervisor changes his mind or her work circumstances change, she

2  could lose her position because of her religious objection. *Id.*

3  <center>**STANDARD OF REVIEW**</center>

4     Under Rule 56(c), summary judgment is appropriate only "if the pleadings, the discov-

5  ery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

6  any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

7  56(c) (2003). All evidence must be "viewed in the light most favorable" to the non-moving

8  party and the burden is on the moving party to show that there are no genuine factual disputes.

9  *Matsushita Elc. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Dial*

10 *Temporary Help Service, Inc. v. Shrock*, 946 F. Supp. 847, 851 (D.C. Or. 1996). In determining

11 whether summary judgment is proper, the trial court should "resolve all reasonable doubts" re-

12 garding the existence of any "genuine issue of material fact against the moving party." *Hector*

13 *v. Wiens*, 533 F.2d 429, 432 (9th Cir. 976); *Shrock*, 946 F.Supp. at 851.

14 <center>**STATEMENT OF ISSUES**</center>

15    Defendants' motions for summary judgment raise the following issues:

16 I.   Should this Court deny summary judgment on Plaintiffs' free exercise claims where
       issues of material fact exist as to the intent of the Regulations, the effect of the Regula-
17     tions in practice, and the degree to which the Regulations favor secular conduct over
       conscientious objections?
18

    II.  Should this Court deny summary judgment on Plaintiffs' Title VII claim where issues
19      of material fact exist as to whether the Regulations prohibit pharmacies from providing
        reasonable accommodations to conscientious objectors?
20

    III. Should this court deny summary judgment on Plaintiffs' Fourteenth Amendment claim
21      where issues of material fact exist as to whether the Regulations violate Plaintiffs' fun-
        damental right to refrain from participating in the taking of human life?
22

23

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 13
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

# ARGUMENT

**I.    Summary Judgment Should Be Denied Because There Are Material Factual Disputes Over Plaintiffs' Free Exercise Claims.**

### A.    The Ninth Circuit's preliminary injunction ruling does not preclude this court from addressing the merits of the free exercise claims.

On the free exercise issue, Defendants stake their summary judgment motion on a single proposition: namely, that "[t]he Court need look no further than the Ninth Circuit's decision in this case to find a basis to grant summary judgment." Interv. Mot. at 8; State Mot. at 7. According to Defendants, the Ninth Circuit finally and conclusively resolved the question of whether the Regulations are neutral and generally applicable; all this Court can do is apply rational basis review. State Mot. 7. (And the Ninth Circuit already "foreshadowed its belief" on rational basis review, too. State Mot. 10.)

Although Defendants studiously avoid using the proper term, this is a claim that the Ninth Circuit's preliminary injunction ruling is the "law of the case." *Farrakhan v. Gregoire*, 590 F.3d 989, 999 (9th Cir. 2010) ("The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case."). Defendants avoid the term for good reason: The Ninth Circuit has repeatedly held that, "[a]s a general rule, decisions on preliminary injunctions"—whether made by the trial court or an appellate court—*"do not constitute law of the case* and *'parties are free to litigate the merits.'"*[4] This rule "acknowledges that decisions on preliminary injunctions are just that—preliminary—and must often be made .on less than a full record." *Ranchers Cattlemen Action*

---

[4] *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3 (9th Cir. 1985) (emphasis added) (quoting *City of Anaheim v. Duncan*, 658 F.2d 1326, 1328 n. 2 (9th Cir.1981)); *see also Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190, 194 (9th Cir. 1953) ("The ruling on the motion for a preliminary injunction leaves open the final determination of the merits of the case."); *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969) (court of appeals' ruling on a preliminary injunction "should

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3006
206·682·0565 Fax. 206·625·1052

1   *Legal Fund United Stockgrowers of America v. U.S. Dept. of Agr.*, 499 F.3d 1108, 1114 (9th

2   Cir. 2007) (internal quotations omitted). It is also based on the fact that decisions on prelimi-

3   nary injunctions require courts "to assess the plaintiff's likelihood of success on the merits, not

4   whether the plaintiff has actually succeeded on the merits." *Southern Oregon Barter Fair v.*

5   *Jackson County, Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004).

6       The only exception to this rule is for "pure issues of law" that are not dependent upon

7   the factual record. *Ranchers Cattlemen*, 499 F.3d at 1114. But where "additional evidence [i]s

8   introduced" after the preliminary ruling, the issue must be "considered anew." *Humanitarian*

9   *Law Project v. United States Dept. of Justice*, 352 F.3d 382, 392-93 (9th Cir. 2003). In sum, as

10  Wright & Miller put it: "The decision of both *the trial and appellate court* on whether to grant

11  or deny a temporary injunction *does not preclude the parties in any way from litigating the me-*

12  *rits of the case.*" 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Prac-*

13  *tice and Procedure* § 2962 (2d ed. 1995) (emphasis added); *see also* 18B Charles Alan Wright,

14  Arthur R. Miller, & Edward H. Cooper § 4478.5 (2d ed. 2002) ("Preliminary or tentative rul-

15  ings *do not establish law of the case*. The most frequent illustrations are provided by prelimi-

16  nary injunction orders. Rulings . . . as to the likely outcome on the merits made for preliminary

17  injunction purposes do not ordinarily establish the law of the case, whether the ruling is made

18  by a trial court *or by an appellate court*.") (emphasis added).

19      Defendants do not even attempt to explain why the Ninth Circuit's preliminary injunc-

20  tion ruling should be an exception to this rule. It is not. The question of whether the Regula-

21  tions are neutral and generally applicable is highly fact intensive. It turns not just on a legal

22  analysis of the Regulations' text, but on several key factual issues, including: (1) "the effect of

23  _____

be read as preliminary and [is] not to be construed as foreclosing any findings and conclusions to the contrary

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 15
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   [the] law in its real operation" (*Lukumi*, 508 U.S. at 535); (2) the "historical background" of the

2   rule, including "the specific series of events leading to [its] enactment . . . , and the legislative

3   or administrative history" (*Id.* at 540); (3) the practical scope of categorical exceptions for

4   secular conduct, compared with the scope of exceptions for religious conduct (*Fraternal Order*

5   *of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-66 (3d Cir. 1999) (Alito,

6   J.) (applying *Lukumi*)); (4) the scope of individualized exceptions for secular conduct (*Black-*

7   *hawk*, 381 F.3d 202 (3d Cir. 2004) (Alito, J.) (applying *Lukumi*); and (5) how the rule is en-

8   forced against secular and religious conduct in practice (*Tenafly Eruv Assoc., Inc. v. Borough of*

9   *Tenafly*, 309 F.3d 144 (3d Cir. 2002)). On each of these issues, Plaintiffs have uncovered a sub-

10  stantial amount of evidence in discovery demonstrating that the Regulations are not neutral and

11  generally applicable. *See* pages _ *infra.* Accordingly, the merits must be "considered anew."

12  *Humanitarian Law Project*, 352 F.3d at 392-93 (9th Cir. 2003).

13         The Ninth Circuit's own opinion confirms this analysis. No fewer than seven times, the

14  Court highlighted the unique procedural posture of the case and the "sparse" preliminary in-

15  junction record.[5] In its key passage on neutrality, the Court based its conclusion squarely on the

16  limited record before it: "Unlike the ordinance at issue in *Lukumi*, the new rules operate neu-

17  trally. . . . *The evidentiary record—though thin given the procedural posture of this case—*

18  sufficiently reflects that the object of the rules was to ensure safe and timely patient access to

19  lawful and lawfully prescribed medications." *Id.* at 1131 (emphasis added). Similarly, when

---

based upon evidence which may be received at the trial on the merits") (internal quotations omitted).

[5] *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1123 (9th Cir. 2009) ("Given the procedural posture of the case, . . . the record with respect to Mesler and Thelen is sparse."); *id.* at 1126 ("Here, the record is admittedly sparse . . ."); *id.* (noting "the preliminary nature of the record"); *id.* at 1131 ("The evidentiary record . . . [is] thin given the procedural nature of this case . . . ."); *id.* at 1133 (questioning whether "the record indicates anything about the Board's motivation in adopting the final rules"); *id.* at 1135 ("Based on the sparse record before it, the district court erred in finding that access to Plan B was not a problem."); *id.* at 1141 ("While we have the discretion to affirm the dis-

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax. 206•625•1052

1   discussing the pivotal survey on access to Plan B—a key fact in the neutrality analysis—the

2   Court said: "We acknowledge that the survey may not accurately reflect the current state of af-

3   fairs. *We expect that on remand, the district court will be provided with more recent and com-*

4   *prehensive data.*" *Id.* at 1115 n.2 (emphasis added). There would be no reason to consider

5   "more recent and comprehensive data" if the Ninth Circuit had definitively resolved the issue.

6          The Board repeatedly says that the Ninth Circuit "instructed this Court [on remand] to

7   analyze the rules under the rational basis test." State Mot. 7; *see id.* at 3 & n.1; *id.* at 21. This is

8   misleading. The Ninth Circuit instructed this Court to use rational basis review only "to the ex-

9   tent that the district court, *upon reconsideration* in light of this disposition, *issues a preliminary*

10  *injunction* as to the named plaintiffs and their employers." 586 F.3d at 1142 n.18 (emphasis

11  added). In other words, if this Court were to reconsider the request for a *preliminary injunc-*

12  *tion*—thus reconsidering the exact same record—then of course, in light of the Ninth Circuit's

13  ruling, it would be required to "apply the rational basis level of scrutiny to determine whether

14  [Plaintiffs] have demonstrated a likelihood of success on the merits[,] . . . whether [Plaintiffs]

15  have demonstrated that they are likely to suffer irreparable harm in the absence of preliminary

16  relief, whether the balance of equities tips in the favor of the three [Plaintiffs], and whether the

17  public interest supports the entry of an injunction." *Id.* at 1142. But this Court is no longer con-

18  sidering a request for a preliminary injunction. These instructions, therefore, are no longer at

19  issue. In short, given the significantly different procedural posture and factual record, the par-

20  ties "are free to litigate the merits." *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d

21  830, 832 n. 3 (9th Cir. 1985).

