Honorable Ronald B. Leighton

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STORMANS, INCORPORATED, et al., | Civil Action No. C07-5374 RBL |
| Plaintiffs, | **PLAINTIFFS' OFFER OF PROOF REGARDING MECHANISM OF ACTION OF EMERGENCY CONTRACEPTIVES RELATED TO THEIR RELIGIOUS BELIEFS** |
| vs. | |
| MARY SELECKY, Secretary of the Washington State Department of Health, et al., | |
| Defendants, | |
| and | |
| JUDITH BILLINGS, et al., | |
| Intervenors. | |

Plaintiffs hereby provide their offer of proof regarding the mechanism of action of Plan B and *ella* related to their sincerely held religious beliefs. By its Amended Order Regarding Motions in Limine date March 15, 2011 (Dkt #458), the Court excluded evidence, including expert testimony, of the mechanism of action of emergency contraceptives. In its Order, the Court permitted Plaintiffs the opportunity to submit an Offer of Proof regarding the basis for their religious beliefs. The following is Plaintiffs' Offer of Proof.

PLAINTIFFS' OFFER OF PROOF REGARDING
MECHANISM OF ACTION OF EMERGENCY
CONTRACEPTIVES (C07-5374) - 1

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

*130003 (13438.00)

1    Plaintiffs' religious beliefs prevent them from taking part in the destruction of

2  innocent human life. Plaintiffs believe that a human life begins at the union of the female

3  ovum and male sperm, or fertilization, at which point the intermingling of the maternal and

4  paternal chromosomes begins. Settled science establishes that the fertilized ovum is a living,

5  human entity. (See attached report of Dr. Bruce Carlson, October 30, 2008).

6    Plaintiffs have each reviewed the attached labeling of Plan B and *ella*, FDA directives

7  regarding Plan B and *ella*, and literature regarding the debate in the medical and

8  pharmaceutical communities concerning the mechanisms of action of Plan B and *ella,* and

9  Plaintiffs firmly believe that Plan B and *ella* can prevent implantation of a fertilized ovum.

10    The manufacturer of Plan B, Barr Pharmaceutical, states in pertinent part: "It is

11  possible that Plan B may also work by preventing fertilization of an egg (the uniting of sperm

12  with the egg) or by preventing attachment (implantation) to the uterus (womb), which usually

13  occurs beginning 7 days after release of an egg from the ovary." The FDA statement on the

14  mechanism of action indicates that Plan B "may inhibit implantation (by altering the

15  endometrium)."

16    With regard to *ella*, its effective period is longer than Plan B. The manufacturer of *ella*

17  states in its labeling: "It is possible that ella may also work by preventing attachment

18  (implantation) to the uterus." The FDA states regarding the mechanism of action: "alterations

19  to the endometrium that may affect implantation may also contribute to efficacy" of *ella.*

20  Moreover, like the abortion drug RU-486, *ella* (or Ulipristal Acetate) is a selective

21  progesterone receptor modulator (SPRM) and can induce an abortion. This is because SPRM

22  works by blocking progesterone, a hormone that is necessary for pregnancy. By blocking

23  progesterone, *ella* can kill a human embryo after implantation. Notably, at the FDA advisory

PLAINTIFFS' OFFER OF PROOF REGARDING
MECHANISM OF ACTION OF EMERGENCY
CONTRACEPTIVES (C07-5374) - 2

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

*130003 (13438.00)

1   panel meeting for *ella*, Dr. Scott Emerson, a professor of Biostatistics at the University of

2   Washington and panelist, raised the point that the low pregnancy rate for women taking *ella*

3   four or five days after intercourse suggests that the drug must have an abortifacient quality.

4   (See attached report of Americans United For Life).

5       Plaintiffs' repugnance at participating in the taking of innocent human life is deeply

6   rooted in their religious faith. The Old Testament psalmist celebrates new life in a prayer to

7   his Creator: "You knit me together in my mother's womb, I praise you because I am fearfully

8   and wonderfully made." Psalm 139. Human life is uniquely and inherently precious because it

9   is created by and in the image of God himself. Genesis 2. For each Plaintiff, their conscience

10  informed by their religious faith constrains them from participating in the ending of unborn

11  human life.

12      Plaintiffs' conviction that human life begins to develop at the point of conception is

13  shared by millions of Americans[1] and by leaders in the religious and scientific communities.

14      In his magisterial statement, *Evangelium vitae,* on the "Value and Inviolability of

15  Human Life," Pope John Paul II, stated:

16

17      Some people try to justify abortion by claiming that the result of conception, at least
        up to a certain number of days, cannot yet be considered a personal human life. But
        in fact, "from the time that the ovum is fertilized, a life is begun which is neither that

18      of the father nor the mother; it is rather the life of a new human being with his own
        growth. It would never be made human if it were not human already. This has always

19      been clear, and ... modern genetic science offers clear confirmation. It has
        demonstrated that from the first instant there is established the programme of what

20      this living being will be: a person, this individual person with his characteristic
        aspects already well determined. Right from fertilization the adventure of a human

21

22  [1] *Stenberg v. Carhart,* 530 U.S. 914, 920, 120 S.Ct. 2597 (2000) ("Millions of Americans
    believe that life begins at conception and consequently that an abortion is akin to causing the

23  death of an innocent child; they recoil at the thought of a law that would permit it.")

PLAINTIFFS' OFFER OF PROOF REGARDING
MECHANISM OF ACTION OF EMERGENCY
CONTRACEPTIVES (C07-5374) - 3

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

*130003 (13438.00)

1  life begins, and each of its capacities requires time-a rather lengthy time-to find its
2  place and to be in a position to act".

3  Even if the presence of a spiritual soul cannot be ascertained by empirical data, the
   results themselves of scientific research on the human embryo provide "a valuable
   indication for discerning by the use of reason a personal presence at the moment of
4  the first appearance of a human life: how could a human individual not be a human
   person?

5

6  Furthermore, what is at stake is so important that, from the standpoint of moral
   obligation, the mere probability that a human person is involved would suffice to
   justify an absolutely clear prohibition of any intervention aimed at killing a human
7  embryo. Precisely for this reason, over and above all scientific debates and those
   philosophical affirmations to which the Magisterium has not expressly committed
8  itself, the Church has always taught and continues to teach that the result of human
   procreation, from the first moment of its existence, must be guaranteed that
9  unconditional respect which is morally due to the human being in his or her totality
   and unity as body and spirit: "The human being is to be respected and treated as a
10  person from the moment of conception; and therefore from that same moment his
   rights as a person must be recognized, among which in the first place is the inviolable
11  right of every innocent human being to life[2]

12  Embryologists concur that the development of human beings begins with conception:

13  The development of a human being begins with fertilization, a process by which two
   highly specialized cells, the *spermatozoon* from the male and the oocyte from the
14  female, unite to give rise to a new organism, the *zygote*. [Langman, Jan. *Medical
   Embryology*. 3rd edition. Baltimore: Williams and Wilkins, 1975, p. 3]

15

16  At the moment the sperm cell of the human male meets the ovum of the female and
   the union results in a fertilized ovum (zygote), a new life has begun.... The term
   embryo covers the several stages of early development from conception to the ninth
17  or tenth week of life. [Considine, Douglas (ed.). Van Nostrand's Scientific
   Encyclopedia. 5th edition. New York: Van Nostrand Reinhold Company, 1976, p.
18  943]

19  Although life is a continuous process, fertilization is a critical landmark because,
   under ordinary circumstances, a new, genetically distinct human organism is thereby
20  formed.... The combination of 23 chromosomes present in each pronucleus results in
   46 chromosomes in the zygote. Thus the diploid number is restored and the
21  embryonic genome is formed. The embryo now exists as a genetic unity. [O'Rahilly,

22

23  [2] http://www.vatican.va/holy_father/john_paul_ii/encyclicals/documents/hf_jp-
   ii_enc_25031995_evangelium-vitae_en.html (last viewed October 31, 2011).

PLAINTIFFS' OFFER OF PROOF REGARDING
MECHANISM OF ACTION OF EMERGENCY
CONTRACEPTIVES (C07-5374) - 4

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

*130003 (13438.00)

1   Ronan and Müller, Fabiola. *Human Embryology & Teratology*. 2nd edition. New
    York: Wiley-Liss, 1996, pp. 8, 29.[3]

2

3   Accordingly, Plaintiffs are constrained by their consciences from participating in the

    taking of innocent human life which begins at conception.

4

5           Respectfully submitted this 31st day of October, 2011.

6

7   By: _/s/  Steven T. O'Ban_____.

8   Steven T. O'Ban, WSBA # 17265            THE BECKET FUND FOR RELIGIOUS
    soban@elmlaw.com                         LIBERTY
    Kristen K. Waggoner, WSBA # 27790        Luke W. Goodrich,
9   kwaggoner@elmlaw.com                     District of Columbia Bar # 977736
    2025 First Ave., Penthouse A             Eric Kniffin
10  Seattle, WA 98121                        District of Columbia Bar # 999473
    (206) 682-0565                           3000 K St., NW, Suite 220
11  Fax: (206) 625-1052

12                                           Washington, DC 20007
                                                (202) 955-0095
13  ALLIANCE DEFENSE FUND
    Benjamin W. Bull (Of Counsel),
    Arizona Bar # 09940
14  Steven H. Aden,
    Virginia Bar # 48036
15  15333 N. Pima Road, Ste. 165
    Scottsdale, AZ 85260
16  (480) 444-0020
    Fax: (480) 444-0028

17

18

19

20

21

22  _____

23  [3] http://www.princeton.edu/~prolife/articles/embryoquotes2.html (last viewed October 31,
    2011)

    PLAINTIFFS' OFFER OF PROOF REGARDING          ELLIS, LI & McKINSTRY PLLC
    MECHANISM OF ACTION OF EMERGENCY                    Attorneys at Law
                                                   2025 First Avenue, Penthouse
    CONTRACEPTIVES (C07-5374) - 5                   Seattle, WA 98121-3125
                                                  206•682•0565  Fax: 206•625•1052

    *130003 (13438.00)



| DRUG FACTS TEXT DEFINED | TYPE SIZE | TYPE FONT |
|---|---|---|
| • DRUG FACTS Title | 9 pt | Helvetica Bold Condensed Oblique |
| • DRUG FACTS CONTINUED | 8 pt | Helvetica Bold. Oblique/Helvetica Condensed |
| • HEADINGS | 8 pt | Helvetica Bold Condensed Oblique |
| • SUBHEADS/BODY TEXT | 6 pt | Helvetica Bold Condensed/Helvetica Condensed |
| | 7 pt | |
| • LEADING | <39 | |
| • # OF CHARACTERS PER INCH | 5 pt | Zapf Dingbats |
| • BULLETS | 2 ems | |
| • SPACE AFTER BULLETED SECTION | 1 pt, .5 pt | |
| • HAIRLINES, HAIRLINES | 2 spaces | |

• SPACE BETWEEN HAIRLINES AND BOX END



| DRUG FACTS TEXT DEFINED | TYPE SIZE | TYPE FONT |
|---|---|---|
| • DRUG FACTS Title | 9 pt | Helvetica Bold Condensed Oblique |
| • DRUG FACTS CONTINUED | 8 pt | Helvetica Bold Cond. Oblique/Helvetica Condensed |
| • HEADINGS | 8 pt | Helvetica Bold Condensed Oblique |
| • SUBHEADS/BODY TEXT | 6 pt | Helvetica Bold Condensed/Helvetica Condensed |
| • LEADING | 7 pt | |
| • # OF CHARACTERS PER INCH | <39 | |
| • BULLETS | 5 pt | Zapf Dingbats |
| • SPACE AFTER BULLETED SECTION | 2 ems | |
| • SPACE AFTER BULLETED SECTION | 1 pt, .5 pt | |
| • BARLINES, HAIRLINES | 2 spaces | |

• SPACE BETWEEN HAIRLINES AND BOX END



## How does Plan B® work?

Plan B® contains a dose of the hormone levonorgestrel that is higher than in a single birth control pill. Levonorgestrel has been used in birth control pills for over 35 years. Plan B® works like a birth control pill to prevent pregnancy mainly by stopping the release of an egg from the ovary. It is possible that Plan B® may also work by preventing fertilization of an egg (the uniting of sperm with the egg) or by preventing attachment (implantation) to the uterus (womb), which usually occurs beginning 7 days after release of an egg from the ovary. Plan B® will not do anything to a fertilized egg already attached to the uterus. The pregnancy will continue.

3

Plan B
LEVONORGESTREL

Plan B® (Levonorgestrel) Tablets, 0.75 mg

℞ only for women age 17 and younger

For women age 17 and younger, Plan B® is a prescription-only emergency contraceptive. Plan B® is intended to prevent pregnancy after known or suspected contraceptive failure or unprotected intercourse. Emergency contraceptive pills (like all oral contraceptives) do not protect against infection with HIV (the virus that causes AIDS) and other sexually transmitted diseases.

DESCRIPTION

Emergency contraceptive tablet. Each Plan B® tablet contains 0.75 mg of a single active steroid ingredient, levonorgestrel [18,19-Dinorpregn-4-en-20-yn-3-one-13-ethyl-17-hydroxy-, (17α)-(-)-], a totally synthetic progestogen. The inactive ingredients present are colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, and lactose monohydrate. The structural formula is as follows:

$C_{21}H_{28}O_2$   Molecular Weight: 312.45

CLINICAL PHARMACOLOGY

Emergency contraceptives are not effective if the woman is already pregnant. Plan B® is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova). In addition, it may inhibit implantation (by altering the endometrium). It is not effective once the process of implantation has begun.

Pharmacokinetics

Absorption

No specific investigation of the absolute bioavailability of Plan B® in humans has been conducted. However, literature indicates that levonorgestrel is rapidly and completely absorbed after oral administration (bioavailability about 100%) and is not subject to first pass metabolism. After a single dose of Plan B® (0.75 mg) administered to 16 women under fasting conditions, maximum serum concentrations of levonorgestrel are 14.1 ± 7.7 ng/mL (mean ± SD) at an average of 1.6 ± 0.7 hours. No formal study of the effect of food on the absorption of levonorgestrel has been undertaken.

Table 1: Pharmacokinetic Parameter Values Following Single Dose Administration of Plan B® (Levonorgestrel) Tablets 0.75 mg in Healthy Female Volunteers

| N | Means (± S.D.) | | | | | |
|---|---|---|---|---|---|---|
| | $C_{max}$ (ng/mL) | $T_{max}$ (h) | CL (L/h) | $V_d$ (L) | $T_{1/2}$ (h) | $AUC_{0-∞}$ (ng/mL/h) |
| 16 | 14.1 ± 7.7 | 1.6 ± 0.7 | 7.7 ± 2.7 | 260.0 | 24.4 ± 5.3 | 123.1 ± 50.1 |

Distribution

Levonorgestrel in serum is primarily protein bound. Approximately 50% is bound to albumin and 47.5% is bound to sex hormone binding globulin (SHBG).

