# EXHIBIT G

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STORMANS, INCORPORATED, doing )
business as RALPH'S THRIFTWAY; )
RHONDA MESLER; and MARGO THELEN, ) Docket No. C07-5374RBL
)
        Plaintiffs, ) Tacoma, Washington
) December 9, 2011
  v. )
)
MARY SELECKY, Acting Secretary of ) VOLUME 6
the Washington State Department )
of Health, et al, )
) ROUGH DRAFT
        Defendants. )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RONALD B. LEIGHTON
UNITED STATES DISTRICT COURT JUDGE.

APPEARANCES:

For the Plaintiffs:       KRISTEN K. WAGGONER
                              STEVEN T. O'BAN
                              KATHERINE L. ANDERSON
                              Ellis, Li & McKinstry
                              Market Place Tower
                              2025 First Avenue, Penthouse A
                              Seattle, Washington  98121-3125

                              ERIC N. KNIFFIN
                              LUKE W. GOODRICH
                              Becket Fund for Religious Liberty
                              3000 K Street Northwest, Suite 220
                              Washington, DC 20007

Court Reporter:          Teri Hendrix
                              Union Station Courthouse, Rm 3130
                              1717 Pacific Avenue
                              Tacoma, Washington  98402
                              (253) 882-3831

Proceedings recorded by mechanical stenography, transcript produced by Reporter on computer.

2

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

```
 1  APPEARANCES CONTINUED:

 2  For the State Defendants:   RENE D. TOMISSER
                                 Attorney General's Office
 3                               7141 Cleanwater Drive Southwest
                                 PO Box 40126
 4                               Olympia, Washington  98504-0126

 5                               JOYCE A. ROPER
                                 Attorney General's Office
 6                               Agriculture & Health Division
                                 Post Office Box 40109
 7                               Olympia, Washington  98504-0109

 8  For the Defendant
     Intervenors:                THOMAS L. BOEDER
 9                               ANDREW L. GREENE
                                 KATHERINE DEWEESE BENNETT
10                               Perkins Coie LLP
                                 1201 Third Avenue, Suite 4800
11                               Seattle, Washington  98101-3099

12

13        REALTIME UNEDITED TRANSCRIPT IN STORMANS v. SELECKY

14      A transcript of proceedings in the above-entitled matter
    is being delivered UNEDITED and UNCERTIFIED by the official
15  court reporter at the request of counsel.
        The purchaser agrees not to disclose this realtime
16  unedited transcript in any form, written or electronic, to
    anyone who has no connection to this case.  This is an
17  unofficial transcript which should NOT be relied upon for
    purposes of verbatim citation of testimony, nor shall it be
18  cited or used in any way or at any time to rebut or contradict
    the official record or certified transcript of the
19  proceedings.  The purchaser agrees to use this realtime draft
    only for the purpose of augmenting counsel's notes and NOT to
20  quote from or cite it in any court proceeding.
        This transcript has not been checked, proofread, or
21  corrected.  It is a draft transcript, NOT a certified
    transcript.  As such it may contain computer-generated
22  mistranslations of Stenotype code or electronic transmission
    errors, resulting in inaccurate or nonsensical word
23  combinations or untranslated Stenotype or nonsensical word
    combinations or untranslated Stenotype symbols which cannot be
24  deciphered by non-Stenotypists.
        Corrections will be made during the preparation of a
25  certified transcript, resulting in differences in content,
    page and line numbers, punctuation, and formatting.
```

1 the case -- have you seen that there are situations, like
2 you've asked about today, where you can be presented with a
3 whole bunch of hypotheticals that simply don't work very well
4 under whatever rule has been adopted by the Board?
5 A.  The rules can never be so prescriptive to tell you under
6 every circumstance what to do.
7 Q.  So does the Board, in executing a rule, try to make a rule
8 that it believes will work the best for the most?
9 A.  That's correct.
10 Q.  Recognizing that there may be hypotheticals, very
11 difficult situations that the rules simply don't address very
12 well?
13 A.  Very much so.
14          MR. TOMISSER:  Thank you, Ms. Boyer.
15          THE COURT:  Mr. Boeder?
16          MR. BOEDER:  No further questions.
17                        EXAMINATION
18 BY THE COURT:
19 Q.  Ms. Boyer, you explained the professionalism of
20 pharmacists --
21 A.  Yes.
22 Q.  -- and their desire to care for their patients, right?
23 A.  Yes.
24 Q.  And that's a philosophy that has been invoked for as long
25 as the profession has been around, hasn't it?