22

23

---

trict court on any ground supported by the . . . record, in light of the undeveloped record, we decline to do so.")
(internal citations and quotations marks omitted).

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 17
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

**B.      There are material factual disputes over whether the Regulations are neutral and generally applicable.**

Once the spurious "law of the case" argument is swept aside, Defendants have no basis for summary judgment. Even assuming the Regulations are facially neutral, "[f]acial neutrality is not determinative." *Lukumi*, 508 U.S. at 534. The Free Exercise Clause forbids not only overt hostility, but "covert suppression" of religious conduct and "subtle departures from neutrality." *Id.* (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)). *See also St. Johns United Church of Christ v. City of Chicago*, 502 F.3d 616, 633 (7th Cir. 2007) (court must look for "subtle or masked hostility" by examining "available evidence that sheds light on the law's object"). If the Regulations are not "neutral" and "generally applicable," they are subject to strict scrutiny. *Id.* at 531-32.

At the preliminary injunction stage, the evidence consisted primarily of the official administrative record. Since the preliminary injunction, discovery has revealed a large volume of new evidence on how the Regulations came to be, what they mean, and how they apply in practice. This evidence has created key factual disputes on at least five independent free exercise theories. Specifically, the Regulations are not neutral and generally applicable because: (1) The practical effect of the Regulations is to target conscientious objections to Plan B; (2) The history behind the Regulations shows an intent to suppress conscientious objections to Plan B; (3) The Regulations provide categorical exemptions for secular but not religious conduct; (4) The Regulations allow the government to make individualized, discretionary exemptions for secular but not religious conduct; and (5) The Regulations have been selectively enforced.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax. 206•625•1052

1.   **The Regulations are not neutral because, in both their operation, and effect, they target conscientious objections to Plan B.**

One way to prove a free exercise violation is to follow the plaintiffs in *Lukumi*—namely, to show that a law is not neutral because "the effect of [the] law in its real operation" is to target religious conduct. 508 U.S. at 535. To determine the law's effect under *Lukumi*, a court must examine a number of facts, including: (a) whether "the burden of the [law], in practical terms, falls on [religious objectors] but almost no others"; (b) whether "the interpretation given to the [law] by [the government]" favors secular conduct; and (c) whether the laws "proscribe more religious conduct than is necessary to achieve their stated ends." *Id.* at 535-40. Some of these points can be assessed based on a law's text; but most require a factual inquiry. Indeed, *Lukumi* expressly distinguished between an analysis of a law's *text* and its *effects*: "*Apart from the text*, the effect of a law in its real operation is strong evidence of its object." *Id.* at 535 (emphasis added).

    *a.*    *The burden falls almost exclusively on conscientious objectors.*

Here, as in *Lukumi*, the burden of the Regulations falls almost exclusively on religious conduct. Although the Regulations broadly require all pharmacies "to deliver lawfully prescribed drugs," they create sweeping exceptions for *almost every known objection to doing so*—except conscientious objections. WAC 246-869-010. For example, pharmacies can refuse to deliver a drug when: (a) the prescription has an error, inadequate instructions, or contraindications; (b) there are state guidelines affecting the availability or usage of the drug; (c) the pharmacy lacks equipment or expertise needed to produce, store, or dispense a drug; or (d) the prescription appears to be fraudulent. WAC 246-869-010(1)(a)-(d). Most importantly, pharmacies can refuse to deliver a drug when they have *business, economic, or convenience reasons* for not stocking it. WAC 246-869-010(1)(e). Essentially the only time a pharmacy can't decline

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  to deliver a drug is when it has conscientious objections to doing so. The result is that "the bur-

2  den of the [Regulations], in practical terms, falls on [conscientious objectors] but almost no

3  others." *Lukumi*, 508 U.S. at 536.

4      Defendants may argue that the Regulations are neutral because they also prohibit phar-

5  macies from referring patients because of "personal" (non-conscientious) objections to a drug.

6  But these so-called "personal" objections are essentially non-existent. Although Washington

7  law has permitted refusals for decades, the Board's 30(b)(6) designee, Lisa Salmi, testified that

8  the Board was not aware of *any* allegations that pharmacists had denied medication due to per-

9  sonal objections. All told, from 1997-2008, the Board received only nine complaints alleging

10 that a pharmacist had declined to dispense a prescription other than Plan B—and Salmi didn't

11 know the reason for *any* of these denials. Ex. 52 (Salmi Dep., 66:9-67:1); Ex. 5 (Fuller Dep.

12 139:12-15). Nor did the Board investigate them. For all the record shows, these refusals could

13 have been based on a clinical judgment, business reasons, or concerns about a fraudulent pre-

14 scription. There is no evidence of any "personal" objections.

15     Nor did the rulemaking process identify any problems with so-called personal objec-

16 tions. One witness hypothesized that a pharmacist might refuse an HIV medication suspecting

17 the patient was homosexual, but no one suggested this had actually occurred. In any event, such

18 conduct would have violated existing anti-discrimination laws and qualified as unprofessional

19 conduct under RCW 18.130.180(7). Ex .15 (Boyer Dep., 66-67, 136-38, 145:11-146:2). Even

20 after the Governor urged Planned Parenthood to identify refusals to dispense drugs other than

21 Plan B, and Planned Parenthood conducted a widespread canvassing effort, the groups came up

22 with only three examples of non-Plan B refusals, which they recited again and again: one in-

23 volving antibiotics related to an abortion procedure, another involving prenatal vitamins pre-

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 20
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   scribed by an abortion clinic, and a third involving syringes. (All three were put forward by a

2   single abortion clinic.)

3       With further discovery, all three proved illusory. In discovery, Plaintiffs learned that the

4   Board had investigated the first two complaints (antibiotics and prenatal vitamins), concluding

5   that the pharmacists had acted reasonably and the patients had received their medication in a

6   timely manner. Ex. 28. The syringe patient has never been identified; the allegation has never

7   been corroborated or investigated; and testimony conflicts as to whether the incident was hypo-

8   thetical or real.[6] In short, defendants have not identified a single, real-world example of a so-

9   called "personal" refusal that is subject to the Regulations—let alone any widespread secular

10  conduct that is subject to the rules. Ex. 15 (Boyer Dep., 41:4-15, 55:6-56:5, 66:8-67:2); Ex. 30

11  (Saxe Dep., 127:19-128:25); Ex. 11 (3/06 letter).

12      By contrast, there is abundant evidence that the Regulations hit real-world conscientious

13  objectors, and hit them hard. Nearly all of the testimony before the Board dealt with conscien-

14  tious objections to Plan B. The Board's 30(b)(6) designee, Salmi, admitted that whenever a

15  commenter mentioned Plan B during the hearings, the commenter invariably described a reli-

16  gious objection or said Plan B was "a form of abortion." Ex. 52 (Salmi Dep., 88:13-89:2).

17  There is no serious dispute that the Regulations burden conscientious objectors. Plaintiffs are

18  prime examples.

19      In short, "the burden of the [Regulations], in practical terms, falls on [conscientious ob-

20  jectors] but almost no others." 508 U.S. at 536. Defendants cannot sanitize the Regulations by

21  positing hypothetical secular conduct that might also be prohibited under the Regulations—any

22  more than the government in *Lukumi* could sanitize its ordinances by positing hypothetical

23

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 21
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax 206•625•1052

1  secular animal killings that might have been prohibited under its ordinances. At a minimum, the

2  parties dispute the real-world existence of any secular objections that are covered by the Regu-

3  lations—a material factual dispute that precludes summary judgment.

4              b.    *The Government interprets the Regulations in a way that favors*
                    *secular conduct.*

5

6      Similar evidence shows that, as in *Lukumi*, "the interpretation given to the [Regulations]

7  by [the government]" favors secular conduct over religious conduct. 508 U.S. at 537. At the

8  center of this case are two regulatory provisions: the "Stocking Exception" (WAC 246-869-

9  010(e)) and the "Representative Assortment" requirement (WAC 246-869-150(1)). The Stock-

10 ing Exception says that a pharmacy doesn't have to deliver a drug if it is "[u]navailab[le] . . .

11 despite good faith compliance with WAC 246-869-150 [the Representative Assortment re-

12 quirement]." WAC 246-869-010(1)(e). The Representative Assortment requirement says that

13 every pharmacy must "must maintain at all times a representative assortment of drugs in order

14 to meet the pharmaceutical needs of its patients." WAC 246-869-150(1). Taken together, these

15 provisions mean that, as long as a pharmacy makes a "good faith" effort to maintain a "repre-

16 sentative assortment" of drugs, it doesn't have to deliver any drug that is out of stock. (Though,

17 under WAC 246-869-010(3), it may be required to obtain the drug or refer the patient to an-

18 other pharmacy.)

19     On their face, these provisions exempt a sweeping amount of conduct from the Regula-

20 tions. Indeed, it is not even clear why *conscientious refusals to stock Plan B* are covered by the

21 *text* of the Regulations at all. Pharmacies across Washington have declined to stock Plan B for

22 a variety of reasons—whether low demand, lack of profitability, or because the pharmacy oc-

23

---

[6] In any event, the Regulations likely do not prohibit the syringe denial under WAC 246-869-010(1)(d) (potentially fraudulent prescriptions) and evidence suggests that the Regulations do not require a pharmacist to dispense if they suspect patient misuse. Ex. 30 (Saxe Dep., 231) (pharmacist not required to dispense if suspected misuse).

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 22
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax. 206•625•1052

1   cupies a unique business niche, among many others. Ex. 5 (Fuller Dep., 192-93); Ex. 30 (Saxe

2   Dep., 31, 34, 37-38); Ex. 15 (Boyer Dep., 19-21, 84) And the Board has never suggested that

3   these refusals to stock Plan B violate the requirement of a "good faith" effort to maintain a

4   "representative assortment" of drugs. Thus, it is unclear why refusing to stock Plan B for rea-

5   sons of conscience would violate this requirement either. In short, Plaintiffs are in full compli-

6   ance with the *text* of the Regulations.