Metabolism

Following a single oral dosage, levonorgestrel does not appear to be extensively metabolized by the liver. The primary metabolites are 3α,5β- and 3α,5α-tetrahydrolevonorgestrel with 16β-hydroxynorgestrel also identified. Together, these account for less than 10% of parent plasma levels. Urinary metabolites hydroxylated at the 2α and 16β positions have also been identified. Small amounts of the metabolites are present in plasma as sulfate and glucuronide conjugates.

Excretion

The elimination half-life of levonorgestrel following single dose administration as Plan B® (0.75 mg) is 24.4 ± 5.3 hours. Excretion following single dose administration as emergency contraception is unknown, but based on chronic, low-dose contraceptive use, levonorgestrel and its metabolites are primarily excreted in the urine, with smaller amounts recovered in the feces.

SPECIAL POPULATIONS

Geriatric

This product is not intended for use in geriatric (age 65 years or older) populations and pharmacokinetic data are not available for this population.

Pediatric

This product is not intended for use in pediatric (premenarchal) populations, and pharmacokinetic data are not available for this population.

Race

No formal studies have evaluated the effect of race. However, clinical trials demonstrated a higher pregnancy rate in the Chinese population with both Plan B® and the Yuzpe regimen (another form of emergency contraception consisting of two doses of ethinyl estradiol 0.1 mg + levonorgestrel 0.5 mg). The reason for this apparent increase in the pregnancy rate of emergency contraceptives in Chinese women is unknown.

Hepatic Insufficiency and Renal Insufficiency

No formal studies have evaluated the effect of hepatic insufficiency or renal insufficiency on the disposition of emergency contraceptive tablets.

Drug-Drug Interactions

No formal studies of drug-drug interactions were conducted.

INDICATIONS & USAGE

For women age 17 and younger, Plan B® is a prescription-only emergency contraceptive that can be used to prevent pregnancy following unprotected intercourse or a known or suspected contraceptive failure. To obtain optimal efficacy, the first tablet should be taken as soon as possible within 72 hours of intercourse. The second tablet must be taken 12 hours later.

Clinical Studies

A double-blind, controlled clinical trial in 1,955 evaluable women compared the efficacy and safety of Plan B® (one 0.75 mg tablet of levonorgestrel taken within 72 hours of intercourse, and one tablet taken 12 hours later) to the Yuzpe regimen (two tablets of 0.25 mg levonorgestrel and 0.05 mg ethinyl estradiol, taken within 72 hours of intercourse, and two tablets taken 12 hours later). Plan B® was at least as effective as the Yuzpe regimen in preventing pregnancy. After a single act of intercourse, the expected pregnancy rate of 8% (with no contraception) was reduced to approximately 1% with Plan B®.

Emergency contraceptives are not as effective as routine contraception since their failure rate, while low based on a single use, would accumulate over time with repeated use (see WARNINGS). See Table 2 Below.

Table 2: Percentage of Women Experiencing an Unintended Pregnancy During the First Year of Typical Use and the First Year of Perfect Use of Contraception and the Percentage Continuing Use at the End of the First Year, United States

| Method (1) | % of Women Experiencing an Unintended Pregnancy within the First Year of Use | | % of Women Continuing Use at One Year (4) |
|---|---|---|---|
| | Typical Use[a] (2) | Perfect Use[a] (3) | |
| Chance[b] | 85 | 85 | |
| Spermicides[c] | 26 | 6 | 40 |
| Periodic Abstinence | 25 | | 63 |
| Calendar | | 9 | |
| Ovulation Method | | 3 | |
| Sympto-thermal[d] | | 2 | |
| Post-ovulation | | 1 | |
| Withdrawal | 19 | 4 | |
| Cap[e] | | | |
| Parous Women | 40 | 26 | 42 |
| Nulliparous Women | 20 | 9 | 56 |
| Sponge | | | |
| Parous Women | 40 | 20 | 42 |
| Nulliparous Women | 20 | 9 | 56 |
| Diaphragm[e] | 20 | 6 | 56 |
| Condom[f] | | | |
| Female (Reality) | 21 | 5 | 56 |
| Male | 14 | 3 | 61 |
| Pill | 5 | | 71 |
| Progestin Only | | 0.5 | |
| Combined | | 0.1 | |
| IUD | | | |
| Progesterone T | 2.0 | 1.5 | 81 |
| Copper T 380A | 0.8 | 0.6 | 78 |
| LNg 20 | 0.1 | 0.1 | 81 |
| Depo Provera | 0.3 | 0.3 | 70 |
| Norplant and Norplant-2 | 0.05 | 0.05 | 88 |
| Female Sterilization | 0.5 | 0.5 | 100 |
| Male Sterilization | 0.15 | 0.10 | 100 |

Emergency Contraceptive Pills: Treatment initiated within 72 hours after unprotected intercourse reduces the risk of pregnancy by at least 75%.[g]

Lactational Amenorrhea Method: LAM is a highly effective, temporary method of contraception.[h]

Source: Trussell J, Contraceptive efficacy. In Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Kowal D, Guest F, Contraceptive Technology: Seventeenth Revised Edition. New York, NY: Irvington Publishers, 1998.

[a] Among typical couples who initiate use of a method (not necessarily for the first time), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[b] Among couples who initiate use of a method (not necessarily for the first time) and who use it perfectly (both consistently and correctly), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[c] Among couples attempting to avoid pregnancy, the percentage who continue to use a method for one year.

[d] The percentages of women becoming pregnant in columns (2) and (3) are based on data from populations where contraception is not used and from women who cease using contraception in order to become pregnant. Among such populations, about 89% become pregnant within one year. This estimate was lowered slightly (to 85%) to represent the percentage who would become pregnant within one year among women now relying on reversible methods of contraception if they abandoned contraception altogether.

[e] Foams, creams, jelly, vaginal suppositories, and vaginal film.

[f] Cervical mucus (ovulation) method supplemented by calendar in the pre-ovulatory and basal body temperature in the post-ovulatory phases.

[g] With spermicidal cream or jelly.

[h] Without spermicides.

[i] The treatment schedule is one dose within 72 hours after unprotected intercourse and a second dose 12 hours after the first dose. The Food and Drug Administration has declared the following brands of oral contraceptives to be safe and effective for emergency contraception: Ovral (1 dose is 2 white pills), Alesse (1 dose is 5 pink pills), Nordette or Levlen (1 dose is 2 light-orange pills), Lo/Ovral (1 dose is 4 white pills), Triphasil or Tri-Levlen (1 dose is 4 yellow pills).

[j] However, to maintain effective protection against pregnancy, another method of contraception must be used as soon as menstruation resumes, the frequency or duration of breastfeeds is reduced, bottle feeds are introduced, or the baby reaches six months of age.

CONTRAINDICATIONS

Progestin-only contraceptive pills (POPs) are used as a routine method of birth control over longer periods of time, and are contraindicated in some conditions. It is not known whether these same conditions apply to the Plan B® regimen consisting of the emergency use of two progestin pills. POPs however, are not recommended for use in the following conditions:
•  Known or suspected pregnancy
•  Hypersensitivity to any component of the product

WARNINGS

Plan B® is not recommended for routine use as a contraceptive. Plan B® is not effective in terminating an existing pregnancy.

Effects on Menses

Menstrual bleeding patterns are often irregular among women using progestin-only oral contraceptives and in clinical studies of levonorgestrel for postcoital and emergency contraceptive use. Some women may experience spotting a few days after taking Plan B®. At the time of expected menses, approximately 75% of women using Plan B® had vaginal bleeding similar to their normal menses, 12-13% bled more than usual, and 12% bled less than usual. The majority of women (87%) had their next menstrual period at the expected time or within ± 7 days, while 13% had a delay of more than 7 days beyond the anticipated onset of menses. If there is a delay in the onset of menses beyond 1 week, the possibility of pregnancy should be considered.

Ectopic Pregnancy

Ectopic pregnancies account for approximately 2% of reported pregnancies (19.7 per 1,000 reported pregnancies). Up to 10% of pregnancies reported in clinical studies of routine use of progestin-only contraceptives are ectopic.

(over)

---



duramed

Plan B®
(Levonorgestrel) Tablets, 0.75 mg
℞ only for women age 17 and younger
Revised APRIL 2008

11001328

Plaintiffs' Exhibit 424

A history of ectopic pregnancy need not be considered a contraindication to use of this emergency contraceptive method. Health providers, however, should be alert to the possibility of an ectopic pregnancy in women who become pregnant or complain of lower abdominal pain after taking Plan B*.

## PRECAUTIONS

### Pregnancy
Many studies have found no effects on fetal development associated with long-term use of contraceptive doses of oral progestins (POPs). The few studies of infant growth and development that have been conducted with POPs have not demonstrated significant adverse effects.

### STD/HIV
Plan B*, like progestin-only contraceptives, does not protect against HIV infection (AIDS) and other sexually transmitted diseases.

### Physical Examination and Follow-up
A physical examination is not required prior to prescribing Plan B*. A follow-up physical or pelvic examination, however, is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking Plan B*.

### Carbohydrate Metabolism
The effects of Plan B* on carbohydrate metabolism are unknown. Some users of progestin-only oral contraceptives (POPs) may experience slight deterioration in glucose tolerance, with increases in plasma insulin; however, women with diabetes mellitus who use POPs do not generally experience changes in their insulin requirements. Nonetheless, diabetic women should be monitored while taking Plan B*.

### Drug Interactions
Theoretically, the effectiveness of low-dose progestin-only pills is reduced by hepatic enzyme-inducing drugs such as the anticonvulsants phenytoin, carbamazepine, and barbiturates, and the antituberculosis drug rifampin.  No significant interaction has been found with broad-spectrum antibiotics.  It is not known whether the efficacy of Plan B* would be affected by these or any other medications.

### Nursing Mothers
Small amounts of progestin pass into the breast milk in women taking progestin-only pills for long-term contraception resulting in steroid levels in infant plasma of 1-6% of the levels of maternal plasma. However, no adverse effects due to progestin-only pills have been found on breastfeeding performance, either in the quality or quantity of the milk, or on the health, growth or development of the infant.

### Pediatric Use
Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older. Use of Plan B* emergency contraception before menarche is not indicated.

### Fertility Following Discontinuation
The limited available data indicate a rapid return of normal ovulation and fertility following discontinuation of progestin-only pills for emergency contraception and long-term contraception.

## ADVERSE REACTIONS
The most common adverse events in the clinical trial for women receiving Plan B* included nausea (23%), abdominal pain (18%), fatigue (17%), headache (17%), and menstrual changes. The table below shows those adverse events that occurred in ≥ 5% of Plan B* users.

**Table 3:  Adverse Events in ≥ 5% of Women, by % Frequency**

| Most Common Adverse Events | Plan B* Levonorgestrel |
|---|---|
| | N=977 (%) |
| Nausea | 23.1 |
| Abdominal Pain | 17.6 |
| Fatigue | 16.9 |
| Headache | 16.8 |
| Heavier Menstrual Bleeding | 13.8 |
| Lighter Menstrual Bleeding | 12.5 |
| Dizziness | 11.2 |
| Breast Tenderness | 10.7 |
| Other complaints | 9.7 |
| Vomiting | 5.6 |
| Diarrhea | 5.0 |

Plan B* demonstrated a superior safety profile over the Yuzpe regimen for the following adverse events:
* Nausea:  Occurred in 23% of women taking Plan B* (compared to 50% with Yuzpe)
* Vomiting:  Occurred in 6% of women taking Plan B* (compared to 19% with Yuzpe)

## DRUG ABUSE AND DEPENDENCE
There is no information about dependence associated with the use of Plan B*.

## OVERDOSAGE
There are no data on overdosage of Plan B*, although the common adverse event of nausea and its associated vomiting may be anticipated.

## DOSAGE AND ADMINISTRATION
One tablet of Plan B* should be taken orally as soon as possible within 72 hours after unprotected intercourse. The second tablet should be taken 12 hours after the first dose. Efficacy is better if Plan B* is taken as directed as soon as possible after unprotected intercourse. Plan B* can be used at any time during the menstrual cycle.

The user should be instructed that if she vomits within one hour of taking either dose of medication she should contact her health care professional to discuss whether to repeat that dose.

## HOW SUPPLIED
Plan B* (Levonorgestrel) Tablets, 0.75 mg are available for a single course of treatment in PVC/aluminum foil blister packages of two tablets each. The tablet is white, round and marked: INOR.

Available as:
Unit-of-use   NDC 51285-769-93
Store Plan B* tablets at controlled room temperature, 20° to 25°C (68° to 77°F); excursions permitted between 15° to 30°C (59° to 86°F) [See USP].



Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970
Phone: 1-800-330-1271    Website: www.go2planb.com

Revised APRIL 2008
BR-0038

 

**ella®**
ulipristal acetate

**Watson®**

Revised : August 2010

512890 -00

**PATIENT INFORMATION**

### FDA Approved Patient Labeling
### Patient Information
**ella** (el-uh)
**(ulipristal acetate) tablet**

Read this Patient Information Leaflet before you take **ella**. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or treatment.

### What is ella?

**ella** is a prescription emergency contraceptive that reduces your chance of becoming pregnant if your birth control fails or you have unprotected sex.

**ella** should not be used as your regular birth control. It is very important that you have a reliable form of birth control that is right for you.

**ella** will not protect you against HIV infection (AIDS) and other sexually transmitted diseases (STDs).

### Who should not take ella?

• Do not take **ella** if you know or suspect you are already pregnant. **ella** is not for use to end an existing pregnancy. Talk to your healthcare provider before taking **ella** if you think you may be pregnant.

• Do not take **ella** if you are breastfeeding, because it is not known if **ella** passes into breast milk.

### What should I tell my healthcare provider before taking ella?

See "Who should not take **ella**?"

Tell your healthcare provider about all the medicines you take, including prescription and nonprescription medicines, vitamins, and herbal supplements.

Using other medicines may affect how **ella** works. These include St. John's Wort, phenytoin, rifampin, phenobarbital, and carbamazepine. Talk to your healthcare provider if you are currently using these medications.

Talk to your healthcare provider if you use hormonal birth control. Using **ella** may make your regular hormonal birth control method less effective. After using **ella**, you should use a reliable barrier method of birth control (such as a condom with spermicide) during any other times that you have sex in that same menstrual cycle.

Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

### When is it not appropriate to use ella?

• Do not use **ella** as a regular birth control method. It does not work as well as most other forms of birth control when they are used consistently and correctly.

• Do not use **ella** if you are already pregnant.

• Do not use **ella** more than one time in the same menstrual cycle for different acts of unprotected sex or birth control failure.

### How does ella work?

**ella** is thought to work for emergency contraception primarily by stopping or delaying the release of an egg from the ovary. It is possible that **ella** may also work by preventing attachment (implantation) to the uterus.