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

1 A. I believe so.
2 Q. It's not related to the rule-making, is it?
3 A. I believe so.
4 Q. Was the Board of Pharmacy -- did it have a role in the law
5 that was passed by the state that the voters called Death With
6 Dignity? Did they counsel; did they give input?
7 A. There was some input around that. We were not a major
8 player in it, but we gave some input, yes.
9 Q. Was there input that only volunteers would have to
10 participate in Death With Dignity?
11 A. I know that's the outcome. I don't know that we
12 specifically gave input to that. The professional
13 association, the State Pharmacy Association, may have. I
14 don't know.
15 Q. But it is a law that respects conscience, does it not?
16 A. Yes, it does.
17 Q. And that's an exception from the generally applicable
18 rule, isn't it?
19 A. Yes, it is.
20 Q. Did you conjure up a reason for a discrepancy in your
21 overall philosophy when you single out the death tonic that a
22 pharmacist is going to dispense?
23 A. If I understand your question, the pharmacist
24 responsibility rule allows for opting out for conscience
25 reasons.

1  Q. Right, but they work at a pharmacy.
2  A. Yes, they do. So that there is a distinction, however.
3  Q. The pharmacy has to --
4  A. Yes.
5  Q. -- has to dispense the Death With Dignity rule?
6  A. Not the Death With Dignity but with the rules here, that's
7  right, the pharmacy --
8  Q. So why the distinction, in your mind, is there a
9  distinction for not having to dispense the material that is
10 going to take a terminally ill patient's life versus another
11 situation?
12 A. Well, the Death With Dignity was done through statute,
13 through the legislature, so not ruled on by the Board or any
14 board. But in this case, pharmacist versus pharmacy rules, I
15 liken it to a particular physician doesn't want to treat a
16 particular patient in an emergency room or in a hospital, but
17 the hospital still has the obligation to take care of the
18 patient. I have that own personal analogy since I come from a
19 hospital practice. The pharmacist can opt out, but the
20 pharmacy needs to take care of that patient.
21 Q. I am focussing on Death With Dignity now.
22 A. Okay.
23 Q. What's the difference between your explanation of the rule
24 and the application of the rule in Death With Dignity?
25 Because the Board of Pharmacy, I would take it, had some

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

1 input?
2 A. I think the Board viewed -- didn't take into account the
3 Death With Dignity statute when they were considering these
4 rules.
5 Q. I am mindful of that.
6 A. Okay.
7 Q. One predated the Death With Dignity, but your input was to
8 carve a significant philosophical bias in the Death With
9 Dignity law, wasn't it? It's going to be only for volunteers?
10 A. Yes, that's right.
11 Q. That was an exception -- that's an exceptional
12 circumstance?
13 A. It is an exceptional circumstance. I see it -- personally
14 I see it as a very exceptional circumstance.
15 Q. Is it less odious for someone who wants to provide, in a
16 pharmacy setting, a drug that's going to cause a death of a
17 life in their faith than the tonic for the terminally ill?
18 A. A very difficult situation, the ability to respond to your
19 question. I am struggling to respond to it. I think the
20 Death With Dignity is an extremely personal and extremely
21 difficult situation. That is not the general approach here.
22 Q. If a person owns a pharmacy and his faith informs him that
23 life begins at conception, and you are going to be the person,
24 the entity, that's going to deliver that drug, is that a valid
25 belief?