7       But the record shows that the Board has *interpreted* those regulations to disfavor reli-

8   gious conduct: In effect, the Board says refusals to stock Plan B for business or economic rea-

9   sons comply with the Regulations, while refusals for reasons of conscience do not. On several

10  occasions, Board staff explained that pharmacies may make decisions—including refusal to

11  stock a drug—based on the niche market they serve, their financial condition, and other busi-

12  ness factors. Similarly, emails, drafts, and witnesses confirmed that the Regulations were not

13  intended to provide an exhaustive list of exemptions, but instead to allow the Board the flexibil-

14  ity to decide on a case-by-case basis whether a pharmacy may refer a patient to a nearby phar-

15  macy, including for business reasons. Ex. 15 (Boyer Dep., 128:4-13); Ex. 8 (Hulet Dep., 26:11-

16  23), 212:19-24, 131:13-24).

17      At the Board's August 31, 2006 meeting, Dockter again raised her concerns that the ex-

18  emptions did not allow sufficient room for business decisions. Board member George Roe ex-

19  plained that he did not believe the Board would discipline a pharmacy for such business deci-

20  sions, and no Board member disagreed. Ex. 48.

21      The record also reveals that the Representative Assortment requirement has *never in its*

22  *history* been enforced against a business decision not to stock a drug. Board inspection proce-

23  dures and Board-generated self inspection reports do not refer to the requirement.  Ex. 61. The

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 23
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  Board does not verify that pharmacies comply with the Representative Assortment requirement,

2  nor do they know how to identify a sufficient patient demand. Ex. 57 (Doll Dep., 16:12-18:4)

3  Indeed, in the nineteen years since the Representative Assortment requirement has been on the

4  books, the Board has *never* investigated or cited *any* pharmacy for violating it—except when

5  Ralph's asserted a conscientious objection. Ex. 57 (Doll Dep., 16-18); Ex. 30 (Saxe Dep., 31,

6  34, 37-38). In short, a large volume of new evidence indicates that the government interprets the

7  Regulations in a way that favors secular conduct over conscientious objections. At a minimum,

8  this evidence creates a material factual dispute.

> c.     *The Regulations proscribe more religious conduct than neces-*
> *sary.*

10      As in *Lukumi*, the Regulations also "proscribe more religious conduct than is necessary

11  to achieve their stated ends." 508 U.S. at 538. Whether the Board could have achieved its stated

12  end (timely access to medication) while still respecting conscience is a highly fact-intensive

13  question. But numerous facts strongly suggest that it could.

14      At most, only six other states prohibit referrals and require pharmacies or pharmacists to

15  dispense medication; the vast majority of states achieve their identical interests without such

16  requirements.[7] Most professional health care organizations support referrals. The American

17  Pharmacist Association has published a guide providing options to ensure timely access to Plan

18  B while respecting a pharmacist's conscience rights. Ex. 59. Rod Shafer from the WSPA, Pro-

19  fessor Downing, and Dockter urged the Governor to consider alternatives adopted by other

20  states including Oregon. *See e.g.,* Ex. 36, (Downing Dep. 146:22-148:10). Planned Parenthood

21  actually *supported* the Oregon policy that allows referral. These groups told the Governor that

---

[7] *See* National Women's Law Center, "Pharmacy Refusals: State Laws, Regulations & Policies," July 2009 Update, available at www.nwwlc.org/pdf/pharmacyrefusalpoliciesJuly2009.pdf..

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3006
206•682•0565 Fax: 206•625•1052

1   even though they advocated for the Oregon compromise, that Washington law would permit

2   them to go further here.  Ex. 58, Ex. 30 (Saxe Dep., 166:9-167:1).

3       Other compromises were also suggested. Downing, Dockter and the State Pharmacy

4   Association (the only pharmacists involved in the Governor's "stakeholder" meetings) pro-

5   posed language to preserve a provider's conscience rights by allowing pharmacies with consci-

6   entious objectors to adopt advance written referral plans ensuring that patients would have

7   timely access to medication. Ex. 45, 46. Dockter explained that this approach followed a simi-

8   lar approach the Board took in another situation involving patient health and safety. Ex. 60. But

9   the Governor removed this language from the Regulations.

10       Other evidence indicates that the Government has prohibited conscientious referrals

11   even where such referrals would serve the alleged interest in timely access to medication. In

12   many (if not most) cases, it is more timely to refer a patient to a nearby pharmacy than to wait

13   for an on-call pharmacist to arrive or be hooked-up by video link—two alternatives the state

14   says it permits. *See e.g.,* Ex. 15 (Boyer Dep., 57:12-58) An absolute prohibition on referral thus

15   not only pressures pharmacies to terminate conscientious objectors, but also *slows* access to

16   medication. In short, the facts indicate that the government could have achieved its stated ob-

17   jective while still respecting conscience. Thus, there remain genuine issues of material fact

18   concerning "the effect of [the Regulations] in [their] real operation." *Lukumi*, 508 U.S. at 535.

19       **2.   The Regulations are not neutral because the events preceding their enactment show that they were directed at conscientious objections.**

20

21       A second, independent way to prove a free exercise violation is to prove discriminatory

intent—in other words, that the law was "enacted 'because of,' not merely 'in spite of,' [its]

22   suppression of" religious conduct. *Lukumi*, 508 U.S. at 540. Under this analysis, "[r]elevant

23   evidence includes, among other things, the historical background of the decision under chal-

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 25
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  lenge, the specific series of events leading to the enactment or official policy in question, and

2  the legislative or administrative history, including contemporaneous statements made by mem-

3  bers of the decisionmaking body." *Id.*[8]

4      Since the preliminary injunction, Plaintiffs have adduced a large volume of evidence

5  confirming this Court's initial conclusion that the Regulations were adopted in order to sup-

6  press conscientious objections to Plan B. Defendants suggest that the Board considered a wide

7  variety of regulations and objections to medications. Very little evidence supports this, let alone

8  enough to warrant summary judgment.

9      As detailed in the Factual Background section above, the focus of the regulatory proc-

10  ess, from beginning to end, was on conscientious objections to Plan B. Brief highlights include:

11  o  Before the regulatory process began, the Board specifically discussed conscientious objec-
      tions to Plan B and supported referrals.

12

13  o  The Governor and her advocates—in internal discussions and when pressuring the Board—
      focused overwhelmingly on conscientious objections to Plan B.

14  o  Public comments during the rulemaking process focused overwhelmingly on conscientious
      objections to Plan B.

15

16  o  Discussions over the draft rules focused on conscientious objections to Plan B.

    o  Within hours of the Board's June 1 vote in favor of accommodating conscientious objec-
17    tions, the Governor and Planned Parenthood set in motion a plan to reverse the Board's de-
      cision. The Governor publicly threatened to replace members of the Board, and the Gover-
18    nor did, in fact, refuse to reappoint Board Chair Awan.

19

20  [8] Defendants may argue that the historical background of the Regulations is irrelevant because the portion of *Lu-kumi* dealing with historical background was not joined by a majority of Justices. But every circuit to address the issue (including the Ninth) has considered historical background to be relevant in free exercise challenges. *See,*
21  *e.g., San Jose Christian College* v. *City of Morgan Hill*, 360 F.3d 1024, 1030 n.4 (9th Cir. 2004); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 633 (7th Cir. 2007); *Prater v. City of Burnside*, 289 F.3d 417,
22  429-30 (6th Cir. 2002). Here, the Ninth Circuit Panel initially ruled the historical background of the Regulations off limits. *Stormans, Inc. v. Selecky*, 571 F.3d 960, 982 (9th Cir. 2009). But in response to criticism from a concur-ring judge, and a petition for rehearing by Plaintiffs, the Ninth Circuit granted panel rehearing and specifically
23  deleted this passage from its opinion, stating instead that the historical background issue "is unsettled." *Stormans*, 586 F.3d at 1131. At a minimum, this leaves this Court free to consider historical background; and in light of the great weight of precedent supporting consideration of historical background, this Court should do so.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 26

**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

o   In discussions over the Governor's draft rule, Dockter, Downing, and the State Pharmacy Association all urged the Governor to protect the right of pharmacists to refer for reasons of conscience. Governor's own handwritten notes indicate her primary concern was ensuring the Regulations were "clean enough for the advocates re: conscious/moral issues." Ex. 44. And the Governor ultimately signed off on a draft regulation that prohibited referrals for reasons of conscience.

o   To ensure her victory, the Governor personally called the Board Chair to pressure him to do pass her Regulations. Ex. 51 (Awan Dep., 71:21-74:18). She then replaced him with appointees recommended by Planned Parenthood.

o   The Board did not research access issues before it passed the Regulations. Its October 2006 survey dealt almost exclusively with Plan B and conscientious refusals. Throughout the rulemaking process, the Board never identified a single incident in which a patient was unable to gain timely access to Plan B.

In sum, the record consists of overwhelming evidence that the Regulations were adopted "because of" conscientious objections to Plan B, not merely "in spite of" them. *Lukumi*, 508 U.S. at 540. At a minimum, this evidence raises a genuine issue of material fact as to whether the Regulations' object was to suppress religiously-motivated conduct.

> **3.    The Regulations are not generally applicable because they categorically favor secular reasons over conscientious reasons for declining to dispense Plan B.**

A third way to prove a free exercise violation is to show that a law is not generally applicable because it "creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection." *Fraternal Order of Police*, 170 F.3d at 365 (Alito, J.). In *Fraternal Order of Police*, for example, a police department adopted a regulation prohibiting officers from growing beards. The regulation made an exception for beards grown for medical reasons, but refused an exception for beards grown for religious reasons. Because this represented a "value judgment in favor of secular motivations, but not religious motivations," the government's actions were subject to strict scrutiny. *Id.* at 366; *see also Lukumi*, 508 U.S. at 543 (a law is not generally applicable if it "fail[s] to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree than [religious conduct]").