### How should I take ella?

• Take **ella** as soon as possible within 5 days (120 hours) after unprotected sex or if you had a birth control failure.

• **ella** can be taken with or without food.

• Contact your healthcare provider right away if you vomit within 3 hours of taking **ella**. Your healthcare provider may prescribe another dose of **ella** for you.

• **ella** can be taken at any time during the menstrual cycle.

### How effective is ella?

If **ella** is taken as directed, it will reduce the chance that you will get pregnant. **ella** is not effective in every case. **ella** is only to be used for a single episode of unprotected intercourse. Be sure to use a regular birth control method the next time you have sex.

**ella** and other emergency contraceptives may be less effective in women with a body mass index (BMI) > 30 kg/m².

### What if I am already pregnant and use ella?

**ella** should not be taken if you are already pregnant. There is little information on whether **ella** would harm a developing baby. Contact your healthcare provider if you think you may be pregnant and have taken ella.

**ella** is not for use to terminate an existing pregnancy.

**ella** ulipristal acetate  Watson 

**What should I do if my menstrual period is delayed beyond 1 week or I have severe lower stomach (abdominal) pain?**

After taking **ella**, your next menstrual period may begin a few days earlier or later than expected. If your period is more than 7 days later than expected, you may be pregnant. You should get a pregnancy test and follow up with your healthcare provider.

If you have severe lower stomach (abdominal) pain about 3 to 5 weeks after taking **ella**, you may have a pregnancy outside of the uterus (womb), which is called an ectopic or tubal pregnancy. An ectopic pregnancy is a serious condition that needs medical treatment right away. Call your healthcare provider or go to the nearest emergency room right away if you think you may have an ectopic pregnancy.

**How often can I use ella?**

**ella** is meant for emergency contraception only, and is not to be used frequently or as a regular birth control. If you need to use emergency contraception often, talk to your healthcare provider and learn about methods for birth control and sexually transmitted disease prevention that are right for you.

**What are the possible side effects of ella?**

The most common side effects of **ella** include:

• headache

• nausea

• stomach (abdominal) pain

• menstrual pain (dysmenorrhea)

• tiredness

• dizziness

Some women taking **ella** may have their next period earlier or later than expected. If your period is more than a week late, you should get a pregnancy test.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all the possible side effects of **ella**. For more information, ask your healthcare provider or pharmacist.

Call your healthcare provider for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store ella?**

• Store **ella** at 68-77°F (20-25°C).

• Protect **ella** from light. Keep **ella** in the blister card inside the original box until you are ready to take it.

Do not use **ella** if the package is torn or broken.

Keep **ella** and all medicines out of the reach of children.

**General information about the safe and effective use of ella?**

Medicines are sometimes prescribed for purposes other than those in a Patient Information Leaflet. Do not use **ella** for a condition for which it was not prescribed. Do not give **ella** to other people, even if they have the same symptoms that you have. It may harm them.

In the case of an overdose, get medical help or contact a Poison Control Center right away at 1-800-222-1222. Overdose experience with **ella** is limited.

This Patient Information Leaflet summarizes the most important information about **ella**. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about **ella** that is written for health professionals.

For more information, go to www.ella-rx.com or you can contact Watson Medical Communications at 1-800-272-5525.

**What are the ingredients in ella?**

**Active ingredients:** ulipristal acetate, 30 mg.

**Inactive ingredients:** lactose monohydrate, povidone, croscarmellose sodium, and magnesium stearate.

Address medical inquiries to:
WATSON
Medical Communications
P.O. Box 1953
Morristown, NJ 07962-1953
800-272-5525

Watson

Distributed By:
Watson Pharma, Inc.
Morristown, NJ 07962 USA

Under License From:
Laboratoire HRA Pharma
75003 Paris, France

ella® is a registered trademark of
Laboratoire HRA Pharma

Manufactured By:
Osny Pharma, 95520 Osny, France; or
León Farma S.A., 24008 León, Spain

512890 00



**ella®**
ulipristal acetate

**Watson®** 
Revised: August 2010
512691-00

**ella®**
ulipristal acetate

PHYSICIAN INFORMATION

---

**HIGHLIGHTS OF PRESCRIBING INFORMATION**

These highlights do not include all the information needed to use ella safely and effectively. See full prescribing information for ella.

**ella (ulipristal acetate) tablet**
Initial U.S. Approval: 2010

**━━━━ INDICATIONS AND USAGE ━━━━**
ella is a progesterone agonist/antagonist emergency contraceptive indicated for prevention of pregnancy following unprotected intercourse or a known or suspected contraceptive failure. ella is not intended for routine use as a contraceptive. (1)

**━━ DOSAGE AND ADMINISTRATION ━━**
• One tablet taken orally as soon as possible within 120 hours (5 days) after unprotected intercourse or a known or suspected contraceptive failure. (2)
• The tablet can be taken with or without food. (2)

**━━ DOSAGE FORMS AND STRENGTHS ━━**
• 30 mg tablet (3)

**━━━━━ CONTRAINDICATIONS ━━━━━**
• Known or suspected pregnancy (4)

**━━ WARNINGS AND PRECAUTIONS ━━**
• ella is not indicated for termination of an existing pregnancy. Exclude pregnancy before administering. (5.1)
• Ectopic pregnancy: Women who become pregnant or complain of lower abdominal pain after taking ella should be evaluated for ectopic pregnancy. (5.2)
• Effect on menstrual cycle: ella may alter the next expected menses. If menses is delayed beyond 1 week, pregnancy should be ruled out. (5.5)
• ella does not protect against STI/HIV. (5.6)

**━━━━━ ADVERSE REACTIONS ━━━━━**
The most common adverse reactions (≥ 5%) in the clinical trials were headache (18%), abdominal pain (12%), nausea (12%), dysmenorrhea (9%), fatigue (6%) and dizziness (5%). (6)

To report SUSPECTED ADVERSE REACTIONS, contact Watson Laboratories, Inc. at 1-800-272-5525 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

**━━━━━━ DRUG INTERACTIONS ━━━━━━**
• Drugs or herbal products that induce certain enzymes, such as CYP3A4, may decrease the effectiveness of ella. (7)

**━━ USE IN SPECIFIC POPULATIONS ━━**
• Nursing mothers: ella is not recommended for use by breastfeeding women. (8.3)
• ella is not intended for use in premenarcheal (8.4) or postmenopausal women. (8.5)

See 17 for PATIENT COUNSELING INFORMATION
and FDA-Approved Patient Labeling          Revised: 08/2010

**FULL PRESCRIBING INFORMATION: CONTENTS\***

1 INDICATIONS AND USAGE
2 DOSAGE AND ADMINISTRATION
3 DOSAGE FORMS AND STRENGTHS
4 CONTRAINDICATIONS
5 WARNINGS AND PRECAUTIONS
  5.1 Existing Pregnancy
  5.2 Ectopic Pregnancy
  5.3 Repeated Use
  5.4 Fertility Following Use
  5.5 Effect on Menstrual Cycle
  5.6 Sexually Transmitted Infections/HIV
6 ADVERSE REACTIONS
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience
7 DRUG INTERACTIONS
  7.1 Changes in Emergency Contraceptive Effectiveness Associated with Co-Administration of Other Products
  7.2 Increase in Plasma Concentrations of ella Associated with Co-Administered Drugs
  7.3 Effects of ella on Co-Administered Drugs
8 USE IN SPECIFIC POPULATIONS
  8.1 Pregnancy
  8.2 Nursing Mothers
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Race
  8.7 Hepatic Impairment
  8.8 Renal Impairment
10 OVERDOSAGE
11 DESCRIPTION
12 CLINICAL PHARMACOLOGY
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
13 NONCLINICAL TOXICOLOGY
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
14 CLINICAL STUDIES
  14.1 Open-Label Study
  14.2 Single-Blind Comparative Study
  14.3 Pooled Analysis
16 HOW SUPPLIED/STORAGE AND HANDLING
17 PATIENT COUNSELING INFORMATION

\*Sections or subsections omitted from the full prescribing information are not listed

---

**FULL PRESCRIBING INFORMATION**

**1    INDICATIONS AND USAGE**

ella is a progesterone agonist/antagonist emergency contraceptive indicated for prevention of pregnancy following unprotected intercourse or a known or suspected contraceptive failure. ella is not intended for routine use as a contraceptive.

**2    DOSAGE AND ADMINISTRATION**

Instruct patients to take one tablet orally as soon as possible within 120 hours (5 days) after unprotected intercourse or a known or suspected contraceptive failure.

The tablet can be taken with or without food.

If vomiting occurs within 3 hours of ella intake, consideration should be given to repeating the dose.

ella can be taken at any time during the menstrual cycle.

**3    DOSAGE FORMS AND STRENGTHS**

The ella tablet is supplied as a white to off-white, round, curved tablet containing 30 mg of ulipristal acetate and is marked "ella" on both sides.

**4    CONTRAINDICATIONS**

ella is contraindicated for use in the case of known or suspected pregnancy. The risks to a fetus when ella is administered to a pregnant woman are unknown. If this drug is inadvertently used during pregnancy, the woman should be apprised of the potential hazard to the fetus. *[See Use in Specific Populations (8.1).]*

**5    WARNINGS AND PRECAUTIONS**

**5.1    Existing Pregnancy**

ella is not indicated for termination of an existing pregnancy. Existing pregnancy should be excluded before prescribing ella. If pregnancy cannot be excluded on the basis of history and/or physical examination, pregnancy testing should be performed. A follow-up physical or pelvic examination is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking ella.

**5.2    Ectopic Pregnancy**

A history of ectopic pregnancy is not a contraindication to use of this emergency contraceptive method. Healthcare providers, however, should consider the possibility of ectopic pregnancy in women who become pregnant or complain of lower abdominal pain after taking ella. A follow-up physical or pelvic examination is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking ella.

**5.3    Repeated Use**

ella is for occasional use as an emergency contraceptive. It should not replace a regular method of contraception. Repeated use of ella within the same menstrual cycle is not recommended, as safety and efficacy of repeat use within the same cycle has not been evaluated.

**5.4    Fertility Following Use**

A rapid return of fertility is likely following treatment with ella for emergency contraception; therefore, routine contraception should be continued or initiated as soon as possible following use of ella to ensure ongoing prevention of pregnancy. While there are no data about use of ella with regular hormonal contraceptives, due to its high affinity binding to the progesterone receptor, use of ella may reduce the contraceptive action of regular hormonal contraceptive methods. Therefore, after use of ella, a reliable barrier method of contraception should be used with subsequent acts of intercourse that occur in that same menstrual cycle.

**5.5    Effect on Menstrual Cycle**

After ella intake, menses sometimes occur earlier or later than expected by a few days. In clinical trials, cycle length was increased by a mean of 2.5 days but returned to normal in the subsequent cycle. Seven percent of subjects reported menses occurring more than 7 days earlier than expected, and 19% reported a delay of more than 7 days. If there is a delay in the onset of expected menses beyond 1 week, rule out pregnancy.

Nine percent of women studied reported intermenstrual bleeding after use of ella.

**5.6    Sexually Transmitted Infections/HIV**

ella does not protect against HIV infection (AIDS) or other sexually transmitted infections (STIs).

**6    ADVERSE REACTIONS**

**6.1    Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in clinical practice.

ella was studied in an open-label multicenter trial (Open-Label Study) and in a comparative, randomized, single-blind, multicenter trial (Single-Blind Comparative Study). In these studies, a total of 2,637 (1,533 + 1,104) women in the 30 mg ulipristal acetate groups were included in the safety analysis. The mean age of women who received ulipristal acetate was 24.5 years and the mean body mass index (BMI) was 25.3. The racial demographics of those enrolled were 67% Caucasian, 20% Black or African American, 2% Asian, and 12% other.

The most common adverse reactions (≥ 10%) in the clinical trials for women receiving ella were headache (18% overall) and nausea (12% overall) and abdominal pain and upper abdominal pain (12% overall). Table 1 lists those adverse reactions that were reported in ≥ 5% of subjects in the clinical studies (14).

**Table 1: Adverse Reactions in ≥ 5% of Women (%) Receiving a Single Dose of ella (30 mg Ulipristal Acetate)**

| Most Common Adverse Reactions | Open-Label Study | Single-Blind Comparative Study |
|---|---|---|
| | N = 1,533 | N = 1,104 |
| Headache | 18 | 19 |
| Nausea | 12 | 13 |
| Abdominal and upper abdominal pain | 15 | 8 |
| Dysmenorrhea | 7 | 13 |
| Fatigue | 6 | 6 |
| Dizziness | 5 | 5 |

**6.2    Postmarketing Experience**

The following adverse reactions have been identified during post-approval use of ella:

Skin and Subcutaneous Tissue Disorders: Acne

Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

**7    DRUG INTERACTIONS**

No drug interaction studies have been conducted for ella in vivo. However, in vitro data indicate that ella is predominantly metabolized by CYP3A4.

**7.1    Changes in Emergency Contraceptive Effectiveness Associated with Co-Administration of Other Products**

Drugs or herbal products that induce certain enzymes, including CYP3A4, may decrease the plasma concentrations of ella, and may decrease its effectiveness. Some drugs or herbal products that may decrease the effectiveness of ella include:

• barbiturates
• bosentan
• carbamazepine
• felbamate
• griseofulvin
• oxcarbazepine
• phenytoin
• rifampin
• St. John's Wort
• topiramate

**7.2    Increase in Plasma Concentrations of ella with Co-Administered Drugs**

CYP3A4 inhibitors such as itraconazole or ketoconazole may increase plasma concentrations of ella.

**7.3    Effects of ella on Co-Administered Drugs**

In vitro studies demonstrated that ella and its metabolite may inhibit the activity of cytochrome P450 enzymes.

**8    USE IN SPECIFIC POPULATIONS**

**8.1    Pregnancy**

Pregnancy Category X. *[See Contraindications (4).]*

Use of ella is contraindicated during pregnancy.

There are no adequate and well-controlled studies in pregnant women.

Ulipristal acetate was administered repeatedly to pregnant rats and rabbits during the period of organogenesis. No teratogenicity was noted in all pregnant rats and in all pregnant rabbits following 12 and 13 days of dosing, at doses of 1 and 1/2 the human exposure, respectively, based on body surface area (mg/m²). There were no malformations or fetuses in these studies. Adverse effects on the offspring of pregnant rats administered during the period of organogenesis through lactation at 1/24 the human exposure based on body surface area. Embryofetal lethality was noted when ulipristal acetate was administered to pregnant monkeys for the first trimester (approximately 3 times the human exposure). No embryofetal lethality was observed in pregnant rabbits with 3 times the human exposure. The human relevance of this finding is unknown.

**8.3    Nursing Mothers**

It is not known if ulipristal acetate is excreted in human breast milk. However, ulipristal acetate is detected in the breast milk of lactating rats. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from ella, breast-fed child cannot be excluded. Use of ella by nursing women is not recommended.