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

1  A.  I wouldn't question the belief.  Again, the Board's been
2  about access to care and not being a barrier.  So it's not an
3  easy dilemma.
4  Q.  Before these rules were adopted, did you work in the
5  environment, in the world of the conscience clauses in the
6  statutes, various forms of conscience, the fundamental right
7  of the individual and the right of religiously-sponsored
8  health care facilities or health care carriers?
9  A.  I did not, no.
10 Q.  When you passed these rules, did you think that there
11 would be an impact on the Catholic hospitals as to Plan B?
12 A.  We didn't discuss it.  We didn't contemplate it, let me
13 put it that way.
14 Q.  The vast majority of the public discourse was on Plan B,
15 wasn't it?
16 A.  The vast majority, yes.
17 Q.  I have seen this stuff, and it's --
18 A.  Yeah.
19 Q.  It's to distraction.  I mean, it's all about Plan B, isn't
20 it?
21 A.  The Board really didn't want it to be all about Plan B.
22 Q.  Right.  But it was a plebiscite, and there were 83 percent
23 of thousands of people who wanted to participate --
24 A.  Yes.
25 Q.  --  and vote, and voted, right?

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

1  A.  Yeah, uh-huh.
2  Q.  And there's a minority group that -- you understand that
3  the Catholic Church is opposed to emergency contraception, is
4  it not?  You know that?
5  A.  Yes.
6  Q.  You know they don't sponsor -- they don't stock it in
7  their retail pharmacy?
8  A.  But I understand that if someone were to come there, they
9  would be sent to that same emergency room within the hospital
10 to get it taken care of.
11 Q.  Now, what's your understanding of the interpretation of
12 that rule in the emergency room if they go to the emergency
13 room and they have not been a victim of sexual assault?
14 A.  I don't know because I have not worked at the Catholic
15 system.
16 Q.  Well, the decision about the constitutionality of this law
17 is based on its generally applicable rule.  It's neutral and
18 it's generally applicable.  And if the emergency room at St.
19 Joe's or Sacred Heart or Providence says we will put it in the
20 kit for sexual assault, and they will administer it in that
21 situation but not for unprotected sex, consensually, they will
22 not dispense it; do they have a different rule than
23 Mr. Stormans has?
24 A.  No, they don't have a different rule, no.
25 Q.  Do they have an exception because they are a

1  religiously-sponsored hospital?
2  A.  No, they don't have an exception.  I think what's
3  happened -- and again, the Board is complaint-driven.  When
4  the person would come to us and complain, then we would
5  investigate that complaint.  But obviously, people probably
6  don't go there for that purpose.
7  Q.  Do you know what the statistics are for poor people and
8  how much of their health care treatment is at the emergency
9  room?
10 A.  Yeah, I know it's a significant.
11 Q.  It's significant and it's growing bigger and bigger?
12 A.  Yes.
13 Q.  I have got another case that the State wants to dial back
14 the compensation for the services that are being done.  So
15 they are going to the emergency rooms --
16 A.  Yes.
17 Q.  -- in some cases?  And you are going to wait until
18 somebody comes and complains, and only then, to enforce this
19 rule in a generally-applicable fashion?
20 A.  It's the way the Board operates.  All these boards operate
21 this way.  No matter the professional board, they operate --
22 health care board -- they operate this way because to do
23 surveillance is difficult.  Now, we do have people that do
24 inspections.
25 Q.  Inspections -- I mean, they know that when they go into

1  the retail pharmacy at St. Peters that they are not going to
2  find Plan B on the shelf, aren't they?  That's what they are
3  going to find?
4  A.  Again, I don't believe they've looked for Plan B on the
5  shelf, and that may be partly because we have got this
6  proceeding going that I believe has dampened the approach to
7  it.
8  Q.  So can a Catholic Church suppress demand?  Can they put a
9  sign up, put a scriptual deal up, and when they tell somebody
10 that they don't have Plan B, they can go away and find another
11 pharmacy, and that will pass away, there will be no
12 enforcement in that situation even though there's a violation?
13 A.  No, there would be enforcement.  It's just like this sign
14 you saw from Walgreens on OxyContin.  That's relatively
15 recent.  Like I say, we are having conversations with their
16 leadership coming up.  Yeah, those are concerns.
17 Q.  Have you contemplated the standoff with the faith-based
18 institutions when you say you have to stock Plan B or you lose
19 your license?
20 A.  I haven't contemplated it, no.
21 Q.  I have contemplated little less -- little more than that
22 for four or five years.  I have tried to figure out what you
23 were going to do.
24     Do you know what the hospital situation in this state is
25 and what percentage of the facilities are in the hands of

ROUGH DRAFT ONLY -- NOT A CERTIFIED COPY!!!!!!!!!!!!!!!