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 27
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1    The question of whether a regulation provides more favorable exemptions for secular

2    conduct than for religious conduct is highly fact-intensive. It turns on (1) the practical scope of

3    the secular conduct that is exempted from the law; and (2) whether that secular conduct under-

4    mines the government's alleged interests "in a similar or greater degree" than religious conduct

5    does. *Id.*

6    Here, too, the record includes a large body of new evidence. As noted above (at 22), the

7    combination of the "Stocking Exception" and the "Representative Assortment" requirement

8    creates a broad exemption for secular conduct: any pharmacy with a "good faith" business rea-

9    son for refusing to stock Plan B need not do so. WAC 246-869-010(1)(e); WAC 246-869-

10   150(1). And never, in the two decades that the Representative Assortment requirement has been

11   on the books, has the government found a pharmacy out of compliance (except Ralph's). Ex. 57

12   (Doll Dep., 16-18); Ex. 30 (Saxe Dep., 31, 34, 37-38).

13   Beyond that, the parties sharply disagree over how the Board interprets the "Specialized

14   Expertise" exemption, which provides that a pharmacy need not deliver a drug when it lacks

15   "specialized equipment or expertise" needed to do so. WAC 246-869-010(1)(d). Several depo-

16   nents, including Board staff and the Governor's "stakeholders," implied that the "specialized

17   expertise" exemption does not require what most would consider "specialized" knowledge. It

18   serves as a catch-all for nearly all non-conscientious objections related to a pharmacy's busi-

19   ness and economic decisions. At least one broad business-related exemption was enumerated in

20   the Governor's earlier drafts. Ex. 46,  Ex. 8 (Hulet Dep., 131:13-24, 265-266, 276:9-278:8); Ex.

21   15 (Boyer Dep., 128:4-13).

22   In discussing the scope of these exemptions, some potential examples raised during the

23   rulemaking process included permitting a pharmacy under the Regulations: to delay filling a

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 28
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax  206•625•1052

1   prescription in the normal course of business (short-staffed, too many prescriptions, pharmacy

2   personnel are on a break); not to stock or fill a prescription if the drug does not fit within the

3   pharmacy's chosen niche market; not to stock or fill a prescription if it subjectively determines

4   the drug is too expensive, the drug is a "loss leader," or the pharmacy must order more of the

5   drug than it believes it can sell; to opt out of programs where the pharmacy must register in a

6   network or document specific information even though such programs do not required special

7   expertise; and to decline to perform simple compounds or dispense syringes because the service

8   will take additional time and resources, even though all pharmacists have the necessary training

9   to perform these services. *See e.g.,* Ex. 15 (Boyer Dep., 19-21; 128:4-13); Ex. 5 (Fuller Dep.,

10   106); Ex. 8 (Hulet Dep., 288-89, 285:11-287:17), Ex. 30 (Saxe Dep. (63, 299:17-230:9).

11       Many of these economic or convenience-based refusals undermine the government's

12   stated interest (timely access to lawful drugs) "in a similar or greater degree" than religious re-

13   fusals do. *Lukumi*, 508 U.S. at 543. Although Defendants may claim that prohibiting such re-

14   fusals might harm some pharmacies financially, the same is true of prohibiting religious refus-

15   als. Indeed, if Ralph's is forced to dispense drugs in violation of conscience, it will be driven

16   entirely out of business.

17       Finally, in addition to these categorical exemptions for business and convenience rea-

18   sons, the Washington Death with Dignity Act, RCW 70.245 ("DWDA"), creates another cate-

19   gorical exemption to the Regulations. The DWDA provides that "[o]nly willing health care

20   providers [defined to include pharmacists] shall participate in the provision to a qualified pa-

21   tient of medication to end his or her life in a humane and dignified manner." RCWA

22   70.245.190(1)(d). Under this provision, notwithstanding the Regulations at issue here, any

23   pharmacy or pharmacist may refuse to dispense lethal drugs on any ground, secular or reli-

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 29
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206·682·0565 Fax 206·625·1052

1   gious. And there appears to be no referral obligation. Although the parties dispute the scope of

2   this exemption, it undermines the government's stated interest in assuring timely access to le-

3   thal drugs at least as much as conscientious objections to Plan B.[9]

4        In sum, the parties sharply disagree over: (1) the scope of exemptions for secular con-

5   duct under the Stocking Exception and Representative Assortment requirement; (2) the scope

6   of exemptions for secular conduct under the Specialized Expertise exemption; (3) the scope of

7   exemptions for objections to lethal drugs; and (4) the question of whether these exemptions un-

8   dermine the government's interest in timely access to drugs "in a similar or greater degree"

9   than religious exemptions would. *Lukumi*, 508 U.S. at 543. These factual issues are more than

10  enough to preclude summary judgment.

11         **4.    The Regulations are not generally applicable because they allow for
                   "individualized governmental assessment of the reasons for the rele-**
12  **                vant conduct."**

13       A fourth way to prove a free exercise violation is to show that a law is not generally ap-

14  plicable because it gives the government discretion to make "individualized exemptions" from

15  a general rule. *Lukumi*, at 537; *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004)

16  (Alito, J.). A law allowing "individualized exemptions" requires strict scrutiny because it "cre-

17  ates the opportunity for a facially neutral and generally applicable standard to be applied in

18  practice in a way that discriminates against religiously motivated conduct." *Id.* at 209 (citing

19  *Smith*). In *Blackhawk*, for example, the government required any person wishing to keep wild-

20  life in captivity to pay a permitting fee, but it allowed the government to waive the fee if a

21  _____

22  [9] The Regulations may also violate the Free Exercise Clause by producing "differential treatment of two relig-
    ions." *Lukumi*, 508 U.S. at 536. As the Supreme Court has repeatedly said, the "clearest command" of the religion
    clauses is that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456
    U.S. 228, 244 (1982). But here, in light of the DWDA, one type of religious objection is permitted (conscientious
23  objections to assisted suicide) but another type is forbidden (conscientious objections to Plan B). This situation is

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 30
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax  206•625•1052

1   waiver would be "consistent with sound game or wildlife management activities or the intent of

2   [the Game and Wildlife Code]." *Id.* at 205. The Third Circuit held that this provision was "suf-

3   ficiently open-ended" to give the government discretion in granting exemptions, thus

4   "bring[ing] the regulation within the individualized exemption rule" and requiring strict scru-

5   tiny. *Id.* at 210.

6      Here, similarly, the Regulations provide an exemption for five, secularly motivated re-

7   fusals to deliver a drug, WAC 246-869-010(1)(a)-(e); but they also provide an open-ended ex-

8   emption covering any "substantially similar circumstances." WAC 246-869-010(1). When a

9   pharmacy claims this open-ended exception, the Board must make an "individualized . . . as-

10   sessment of the reasons for the relevant conduct" to determine whether the circumstances are

11   "substantially similar." *Lukumi*, 508 U.S. at 537 (quoting *Smith*).

12      Board members, staff and stakeholders confirmed the Board will consider circum-

13   stances on a case-by-case basis. Referrals may be permitted in some instances. Board members

14   have also independently confirmed this during the rulemaking process. Ex. 1; Ex. 48. Because

15   this open-ended process gives the government an opportunity to treat secular refusals more fa-

16   vorably than religious refusals, it is subject to heightened scrutiny. *Blackhawk*, 381 F.3d at 210.

17   At a minimum, there are material disputed facts over the scope and application of this open-

18   ended process.

19      **5.      The Regulations are not neutral because they are unevenly enforced.**

20      Finally, a fifth way to prove a free exercise violation is to show that a nominally neutral

21   and generally applicable law has "been enforced in a discriminatory manner." *Blackhawk*, 381

22   F.3d at 209 (Alito, J.) (citing *Tenafly*, 309 F.3d at 167-72). In *Tenafly*, for example, a local or-

23

---

much the same as *Lukumi*, where kosher slaughter was permitted but Santeria sacrifice was forbidden. The Su-
preme Court suggested that this might be "an independent constitutional violation." 508 U.S. at 536.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 31

**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1    dinance broadly banned the placement of any "sign or advertisement, or other matter upon any

2    pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place . . . ." 309 F.3d

3    at 151. In practice, the local government permitted the placement on utility poles of a variety of

4    signs and symbols, such as house number signs, lost animal signs, and the like; but it refused to

5    permit Orthodox Jews to do the same with religiously significant items called *lechis* (thin black

6    strips of plastic demarcating the area within which Orthodox Jews may carry objects on the

7    Sabbath). *Id.* at 151-52. Although the ordinance was plainly neutral and generally applicable on

8    its face, the Court struck it down because the government's "selective, discretionary application

9    of [the ordinance]" effectively "'single[d] out' the plaintiffs' religiously motivated conduct for

10   discriminatory treatment." *Id.* at 168.

11        As explained above, the government's enforcement action against Ralph's rests on the

12   premise that Ralph's has failed to make a "good faith" effort to comply with the Representative

13   Assortment requirement. WAC 246-869-150(1). Yet in the 19 years the Representative As-

14   sortment requirement has been on the books, the Board has never once enforced it against any

15   other pharmacy. That evidence alone is amply sufficient to make out a claim for selective en-

16   forcement in violation of the Free Exercise Clause. *See Tenafly*, 309 F.3d at 168.

17        **6.    Defendants' Reliance on *American Life League v. Reno* is misplaced.**

18        In response, Defendants may argue that "[t]he neutrality of the new rules is not de-

19   stroyed by the possibility that pharmacists with religious objections to Plan B will *dispropor-*

20   *tionately require accommodation* under the rules." *Stormans*, 586 F.3d at 1131 (citing *Ameri-*

21   *can Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995)) (emphasis added). But Plaintiffs

22   agree with this proposition. Plaintiffs are not basing their free exercise claim merely on the fact

23   that the Regulations *disproportionately impact* conscientious objectors (although they surely

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 32
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   do). Rather, Plaintiffs offer five different ways of showing that the Board has *targeted* consci-

2   entious objectors or *favored* secular conduct: (1) the effect of the law in its operation is to target

3   conscientious objection; (2) the legislative history shows an intent to target conscientious ob-

4   jection; (3) the Regulations make categorical exceptions for secular conduct but not religious

5   conduct; (4) the Regulations give the government discretion to make individualized exceptions

6   for secular conduct; and (5) the Regulations have been selectively enforced. None of these ar-

7   guments suggests that a law can be invalidated "simply because it may affect a greater propor-

8   tion of one [religion] than of another." *Washington v. Davis*, 426 U.S. 229, 242 (1976) (reject-

9   ing disparate impact theory under Equal Protection Clause).