**8.4    Pediatric Use**

Safety and efficacy of ella have been established in women of reproductive age. Safety and efficacy are expected to be the same for postpubertal adolescents less than 18 years and for users 18 years and older. Use of ella before menarche is not indicated.

**8.5    Geriatric Use**

This product is not intended for use in postmenopausal women.

**8.6    Race**

While no formal studies have evaluated the effect of race, population pharmacokinetic study comparison of two pharmacokinetic parameters of ulipristal acetate exposure in South Asians may accelerate metabolism in African Americans. However, no difference in effectiveness or safety was observed for women of different races.

**8.7    Hepatic Impairment**

No studies have been conducted to evaluate the effect of hepatic disease on the disposition of ella.

**8.8    Renal Impairment**

No studies have been conducted to evaluate the effect of renal disease on the disposition of ella.

**10    OVERDOSAGE**

Experience with ulipristal acetate overdose is limited. In one study, single doses equivalent to up to 5 times that administered to a limited number of subjects resulted in no adverse reactions.

**11    DESCRIPTION**

The ella (ulipristal acetate) tablet for oral use contains a single active steroid ingredient, ulipristal acetate: 11β-(4-N,N-dimethylaminophenyl)-17α-acetoxy-19-norpregna-4,9-dien-3,20-dione], a synthetic progesterone agonist/antagonist which acts as lactose-monohydrate and croscarmellose sodium and magnesium stearate.

Ulipristal acetate is a white to yellow crystalline powder having a molecular weight of 475.6.

**Watson®**
Revised: August 2010
512891-00

ella®
ulipristal acetate

**Watson®**



---

**5.6   Sexually Transmitted Infections/HIV**

ella does not protect against HIV infection (AIDS) or other sexually transmitted infections (STIs).

**6   ADVERSE REACTIONS**

**6.1   Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in clinical practice.

ella was studied in an open-label multicenter trial (Open-Label Study) and in a comparative, randomized, single-blind, multicenter trial (Single-Blind Comparative Study). In these studies, a total of 2,637 (1,533 + 1,104) women in the 30 mg ulipristal acetate groups were included in the safety analysis. The mean age of women who received ulipristal acetate was 24.5 years and the mean body mass index (BMI) was 25.3. The racial demographics of those enrolled were 67% Caucasian, 20% Black or African American, 2% Asian, and 12% other.

The most common adverse reactions (≥ 10%) in the clinical trials for women receiving ella were headache (18% overall) and nausea (12% overall) and abdominal and upper abdominal pain (12% overall). Table 1 lists those adverse reactions that were reported in ≥ 5% of subjects in the clinical studies (14).

**Table 1: Adverse Reactions ≥ 5% of Women (%) Receiving a Single Dose of ella (30 mg Ulipristal Acetate)**

| Most Common Adverse Reactions | Open-Label Study  N = 1,533 | Single-Blind Comparative Study  N = 1,104 |
|---|---|---|
| Headache | 18 | 19 |
| Nausea | 12 | 13 |
| Abdominal and upper abdominal pain | 15 | 6 |
| Dysmenorrhea | 7 | 13 |
| Fatigue | 6 | 4 |
| Dizziness | 5 | 5 |

**6.2   Postmarketing Experience**

The following adverse reactions have been identified during post-approval use of ella:

Skin and Subcutaneous Tissue Disorders: Acne

Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

**7   DRUG INTERACTIONS**

No drug interaction studies have been conducted for ella in vivo. However, in vitro data indicate that ella is predominantly metabolized by CYP3A4.

**7.1   Changes in Emergency Contraceptive Effectiveness Associated with Co-Administration of Other Products**

Drugs or herbal products that induce enzymes, including CYP3A4, may decrease the plasma concentrations of ella, and may decrease its effectiveness. Some drugs or herbal products that may decrease the effectiveness of ella include:

- barbiturates
- bosentan
- carbamazepine
- felbamate
- griseofulvin
- oxcarbazepine
- phenytoin
- rifampin
- St. John's Wort
- topiramate

---

**7.2   Increase in Plasma Concentrations of ella Associated with Co-Administered Drugs**

CYP3A4 inhibitors such as itraconazole or ketoconazole may increase plasma concentrations of ella.

**7.3   Effects of ella on Co-Administered Drugs**

In vitro studies demonstrated that ella does not induce or inhibit the activity of cytochrome P450 enzymes.

**8   USE IN SPECIFIC POPULATIONS**

**8.1   Pregnancy**

Pregnancy Category X. [See Contraindications (4).]

Use of ella is contraindicated during an existing or suspected pregnancy.

There are no adequate and well controlled studies in pregnant women.

Ulipristal acetate was administered repeatedly to pregnant rats and rabbits during the period of organogenesis. Embryofetal loss was noted in all pregnant rats and in half of the pregnant rabbits following 12 and 13 days of dosing, at daily drug exposures 1/3 and 1/2 the human exposure, respectively, based on body surface area (mg/m²). There were no malformations of the surviving fetuses in these studies. Adverse effects were not observed in the offspring of pregnant rats administered ulipristal acetate during the period of organogenesis through lactation at drug exposures 1/24 the human exposure based on AUC. Administration of ulipristal acetate to pregnant monkeys for 4 days during the first trimester caused pregnancy termination in 2/5 animals at daily drug exposures 3 times the human exposure based on body surface area.

**8.3   Nursing Mothers**

It is not known if ulipristal acetate is excreted in human milk. However, ulipristal acetate is detected in milk of lactating rats. Because many drugs are excreted in human milk, risk to the breast-fed child cannot be excluded. Use of ella by breastfeeding women is not recommended.

**8.4   Pediatric Use**

Safety and efficacy of ella have been established in women of reproductive age. Safety and efficacy are expected to be the same for postpubertal adolescents less than 18 years and for users 18 years and older. Use of ella before menarche is not indicated.

**8.5   Geriatric Use**

This product is not intended for use in postmenopausal women.

**8.6   Race**

While no formal studies have evaluated the effect of race, a cross-study comparison of two pharmacokinetic studies indicated that exposure in South Asians may be different than in Caucasians and African Americans. However, no difference in efficacy and safety was observed for women of different races in clinical studies.

**8.7   Hepatic Impairment**

No studies have been conducted to evaluate the effect of hepatic disease on the disposition of ella.

**8.8   Renal Impairment**

No studies have been conducted to evaluate the effect of renal disease on the disposition of ella.

**10   OVERDOSAGE**

Experience with ulipristal acetate overdose is limited. In a clinical study, single doses equivalent to up to 4 times ella were administered to a limited number of subjects without any adverse reactions.

**11   DESCRIPTION**

The ella (ulipristal acetate) tablet for oral use contains 30 mg of a single active steroid ingredient, ulipristal acetate [17α-acetoxy-11β-(4-N,N-dimethylaminophenyl)-19-norpregna-4,9-diene-3,20-dione], a synthetic progesterone agonist/antagonist. The inactive ingredients are lactose monohydrate, povidone K-30, croscarmellose sodium and magnesium stearate.

Ulipristal acetate is a white to yellow crystalline powder which has a molecular weight of 475.6.

---

The structural formula is:



$C_{30}H_{37}NO_4$

**12   CLINICAL PHARMACOLOGY**

**12.1   Mechanism of Action**

When taken immediately before ovulation is to occur, ella postpones follicular rupture. The likely primary mechanism of action of ulipristal acetate for emergency contraception is therefore inhibition or delay of ovulation; however, alterations to the endometrium that may affect implantation may also contribute to efficacy.

**12.2   Pharmacodynamics**

Ulipristal acetate is a selective progesterone receptor modulator with antagonistic and partial agonistic effects (a progesterone agonist/antagonist) at the progesterone receptor. It binds the human progesterone receptor and prevents progesterone from occupying its receptor.

The pharmacodynamics of ulipristal acetate depends on the timing of administration in the menstrual cycle. Administration in the mid-follicular phase causes inhibition of folliculogenesis and reduction of estradiol concentration. Administration at the time of the luteinizing hormone peak delays follicular rupture by 5 to 9 days. Dosing in the early luteal phase does not significantly delay endometrial maturation but decreases endometrial thickness by 0.6 ± 2.2 mm (mean ± SD).

**12.3   Pharmacokinetics**

**Absorption**

Following a single dose administration of ella in 20 women under fasting conditions, maximum plasma concentrations of ulipristal acetate and the active metabolite monodemethyl-ulipristal acetate were 176 and 69 ng/ml and were reached at 0.9 and 1 hour, respectively.

**Figure 1: Mean (± SD) Plasma Concentration-Time Profile of Ulipristal Acetate and Monodemethyl-Ulipristal Acetate Following Single Dose Administration of 30 mg Ulipristal Acetate**



**Table 2: Pharmacokinetic Parameter Values Following Administration of ella (ulipristal acetate) Tablet 30 mg to 20 Healthy Female Volunteers under Fasting Conditions**

| | Mean (± SD) | | | | |
|---|---|---|---|---|---|
| | $C_{max}$ (ng/ml) | $AUC_{0-t}$ (ng.hr/ml) | $AUC_{0-∞}$ (ng.hr/ml) | $t_{max}$ (hr)* | $t_{1/2}$ (hr) |
| Ulipristal acetate | 176 (89) | 548 (259) | 556 (260) | 0.9 (0.5-2.0) | (6.3) |
| Monodemethyl-ulipristal acetate | 69 (26) | 240 (59) | 246 (59) | 1.00 (0.8-2.0) | 27 (6.9) |

$C_{max}$ = maximum concentration
$AUC_{0-t}$ = area under the drug concentration curve from time 0 to time of last determinable concentration
$AUC_{0-∞}$ = area under the drug concentration curve from time 0 to infinity
$t_{max}$ = time to maximum concentration
$t_{1/2}$ = elimination half-life
* Median (range)

ella®
ulipristal acetate

**Effect of food:** Administration of ella together with a high-fat breakfast resulted in approximately 40-45% lower mean $C_{max}$, a delayed $t_{max}$ (from a median of 0.75 hours to 3 hours) and 20-25% higher mean $AUC_{0-∞}$ of ulipristal acetate and monodemethyl-ulipristal acetate compared with administration in the fasting state. These differences are not expected to impair the efficacy or safety of ella to a clinically significant extent; therefore, ella can be taken with or without food.

**Distribution**

Ulipristal acetate is highly bound (> 94%) to plasma proteins, including high density lipoprotein, alpha-1-acid glycoprotein, and albumin.

**Metabolism**

Ulipristal acetate is metabolized to mono-demethylated and di-demethylated metabolites. *In vitro* data indicate that this is predominantly mediated by CYP3A4. The mono-demethylated metabolite is pharmacologically active.

**Excretion**

The terminal half-life of ulipristal acetate in plasma following a single 30 mg dose is estimated to 32.4 ± 6.3 hours.

**13   NONCLINICAL TOXICOLOGY**

**13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility**

Carcinogenicity: Carcinogenicity studies with ulipristal acetate have not been conducted.

Genotoxicity: Ulipristal acetate was not genotoxic in the Ames assay, *in vitro* mammalian assays utilizing mouse lymphoma cells and human peripheral blood lymphocytes, and in an *in vivo* micronucleus assay in mice.

Impairment of Fertility: Single oral doses of ulipristal acetate prevented ovulation in 50% of rats at 2 times the human exposure based on body surface area (mg/m²). Single doses of ulipristal acetate given on post-coital days 4 or 5 prevented pregnancy in 80-100% of rats and in 50% of rabbits when given on post-coital days 5 or 6 at drug exposures 4 and 12 times the human exposure based on body surface area. Lower doses administered for 4 days, to rats and rabbits were also effective at preventing ovulation and pregnancy.

**14   CLINICAL STUDIES**

Two multicenter clinical studies evaluated the efficacy and safety of ella. An open-label study provided the primary data to support the efficacy and safety of ulipristal acetate for emergency contraception when taken 48 to 120 hours after unprotected intercourse. A single-blind comparative study provided the primary data to support the efficacy and safety of ulipristal acetate for emergency contraception when taken 0 to 72 hours after unprotected intercourse and provided supportive data for ulipristal acetate for emergency contraception when taken > 72 to 120 hours after unprotected intercourse. Women in both studies were required to have a negative pregnancy test prior to receiving emergency contraception. The primary efficacy analyses were performed on subjects less than 36 years of age who had a known pregnancy status after taking study medication.

**Table 3: Summary of Clinical Trial Results for Women Who Received a Single Dose of ella (30 mg Ulipristal Acetate)**

|  | Open-Label Study 48 to 120 Hours* | Single-Blind Comparative Study 0 to 72 Hours* |
|---|---|---|
|  | N = 1,242 | N = 844 |
| Expected Pregnancy Rate** | 5.5 | 5.6 |
| Observed Pregnancy Rate** (95% confidence interval) | 2.2 (1.5, 3.2) | 1.9 (1.1, 3.1) |

*Time after unprotected intercourse when ella was taken

**Number of pregnancies per 100 women at risk for pregnancy

**14.1   Open-Label Study**

This study was a multicenter single-arm study conducted at 40 family planning clinics in the United States. Healthy women with a mean age of 24 years who requested emergency contraception 48 to 120 hours after unprotected intercourse received a dose of 30 mg ulipristal acetate (ella). The median BMI for the study subjects was 25.3 and ranged from 16.1 to 61.3 kg/m².

Twenty-seven pregnancies occurred in 1,242 women aged 18 to 35 years evaluated for efficacy. The number of pregnancies expected without emergency contraception was calculated based on the timing of intercourse with regard to each woman's menstrual cycle. ella statistically significantly reduced the pregnancy rate, from an expected rate of 5.5% to an observed rate of 2.2%, when taken 48 to 120 hours after unprotected intercourse.

**14.2   Single-Blind Comparative Study**

This study was a multicenter, single-blind, randomized comparison of the efficacy and safety of 30 mg ulipristal acetate (ella) to levonorgestrel (another form of emergency contraception). Subjects were enrolled at 35 sites in the U.S., the United Kingdom and Ireland, with the majority (66%) having been enrolled in the U.S. Healthy women with a mean age of 25 years who requested emergency contraception within 120 hours of unprotected intercourse were enrolled and randomly allocated to receive ella or levonorgestrel 1.5 mg. The median BMI for the study subjects was 25.3 and ranged from 14.9 to 70.0 kg/m².

In the ella group, 16 pregnancies occurred in 844 women aged 16 to 35 years when emergency contraception was taken 0 to 72 hours after unprotected intercourse. The number of pregnancies expected without emergency contraception was calculated based on the timing of intercourse with regard to each woman's menstrual cycle. ella statistically significantly reduced the pregnancy rate, from an expected 5.6% to an observed 1.9%, when taken within 72 hours after unprotected intercourse. There were no pregnancies observed in the women who were administered ella more than 72 hours after unprotected intercourse (10% of women who received ella).