1 faith-based institutions?
2 A.   It's significant, yes, I understand.
3 Q.   But you are going to enforce it across the board, not just
4 taking the low-hanging fruit, Mr. Stormans or anybody, and you
5 are going to enforce it against the pharmacies of the
6 Catholic --
7 A.   Again, the Board operates on a complaint.  If a complaint
8 comes in, we will investigate it.
9 Q.   You know, that defies common sense.  You know St. Joe's,
10 do they have a population that would have a demand for Plan B?
11 A.   Probably not.
12 Q.   The neighborhood around St. Joe's does not have a need for
13 Plan B?
14 A.   Probably the neighborhood does, but those folks probably
15 don't go there to get Plan B.
16 Q.   So we've got trained patients that will go to their own
17 place until a shopping tour by Planned Parenthood to expose
18 someone, that's right?  That's not fundamentally fair.  It's
19 got to be enforced against all of them or it's got to be
20 enforced to none of them.
21      You can put the crucifix on the door of the pharmacy, you
22 can put a sign saying it's wrong or whatever the Pope says in
23 his message, and they just go away, right, they don't have to
24 be vigilant, they don't have to be demanding.  They don't have
25 to be militant; they just walk away and go find their Plan B

1  somewhere else, right?
2  A.  Practically speaking, I think the people don't seek Plan B
3  where they assume they can't get it.
4  Q.  My God.  My God.  So he's out there, right fruit, right
5  fruit, the test marketers, they go to his store and say "do
6  you have Plan B?"  And he's honest, he says, "it violates the
7  tenet of my faith and I can't do that."  And they will picket
8  him.  They will make complaints in triplicate.  They will go
9  get him, and he'll be out, and these two women will be out.
10 And nobody will ever complain about the religiously-sponsored
11 care facilities that provide so much of our health care in
12 this state, and that hasn't surfaced in the debate in the
13 Board?
14 A.  It has not, that's right.  The Board looked at this
15 deliberately, looked at this in a more broad context, not just
16 Plan B.
17 Q.  The First Amendment implicates the rule in a serious way.
18 That's why we are here.  That's the debate.  It's not
19 OxyContin.  It may be a stupid rule, but I will enforce a
20 stupid rule that's constitutional.  It's misguided, maybe.
21 That's okay.
22     But when you draw a distinction between people of faith
23 and one guy loses his license and another person with the same
24 faith lives in anonymity, supposedly, that's troublesome.
25 That's troublesome.

1    Anyway, any questions that anybody wants?
2            MR. O'BAN:  Not from the plaintiffs, Your Honor.
3            THE COURT:  Ms. Boyer, thank you very much.
4            THE WITNESS:  Certainly.
5            THE COURT:  I meant no disrespect at all.  These are
6    tough questions, and I have spent a great deal of time toiling
7    in these fields, and I am having a tough time.
8            THE WITNESS:  Can I share one other thing?
9            THE COURT:  Yes.
10           THE WITNESS:  One other thought to think about is, to
11   me, in some ways there's a slippery slope here.  If you look
12   at other types of faith where it isn't just anti-Plan B, they
13   don't believe -- if I am a pharmacist who is some other faith,
14   that I hate to name, but doesn't believe in treating mental
15   health --
16           THE COURT:  Right.
17           THE WITNESS:  -- so then do I carve out for them?  So
18   to me, by being more neutral, as we believe these rules are,
19   then you are taking us down a path that I guess would be
20   worrisome.
21           THE COURT:  These rules are the slippery slope.
22   Facilitated referral, refuse and referral, is the way that
23   business was done for a long, long, long time, and not too
24   many patients were ignored.
25       So thank you very much.