10   In fact, *Lukumi* expressly distinguishes between disparate impact claims and claims

11   based on targeting or favoritism. "To be sure," the Court said, "*adverse impact* will not always

12   lead to a finding of *impermissible targeting*" (suggesting, however, that sometimes it would).

13   *Lukumi*, 508 U.S. at 535 (emphasis added). But the Free Exercise Clause is *always* violated

14   where the "design of these laws accomplishes instead a 'religious gerrymander[.]'" *Lukumi*,

15   508 U.S. at 535 (quoting *Walz v. Tax Comm'n*, 397 U.S. at 696). To determine whether a law

16   accomplishes such a "religious gerrymander," a court "'must survey meticulously the circum-

17   stances of *governmental categories*'" *Id.* at 534 (quoting *Walz*, 397 U.S. at 696) (emphasis add-

18   ed).

19   That is just what Plaintiffs argue here. Each of their arguments goes to "governmental

20   categories" and the "design of these [Regulations]." *Id.* at 534-35. Examining the law's effect

21   in real operation, as set out in *Lukumi*, is by definition just the sort of meticulous investigation

22   into governmental categories that *Lukumi* contemplated. Similarly, examining the categorical

23   and individualized exemptions will show whether there has been a religious gerrymander. And

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax 206•625•1052

1   examining the discriminatory intent in the legislative history, or a history of selective enforce-

2   ment, goes to the "circumstances" and design of the governmental categories provided in the

3   Regulations. *Id.* at 534.

4        *American Life League v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995), which the Ninth Cir-

5   cuit cited on appeal, supports this distinction, too. There, the court distinguished the disparate

6   impact point made by the Ninth Circuit from a claim that the law accomplishes a "religious ger-

7   rymander" or "single[s] out religious practices for discriminatory treatment." *Id.* Similarly, in

8   *Booth v. Maryland*, the Fourth Circuit applied *American Life League* to state the general rule of

9   neutrality under *Smith*, while citing *Lukumi* for the point that courts must make a meticulous

10  examination of governmental categories to seek out religious gerrymanders. 327 F.3d 377, 380

11  (4th Cir. 2003). *American Life League* and *Booth* further support the distinction between a dis-

12  parate impact claim on the one hand, and the Free Exercise claims advanced by Plaintiffs here.

13      **C.**    **The Regulations cannot survive strict scrutiny.**

14      Because there are material factual disputes over whether the Regulations are neutral and

15  generally applicable, the relevant question on summary judgment is not whether the Regula-

16  tions survive *rational basis scrutiny*; the question is whether the Regulations, as a matter of

17  law, survive *strict scrutiny*. This requires Defendants to show that the Regulations "advance

18  interests of the highest order" and are "narrowly tailored in pursuit of those interests." *Lukumi*,

19  508 U.S. at 546 (quotations omitted). "Requiring a State to demonstrate a compelling interest

20  and show that it has adopted the least restrictive means of achieving that interest is the most

21  demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534

22  (1997).

23

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 34
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1    Defendants cannot satisfy this test at all, much less as a matter of law. As explained

2    above, even assuming the Board has a compelling interest in ensuring timely access to Plan B,

3    the Regulations are not the least restrictive means of accomplishing those interests. They permit

4    a significant amount of secular conduct that undermines timely access to Plan B (including, for

5    example, economic refusals to stock Plan B); and they prohibit much more religious conduct

6    than is necessary to ensure access to Plan B (including, for example, conscientious refusals that

7    pose no threat to obtaining Plan B). The Regulations thus fail under *Lukumi*. *See* 508 U.S. at

8    546 (ordinances failed strict scrutiny because they were "overbroad or underinclusive in sub-

9    stantial respects").

10    Nor is it clear that the Regulations, as applied to conscientious objection, actually fur-

11    ther the Board's alleged interest in timely access to prescribed drugs. Many deponents have

12    confirmed that a severe pharmacist shorts exists in Washington. They have also confirmed that

13    only one pharmacist is on duty at a time in most pharmacies. Refusing to allow pharmacies and

14    pharmacists to refer patients because conscientious objections will force pharmacists and

15    pharmacy owners – like Plaintiffs – to leave the profession. The Board's Regulation ultimately

16    reduces, rather than increases, access to drugs.

17    **II.    Summary Judgment Should Be Denied Because There Are Material Factual Dis-
         putes Over Plaintiffs' Supremacy Clause Claims.**

18

19    The Regulations are not only unconstitutional under the Free Exercise Clause, but also

20    preempted under the Supremacy Clause because they conflict with Title VII. Several material

21    factual disputes prevent summary judgment on this claim.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

**A.      The Regulations Conflict with Title VII and Therefore Fail Under the Supremacy Clause.**

Under the Supremacy Clause of Article VI of the U.S. Constitution, federal law preempts state law in three scenarios: (1) an express statement of preemption, (2) occupation of the field, or (3) conflict with a state law. *Malabed v. No. Slope Borough*, 335 F.3d 864, 869 (9th Cir. 2003); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). Here, the Regulations are preempted under the first and third scenarios because they permit (and in some cases require) employers to discriminate against their employees in violation of Title VII.

**1.      Congress expressed its intent that Title VII have preemptive effect.**

The first basis for preemption is Congress's express statement of preemption. Title VII expressly provides that it preempts "any provision of State law" that is "inconsistent with any of the purposes of this Act, or any provision thereof." 42 U.S.C. § 2000h-4. Similarly, 42 U.S.C. § 2000e-7 provides an exemption from any state law that "require[s] or permit[s] the doing of any act which would be an unlawful employment practice" under Title VII. In light of these provisions, the Ninth Circuit has said that state laws that require or permit a violation of Title VII are preempted. *Malabed*, 335 F.3d at 870, 871; *see also Sosa v. Hiraoka*, 920 F.2d 1451 (9th Cir. 1990); *Rosenfeld v. So. Pac. Co.*, 444 F.2d 1219 (9th Cir. 1971).

The Regulations permit, and in many cases require, a violation of Title VII because they prohibit employers from accommodating their employees' religious beliefs. In the absence of the Regulations, pharmacies were free to accommodate the religious beliefs of their pharmacists in a variety of ways. Most notably, pharmacies could allow pharmacists with conscientious objections to refer patients to a nearby pharmacy for timely access to Plan B. That is just the sort of reasonable accommodation that Title VII requires. 42 U.S.C. § 200e(j); *American*

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 36
**\*\*119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   *Postal Workers Union v. Postmaster Gen.*, 781 F.2d 772, 776 (9th Cir. 1986). And it is just

2   what Plaintiff Thelen's and Plaintiff Mesler's employers did before passage of the Regulations.

3        But in the wake of the Regulations, pharmacies must deliver lawfully prescribed drugs

4   and devices "in a timely manner," regardless of the conscientious objections of their employ-

5   ees. Indeed, the accommodations practiced by Thelen's and Mesler's employers—timely refer-

6   ral to a nearby provider—are strictly prohibited. Instead, to comply with the Regulations, a

7   pharmacy must have a pharmacist available at all times who is willing to dispense all medica-

8   tions, regardless of religious belief. If a pharmacy can afford to have only one pharmacist on

9   staff at a time—which is the case for most Washington pharmacies—the pharmacy would be in

10   violation of the Regulations if it hired or retained a pharmacist with conscientious objections.

11   Ex. Thus, the regulations effectively force pharmacies to fire, or refuse to accommodate, cer-

12   tain pharmacists because of their religious beliefs. This directly conflicts with Title VII.

13        Moreover, the Board has expressed its intention to discipline a pharmacist or pharmacy

14   if any pharmacist declines to fill a prescription because of his or her religious beliefs. The

15   Board has suggested that it will defer to the HRC to interpret and enforce the prohibition on

16   discrimination in WAC 246-869-010(4)(d). Ex. 30 (Saxe Dep., 192), Ex. 54. And in its 16-page

17   letter to the Board, the HRC said that any pharmacist who exercises his or her religious beliefs

18   in declining to dispense Plan B violates Washington's anti-discrimination laws. The HRC has

19   also stated that liability extends not only to the pharmacist, but also to the employing phar-

20   macy. Ex. 26. Indeed, a pharmacy is prohibited from accommodating a conscientious objector

21   *even if the pharmacy has another pharmacist on site to fill prescriptions to which the colleague*

22

23

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 37
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1    *objected.*[10] Ex. 26. The Regulations thus mandate an employment practice illegal under federal

2    law—refusing to accommodate an employee's religious beliefs—by making it illegal under

3    state law to accommodate that employee's beliefs. Accordingly, the Regulations create an envi-

4    ronment that requires or permits a pharmacy to violate Title VII.

5    Indeed, that is just what has happened to Thelen. Thelen, a licensed pharmacist for over

6    35 years, maintained religious objections to dispensing Plan B, and her employer always ac-

7    commodated her religious beliefs. But once the Board passed the Regulations, she was fired.

8    Ex. 4. Thelen's pharmacy had only one pharmacist on site during each shift and it was unable

9    to afford scheduling a second pharmacist to be on site or on call at the same time. Ex. 4. In

10   short, Thelen lost her job because the Regulations made it impossible for the pharmacy to ac-

11   commodate her religious beliefs as Title VII requires. Plaintiff Mesler will be in a similar posi-

12   tion if the Regulations are enforced.