**14.3   Pooled Analysis**

Data from the two studies were pooled to provide a total efficacy population of women treated with ulipristal acetate up to 120 hours after UPI. Time trend analysis for the five 24-hour intervals from 0 to 120 hours between unprotected intercourse and treatment was conducted. There were no significant differences in the observed pregnancy rates across the five time intervals.

Subgroup analysis of the pooled data by BMI showed that for women with BMI > 30 kg/m² (16% of all subjects), the observed pregnancy rate was 3.1% (95% CI: 1.7, 5.7), which was not significantly reduced compared to the expected pregnancy rate of 4.5% in the absence of emergency contraception taken within 120 hours after unprotected intercourse. In the comparative study, a similar effect was seen for the comparator emergency contraception drug, levonorgestrel 1.5 mg. For levonorgestrel, when used by women with BMI > 30 kg/m², the observed pregnancy rate was 7.4% (95% CI: 3.9, 13.4), compared to the expected pregnancy rate of 4.4% in the absence of emergency contraception taken within 72 hours after unprotected intercourse.

**16   HOW SUPPLIED/STORAGE AND HANDLING**

ella (ulipristal acetate) tablet, 30 mg is supplied in a PVC-PE-PVDC-aluminum blister. The tablet is a white off-white, round, curved tablet marked with "ella" on both sides.

NDC 52544-238-54 (1 tablet unit of use package)

Store at 20-25°C (68-77°F). [See USP controlled room temperature.]

Keep the blister in the outer carton in order to protect from light. Keep out of reach of children.

**17 PATIENT COUNSELING INFORMATION**

*[See FDA-Approved Patient Labeling]*

**Information for Patients**

• Instruct patients to take ella as soon as possible and not more than 120 hours after unprotected intercourse or a known or suspected contraceptive failure.

• Advise patients that they should not take ella if they know or suspect they are pregnant and that ella is not indicated for termination of an existing pregnancy.

• Advise patients to contact their healthcare provider immediately in case of vomiting within 3 hours of taking the tablet, to discuss whether to take another tablet.

• Advise patients to seek medical attention if they experience severe lower abdominal pain 3 to 5 weeks after taking ella, in order to be evaluated for an ectopic pregnancy.

• Advise patients to contact their healthcare provider and consider the possibility of pregnancy if their period is delayed after taking ella by more than 1 week beyond the date it was expected.

• Advise patients not to use ella as routine contraception, or to use it repeatedly in the same menstrual cycle.

• Advise patients that ella may reduce the contraceptive action of regular hormonal contraceptive methods and to use a reliable barrier method of contraception after using ella, for any subsequent acts of intercourse that occur in that same menstrual cycle.

• Inform patients that ella does not protect against HIV infection (AIDS) and other sexually transmitted diseases/infections.

• Advise patients that they should not use ella if they are breastfeeding.

**FDA-Approved Patient Labeling
Patient Information
ella (•el-uh•)
(ulipristal acetate) tablet**

Read the Patient Information Leaflet before you take ella. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or treatment.

**What is ella?**

ella is a prescription emergency contraceptive that reduces your chance of becoming pregnant if your birth control fails or you have unprotected sex.

ella should not be used as your regular birth control. It is very important that you have a reliable form of birth control that is right for you.

ella will not protect you against HIV infection (AIDS) and other sexually transmitted diseases (STDs).

**Who should not take ella?**

• Do not take ella if you know or suspect you are already pregnant. ella is not for use to end an existing pregnancy. Talk to your healthcare provider before taking ella if you think you are pregnant.

• Do not take ella if you are breastfeeding, because it is not known if ella passes into breast milk.

**What should I tell my healthcare provider before taking ella?**

See "Who should not take ella?"

Tell your healthcare provider about all the medicines you take, including prescription and nonprescription medicines, vitamins, and herbal supplements.

Using other medicines may affect how ella works. These include St. John's Wort, phenytoin, rifampin, phenobarbital, and carbamazepine. Talk to your healthcare provider if you are currently using these medications.

Talk to your healthcare provider if you use hormonal birth control. Using ella may make your regular hormonal birth control method less effective. After using ella, you should use a reliable barrier method of birth control (such as a condom with spermicide) during any other times that you have sex in that same menstrual cycle.

Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

**When is it not appropriate to use ella?**

• Do not use ella as a regular birth control method. It does not work as well as most other forms of birth control when they are used consistently and correctly.

• Do not use ella if you are already pregnant.

• Do not use ella more than one time in the same menstrual cycle for different acts of unprotected sex or birth control failure.

**How does ella work?**

ella is thought to work for emergency contraception primarily by stopping or delaying the release of an egg from the ovary. It is possible that ella may also work by preventing attachment (implantation) to the uterus.

**How should I take ella?**

• Take ella as soon as possible within 5 days (120 hours) after unprotected sex or if you had a birth control failure.

• ella can be taken with or without food.

• Contact your healthcare provider right away if you vomit within 3 hours of taking ella. Your healthcare provider may prescribe another dose of ella for you.

• ella can be taken at any time during the menstrual cycle.

**How effective is ella?**

If ella is taken as directed, it will get pregnant. ella is not effective used for a single episode of unp use a regular birth control method

ella and other emergency contra women with a body mass index (

**What if I am already pregnant ar**

ella should not be taken if you include information on whether ella Contact your healthcare provider i and have taken ella.

ella is not for use to terminate an

**What should I do if my menstr 1 week or I have severe lower st**

After taking ella, your next men days earlier or later than expected days later than expected, you may pregnancy test and follow up with

If you have severe lower stomac 5 weeks after taking ella, you m the uterus (womb), which is calle An ectopic pregnancy is a seriou treatment right away. Call your h nearest emergency room right awa ectopic pregnancy.

**How often can I use ella?**

ella is meant for emergency cont used frequently or as a regular b emergency contraception often, t and learn about methods for birth disease prevention that are right f

**What are the possible side effect**

The most common side effects of

• headache
• nausea
• stomach (abdominal) pain
• menstrual pain (dysmenorrhea
• tiredness
• dizziness

Some women taking ella may hav than expected. If your period is m get a pregnancy test.

Tell your healthcare provider if bothers you or that does not go aw

These are not all the possible information, ask your healthcare p

Call your healthcare provider for You may report side effects to FD/

**How should I store ella?**

• Store ella at 68-77°F (20-25°C

• Protect ella from light. Keep e original box until you are ready

Do not use ella if the package is t

Keep ella and all medicines out of

**General Information about the sa**

Medicines are sometimes prescr those in a Patient Information Le condition for which it was not pres people, even if they have the sam may harm them.

In the case of an overdose, co Poison Control Center right away experience with ella is limited.

This Patient Information Leaflet s information about ella. If you wo with your healthcare provider or p healthcare provider for informatio health professionals.

Watson.

**Left column (partial, cropped):**

i occurred in 1,242 women aged 18 to 35
y. The number of pregnancies expected
aception was calculated based on the
n regard to each woman's menstrual
gnificantly reduced the pregnancy rate,
.5% to an observed rate of 2.2%, when
ar unprotected intercourse.

**parative Study**

er, single-blind, randomized comparison
y of 30 mg ulipristal acetate (ella) to
form of emergency contraception).
35 sites in the U.S., the United Kingdom
ority (66%) having been enrolled in the
a mean age of 25 years who requested
within 120 hours of unprotected
and randomly allocated to receive ella
The median BMI for the study subjects
s 14.9 to 70.0 kg/m².

gnancies occurred in 844 women aged
rgency contraception was taken 0 to 72
itercourse. The number of pregnancies
ncy contraception was calculated based
with regard to each woman's menstrual
significantly reduced the pregnancy
.6% to an observed 1.9%, when taken
nprotected intercourse. There were no
the women who were administered ella
nprotected intercourse (10% of women

i were pooled to provide a total efficacy
th ulipristal acetate up to 120 hours
lysis for the five 24-hour intervals from
unprotected intercourse and treatment
vere no significant differences in the
across the five time intervals.

) pooled data by BMI showed that for
/m² (16% of all subjects), the observed
x (95% CI: 1.7, 5.7), which was not
npared to the expected pregnancy rate
r emergency contraception taken within
icted intercourse. In the comparative
is seen for the comparator emergency
norgestrel 1.5 mg. For levonorgestrel,
with BMI > 30 kg/m², the observed
, (95% CI: 3.9, 13.4), compared to the
of 4.4% in the absence of emergency
r72 hours after unprotected intercourse.

**RAGE AND HANDLING**

let, 30 mg is supplied in a PVC-PE-PVDC-
let is a white to off-white, round, curved
on both sides.

Jet unit of use package)

L [See USP controlled room temperature.]
er carton in order to protect from light.
fren.

**INFORMATION**

nt Labeling]

e ella as soon as possible and not more
unprotected intercourse or a known or
re failure.

ey should not take ella if they know or
nant and that ella is not indicated for
ng pregnancy.

act their healthcare provider immediately
within 3 hours of taking the tablet, to
e another tablet.

k medical attention if they experience
al pain 3 to 5 weeks after taking ella, in
or an ectopic pregnancy.

act their healthcare provider and consider
ancy if their period is delayed after taking
ek beyond the date it was expected.

use ella as routine contraception, or to
same menstrual cycle.

• Advise patients that ella may reduce the contraceptive action of regular hormonal contraceptive methods and to use a reliable barrier method of contraception after using ella, for any subsequent acts of intercourse that occur in that same menstrual cycle.
• Inform patients that ella does not protect against HIV infection (AIDS) and other sexually transmitted diseases/infections.
• Advise patients that they should not use ella if they are breastfeeding.

**FDA-Approved Patient Labeling**
**Patient Information**
**ella** (el-uh)
**(ulipristal acetate) tablet**

Read this Patient Information Leaflet before you take ella. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or treatment.

**What is ella?**

ella is a prescription emergency contraceptive that reduces your chance of becoming pregnant if your birth control fails or you have unprotected sex.

ella should not be used as your regular birth control. It is very important that you have a reliable form of birth control that is right for you.

ella will not protect you against HIV infection (AIDS) and other sexually transmitted diseases (STDs).

**Who should not take ella?**

• Do not take ella if you know or suspect you are already pregnant. ella is not for use to end an existing pregnancy. Talk to your healthcare provider before taking ella if you think you are pregnant.
• Do not take ella if you are breastfeeding, because it is not known if ella passes into breast milk.

**What should I tell my healthcare provider before taking ella?**

See "Who should not take ella?"

Tell your healthcare provider about all the medicines you take, including prescription and nonprescription medicines, vitamins, and herbal supplements.

Using other medicines may affect how ella works. These include St. John's Wort, phenytoin, rifampin, phenobarbital, and carbamazepine. Talk to your healthcare provider if you are currently using these medications.

Talk to your healthcare provider if you use hormonal birth control. Using ella may make your regular hormonal birth control method less effective. After using ella, you should use a reliable barrier method of birth control (such as a condom with spermicide) during any other times that you have sex in that same menstrual cycle.

Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

**When is it not appropriate to use ella?**

• Do not use ella as a regular birth control method. It does not work as well as most other forms of birth control when they are used consistently and correctly.
• Do not use ella if you are already pregnant.
• Do not use ella more than one time in the same menstrual cycle for different acts of unprotected sex or birth control failure.

**How does ella work?**

ella is thought to work for emergency contraception primarily by stopping or delaying the release of an egg from the ovary. It is possible that ella may also work by preventing attachment (implantation) to the uterus.

**How should I take ella?**

• Take ella as soon as possible within 5 days (120 hours) after unprotected sex or if you had a birth control failure.
• ella can be taken with or without food.
• Contact your healthcare provider right away if you vomit within 3 hours of taking ella. Your healthcare provider may prescribe another dose of ella for you.
• ella can be taken at any time during the menstrual cycle.

**How effective is ella?**

If ella is taken as directed, it will reduce the chance that you will get pregnant. ella is not effective in every case. ella is only to be used for a single episode of unprotected intercourse. Be sure to use a regular birth control method the next time you have sex.

ella and other emergency contraceptives may be less effective in women with a body mass index (BMI) > 30 kg/m².

**What if I am already pregnant and use ella?**

ella should not be taken if you are already pregnant. There is little information on whether ella would harm a developing baby. Contact your healthcare provider if you think you may be pregnant and have taken ella.

ella is not for use to terminate an existing pregnancy.

**What should I do if my menstrual period is delayed beyond 1 week or I have severe lower stomach (abdominal) pain?**

After taking ella, your next menstrual period may begin a few days earlier or later than expected. If your period is more than 7 days later than expected, you may be pregnant. You should get a pregnancy test and follow up with your healthcare provider.

If you have severe lower stomach (abdominal) pain about 3 to 5 weeks after taking ella, you may have a pregnancy outside of the uterus (womb), which is called an ectopic or tubal pregnancy. An ectopic pregnancy is a serious condition that needs medical treatment right away. Call your healthcare provider or go to the nearest emergency room right away if you think you may have an ectopic pregnancy.

**How often can I use ella?**

ella is meant for emergency contraception only, and is not to be used frequently or as a regular birth control. If you need to use emergency contraception often, talk to your healthcare provider and learn about methods for birth control and sexually transmitted disease prevention that are right for you.

**What are the possible side effects of ella?**

The most common side effects of ella include:

• headache
• nausea
• stomach (abdominal) pain
• menstrual pain (dysmenorrhea)
• tiredness
• dizziness

Some women taking ella may have their next period earlier or later than expected. If your period is more than a week late, you should get a pregnancy test.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all the possible side effects of ella. For more information, ask your healthcare provider or pharmacist.

Call your healthcare provider for medical advice about side effects. You may report side effects to FDA 1-800-FDA-1088.

**How should I store ella?**

• Store ella at 68-77°F (20-25°C).
• Protect ella from light. Keep ella in the blister card inside the original box until you are ready to take it.

Do not use ella if the package is torn or broken.

Keep ella and all medicines out of the reach of children.

**General information about the safe and effective use of ella:**

Medicines are sometimes prescribed for purposes other than those in a Patient Information Leaflet. Do not use ella for a condition for which it was not prescribed. Do not give ella to other people, even if they have the same symptoms that you have. It may harm them.

In the case of an overdose, get medical help or contact a Poison Control Center right away at 1-800-222-1222. Overdose experience with ella is limited.

This Patient Information Leaflet summarizes the most important information about ella. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about ella that is written for health professionals.

**Far right column:**

For more information, go to www.ella-rx.com or you can contact Watson Medical Communications at 1-800-272-5525.

**What are the ingredients in ella?**

**Active ingredient:** ulipristal acetate, 30 mg
**Inactive ingredients:** lactose monohydrate, povidone, croscarmellose sodium, and magnesium stearate.

Address medical inquiries to:
WATSON
Medical Communications
P.O. Box 1953
Morristown, NJ 07962-1953
800-272-5525

Watson.