13   Defendants respond by suggesting other potential accommodations that a pharmacy

14   might make. Interv. Mot. at 16-18; State Mot. at 20. But these potential accommodations, if

15   they exist in practice at all, are the subject of hotly contested factual disputes. Other than the

16   Board's pharmacy survey, the record indicates that the Board made no attempt to investigate

17   what accommodations a pharmacy could offer a pharmacist. The survey and Small Business

18   Economic Impact Statement focused only on hiring a second pharmacist or hiring an on-call

19   pharmacist. *See e.g.,* Ex. 49. But a pharmacy that staffs only one pharmacist on site in each

20   shift faces significant financial hardship in adding another pharmacist to staff the shift or on-

21

22   _____

[10] At the preliminary injunction stage, the HRC argued that Brenman's letter was his personal opinion and not the official position of the HRC. In discovery, the HRC produced copies of emails and letters expressing the opposite. In addition, Plaintiffs learned that the HRC Chair (Friedt) and its Assistant Attorney General were intimately in-

23   volved in preparing the letter. When the Board sent a *second* letter to the Board, emails indicate that other HRC Commissioners also approved of the letter and had been kept informed and approved of the HRC's actions.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 38
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1  call. The cost to hire an additional pharmacist is prohibitively expensive. Ex. 49; Ex. 15 (Boyer

2  Dep., 45:13-47:18). The most likely option would be termination of the conscientious objector.

3      The Board has made no attempt to explain what accommodations remain after the

4  Regulations. Ex. 15 (Boyer Dep., 35:13-23, 74:17-24). Interestingly, the Board leaves it to In-

5  tervenor-Defendants to propose that distribution by a second pharmacist via teleconference, a

6  pharmacy technician, or an automated dispensing machine would be acceptable. Interv. Mot. at

7  19. Perhaps the reason the Board is silent is because it requires pharmacies to obtain special

8  approval for telepharmacy services and automated dispensing devices. Telepharmacy requires a

9  substantial investment by the pharmacy including software, computer equipment, and video

10 equipment to ensure the security of medical information and that the pharmacist supervises all

11 aspects of the transaction. Telepharmacy also requires the pharmacy to provide the patient a

12 private area to consult with the pharmacist by video-link. And an automated dispensing ma-

13 chine is even more expensive than telepharmacy. Although Defendants likely dispute this fact,

14 these alternatives would not be feasible accommodations for most pharmacy locations. Ex. 15

15 (Boyer Dep., 30-32, 34); Ex. 30 (Saxe Dep., 39-41, 45, 53); Ex. 5 (Fuller Dep., 38, 40, 75).

16      Further, a technician cannot fill a prescription until and unless a licensed pharmacist has

17 visually verified it. RCW 18.64.250(2); RCW 18.64A.030(1). The pharmacy would still have to

18 schedule a second pharmacist to supervise the dispensing pharmacy technician. This is true for

19 a behind-the-counter sale of Plan B as well, and is further supported by the Board's require-

20 ment that all telepharmacies must include a video-link so that the remote pharmacist can super-

21 vise the technician. Ex. 15 (Boyer Dep., 30-32, 34); Ex. 30 (Saxe Dep., 39-41, 45, 53); Ex. 5

22 (Fuller Dep., 38, 40, 75).In short, the Regulations forbid employers from making any reason-

23 able accommodations for conscientious objectors, as they are required to do under Title VII.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1    Specifically, the Regulations in many cases require a pharmacy to refuse to employ conscien-

2    tious objectors, and in other cases impose liability merely for employing conscientious objec-

3    tors. This is flatly inconsistent with Title VII. At a minimum, there are serious factual disputes

4    over what accommodations, if any, are available under the Regulations.

5                    **2.       The Regulations conflict with Title VII.**

6            The second basis for preemption is the conflict between the Regulations and Title VII.

7    Conflicts occur when the state law makes "compliance with both federal and state regulations a

8    physical impossibility" and when it "stands as an obstacle to the accomplishment and execution

9    of the full purposes and objectives of Congress." *Cal. Fed. Savings & Loan Assoc. v. Guerra*,

10   479 U.S. 272, 281 (1987) (citations omitted)). Congress passed Title VII "to prohibit all prac-

11   tices in whatever form which create inequality in employment due to discrimination on the ba-

12   sis of race, religion, sex, or national origin, and ordained that its policy of outlawing such dis-

13   crimination should have the 'highest priority." *Franks v. Bowman Transp. Co.*, 424 U.S. 747,

14   763 (1976) (citations omitted). As discussed above, the Regulations prevent a pharmacy from

15   offering reasonable accommodations to conscientious objectors, making compliance with Title

16   VII and the Regulations in many cases impossible.  This conflict overcomes any presumption

17   asserted by Defendants that the Regulations are valid.[11]

18                   **B.      Legislative Immunity and Exhaustion Fail as Defenses.**

19           The Board's claim to legislative immunity is likewise meritless. State Mot. 19. Defen-

20   dants misunderstand the nature of legislative immunity and Plaintiffs' Supremacy Clause claim.

21   Legislative immunity applies only to legislative acts, such as *deliberating* over legislation or

22   _____

23   [11] The Board argues that the Regulations do not conflict with Title VII because of "the presumption that state or
     local regulation of matters related to health or safety is not invalidated under the Supremacy Clause." *Hillsborough
     Cty., Fla. v. Automated Medical Labs., Inc.*, 471 U.S. 707, 715 (1985). (State Mot. at 20.) However, "a conflict

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 40
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   *enacting* a regulation. *See Kaahumanu v. County of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003).

2   It does not apply to executive actions such as *enforcing* a regulation.

3   Here, Plaintiffs are not suing the Board to impose liability on individual Board mem-

4   bers, nor are they seeking an order forcing the Board to amend the Regulations, nor are they

5   trying to interfere with the legislative process. Instead, they simply seek a ruling that the Regu-

6   lations are preempted by federal law, and an injunction prohibiting Defendants from enforcing

7   the Regulations against them. Amended Complaint ¶ 84. Because enforcement is not a legisla-

8   tive act, immunity is unavailable. *See Kaahumanu*, 315 F.3d at 1220 (no immunity for local

9   government's application of a zoning ordinance). Indeed, were the law otherwise, *no* govern-

10  mental act could be challenged as long as it ultimately originated in legislative action. But it is

11  clearly within the role of the federal courts to consider whether state regulations conflict with

12  federal (and therefore supreme) anti-discrimination statutes. *See, e.g., EEOC v. Massachusetts*,

13  987 F.2d 64, 72 (1st Cir. 1993); *Rosenfeld*, 444 F.2d at 1226.[12]

14  Finally, for the first time in this litigation, the Board also makes the spurious argument

15  that this Court lacks jurisdiction to hear the Title VII claim because Plaintiffs did not file a

16  complaint with the EEOC. State Mot. at 21. The cases cited by Defendants involve discrimina-

17  tion claims against an employer, not claims regarding regulations.  *See Sosa v. Hiraoka*, 920

18  F.2d at 1453; *Kirk v. Rockwell Int'l. Corp.*, 578 F.2d 814, 815 (9th Cir. 1978). *See, e.g., 42*

19  U.S.C.A. § 200e-5(a). The State does not employ Defendants. This is a claim challenging the

20  Regulations themselves as preempted under the Supremacy Clause, not a garden-variety em-

21

22  between a particular local provision and the federal scheme" overcomes the presumption. *Id.*, 471 U.S. at 716. Further, the presumption applies to only valid regulations. *Id.*, 471 U.S. at 715-16.
[12] In any event, any legislative immunity defense is waived because the Board never pleaded  as an affirmative

23  defense. *See, e.g., Scott v. Taylor*, 405 F.3d 1251, 1258 (11th Cir. 2005) ("Legislative immunity is an affirmative defense which can be waived or forfeited, and, unless raised, does not affect the power of a federal court to adjudicate.") (Jordan, J., concurring) (collecting cases).

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 41
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

ployment discrimination lawsuit. The EEOC has no authority to review such a challenge. *See*

*Gilbert v. National Transportation Safety*, 80 F.3d 364, 366-367 (9th. Cir. 1996).

**III.    Summary Judgment Should Be Denied Because There Are Material Factual Disputes Over Plaintiffs' Fourteenth Amendment Claims.**

Defendants argue that there is no fundamental right of conscience to refuse to take human life. Interv. Mot. 13. Defendants are mistaken. The fundamental right to refuse to take human life is "deeply rooted in this Nation's history and tradition,' ... and is 'implicit in the concept of ordered liberty.'" The Regulations infringe on Plaintiffs' fundamental right unless they pass strict scrutiny.

**A.    Fundamental Right Not to be Coerced into Taking Human Life.**

The Due Process Clause provides heightened protection against government interference with certain fundamental rights and liberty interests."[13] *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) *Reno v. Flores*, 507 U.S. 292, 301-302 (1993); *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992). A right is fundamental where it is "objectively, 'deeply rooted in this Nation's history and tradition,' ... and 'implicit in the concept of ordered liberty' such that 'neither liberty nor justice would exist if [it was] sacrificed.'" *Id.* (quoting *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) and *Palko v. Connecticut*, 302 U.S. 319 (1937)). The scope of the court's search is the nation's "history, legal traditions, and practices. *Id.* at 721. To have any force, the right must be "so rooted in the traditions and conscience of our

---

[13]The "liberty" interests the Supreme Court has held to be protected by the Due Process Clause include the rights to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965); to use contraception, *ibid.; Eisenstadt v. Baird*, 405 U.S. 438 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952), and to abortion, *Casey, supra.* The Court also strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. *Cruzan*, 497 U.S., at 278-279.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax 206•625•1052

1   people as to be ranked as fundamental." *Snyder v. Commonwealth*, 291 U.S. 97, 105 (1934).

2   Finally, the right must be subject to a "careful description" of the asserted fundamental liberty

3   interest at stake. *Flores*, 507 U.S. at 302. The Fourteenth Amendment "forbids the government

4   to infringe ... 'fundamental' liberty interests at all, no matter what process is provided, unless

5   the infringement is narrowly tailored to serve a compelling state interest." *Id.*

6          The fundamental liberty interest at issue here is the right to refuse to take human life. It

7   is a fundamental right deeply rooted in the traditions and conscience of our Nation. It was first

8   manifested in compulsory military service but naturally and promptly arose in a variety of con-

9   texts in recent decades in response to new legal, social, and scientific developments.