Distributed By:
Watson Pharma, Inc.
Morristown, NJ 07962 USA

Under License From:
Laboratoire HRA Pharma
75003 Paris, France

ella® is a registered trademark of
Laboratoire HRA Pharma

Manufactured by:
Osny Pharma, 95520 Osny, France
or
Leon Farma S.A., 24008 León, Spain

512891-00



THE UNIVERSITY OF MICHIGAN

**INSTITUTE OF GERONTOLOGY**
Bruce M. Carlson, M.D., Ph.D.
~~Director~~

300 NORTH INGALLS
ANN ARBOR, MI 48109-2007
734-764-3493      Fax 734-936-2116
http://www.iog.umich.edu

October 30, 2008

Ms. Kristen Waggoner
Ellis, Li & McKinstry PLLC
601 Union Street, Suite 4900
Seattle, Washington 98011

RE: Stormans, Mesler, Thelen v. Selecky et al.
    Civil Action No. C07-5374

Dear Ms. Waggoner:

I am responding to your request to provide expert testimony in the above-mentioned case, specifically in areas involving the early human embryo and in rebuttal to the expert report of David A. Grimes, M.D.

My name is Bruce M. Carlson, M.D., Ph.D., and my present position is Professor Emeritus at the University of Michigan Medical School. From 1966-2000, I was a faculty member in the Department of Anatomy and Cell Biology and served as Chairman of that Department from 1988-2000. From 2000-2004 I was Director of the Institute of Gerontology and retired as a full-time faculty member of the University in 2006. I have also served as President of the American Association of Anatomists and President of the Association of Anatomy, Cell Biology and Neurobiology Chairpersons.

My curriculum vitae is presented as Exhibit 1. I have taught human embryology at the University of Michigan Medical School for the past 42 years and among my 12 single-authored books are two widely used textbooks of embryology - <u>Patten's Foundations of Embryology</u>, 3rd - 6th editions and <u>Human Embryology and Developmental Biology</u>, 1st - 3rd editions. The fourth edition of this text is scheduled for publication in December, 2008. I have conducted and have published the results of laboratory research on vertebrate embryos and have had extensive research contact with

1

the Patten Human Embryo Collection at the University of Michigan and the human embryo collections residing in the National Museum of Medicine in Washington, DC, as well as human embryology collections at Charles University in Prague, Czechoslovakia.

Details of my recent involvement as an expert witness and my fee schedule are appended as Exhibits 2 and 3. Source materials for this report are listed in Exhibit 4.

### The Principal Issue of This Report

A large number of people, for religious reasons, feel that upon fertilization (conception) a human embryo should be accorded the rights of and respect due to a postnatal individual. This is the belief of the plaintiffs. Fundamental to this belief are several biological issues - for example, is an embryo a living being upon fertilization of the egg and is it endowed with human qualities. These terms are very controversial because their use and the understanding of their use depend upon how they are defined. This report will approach the topic from the standpoint of biology, rather than from that of values. The principal issues to be addressed will be 1) Is the embryo living from the moment of fertilization? and 2) Is it biologically human? I shall discuss these in the context of my experience as a teacher and as a scientist who has conducted research at both ends of the life spectrum.

### The Biology of the Early Human Embryo

Fertilization (Day 1). Fertilization is a series of processes, rather than a single event. In my textbooks, I have described the process of fertilization as beginning when the sperm (spermatozoon) starts to penetrate the corona radiata (a layer of cells) that surrounds the egg (ovum) and ending with the intermingling of the maternal and paternal chromosomes within 24 hours after the sperm has actually entered the egg proper. Before fertilization, both the egg and sperm are living cells, but as the result of previous meiotic divisions each contains only half the number of chromosomes (haploid number) found in a normal somatic cell within the body. If fertilization does not occur, both the

2

egg and the sperm will die. Fertilization normally occurs within the upper third of the uterine (fallopian) tube.

After the sperm has entered the egg, its chromosomes expand, and the proteins (protamines) that bound their genetic material become replaced with another set of similar proteins, called histones. In most normal cells, histones are involved in regulating what portions of the DNA contained within the chromosomes will or will not be able to express their genetic information, whereas protamines allow the tight packing of the chromosomes that occurs as the final shaping of the spermatozoon takes place in the testis. The mitochondria present in the spermatozoon (in the midpiece) also enter the egg, but the preponderance of evidence suggests that the DNA contained in the mitochondria does not persist in the egg in a form that will significantly affect future development of the embryo. As the chromosomes from the male begin to expand, they become contained in a cellular substructure, called the male pronucleus. While this is occurring, the chromosomes contained in the nucleus of the egg divide, and the egg gives off a presumably non-functional structure called the second polar body, which contains half of the chromosomal material that was present in the egg. The remaining female chromosomal material becomes organized into a female pronucleus. During the hours of the pronuclear stage, the DNA in both the male and female pronuclei replicates - a necessary step that anticipates the first division of the fertilized egg. Late in the first day after the sperm has penetrated the egg, the membranes that surround the male and female pronuclei break down, and the chromosomes intermingle as they undergo reorganization to form a mitotic spindle apparatus that prepares the now fertilized egg (called a zygote) to undertake a typical mitotic division. This division is completed around the end of the first day, and the embryo now consists of two cells.

With fertilization, the normal diploid number of chromosomes (46 in humans) is restored, and the genetic sex of the embryo is determined, depending upon whether the sperm carried an X or a Y chromosome. Through the previous processes of meiosis and the mingling of maternal and paternal chromosomes, the zygote is a genetically unique product. The process of fertilization also causes metabolic activation of the egg. This is necessary for cleavage and subsequent development of the embryo. The fertilized egg is a living entity, and at no time before and after fertilization did life cease to exist.

3

Day 2. The first few days after fertilization are called the period of cleavage, when the embryo develops from a single-celled zygote to a structure containing more than 100 cells. As an embryologist, I use the term "embryo" to refer to all stages of development after fertilization. During the second day, each of the two cells (called blastomeres) of the embryo divides, and by the end of the second day, the embryo consists of four cells.

Day 3. During the third day, the pace of cell division in the embryo accelerates, so that by the end of the third day a typical embryo may consist of as many as 16 cells. This stage is called the morula (after the Latin term for mulberry, which it resembles). The three-day embryo is still floating freely as it descends toward the uterus within the uterine tube of the mother. Toward the end of the third day a significant developmental event begins to occur. Called compaction, it is manifest by the smoothing out of the cellular boundaries at the surface of the embryo. Accompanying compaction is the emergence of different properties between the cells at the surface of the embryo and those completely embedded within the morula. Those on the surface have begun to undergo a form of specialization that commits them to becoming cells of the future placenta, as well as other structures (extraembryonic membranes) that are not part of the embryonic body. On the other hand, those on the inside remain relatively generalized, and a number of them or their descendants will ultimately form the body of the embryo.

Day 4. The fourth day sees the number of cells in the embryo increasing, and at the same time the embryo moves from the uterine tubes into the cavity of the uterus, but it is still floating freely in the fluid lining the uterine cavity. The embryo has, by now, developed a fluid-filled cavity, called a blastocoele, and the overall embryo complex is commonly called a blastocyst. The blastocyst is still surrounded by a non-cellular membrane (the zona pellucida), which surrounded the unfertilized egg. Within the zona pellucida, the blastocyst consists of an outer layer of flattened cells, called the trophoblast. These are the cells that will form the future placenta. On the inside is a mass of cells, called the inner cell mass, which will form the body of the embryo. These cells, if removed, also represent the source of embryonic stem cells. Individual cells of the inner cell mass have the potential to form any cell of the adult body.

4

Day 5. By the fifth day, the embryo (the blastocyst) is freely floating in the uterine cavity. It has not yet implanted into the uterine lining, but in anticipation of that event, areas of the surrounding zona pellucida are becoming degraded. Soon the blastocyst will begin to become extruded from the its zona covering in a process that is commonly referred to as "hatching." The portions of the trophoblast - the outer layer of the blastocyst - that have worked their way outside the zona are adapted to adhere to the uterine lining (the endometrium) when they come into contact with it.

Days 6-7. As the blastocyst, now freed from its zonal covering, attaches and begins to sink into the endometrial lining, its outer layer becomes more specialized into the types of cells that characterize the later placenta. In the interior, the cells of the inner cell mass are undergoing intense developmental changes, and specializations are occurring within them, as well. Among the first is the formation of a thin cellular layer that appears beneath the inner cell mass. This layer, called the hypoblast, represents the precursor of the lining of the yolk sac.

Days 8-14. This is a very important period in the history of the embryo. As the overall embryo complex continues to become embedded within the endometrium, the cells descended from the former inner cell mass undergo some very complex developmental changes in a process that is called gastrulation. This results in the formation of three layers of cells, arranged almost like a stack of three pancakes, that are specific precursors of the cells and tissues of the adult body. At this point, one can definitively identify the three body axes (anteroposterior, dorsoventral and left-right).

### At What Point Does a Human Embryo Become a Human?

When an embryo should be accorded the full moral status of a postnatal individual is an issue that is based largely on a person's belief system. This question has been interpreted in a variety of ways at different times and as viewed through different lenses. Rather than repeat the litany of reasoning that would support or deny these various positions, I shall briefly discuss why individuals, such as the plaintiffs, would hold the view that upon fertilization a human embryo merits full protection.

5

A person may believe in the sanctity of the early human embryo because it is a tenet of that person's religion and that no further evidence is required. If this is the basis for the belief, it is not really discussable because it is based upon acceptance of the dogma of that religion. The plaintiffs' beliefs, however, are based on both religious teachings and their interpretation of scientific evidence.

Another determinant of a person's belief is that person's view of the status of the fertilized egg after examination of the biological evidence. Is it living? Is it human? Is it a separate individual? Is it unique? At what specific point does it become endowed with the human qualities in question? Many sophisticated biological and philosophical arguments have been posed on both sides of these issues, and these all merit serious consideration in appropriate venues, but more relevant in the context of this case is how these questions would likely be viewed by those who hold this belief.

There is little question about whether or not the zygote is living, because at no point has it or the precursor egg or sperm cells been biologically dead at the cellular level. There should also be no question that biologically the zygote is human (rather than some other species) in the adjectival sense. This can be easily confirmed by DNA analysis. Any further discussion of the humanity of the embryo at this or any other stage depends upon how "humanness" is defined by the participants in the discussion. In the vast majority of cases uniqueness can be confirmed through molecular technology, although experts can disagree about the finer points of this argument in cases such as identical twinning. Whether or not a zygote or an embryo of any age is separate depends largely upon one's definition of "separateness," especially in the relationship between the embryo and its mother. At no point in its life history is the human body precisely the same as it was even the previous second, and from fertilization to the time of death the human body has often been viewed as a constantly changing continuum with no discrete lines or periods of demarcation.

The concept of ensoulment at fertilization is an important one to many, despite the difficulties posed by embryo splitting or fusion. Similarly, arguments have focused upon the exact moment in the lengthy process of fertilization when ensoulment would occur. It is unlikely, however, that such arcane issues play a significant role in the reasoning of most individuals who believe that the earliest embryo deserves full protection.

6

Many textbooks of embryology place great emphasis on fertilization as the time when a new individual is created.  For example,

1) *There is perhaps no phenomenon in the field of biology that touches so many fundamental questions as the union of the germ cells in the act of fertilization; in this supreme event all the strands of the web of two lives are gathered in one knot from which they diverge again and are rewoven in a new individual life history,... The elements that unite are single cells, each on the point of death, but by their union a rejuvenated individual is formed, which constitutes a link in the eternal processes of Life.*  Lillie (1919).

2) *The time of fertilization represents the starting point in the life history, or ontogeny, of the individual.*  Carlson (1996).

3) *Human development begins at fertilization when a male gamete or sperm unites with a female gamete or oocyte to form a single cell, a zygote.  This highly specialized cell marks the beginning of each of us as a unique individual.*  Moore and Persaud (2008).

4) *Fertilization is the process whereby two sex cells (gametes) fuse together to create a new individual with genetic potentials derived from both parents.*  Gilbert (2000).

Of greatest relevance to this case, there are many reasons, biological, religious or philosophical, why individuals, such as the plaintiffs, would have cause to believe sincerely that upon fertilization a human embryo deserves full protection.

### Responses to the Expert Report of Dr. David A. Grimes

In his submitted opinion of September 26, 2008, Dr. Grimes places considerable emphasis on the beginning of pregnancy, the mechanism of action of Plan B, and the assertion that Plan B cannot cause abortion.  While his arguments appear to be well reasoned, in my opinion they for the most part seem to miss the point of the plaintiffs' case, namely that from the time of fertilization the human embryo deserves full protection.  Specific examples will be examined below, with his paragraph numbers as reference points.

7

#11  Because the plaintiffs believe that human life should be protected from the time of fertilization, the discussion of pregnancy's beginning upon implantation is irrelevant, because at the time of implantation the embryo has already been worthy of protection for approximately six days.

#12  The example of in vitro fertilization is an interesting one, but not relevant here because most people, who believe in the right to life, including the plaintiffs, would view the embryo developing in vitro as morally equivalent to an unimplanted embryo in the uterine tubes or uterus.  Whether or not the hypothetical woman feels that she is pregnant is not material to the main point of the plaintiffs' case.  The emphasis in this paragraph is placed upon the woman and not the status of the embryo, which is the issue in question.

#13  Again, in this paragraph, Dr. Grimes' focus is on the woman, whereas that of the plaintiffs is on the rights and status of the fertilized egg.

#14  The thrust of this paragraph depends upon one's definition of conception.  Standard medical dictionaries define conception as follows:
Dorland's Illustrated Medical Dictionary, 29[th]ed.  *Conception.  The onset of pregnancy, marked by fertilization of an oocyte by a sperm or spermatozoon; formation of a visible zygote.*
Mosby's Medical Dictionary, 7[th]ed.  *Conception. The beginning of pregnancy, usually taken to be the instant that a spermatozoon enters an ovum and forms a viable zygote.*
Stedman's Medical Dictionary, 28[th]ed.  *Conception. Fertilization of an oocyte by a sperm.*
If one accepts the definitions of conception given in these dictionaries, Plan B, despite its common designation as an emergency contraceptive, would not be a contraceptive at all if it prevents an embryo from implanting into the uterine wall.

#15-17  Regarding the mechanism of action of Plan B, the plaintiffs' concerns would only be assuaged if the scientific evidence showed that in no case does Plan B act by preventing implantation of an existing embryo.

8

#18  The time of effectiveness of Plan B is best left to other experts.

#19-22  Whether or not Plan B does or does not cause abortion depends principally upon one's definition of abortion.  Of greater relevance to the plaintiffs is the question of whether or not the use of Plan B results in the ultimate destruction of living early human embryos.

#23-25  The issues discussed in these paragraphs are not germane to this discussion, but they again focus upon the woman, rather than on the embryo.