10                  **1.      Right of Conscientious Objection to Military Service.**

11

12         Moral consensus prior to the time of the Founding was that self-defense was mandatory.

    Initially, the Quakers, an unpopular minority, were imprisoned and their property confiscated

13  for refusing to serve in local militias because they conscientiously objected to taking human

14  life. But their stand gradually changed opinion.[14]  Exemptions from military service were es-

15  tablished early on in Massachusetts (1661), Rhode Island (1673), and Pennsylvania (1757).

16  Lillian Schlissel ed., *Conscience in America*, p. 28, E. P. Dutton & Co., Inc. (1968). Peter

17  Brock ed., *Liberty and Conscience* 10, Oxford University Press (2002). Similar exemptions

18  were enacted in states that entered the Union after the Revolutionary War period – Illinois

19  (1818), Alabama (1819), Iowa (1846), Kentucky (1850), Indiana (1851), Kansas (1855), and

20  Texas (1859), among others. Lillian Schlissel, *supra*, at 57. The tradition of conscientious ob-

21

22  ─────────────
    [14] George Washington wrote to a Quaker correspondent: "I assure you very especially that in my opinion the con-
    scientious scruples of all men should be treated with great delicacy ... it is my wish and desire the laws may al-

23  ways be extensively accommodated to them as a due regard to the protection and essential interest of the nation
    may justify." Letter from George Washington to the Religious Society Called Quakers (Oct. 1789), in George
    Washington on Religious Liberty and Mutual Understanding 11 (E. Humphrey ed.1932).

CONSOLIDATED RESPONSE TO STATE                          ELLIS, LI & McKINSTRY PLLC
DEFENDANTS' AND DEFENDANT-                                      Attorneys at Law
INTERVENORS' MOTIONS FOR SUMMARY                              Two Union Square
JUDGMENT - 43                                         601 Union Street, Suite 4900
**119652 (13438.00)                                     Seattle, WA 98101-3906
                                                   206·682·0565 Fax: 206·625·1052

1    jection gained significant legal ground during the Civil War. President Lincoln directed his War

2    Department to make accommodations for those with objections to bearing arms. J. G. Randall

3    & Richard Nelson Current, *Lincoln the President,* 172-75 University of Illinois Press (1999).

4         In World War I, Congress enacted the first comprehensive conscientious objection bill.

5    Congress followed that enactment with a second in World War II. And during the Vietnam

6    War, the Supreme Court stretched the conscientious objector exemption to include not only re-

7    ligiously-based objections, but all "sincere and meaningful" beliefs that "occup[y] a place . . .

8    parallel to that filled by the orthodox belief in God." Many states have also written conscien-

9    tious objection into their laws regulating state militias. *Macintosh v. United States*, 42 F.2d 845,

10   848, n. 1, n. 2. (2nd Cir. 1930), *rev'd*, 283 U.S. 605 (1931). While the Supreme Court did not

11   recognize a constitutionally protected right to refrain from military service in the 1930's, its

12   reasoning was grounded in the "well-nigh limitless extent of the war powers." *United States v.*

13   *Macintosh*, 283 U.S. 605 (1931). In 1970, the Supreme Court observed that the policy of ex-

14   empting conscientious objectors "is one of longstanding tradition in this country" dating back

15   to colonial times and had "roots … deeply embedded in history." *Welsh v. United States*, 398

16   U.S. 333, 365-66 (1970) (Harlan, J., concurring). The *Welsh* court broadened the scope of the

17   conscientious objector status to "deeply held moral" and "ethical" beliefs. *Welsh*, 398 U.S. at

18   344. In *Seeger*, the Court observed:

19        [B]oth morals and sound policy require that the state should not violate the conscience
          of the individual. All our history gives confirmation to the view that liberty of con-
20        science has a moral and social value which makes it worthy of preservation at the hands
          of the state. So deep in its significance and vital, indeed, is it to the integrity of man's
21        moral and spiritual nature that nothing short of the self-preservation of the state should
          warrant its violation.

22

23

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   *States v. Seeger*, 380 U.S. 163, 170 (1965) (quoting Stone, The Conscientious Objector, 21 Col.

2   Univ. Q. 253, 269 (1919). The history of the military conscientious objection shows that the

3   right of conscience is deeply rooted in our traditions and has been steadily broadened.

4         **2.    The Right of Conscientious Objection to Abortion.**

5       Legislative protection of conscientious objection for medical providers sprung up over-

6   night following the 1973 U.S. Supreme Court decision in *Roe v. Wade*. A full 47 out of 50

7   states protect health care practitioners' right of conscience to some degree, many providing full

8   exemptions to any health care practitioner who conscientiously refuses to participate in an

9   abortion. Robin Fretwell Wilson, *Matters of Conscience: Lessons for Same-Sex Marriage from*

10   *the Healthcare Context*, in *Same Sex Marriage And Religious Liberty* 90-91 (Douglas Laycock

11   et al. eds. 2008) (summarizing the right of conscientious objection in the medical field).

12       Congress immediately passed the Church Amendment, which prohibits the government

13   from requiring health care professionals or institutions, as a condition of receiving federal

14   funds, to assist in any abortion in violation of their "religious beliefs or moral convictions."

15   Health Programs Extension Act § 401, Pub. L. No. 93-45, 87 Stat. 91, 95 (June 18, 1973), codi-

16   fied at 42 U.S.C. § 300a-7(b)-(c)(1). Other federal laws passed in the 1970s prohibit medical

17   facilities that receive federal funds from discriminating against any medical provider who ob-

18   jects to participating in an abortion on grounds of conscience. 42 U.S.C. § 300a-7(c)(1). These

19   amendments remain in force and have been joined by many others.[15]

20

21

---

22   [15] *See, e.g.*, 42 U.S.C. § 300a-7(c)(2) (conscientious objections in medical research); 42 U.S.C. § 300a-7(d) (conscientious objections in health service programs and research activities); 42 U.S.C. § 300a-7(e) (conscientious objections to abortion by participants in medical training programs); 42 U.S.C. § 238n (conscientious objections to abortion by health care entities or training programs); Consolidated Appropriations Act, 2008, Public Law No.

23   110-161, Div. G, § 508(d), 121 Stat. 1844, 2209 (Dec. 26, 2007) ("Weldon Amendment") (annual appropriations

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

On the same day it decided *Roe v. Wade*, the Supreme Court also decided *Doe v. Bolton*, which struck down Georgia's criminal abortion statute. In *Doe*, the Court recognized that protecting conscientious objectors was appropriate:

> Under [Georgia law], the [denominational] hospital is free not to admit a patient for an abortion. . . . Further a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure. These provisions obviously are in the statute *in order to afford appropriate protection to the individual and to the denominational hospital.*

410 U.S. 179, 197-98 (1973)(emphasis added). In the wake of *Roe*, plaintiffs brought numerous lawsuits attempting to compel public hospitals to provide abortions. But federal courts repeatedly held that the liberty interest recognized in *Roe* was not sufficient to overcome the right of conscientious objection approved in *Doe.*[16]

Washington state has enacted a similar right of conscience regarding abortion that protects any "person," including pharmacists and pharmacies. RCW 9.02.150. Washington also enacted in the context of the state's basic health plan (RCW 70.47.160) and health insurance (RCW 48.43.065) statutes that recognize this fundamental right:

> The legislature recognizes that every individual possesses a fundamental right to exercise their religious beliefs and conscience. . . . No individual health care provider . . . may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion.

---

provision stripping federal, state, and local governments of certain federal funds if they discriminate against health care entities that refuse to participate in abortion).

[16] *See, e.g., Doe v. Hale Hospital*, 500 F.2d 144, 147 (1st Cir. 1974) ("Nor does this order require that any individual ... participate or assist in any way in the performance of these abortions if that person as a matter of conscience objects to so doing."); *Doe v. Poelker*, 515 F.2d 541, 546 (8th Cir. 1975), *rev'd on other grounds*, 432 U.S. 519 (1977) (order to allow abortions "should not require that any present member of the staff of the public hospitals ... participate or assist in any way in the performance of abortions if, as a matter of conscience, he objects to so doing."); *Wolfe v. Schroering*, 541 F.2d 523, 527 (6th Cir. 1976) ("We are of the view that the conscience clause may constitutionally permit ... physicians, nurses and employees to refuse to perform or participate in performing abortions for 'ethical..., moral, religious or professional reasons.'").

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 46
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206·682·0565 Fax: 206·625·1052

1   This statute, enforced by the Insurance Commissioner, authorizes insurance carriers to allow

2   health care providers to refuse on conscience grounds and refer to a nearby provider.[17]

3        The right to refuse to take prenatal life springs from the same deeply-rooted traditions

4   as military conscientious objection.

5        **3.      The Right of Conscientious Objection to Assisted Suicide Laws.**

6        The fundamental right to refuse to take human life was extended to physician-assisted

7   suicide without controversy or debate. Presently, only two states - Oregon and Washington -

8   have statutory schemes that authorize assisted suicide, both of which are recent developments

9   in the law. Both statutes make explicit that medical providers constrained by conscience from

10  assisting in taking innocent life are exempt. ORS 127.885(4). Washington, which modeled its

11  assisted suicide statute on Oregon's, adopted a similar exemption that allows medical provid-

12  ers, including pharmacists, to refuse to participate in the taking of innocent life. RCW

13  70.245.190(1)(d).[18] No one rejects this right of conscientious objection because it is so deeply

14  rooted in the conscience of the people.

15       **4.      The Right of Conscientious Objection to State Executions.**

16       States recognize the right of conscience of state correctional personnel whose duties

17  may involve participating in state sanctioned capital punishment. For example, Oregon De-

18  _____

    [17] The Insurance Commissioner's Rule 30(b)(6) witness testified regarding RCW 43.48.065:

19

20      Q.      And if a carrier reported back to you our policy is that we will require a doctor which will not
            write a Plan B prescription notify the patient and refer the patient to a nearby provider who will provide
            the Plan B prescription within the Olympia area, would that be an adequate mechanism?