### Summary

In my professional opinion, there are ample biological, religious and philosophical reasons to support the plaintiffs' sincere religious belief that the human embryo is deserving of protection upon the completion of fertilization.  One may or may not agree with that position, but that is not the point of the argument.

Respectfully submitted on October 30, 2008

Bruce M. Carlson, M.D., Ph.D.

9



AMERICANS
UNITED
FOR LIFE

SUBMITTED VIA EMAIL

Anna Franzonello
Staff Counsel
Americans United for Life
655 15th St. NW
Suite 410
Washington, D.C. 20005

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attn: CMS-9992-IFC2
P.O. Box 8010
Baltimore, MD 21244-8010

**Re:  file code CMS-9992-IFC2**

To whom it may concern:

Americans United for Life is deeply concerned about the guidelines and regulation
concerning preventive services for women that was issued by the Health Resources
and Services Administration (HRSA) and the Department of Health and Human
Services (HHS) on August 1, 2011.

The HRSA exceeded or abused the discretion it was granted under the Affordable
Care Act by mandating that insurance plans fully-cover "all Food and Drug
Administration approved contraceptives, sterilization procedures... ." Contrary to
the stated intent of the preventive services provision of the Affordable Care Act,
the HRSA mandate includes drugs and devices with known life-ending
mechanisms of action, including the abortion-inducing drug *ella*.

The HRSA mandate, which will coerce the consciences of many Americans by
requiring they pay for drugs and devices they have an ethical, moral, or religious
objection to, was based on an ideologically-driven recommendation from the
Institute of Medicine.

In addition, the "accommodation" for a narrowly-defined set of "religious employers" suggested by HHS fails to protect the conscience rights of many Americans, disrupts conscience protection laws of several states, and violates the principles of longstanding protections in federal law.

This comment addresses both the inappropriate over-reach of the HRSA mandate and the insufficiency of the conscience "accommodation" suggested by HHS.

1. **The HRSA guidelines violate the intent of Section 2713(a)(4) of the Affordable Care Act by including mandated coverage for drugs and devices with life-ending mechanisms of action, such as the abortion-inducing drug *ella*.**

The statutory language of Section 2713(a)(4), which was added to the Affordable Care Act[1] by amendment on December 3, 2009 and requires private insurance plans to cover certain preventive services, does not require the inclusion of "contraception" as a covered service. Further, statements offered by the amendment's author as well as statements offered during the Senate floor debate over the addition of Section 2713(a)(4) to the Act demonstrate that the amendment was intended to prevent *diseases*, not to end pregnancies. Specifically, abortion was not intended to be included under the amendment "in any way." Thus, the legislative history of the amendment suggests that by mandating coverage for "all Food and Drug Administration (FDA) approved contraceptives," which includes the abortion-inducing drug *ella*, the HRSA abused or exceeded its discretion.

a. **Section 2713(a)(4) of the Affordable Care Act does not explicitly include contraception, and the Senate floor debate over the addition of Section 2713(a)(4) to the Act demonstrates that it the amendment was intended to prevent *diseases*, not to end pregnancies.**

Senator Barbara Mikulsi (D-MD), who offered the amendment which became Section 2713(a)(4) of the Affordable Care Act, issued a press release providing the following description of her amendment:

> Services that would be covered under the Mikulski Amendment are likely to include cervical cancer screenings for a broad group of women; annual mammograms for women under 50; pregnancy and

---

[1] Pub. L. 111-148 (2010) [hereinafter ACA].

postpartum depression screenings; screenings for domestic violence; and annual women's health screenings, which would include testing for diseases that are leading causes of death for women such as heart disease and diabetes.[2]

In her prepared floor statement, Senator Mikulski again emphasized that her amendment was meant to cover life-saving, disease-preventing services, concluding:

> Often health care doesn't cover basic women's health care like mammograms and cervical cancer screenings. My amendment is about saving lives and saving money to give women access to comprehensive preventive services that are affordable and life saving.[3]

Further, during a debate over the amendment on the Senate Floor on December 3, 2009, Senator Mikulski had the following exchange with Senator Robert Casey (D-PA) in which she clarified that abortion was not intended to be covered "in any way" and, in fact, her amendment was "strictly concerned with ensuring that women get the kind of preventive screenings and treatments they need to **prevent diseases** particular to women..." (emphasis added):

> Mr. CASEY. There is one clarification I would like to ask the Senator. I know we discussed it during the HELP markup and it was not clarified at that time and thus I chose to vote against the amendment because of the possibility that it might be construed so broadly as to cover abortion. But I understand that the Senator has now clarified specifically that this amendment will not cover abortion in any way. Specifically, abortion has never been defined as a preventive service and there is neither legislative intent nor the language in this amendment to cover abortion as a preventive service or to mandate abortion coverage in any way. I ask the Senator is that correct?
>
> Ms. MIKULSKI. Yes, that is correct. This amendment does not cover abortion. Abortion has never been defined as a preventive

---

[2] Press Release, Senator Barbara Mikulski, *Mikulski Puts Women First in Health Care Debate* (November 30, 2009), *available at* http://mikulski.senate.gov/media/record.cfm?id=320304 (*last visited* Sept. 20, 2011).
[3] *Id.*

service.  This amendment is strictly concerned with ensuring that women get the kind of preventive screenings and treatments they need to prevent diseases particular to women such as breast cancer and cervical cancer.  There is neither legislative intent nor legislative language that would cover abortion under this amendment, nor would abortion coverage be mandated in any way by the Secretary of Health and Human Services.[4]

First, pregnancy is not a disease and it is, thus, illogical to include elective contraceptive-coverage through an amendment "strictly concerned" with preventing diseases.  Moreover, it is directly contrary to Senator Mikulski's assurance that abortion would not be covered "in any way" to include abortion-inducing drugs, such as *ella*, in preventive care and screenings.

> **b. Contrary to the stated intent of Section 2713(a)(4), HRSA's mandated coverage for the "all FDA-approved contraceptives" inappropriately includes drugs and devices with known life-ending mechanisms of action, including the abortion-inducing drug *ella*.**

The guidelines issued by the HRSA mandating coverage for contraceptives clarifies that its definition is broad: "All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  Such a definition includes drugs and devices with known life-ending mechanisms of action, including the abortion-inducing drug *ella*.

Like the abortion drug RU-486, Ulipristal Acetate (*ella*) is a selective progesterone receptor modulator (SPRM).  Despite its "indication" for use as "emergency contraception," *ella* – like RU-486 – can induce an abortion.[5]  This is because an

---

[4] Cong. Rec. S12274 (daily ed. Dec. 3, 2009) (colloquy between Sen. Mikulski and Sen. Casey), *available at* http://thomas.loc.gov. On December 1, 2009, Senator Mikulski stated: "There are no abortion services included in the Mikulski amendment.  It is screening for diseases that are the biggest killers for women – the silent killers of women.  It also provides family planning – but family planning as recognized by other acts." Cong. Rec. S12028 (daily ed. Dec. 1, 2009) (statement of Senator Mikulski), *available at* http://thomas.loc.gov.

[5] "The mechanism of action of ulipristal in human ovarian and endometrial tissue is identical to that of its parent compound mifepristone." D. Harrison & J.Mitroka, *Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health*, 45 Annals Pharmacotherapy 115 (Jan. 2011).

SPRM "works" by blocking progesterone, a hormone that is necessary for pregnancy.[6] By blocking progesterone, *ella* can kill a human embryo even after implantation.

Studies confirm that *ella* is harmful to an embryo.[7] The FDA's own labeling notes that *ella* may "affect implantation,"[8] and contraindicates (or advices against) use of *ella* in the case of known or suspected pregnancy. Notably, at the FDA advisory panel meeting for *ella*, Dr. Scott Emerson, a professor of Biostatistics at the University of Washington and panelist, raised the point that the low pregnancy rate for women taking *ella* four or five days after intercourse suggests that the drug *must* have an "abortifacient" quality.[9]

---

[6] Planned Parenthood materials acknowledge that chemical abortions are accomplished by blocking progesterone. *See e.g.* Planned Parenthood of Arizona, Client Information for Informed Consent: using the abortion pill, *available at* http://www.plannedparenthood.org/ppaz/images/Arizona/web-AB_by_Pill_E(1).pdf (*last visited* Sept. 1, 2011). ("Abortion pill" is a popular name for a medicine called mifepristone....It ends the pregnancy. It does this by keeping your body from making a certain hormone called progesterone. The pregnancy cannot go on without progesterone.")

[7] *See* European Medicines Agency, Evaluation of Medicines for Human Use: CHMP Assessment Report for Ellaone 16 (2009), *available at* http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Public_assessment_report/human/001027/WC500023673.pdf (*last visited* Sept. 27, 2011). *See also ella* Labeling Information (Aug. 13, 2010), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf (*last visited* Sept. 27, 2011).

[8] *ella* Labeling Information (Aug. 13, 2010), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf (*last visited* Sept. 27, 2011).

[9]*See* Transcript, Food and Drug Administration Center for Drug Evaluation and Research (CDER), Advisory Committee for Reproductive Health Drugs, June 17, 2010, *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/Repro ductiveHealthDrugsAdvisoryCommittee/UCM218560.pdf (*last visited* Sept. 26, 2011). "What's very, very bothersome here, again, to me, is that we shouldn't be seeing this much of an effect according to your presumed mechanisms of action; that if there is no abortifacient aspect of this treatment, no effect on implantation, I just can't make these numbers jive, unless there is a substantial difference in the demographics according to the women who are presenting with this sort of data. ..." "So this still comes back to this mechanism of action then. Why would we expect that if -- and I'll even concede that the primary mechanism of action might be delayed ovulation, but not in this group that's five days out from unprotected intercourse."
The response to Dr. Emerson's questions given by Dr. Erin Gainer, representing HRA Pharma, *ella*'s sponsor, acknowledged that HRA Pharma lacked sufficient data to make an assurance that *ella* did not have an abortifacient aspect, "Again, given the variability that we know when ovulation actually occurs in a given cycle, it's very hard to comment on how many of the women treated days 4 and 5 may have been post-ovulation. We don't have biochemical data on the

Other FDA-labeled "contraceptives" also have known life-ending mechanisms of action. Plan B, commonly referred to as "the morning after pill," can kill a human embryo by preventing implantation.[10]   Intrauterine Devices (IUDs) are also acknowledged to work not only by preventing conception, but by blocking implantation.[11]   Other hormonal contraceptives are also argued to change the endometrial lining making a woman's uterus "hostile" for the implantation of a human embryo.[12] The more "effective" a contraceptive drug or device is generally coincides with a mechanism of action other than preventing conception.

Notably, *ella*'s deadliness goes beyond that of any other "contraceptive" approved at the time of the Affordable Care Act's enactment. Without diminishing the legitimate and serious objections to the deceptive approval of other life-ending drugs and devices, it should be acknowledged that by approving *ella* as "contraception" the FDA has removed, not simply blurred, the line between "contraception" and "abortion" drugs. No longer is the FDA hiding behind a changed definition of pregnancy[13]; the FDA-approved "contraceptive" *ella* can work by ending an "established" pregnancy.

---

individual women included. So it is very hard to comment on where those women actually were."

[10] Plan B Approved Labeling, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021045s011_Plan_B_PRNTLBL.pdf (last visited Sept. 27, 2011). The FDA's labeling acknowledges that Plan B can prevent implantation of a human embryo.

[11] *See* http://www.womenshealth.gov/publications/our-publications/fact-sheet/birth-control-methods.pdf (last visited Sept. 27, 2011). The Department of Health and Human Services guide to "Birth Control Methods" describes among the mechanisms of action for copper IUDs, "If fertilization does occur, the IUD keeps the fertilized egg from implanting in the lining of the uterus." For hormonal IUDs the guide states, "It also affects the ability of a fertilized egg to successfully implant in the uterus."

[12] *See e.g.* Frye, *An Overview of oral contraceptives: Mechanisms of action and clinical use*, 66 Neurology S29 (2006). "[C]hanges in the endometrium may affect survival of a blastocyst within the uterus or prevent implantation." *See also* Larimore & Sanford, *Postfertilization Effects of Oral Contraceptives and Their Relationship to Informed Consent*, 9 ARCH FAM MED. 126 (2000). Citing the Food and Drug Administration "approved product information" for oral contraceptives in the Physician's Desk Reference, "Although the primary mechanism of action is inhibition of ovulation, other alterations include changes in the cervical mucus, which increase the difficulty of sperm entry into the uterus, and changes in the endometrium, which reduce the likelihood of implantation."

[13] For an overview of the "changed" definition of pregnancy, *see* Christopher Gacek, *Conceiving Pregnancy: U.S. Medical Dictionaries and Their Definitions of Conception and Pregnancy*, FRC

Though "indicated" for contraceptive use, mandated coverage for *ella* opens the door to off-label intended-abortion usage of the drug being funded by all health insurance plans. This runs directly contrary to Senator Mikulski's assurance that "nor would abortion coverage be mandated in any way…"

Significantly, *ella* was approved by the FDA several months after the Affordable Care Act was enacted and, therefore, its inclusion in the preventive services mandate was not contemplated by Congress, even if other methods of "contraception" were. While forced coverage of contraceptives in private plans is an entirely new and unprecedented concept, in the case of *ella*, a new type of "contraceptive" drug, there is not precedent for its inclusion even in government healthcare programs. Only approved by the FDA in August 2010, there can be no reliance argument made on a history of taxpayer-funding for the abortion-inducing drug *ella* through government programs that cover other contraceptives.

> c. **The HRSA guidelines came from the advice of an ideologically-driven Institute of Medicine panel.**

The Institute of Medicine (IOM), tasked with advising HRSA on what should be included in the preventive services mandate, had an abortion-advocacy bias in its panel membership as well as its invited presenters.

Dissenting from the IOM recommendation, committee member Dr. Anthony Lo Sasso criticized the committee's lack of transparency and creation of an advocacy-based recommendation,

> The committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy.[14]

---

INSIGHT PAPER (April 2009), *available at* http://www.frc.org/life--bioethics (last visited Sept. 1, 2011).
[14] COMMITTEE ON PREVENTIVE SERVICES FOR WOMEN; INSTITUTE OF MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 207 (2011) *available at* http://www.nap.edu/catalog.php?record_id=13181 (*last visited* Aug. 1, 2011).

Several members of the IOM panel have direct ties to Planned Parenthood, the nation's largest abortion provider,[15] which stands to gain financially from the IOM recommendation, as well as other openly pro-abortion organizations.[16]

A look at the organizations invited to present at the IOM's three public meetings on the preventive services mandate underscore its advocacy-based bias.[17]

Notably, at the first meeting, groups invited to speak on "women's issues" included the nation's largest abortion provider, Planned Parenthood.   Planned Parenthood, as a distributor of "contraceptives," stands to gain tremendously if insurance plans are required to cover contraceptives without co-pay, a financial stake which was never disclosed as a conflict of interest.