21      A.      That would be an adequate mechanism.

22  Ex. 53.  It is precisely the fundamental right to refuse to participate in taking human life and refer a patient that
    Plaintiffs seek, but are denied by the Regulations, while a physician refusing to write a Plan B prescription is per-

23  mitted to refer the patient under RCW 43.48.065.

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 47
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206·682·0565 Fax: 206·625·1052

1   partment of Corrections regulations provide: "(b) Conscience Clause: Except as provided by

2   statute, no employee of the Department of Corrections shall be required to participate in the

3   execution of an inmate sentenced to death." Or. 291-024-0005 (2009).[19] Thus, even for state

4   correctional workers, it is widely recognized the state should not force them to take human life

5   in violation of conscience.

6   ## 5.   The Right of Conscientious Objection in Foreign and International Law.

7   Nor are protections for conscientious objectors unique to the United States. Many for-

8   eign countries provide analogous, and sometimes even stronger, protections for conscience in

9   the health care field. In the United Kingdom, for example, the first statute legalizing abortion in

10  1967 provided an exemption for conscientious objectors: "no person shall be under any duty, . .

11  . to participate in any treatment authorized by this Act to which he has a conscientious objec-

12  tion." Abortion Act 1967 (c. 87). Similar protections are provided in the laws of many other

13  western countries, including Australia, Austria, Belgium, Cyprus, Denmark, France, Germany,

14  Hungary, Ireland, Italy, New Zealand, Portugal, and Spain. [20]

15  Although not in the direct tradition of the United States, the international community

16  has also acknowledged a right of conscience. The United Nations Universal Declaration of

17  Human Rights, adopted by the General Assembly of the United Nations in 1948, declares:

18

---

19  [18] The Board members and staff testified in deposition that an exemption was appropriate because pharmacists should do no harm and that includes not being coerced into participating in taking human life against a pharmacist's objection. Ex. 5 (Fuller Dep., 32:12-34:25).

20  [19] *See also,* Cal. Penal Code § 3605 (West 2002); Fla. Stat. § 922.105 (2009); Ga. Code Ann. § 17-10-38 (2009); 75 Ill. Comp. Stat. 5/119-5 (2003); La. Rev. Stat. Ann. § 15:569 (2005); Ariz. Dep't of Corr., Dep't Order 710

21  (2009); Dep't of Corr., State of Conn., Directive No. 6.15 (2004); Idaho Dep't of Corr. Standard Operating Procedure 135.02.01.001 (2006); 501 Ky. Admin. Regs. 16:320 (2010); Dep't of Corr., State of Wash., Policy No. DOC 490.200 (2008)

22  [20] http://www.aph.gov.au/library/pubs/rp/1998-99/99rp01.htm; http://acts2.oireachtas.ie/zza20y1979.1.html; http://www.legislation.co.nz/act/public/1977/0112/latest/DLM17680.html; *See generally*

23  *http://ec.europa.eu/justice_home/cfr_cdf/doc/avis/2005_4_en.pdf* (last viewed April 23, 2010)

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 48
**119652 (13438.00)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax. 206•625•1052

> Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

Universal Declaration of Human Rights, Art. 18. This provision has been interpreted by the UN Human Rights Committee to include a right to refrain from taking life due to a conscientious objection. UN Human Rights Committee, General Comment No. 22 (Art. 18). Even though these statements are not a product of the United States' history and tradition, the U.S. Supreme Court has expressed a willingness to look to international standards as support for the fundamental rights established under the Constitution. *See Atkins v. Virginia*, 536 U.S. 304, 316 n. 21 (2002) (looking to international laws opposed to the execution of the mentally handicapped to support the conclusion that such statutes are prohibited by the Constitution).

### 6.   The Right of Conscientious Objection in the U.S. Medical Community.

Finally, the right of conscience has long been recognized in the medical community. Since at least 1973, for example, the American Medical Association has repeatedly affirmed that "[n]either physician, hospital, nor hospital personnel shall be required to perform any act violative of personally held moral principles." Rather, "good medical practice requires only that the physician or other professional withdraw from the case, so long as the withdrawal is consistent with good medical practice." Ex. 56.

Similarly, the American Pharmacists' Association explicitly recognizes "the individual pharmacist's right to exercise conscientious refusal" and supports "the establishment of systems to ensure patient's access to legally prescribed therapy without compromising the pharmacist's right of conscientious refusal." Ex. 55.

The medical community's recognition of the right of conscience is simply one such stream of many that flow from a single source of liberty-- the fundamental right to refuse to

CONSOLIDATED RESPONSE TO STATE
DEFENDANTS' AND DEFENDANT-
INTERVENORS' MOTIONS FOR SUMMARY
JUDGMENT - 49
**119652 (13438.00)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

take human life.  The right to refuse to sell and dispense Plan B for pharmacy owners and pharmacists emanates from the same liberty.

**B.      The Conscience Regarding Human Life is Central to Liberty.**

The right to refrain from taking human life is not only deeply rooted in our nation's history, but also "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). By any measure, the refusal to take innocent human life satisfies that standard; indeed, it is more fundamental to liberty than several other rights the Supreme Court has recognized. Under *Casey*'s standard, for example, the question is whether the right involves "choices central to personal dignity and autonomy," such as "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." 505 U.S. at 851. Surely the right to refrain from taking human life is part of the right to define one's own concept of "existence, meaning and the mystery of human life." *Id.*

In every account of human ethics and morality, fidelity to conscience is closely identified with preserving one's moral integrity—the obligation to do good and avoid evil as one understands it. Edmund Pellegrino, *The Physician's Conscience, Conscience Clauses and Religious Belief*, 30 Fordham Urban Law Journal 221 (2002). To conclude that something must be done or avoided, and to act upon that moral conviction, is to live consistently with the kind of person one is and is convinced he must be. In short, an essential aspect to being human is the freedom to follow the dictates of one's conscience. To violate conscience is to do violence to one's personal identity so directly as to invite severe psychological, emotional and, many might say, spiritual turmoil.

No society, of course, can or should protect the absolute autonomy of anyone's conscience. But our society can and does protect the tradition now firmly rooted that no one may

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

be forced to take human life and violate his conscience. A simple illustration demonstrates how deeply imbedded this right is in our Nation's DNA. Suppose that the Washington State Department of Corrections is no longer able to recruit staff to assist in executions of capital criminals. Because most voters support capital punishment, the Washington State Legislature responds by enacting a new law providing that randomly selected Washington residents will be conscripted to participate directly in the execution of a convicted murderer or face forfeiture of government entitlements and business or occupation licenses. Who would not recoil at a law forcing others to take even condemned human life? That we know our reaction would be shared by most Americans is simply another form of the "deeply rooted tradition" and "conscience of our people" opposed to the state forcing a man to violate his conscience in this way.

Even a pluralistic society can agree, and has agreed since before our Nation's founding, that protecting human life is the enduring moral cord that runs through every belief system.[21] If a free society is to value and preserve the right of conscience in any form it must, at minimum, refrain from coercing its citizens to violate their conscience to take human life.

In sum, in an unbroken line of tradition, from the colonial era to the present, our nation has recognized the right to refrain from taking human life. That right has been recognized and protected, without exception, in every context in which it has been implicated—whether in the context of combating our nation's enemies, participating in the execution of a convicted criminal, or assisting in the abortion of an unborn child. And the historical pedigree of that right far outshines several of the Due Process liberty interests already recognized by the Supreme Court.

---

[21] A myriad of state and federal laws and programs affirm our Nation's support for preserving and protecting human life and potential life: first responders, public hospitals and health care, suicide prevention, publicly funded prenatal health care, government grants for R&D in the pharmaceutical and health care fields; wrongful death laws, and criminal homicide laws. Even laws permitting the terminally ill to consent to the cessation of medical care or assisted suicide erect significant safeguards to ensure the patient is terminally ill and consents to the acceleration of his death.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052

1   The right to refrain from dispensing Plan B is one more manifestation of this fundamental lib-

2   erty. Plainly, a fundamental right against such state coercion is protected by the Fourteenth

3   Amendment.

4   **C.      Plaintiffs Refuse to Stock, Sell and Dispense Plan B Because of Conscience.**

5          There can be no dispute that the Stormans, Mesler and Thelen are constrained by con-

6   science not to stock, sell or dispense Plan B because they sincerely believe it terminates inno-

7   cent human life. The Regulations force the Plaintiffs to choose between participating in taking

8   human life or losing their pharmacy licenses and losing their livelihoods. Secured by the Due

9   Process Clause of the Fourteenth Amendment, their fundamental right not to be coerced into

10  taking human life has been violated by the Regulations.

11                               **CONCLUSION**

12         Genuine issues of material fact exist with regard to Plaintiffs' Free Exercise, Title VII,

13  and Fourteenth Amendment Due Process claims. For this reason, Plaintiffs respectfully request

14  that this Court deny Defendants' motions for summary judgment.

15                                  s/ Kristen K. Waggoner

16  THE BECKET FUND FOR              ELLIS, LI & McKINSTRY PLLC
       RELIGIOUS LIBERTY             Kristen K. Waggoner, WSBA 27790
17  Luke W. Goodrich                  Steven T. O'Ban, WSBA 17265
    Lori H. Windham                   601 Union Street
18  1350 Connecticut Ave., NW         Ste. 4900
    Ste. 605                          Seattle, WA 98101-3906
19  Washington, DC 20036              Tel: 206/682-0565
    Tel: 202/349-7200                 Fax: 206/625-1052

20
21                                    ALLIANCE DEFENSE FUND
                                      Steven H. Aden
22                                    Matthew S. Bowman
                                      Alliance Defense Fund
23                                    801 G St., N.W., Suite 509
                                      Washington, DC  20001
                                      Tel.: 202/393-8690
                                      Fax: 202/347-3622

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Two Union Square
601 Union Street, Suite 4900
Seattle, WA 98101-3906
206•682•0565 Fax: 206•625•1052