---

[15] According to her biography, Dr. Paula Johnson "served for many years on the board of Planned Parenthood League of Massachusetts and chaired the board from 1997-1998." *See* http://www.bphc.org/boardofhealth/boardmembers/Pages/Home.aspx (*last visited* Sept. 27, 2011); Dr. Magda Peck served as chair and vice-chair of the Board of Directors Planned Parenthood of Nebraska Council Bluffs (now Planned Parenthood of the Heartland) from 2006-2009. *See* http://www4.uwm.edu/secu/news_events/sph-dean/Peck-cv.pdf (*last visited* Sept. 27, 2011); Dr. Carol Weisman served as a member of the Affiliate Medical Committee of Planned Parenthood of Maryland from 1993-1997 and was a member of the Board of Directors of Planned Parenthood of Maryland from 1978-1984. *See* http://www.pennstatehershey.org/c/document_library/get_file?folderId=229089&name=DLFE-25907.pdf (*last visited* Sept. 27, 2011).

[16] Dr. Francisco Garcia has worked with the International Planned Parenthood Federation *See* http://orwh.od.nih.gov/about/Garcia%20(updated%202-18-10)--edited%20clean%20copy.pdf (*last visited* Sept. 27, 2011); Dr. Paula Johnson serves on the board of the Center for Reproductive Rights, an organization which seeks to expand abortion access. *See* http://www.bphc.org/boardofhealth/boardmembers/Pages/Home.aspx (*last visited* Sept. 27, 2011); Dr. Claire Brindis is a co-founder of the Bixby Center for Global and Reproductive Health.  The Bixby Center provides abortion training and runs initiatives designed to increase and expand abortion services. *See* http://bixbycenter.ucsf.edu/research/abortion.html (*last visited* Sept. 27, 2011).  Dr. Brindis also chaired the Population, Family Planning and Reproductive Health Section (PRSH) of the American Public Health Association.  The PRSH has a "task force" dedicated to abortion. *See* http://www.apha.org/membergroups/sections/aphasections/population/benefits/taskforces.htm (*last visited* Sept. 27, 2011); Dr. Angela Diaz has served as a Board Member for the Physicians for Reproductive Choice and Health. *See* http://www.prch.org/about-board-directors (*last visited* Sept. 27, 2011); and Dr. Alina Salganicoff has worked as a trainer and counselor for CHOICE, "a Philadelphia-based reproductive health care advocacy organization." *See* http://www.kff.org/womenshealth/upload/Speaker-Biographies-Women-and-Health-Care-A-National-Profile.pdf (*last visited* Sept. 27, 2011).

[17] The IOM meeting information and agendas are *available at* http://iom.edu/Activities/Women/PreventiveServicesWomen.aspx (*last visited* Sept. 27, 2011).

Other invited presenters included the National Women's Law Center which states on its website, "We're working to ensure that women have access to abortion care by protecting and advancing this fundamental right."[18] The second meeting included a presentation by a former official affiliate of Planned Parenthood, the Guttmacher Institute, whose "Guiding Principles" include working to "protect, expand and equalize access to information, services and rights that will enable women and men to … exercise the right to choose abortion."[19]

Thus, it is unsurprising with an ideologically-stacked deck, that nearly every invited presenter urged the inclusion of *all FDA-approved contraceptives* in the mandate, without addressing any conscience concerns for Americans who oppose drugs and devices with life-ending mechanisms of action.

Further, the IOM's own Report acknowledged that the panel would have considered abortion *per se* as a "preventive service" had it not been otherwise constrained by the Affordable Care Act, "Finally, despite the potential health and well-being benefits to some women, abortion services were considered to be outside of the project's scope, given the restrictions contained in the ACA."[20]

### 2. HHS' proffered conscience "accommodation" for a narrowly defined set of "religious employers" is inadequate.

The HHS regulation's proposed exemption fails to protect the serious and legitimate conscience concerns of many Americans. Instead, it disrupts the conscience protections contained in the laws of several states. The narrowly defined "accommodation" has no precedent in federal law; rather, a mandate including sterilization and abortion-inducing drugs violates the principles of long-standing federal laws protecting conscience rights.

#### a. The conscience exemption adopted by HHS fails to protect the conscience of many Americans

---

[18] National Women's Law Center, *Our Issues, Abortion, available at* http://www.nwlc.org/our-issues/health-care-%2526-reproductive-rights/abortion (*last visited* Sept. 27, 2011).

[19] Guttmacher Institute, *Mission, available at* http://www.guttmacher.org/about/mission.html (*last visited* Sept. 27, 2011).

[20] *Clinical Preventive Services for Women: Closing the Gaps*, INSTITUTE OF MEDICINE (July 19, 2011) at 21.

HHS has suggested a limited exception to the HRSA mandate, exempting a narrowly defined category of "religious employers." However, by adopting such a narrow definition, most religiously-affiliated schools, hospitals, and charitable organizations would not be included in the exception's protection. Moreover, non-religiously affiliated institutions – whose pro-life consciences are nonetheless violated by the mandate – are unquestionably left unprotected by the limited conscience protection.

### b. The guidelines and regulation issued by HRSA and HHS disrupt duly enacted state laws protecting the conscience of healthcare payers.

Mandated coverage for contraceptives is unprecedented in nearly half the states. Even those states that have adopted so-called "contraceptive equity" laws generally only apply their requirement to insurance plans that offer prescription coverage. (Therefore allowing an employer the option, albeit a difficult choice, to drop prescription coverage altogether.)  In addition, multiple states explicitly exclude certain specific FDA-labeled "contraceptives" from its mandate. Moreover, many states with religious employer exemptions adopt a more expansive definition than that provided for by the HHS regulation.  Thus, the guidelines and regulation issued by the HRSA and HHS extend beyond any coercive measure enacted by the states.  Further, the mandate stands in direct opposition to the duly enacted law of Mississippi which protects the conscience rights of healthcare payers.  Thus, the HRSA mandate and narrow HHS "accommodation" supplants the reasoned judgment of the states with an ideologically-driven coercive measure.

The state of Mississippi has chosen to statutorily protect the conscience rights of its healthcare payers.  The Mississippi law is comprehensive, and its right to decline to pay applies to any healthcare service that violates the payer's conscience, "A health-care payer has the right to decline to pay, and no health-care payer shall be required to pay for or arrange for the payment of a health-care service that violates its conscience."[21] The mandate imposed by HRSA stands in direct opposition to Mississippi's duly enacted law.

HHS is correct that the vast majority of states that have enacted contraceptive coverage laws contain an exemption for religious employers.  However, many of these states define "religious employer" more broadly than HHS, and thus the mandate and regulations would trump their state protections as well.  For example,

---

[21] Miss. Code Ann. § 41-107-9 (2004).

Nevada law exempts insurers "affiliated with a religious organization,"[22] while Missouri exempts *anyone* (not limited to religious employers) with a "moral, ethical, or religious" conscientious objection[23] and *any* health carrier "owned, operated, or controlled … by an entity that is operated pursuant to moral, ethical or religious tenets…"[24]    Missouri's reasoned judgment to protect the conscience rights all its citizens would be eviscerated by the HHS rule.

Moreover, in the states that have adopted the narrow definition of religious employer proposed by HHS, their contraceptive mandates only apply to plans that offer prescription coverage.    That means that employers still have the choice (admittedly a tough decision) to not offer prescription coverage.    In contrast, the HRSA guidelines apply to nearly *all* insurance plans and the Affordable Care Act does not offer many organizations and individuals (without a penalty) a similar escape from its coercive measure.    Even currently "grandfathered" plans will be subjected to the mandate if any number of changes is made to their plans.[25]

In addition, many states do not require coverage for *all* FDA approved contraceptives and multiple states have explicitly chosen to reject certain so-called "contraceptives" from their mandates.    For example, Arkansas clearly excludes from its mandate so-called "emergency contraception": "Nothing contained in this subchapter shall be construed to require any insurance company to provide coverage for an abortion, an abortifacient, **or any United States Food and Drug Administration-approved emergency contraception.**"[26] North Carolina likewise excludes emergency contraception,[27] while  Texas' law excludes "abortifacients or any other drug or device that terminates a pregnancy."

Other state laws clarify that their mandates are not to include abortion-inducing drugs.  Georgia law, for example, states, "Likewise, nothing contained in this Code section shall be construed to require any insurance company to provide coverage

---

[22] Nev. Rev. Stat. § 689A.047 (1999).

[23] Mo. Rev. Stat. § 376.1199 (2001).

[24] *Id.*

[25] *See* http://www.ncsl.org/documents/health/GrandfatheredPlans.pdf. (*last visited* Sept. 27, 2011). It is estimated that anywhere from 20 to51 percent of small employer plans and 23 to 66 percent of large employer plans will retain their "grandfather" status by 2013. *See* http://www.healthreform.gov/newsroom/keeping_the_health_plan_you_have.html.

[26] Ark. Stat. Ann. §23-79-1103-1104 (2005).

[27] N.C. Gen. Stat. § 58-3-178 (1999). The law excludes "The prescription drug marketed under the name "Preven" or any "equivalent drug product" as defined in G.S. 90-85.27(1)."

for abortion."[28]  Maine's law states that the mandate "may not apply to prescriptions designed to terminate a pregnancy."[29] Rhode Island's law includes, "[p]rovided, that nothing in this subsection shall be deemed to mandate or require coverage for the prescription drug RU 486."[30]  Keeping in mind that these laws, explicitly excluding the abortion drug RU-486, pre-date the approval of a substantially similar drug, *ella*, the HRSA/HHS mandated coverage preempt the principles, if not the letter, of these laws.

In addition, while the HRSA guidelines require inclusion of sterilization as a covered service, the Illinois' contraceptive mandate states, "Nothing in this Section shall be construed to require an insurance company to cover services related to permanent sterilization that requires a surgical procedure."[31]

Contrary to the HHS regulation's insinuation that its "accommodation" draws it in line with the majority of states, the HRSA and HHS guidelines and regulation are a nation-wide evisceration of existing state laws.

### a. A mandate including sterilization and abortion-inducing drugs violates the principles of long-standing federal laws protecting conscience rights.

The Affordable Care Act, states explicitly that "Nothing in this Act shall be construed to have any effect on Federal laws regarding – (i) conscience protection..."[32]  However, the mandate and regulation issued through HRSA and HHS violate the principles of long-standing federal laws that provide broad conscience protections.

Congress first addressed the issue of conscience protections just weeks after the U.S. Supreme Court decision in the *Roe v. Wade* case.[33]  In 1973, Congress passed the first of the Church Amendments (named for its sponsor, Senator Frank Church).[34]  The Amendment provides that the receipt of funding through three federal programs cannot be used as a basis to compel a hospital or individual to

---

[28] Ga. Code § 33-24-59.6 (1999).
[29] Me. Rev. Stat. Ann. Tit. 24 §2332-J (1999).
[30] R.I. Gen. Laws § 27-18-57 (2000).
[31] Ill. Rev. Stat. ch. 215 § 5/356z.4 (2003).
[32] ACA §1303(c)(2)(A)(i).
[33] 410 U.S. 113 (1973).
[34] 42 U.S.C. 3001-7.

participate in an abortion or sterilization procedure to which the hospital or individual has a moral or religious objection.

In addition, §§ c(2) and (d) of the Church Amendment provide broad protection ensuring that no "individual shall be required to perform or assist in the performance of any part of a health service program or research activity," funded in whole or in part by the federal government if doing so "would be contrary to his religious beliefs or moral convictions." Thus, the protections of the Church Amendment are broad and are not limited to abortion and sterilization.

Taken together, the original and subsequent Church Amendments protect healthcare providers from discrimination by recipients of HHS funds on the basis of their objection, because of religious belief or moral conviction, to performing or participating in *any* lawful health service or research activity.

In addition, the Hyde-Weldon Amendment, first enacted in 2005, provides that no federal, state, or local government agency or program that receives funds in the Labor/Health and Human Services appropriations bill may discriminate against a healthcare provider because the provider refuses to provide, pay for, provide coverage of, or refer for abortion.[35]

In contrast to the principles of these federal laws which recognize a right not to be coerced into participating in abortion, sterilization, and other services "contrary to his religious or moral convictions," the HRSA mandate leaves most Americans no option but to be on an insurance plan that covers the abortion-inducing drug *ella*, sterilization, and other "contraceptive" items and services to which he or she may have a sincerely held ethical, moral, or religious objection. The HRSA mandate is not a question of taxpayer-funding, but applies to all health insurance plans.

**Conclusion**

On September 9, 2009, President Obama addressed a joint session of Congress to outline his vision for a healthcare bill, and to clear up any "misunderstandings" about existing proposals.[36] Of particular note the President asserted, "And one

---

[35] Consolidated Appropriations Act 2008, Pub. L. No. 110-161, §508(d), 121 Stat. 1844, 2209 (2007).
[36] President Obama's address in its entirety, President Barack Obama, *Remarks by the President to a Joint Session of Congress on Health Care*, September 9, 2009, *available at* www.whitehouse.gov/the_press_office/Remarks-by-the-President-to-a-Joint-Session-of-Congress-on-Health-Care/.

more misunderstanding I want to clear up—under our plan, no federal dollars will be used to fund abortions, and federal conscience laws will remain in place."[37]

Unfortunately, the HRSA guidelines and HHS regulation concerning preventive services fly in the face of the President's assurance, as well as the very words of the Affordable Care Act and its legislative history.

It is not a tiny minority that stands in opposition to the HRSA mandate. In fact, more Americans oppose the mandate than support it. According to a Rasmussen poll, 46 percent oppose forcing "contraceptive" coverage, while only 39 percent approve.[38] Nor is this an issue of women versus men. Women's opinion, according to the Rasmussen poll, was nearly evenly split. Only 40 percent of women approve, while 42 percent of women oppose the mandate. Even these numbers fail to tell the entire story, considering Rasmussen did not mention that abortion-inducing drugs and devices, such as *ella*, are included in mandate.[39]

In accord with the language and history of the Affordable Care Act and the weight of public opinion, Americans United for Life implores HHS to repeal the HRSA guidelines mandating coverage for all FDA approved contraceptives and sterilization.

The damage done by the mandate will be hard to counteract once the insurance market stops accommodating conscience rights. Thus, immediate action on the part of HHS is necessary to address the inappropriate HRSA mandate.


Sincerely,

/s/ Anna Franzonello
Staff Counsel
Americans United for Life

---

[37] *Id.*

[38] *See 39% Say Health Insurance Companies Should Be Required to Cover Contraceptives*, RASSMUSSEN REPORTS, Aug. 4, 2011 *available at* http://www.rasmussenreports.com/public_content/politics/current_events/healthcare/august_2011/39_say_health_insurance_companies_should_be_required_to_cover_contraceptives (*last visited* Sept. 27, 2011).

[39] *Id.* Rather, the question posed was general, "Should health insurance companies be required by law to cover all government-approved contraceptives for women, without co-payments or other charges to the patient?"