IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

STORMANS, INCORPORATED, et al.,

        Plaintiffs,

     vs.

MARY SELECKY, Secretary of the
Washington State Department of Health,
et al.,

        Defendants,

     and

JUDITH BILLINGS, et al.,

        Intervenors.

No. C07-5374 RBL

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Kristen K. Waggoner, WSBA # 27790
Steven T. O'Ban, WSBA # 17265
ELLIS, LI & McKINSTRY PLLC
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
(206) 682-0565

THE BECKET FUND FOR
RELIGIOUS LIBERTY
Luke W. Goodrich, DC Bar #977736
Eric Kniffin, DC Bar #999473
3000 K Street, NW, Suit. 220
Washington, DC 20036
(202) 955-0095

ALLIANCE DEFENSE FUND
Benjamin W. Bull (Of Counsel),
Arizona Bar # 009940
Steven H. Aden, Virginia Bar # 48036
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

## <u>TABLE OF CONTENTS</u>

Page

<u>FINDINGS OF FACT</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    I.    The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    II.    Pharmacy Practice before the 2007 Regulations. . . . . . . . . . . . . . . . . . . . . 7

        A.    Pharmacies' discretion over stocking and referral . . . . . . . . . . . . . . . 8

        B.    Referrals for reasons of conscience.. . . . . . . . . . . . . . . . . . . . .. . . . . 10

    III.    The Development of the 2007 Washington Regulations . . . . . . . . . . . . . . . .13

        A.    Planned Parenthood and the Governor seek to prohibit Conscientious objections to Plan B . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.    The Board supports the right of conscience. . . . . . . . . . . . . . . . . . . . . 14

        C.    The Governor considers how to circumvent the Board, and the Human Rights Commission intervenes . . . . . . . . . . . . . . . . . . . . . . . . 15

        D.    The Board holds public hearings. . . . . . . . . . . . . . . . . . . . . . . . . . . .16

        E.    The Board rejects the Governor's rule . . . . . . . . . . . . . . . . . . . . . . . . .16

        F.    The Governor threatens the Board and begins to re-write the rule. . . .17

        G.    The Governor convenes a task force. . . . . . . . . . . . . . . . . . . . . . . . . . .19

        H.    The task force agrees to include business exemptions in the rule. . . . 19

        I.    The Board approves the Governor's rule. . . . . . . . . . . . . . . . . . . . . . . 23

        J.    The rulemaking process focused on conscientious objections to Plan B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 25

        K.    The 2010 Rulemaking process confirmed that the Regulations protect referrals for business reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - i
(C07-5374 )

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131229 (13438.00)

IV.     Access to Medications Before and After the 2007 Regulations . . . . . . . . . . .29

        A.      Access to emergency contraception generally . . . . . . . . . . . . . . . . . 30

        B.      Survey data on access to Plan B . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        C.      Board testimony on access to Plan B. . . . . . . . . . . . . . . . . . . . . . . .32

        D.      Refusal stories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

V.      The Text of Washington's Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VI.     The Operation of the Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        A.      Stocking in practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

        B.      Referral in practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

        C.      Conscientious objection in practice . . . . . . . . . . . . . . . . . . . . . . . . . 46

VII.    The Interpretation of the Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

        A.      Interpretation in the delivery rule. . . . . . . . . . . . . . . . . . . . . . . . . . . .47

        B.      Complaint-driven enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        C.      Accommodations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VIII.   The Effect of the 2007 Regulations on the Plaintiffs. . . . . . . . . . . . . . . . . .57

        A.      Impact on the Stormans' family. . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

        B.      Impact on Ms. Mesler and Ms. Thelen. . . . . . . . . . . . . . . . . . . . . . . .60

IX.     The Effect of the 2007 Regulations on Catholic pharmacies . . . . . . . . . . . . 61

CONCLUSIONS OF LAW

I.      Law of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - ii
(C07-5374 )

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131229 (13438.00)

II.     Free Exercise Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

        A.      Overview of governing legal principles. . . . . . . . . . . . . . . . . . . . . .66

        B.      General applicability – categorical exemptions. . . . . . . . . . . . . . . 68

        C.      General applicability – individualized exemptions . . . . . . . . . . . . .80

        D.      General applicability – selective enforcement. . . . . . . . . . . . . . . . .85

        E.      Neutrality – religious gerrymandering  . . . . . . . . . . . . . . . . . . . . .. 92

                1.      The practical burden of the Regulations . . . . . . . . . . . . . . 92

                2.      The interpretation of the Regulations. . . . . . . . . . . . . . . . .. 94

                3.      The overbreadth of the Regulations. . . . . . . . . . . . . . . . . .. 95

        F.      Neutrality – discriminatory intent . . . . . . . . . . . . . . . . . . . . . . . . .. 97

        G.      Neutrality – differential treatment of two religions. . . . . . . . . . . . 102

        H.      Hybrid rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .104

        I.      Strict Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...104

                1.      Over-inclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

                2.      Under-inclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .106

                3.      Undermining the interest . . . . . . . . . . . . . . . . . . . . . . . . . 107

        J.      Rational basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..108

III.    Supremacy Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .108

IV.     Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .110

V.      Permanent Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .114

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

# INTRODUCTION

The question in this case is whether the government can prohibit pharmacies from referring patients to a nearby pharmacy or other provider for reasons of conscience, while permitting pharmacies to refer patients for a wide variety of business, economic, and convenience reasons. The answer, under the Free Exercise and Due Process Clauses of the Constitution, is "no."

As shown at trial, pharmacies refer patients every day for a wide variety of reasons. They do it when patients request a drug that falls outside their business niche; they do it when they choose not to order a drug because it is too expensive; they do it when a drug is temporarily out of stock for business reasons; they do it when carrying the drug may attract drug seekers or increase the risk of theft; and they do it when they don't want to deal with a patient's insurer or burdensome administrative requirements—among many other reasons. All of these referrals have been occurring for many years; all of them continue unabated under the State's Regulations. But referrals for reasons of conscience are prohibited. That alone establishes that the Regulations are not generally applicable.

In response, the State argues that many of these common business referrals may be technically *illegal* under the Regulations. So, for example, pharmacies must stock drugs that fall outside their business niche; they must stock expensive drugs that will expire before they can be sold; they must stock OxyContin regardless of theft; and they must perform simple compounding, unit dosing, and any other services a patient requests, no matter how inconvenient or unprofitable. Obviously, this does not occur in practice. So when asked why the Board has never punished any of these widespread business practices, the State claims that the

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

Board is "complaint-driven." That is, the Board must sit on its hands and ignore these widespread "violations" of its rules until it receives a citizen complaint.

This argument is both meritless and implausible. As shown at trial, the Board is not solely complaint-driven, but instead has numerous tools for promoting compliance with its Regulations: It inspects pharmacies every two years; it initiates its own complaints; it publishes regular newsletters flagging compliance issues; and it works with the State Pharmacy Association to educate pharmacists. But the Board has never used any of these tools to promote its supposedly strict interpretation of the Regulations. Rather, internal Board correspondence, together with the testimony at trial, demonstrates that the supposedly strict interpretation of the Regulations is merely a post-hoc litigating position. In reality, the Board has no interest in prohibiting widespread referrals for business and other non-conscience reasons. Rather, the Regulations were designed to permit these referrals precisely because they have long been an integral part of the practice of pharmacy.

Even if the Board were complaint-driven, there are two problems with its argument. First, even the strictest interpretation of the Regulations still leaves pharmacies free to refer patients elsewhere for a wide variety of business reasons. For example, it is undisputed that pharmacies can refer patients when they have never had a request for a drug before; when they are temporarily out of stock for business reasons; when they have made a business decision not to acquire specialized equipment or expertise; or when they do not wish to deal with the patient's insurer. Beyond that, the Board has discretion to permit additional referrals on a case-by-case basis in "substantially similar circumstances." These undisputed referrals threaten access just as much (or more than) referrals for

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 2
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

reasons of conscience; thus, even under a strict interpretation, the Regulations are not generally applicable.

Second, even assuming the Board were complaint-driven, relying on citizen complaints has resulted in selective enforcement. As shown at trial, Planned Parenthood and other pro-choice groups have conducted an active campaign to seek out pharmacies with religious objections to Plan B and to file complaints with the Board. From 2006 to 2008, a single drug—Plan B—accounted for 46% of all refusal complaints. By contrast, widespread business referrals rarely, if ever, give rise to a complaint. Thus, the Board's investigatory and enforcement efforts have focused disproportionately on conscientious objections to Plan B.

Finally, the history of the Regulations confirms that they were intended to target conscientious objections to Plan B. As shown at trial, the regulatory process was initiated in response to conscientious objections to Plan B; the focus of the process, from beginning to end, was on conscientious objections to Plan B; the process was driven by powerful political opposition to conscientious objections to Plan B; and the only result of the Regulations has been to prohibit conscientious objections to Plan B. In short, it is impossible to examine the history of the Regulations without concluding that they are primarily focused on stopping conscientious objections to Plan B.

All of this controversy has taken a severe toll on the Plaintiffs. The owners of Ralph's Thriftway were not seeking out a political controversy; they did not even know what Plan B was until they started receiving requests from pro-choice test shoppers. But as soon as they mentioned a religious reason for not stocking Plan B, they were flooded with picketing, boycotting, test shopping, and complaints. They have now been told that they are operating in "outright defiance" of the Regulations and are subject to the loss of their pharmacy license. Similarly, Ms.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 3
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Thelen was forced to leave a job that she loved due to the Regulations. And Ms. Mesler has been told that she will be fired if the Regulations stand.

The saddest part of this controversy is how needless it is. People of many different beliefs, or no beliefs, live in Washington. Conscience protections allow people of diverse values to live peacefully in society with one another. The vast majority of states have solved this societal conundrum by providing protections for pharmacists, without incident. Here, Plaintiffs have agreed to refer patients to dozens of nearby pharmacies that stock Plan B, yet the State has rejected this compromise—even while conceding that conscientious objections to Plan B do not impede timely access to medication. Plaintiffs do not seek to impose their beliefs. All Plaintiffs ask is to be allowed to refer patients rather than be forced to take what they believe to be innocent human life; the Constitution requires no less.

This Court conducted a bench trial of the above-captioned matter November 28-December 1, 2011, December 8-9, 2011, December 19-22, 2011, December 27, 2011, and January 18, 2012. Plaintiffs Stormans, Inc., Margo Thelen and Rhonda Mesler are represented by their attorneys Kristen K. Waggoner, Steven T. O'Ban and Katherine Anderson of Ellis, Li & McKinstry, PLLC and Luke Goodrich and Eric Kniffin of the Becket Fund for Religious Liberty, *pro hac vice*, and Defendant State officials are represented by Rene D. Tomisser and Joyce Roper of the Office of Attorney General, and Defendants-Intervenors are represented by Thomas Boeder, Andrew Greene and Katherine Bennett of Perkins Coie.

The Court received extensive testimonial and documentary evidence. The vast majority of the testimonial evidence was provided by licensed pharmacists or pharmacy owners including former and current Chairs of the Board, two former Board Executive Directors and the current Board Executive Director, and a veteran Board Inspector and long-serving Pharmacist Consultant, each of whom

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 4
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

have served in their respective positions for nearly 20 years, and the former Executive Director of the Washington State Pharmacy Association.[1]

After considering the evidence and the argument and authorities presented by the parties' counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. The Parties

1. Plaintiff Stormans, Inc. is a closed corporation, owned by Ken Stormans who serves as President, and his three children, Kevin Stormans, Greg Stormans, and Charelle Foege, who serve as Vice Presidents of the corporation.

2. Stormans, Inc. owns Bayview Thriftway and Ralph's Thriftway in Olympia, Washington. Ralph's is a fourth-generation, family-operated grocery store that includes a general retail pharmacy. Ralph's has had a pharmacy located in the building since it began its operations in 1944.

3. Plaintiff Margo Thelen is a pharmacist licensed by the State of Washington. Ms. Thelen currently works as a staff pharmacist at a hospital pharmacy within Washington. Prior the Regulations becoming effective, she worked as a staff pharmacist at Safeway. She has spent nearly all of her 40-year career in retail pharmacy, both independent community and chain pharmacies. She has never been employed by Ralph's.

4. Plaintiff Rhonda Mesler is a pharmacist licensed by the State of

---

[1] The Court heard live testimony from former Board member and current Executive Director, Susan Teil Boyer, and former Chair and current Board member Gary Harris. The Court reviewed deposition testimony from former Board Chair Asaad Awan and Fed. R. 30(b)(6) deposition testimony from the Board's current Chair, Al Linggi, and Boyer. The Court heard live testimony from Steven Saxe, Lisa (Salmi) Hodgson, and Susan Teil Boyer, who served consecutively as the Board's Executive Directors from 2004-present. Rod Shafer served as the Executive Director of the Washington State Pharmacy Association for nearly 15 years until October 2008.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 5
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Washington. Ms. Mesler works as a pharmacy manager at a pharmacy within Washington. She has been employed by her chain pharmacy for nearly eight years. She has spent over 20 years working mainly at chain pharmacies in Washington. She has never been employed by Ralph's.

5. Defendant Mary Selecky is the Secretary of the Washington State Department of Health ("DOH"). Defendant Laurie Jinkins was an Assistant Secretary responsible for the Washington Health Systems Quality Assurance, which includes the Board of Pharmacy. The remaining defendants, George Roe, Susan Teil Boyer, Dan Connolly, Gary Harris, Vandana Slatter, Rebecca Hille, and Rosemarie Duffy, or their successors are members of the Washington Board of Pharmacy ("Board").

6. All Board members, like the Secretary and Assistant Secretary of the Department of Health, are appointed by the Governor. Five of the seven Board members are licensed pharmacists and the two remaining members are public members, not affiliated with any aspect of pharmacy. The term of appointment is four years. A member can be appointed to a second term, but can serve no more than two consecutive terms.

7. The Department of Health provides all staff to the Board of Pharmacy. Staff assigned to the Board are employees of the Department of Health.

8. The Board of Pharmacy is responsible for the practice of pharmacy in the state of Washington and to enforce all laws placed under its jurisdiction. The Board also determines the qualifications for licensure and administers discipline against the licenses held by licensees under procedures required in Wash. Rev. Code §§ 18.64. 18.130, 34.05. Discipline for pharmacies and pharmacists may include suspension and revocation of one's license.

9. Defendant-Intervenors Judith Billings, Rhiannon Andreini, Jeffrey

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Schouten, Molly Harmon, Catherine Rosman, Emily Schmidt, and Tami Garrard (together "Intervenor-Defendants") each claim to have an interest in this lawsuit. Two of the intervenors are HIV-positive and the remaining intervenors are women of child-bearing age who seek to ensure access to emergency contraception.

10.    Plaintiffs' religious beliefs prevent them from taking part in the destruction of innocent human life, and Plaintiffs believe that human life begins at the moment of fertilization. Plaintiffs have reviewed the labeling, FDA directives and other literature regarding the mechanism of action of Plan B and *ella* ("emergency contraceptives") and believe that emergency contraceptives can prevent implantation of a fertilized ovum. Accordingly, Plaintiffs' religious beliefs forbid them from dispensing these drugs.

11.    When Plaintiffs receive requests for these drugs, they provide the customer with a "facilitated referral." By stipulation, Plaintiffs and the State-Defendants have defined a facilitated referral as "referr[ing] the customer to a nearby provider and, upon the patient's request, call[ing] the provider to ensure the product is in stock."[2] None of Plaintiffs' customers has ever been denied timely access to emergency contraception.

12.    In 2007, the Board enacted a new regulation (WAC 246-869-010) and revised an existing regulation (WAC 246-863-095). Together with WAC 246-869-150(1) (collectively, the "Regulations"), these Regulations prohibit pharmacies from providing facilitated referrals if a pharmacy or pharmacist has a conscientious objection to delivering or dispensing that drug. Plaintiffs challenge the Regulations as a violation of the Free Exercise Clause, the Supremacy Clause, and the Due Process Clause of the U.S. Constitution.

## II. Pharmacy Practice before the 2007 Regulations

---

[2] Plaintiffs' Exhibit ("PX") 348 (Stipulation, Dkt. 441), ¶ 1.2.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 7
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## A. Pharmacies' discretion over stocking and referral.

13.     The business of pharmacy is complex. There are over 6,000 FDA-approved drugs, and no pharmacy stocks them all. Thus, every pharmacy must make decisions about which drugs to stock.

14.     Pharmacies also face significant financial and competitive pressures. In recent years, pharmacies have faced higher operational costs, decreasing reimbursement rates, and more aggressive auditing from the insurance sector.[3] For many drugs, pharmacies receive minimal net profits and dispensing fees.[4] Often, pharmacies must order more of a drug than what the patient requires. And they also receive "numerous high cost yet low volume prescriptions."[5]

15.     As a result of these pressures, pharmacies work to balance inventory expense against patient demand. Many pharmacies emphasize inventory control, imposing inventory benchmarks and urging pharmacists to turn over their inventory on a monthly basis.

16.     The impact of inventory costs on pharmacies varies depending on the size of the pharmacy, whether it is an independent or chain pharmacy, the clientele it has chosen to serve, and other factors. As the State's attorney explained in an email, pharmacies cannot carry "all medications needed by their community or patient population...."[6] Thus, more and more pharmacies have begun to limit their inventory to certain medications and patient populations.[7] And all pharmacies must make choices about how to control variable costs, including labor and inventory.

---

[3] PX 297 (Memo from Al Linggi); Board's Rule 30(b)(6) designee and Board Chair Al Linggi Dep., pp. 42-45; Trial Draft Transcript ("Tran."), Shafer, Day 1, pp. 99-100, Day 10, pp. 131-136; Tran. Harris, Day 10, p. 51.
[4] *See e.g.,* Tran. Shafer, Day 1, pp. 98-99, 116.
[5] PX 297. *See also* n. 2.
[6] PX 343(email from Board's attorney); Tran. Harris, Day 10, pp. 91-92.
[7] Tran. Shafer, Day 1, pp. 151-52.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

17.     Pharmacies decide which drugs to stock based on a variety of factors. These factors include, among other things, the niche market the pharmacy chooses to serve, the expense of the drug, the shelf-life of the drug, the demand for the drug, insurance reimbursement amounts and requirements, monitoring or training required to dispense the drug, inventory carrying costs, contractual limitations of wholesalers and buying groups, and the administrative resources associated with the drug.

18.     Board regulations have long given pharmacies broad discretion to decide which drugs to stock. The primary regulation applicable to stocking decisions is WAC 246-869-150(1). The Stocking Rule provides: "The pharmacy must maintain at all times a representative assortment of drugs in order to meet the pharmaceutical needs of its patients." *Id.* Although the Stocking Rule has been part of the Board's regulations for over forty years, the Board has made no effort to police compliance, and no pharmacy has ever been cited for violating it.

19.     Board regulations have also long given pharmacies broad discretion to decide which patients to serve and when to refer patients to a nearby pharmacy. Because pharmacies stock only a fraction of all FDA-approved drugs, they receive requests many times a day for a drug that is out of stock.[8] When a pharmacy receives a request for a drug that is out–of–stock, the standard practice is to do one of three things: (1) obtain the drug for the customer (for example, by ordering it, and asking the patient to return to pick it up later); (2) return the unfilled prescription to the customer; or (3) refer the customer to another pharmacy that

---

[8] *See e.g.,* Tran. Fuller, Day 4, pp. 33-34; Tran. Boyer, Day 5, 151, 170; Tran. Thelen, Day 6, p. 142-46; Tran. Mesler, Day 6, pp. 177, 185-90, Day 7, p. 154; Tran. Harris, Day 10, p. 8, 91, Day 11, p. 50; Board Chair Asaad Awan Dep., 17:12-18:4, 58:18-59:4; Rule 30(b)(6) designee, Chair Linggi Dep., 130:19-131:1. *See also* PX 315 (2010 Board minutes); PX 356 (Board transcript of 2010 meeting); State's Exhibit A-27 (September 2010 public comment from WSPA); PX 348 (Stipulation Dkt 441); PX 343 (email from Board's attorney); PX 359 (letter from Board Chair); PX 380 (email from Board Chair); PX 405 (letter from Board's attorney); PX 322 (AAG statement).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 9
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1 will fill the patient's prescription.

2     20.    Referring the customer to another pharmacy is a very common

3 method for dealing with an out-of-stock drug. Pharmacies refer patients to other

4 pharmacies at least several times a day because a drug is not in stock.[9] The State

5 formally stipulated that referral is often the most effective means to meet the

6 patient's request when a pharmacy or pharmacist is unable or unwilling to provide

7 the requested medication or when the pharmacy is out of stock of medication.[10]

8 **B. Referrals for reasons of conscience.**

9     21.    Before the 2007 Regulations, pharmacies in Washington were also

10 permitted to refer patients for reasons of conscience.[11]

11     22.    In 1995, when the Washington legislature enacted the Basic Health

12 Care Law, it also enacted statutory protections for the right of conscience. RCW

13 48.43.065(1)-(2)(a); *see also* RCW 70.47.160(1)-(2)(a). The law recognizes that

14 "every individual possesses a fundamental right to exercise their religious beliefs

15 and conscience," and provides that no health care entity, including pharmacies or

16 pharmacists, "may be required by law or contract in any circumstances to

17 participate in the provision of or payment for a specific service if they object to so

18 doing for reason of conscience or religion." *Id.*

19     23.    Although portions of the Basic Health Care Law have been repealed,

20 the State Insurance Commissioner continues to take the position that all insurers

21 must accommodate health care providers, including pharmacists, who decline to

22 provide a medical service based on conscience. It has also recognized and approved

23 of referral as a fully protected mechanism to accommodate conscientious objectors,

24

25

---

[9] *Id.*

26 [10] PX 348 (Stipulation Dkt 441) ¶ 1.5.

[11] *See e.g.,* PX 11 (email from Saxe); PX 24 (Board newsletter); PX 348.

27

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 10
(C07-5374)

**131235 (13438.00)

1  including pharmacists who decline to dispense Plan B.[12]  Prior to the rulemaking

2  process, Board staff advised pharmacists that the conscience statutes protected

3  pharmacists from having to violate their conscience.

4  24.  Referrals for reasons of conscience are also permitted in the vast

5  majority of states. The right to engage in referral for reasons of conscience has

6  been endorsed by the Washington State Pharmacy Association ("WSPA).  In 1998,

7  the American Pharmacists Association (APhA) adopted a policy expressly

8  recognizing "the individual pharmacist's right to exercise conscientious refusal,"

9  and supporting increased access to medication "without compromising the

10  pharmacist's right of conscientious refusal."[13]  The APhA position endorses referral

11  when a pharmacist has a conscientious objection.

12  25.  The APhA policy was proposed by Don Williams, then-Executive

13  Director of the Board in Washington, in response to Oregon's Death With Dignity

14  Act in 1998.[14]  Board witnesses testified that they continue to support a

15  pharmacist's right to not dispense lethal drugs in the context of physician-assisted

16  suicide.[15]

17  26.  In 2005, the issue of conscience-based referrals for Plan B began

18  receiving increased media attention. National and state-level pro-choice groups

19  launched a concerted effort to press for legislation banning the practice and many

20  states considered various measures in response. Only a handful of states adopted

21  measures. In Illinois, for example, Governor Rod Blagojevich signed an emergency

22  rule in early 2005 that required pharmacists to dispense emergency contraceptives

---

[12]Insurance Commissioner's Rule 30(b)(6) designee, Elizabeth Berendt Dep., 21:11-25:6; 34:5-24; 37:11-38:2.

[13] PX 22 (WSPA Conscience Clause Committee Report with APhA policy).

[14] Tran. Shafer, Day 10, pp. 128-129.

[15]  *See e.g.,* Tran. Shafer, Day 1, pp. 109-10; Tran. Saxe, Day 1, p. 186; Tran. Fuller, Day 4, pp. 17-18; Tran. Boyer, Day 5, 186; Tran. Harris, Day 10, p. 59, Day 11, p. 48.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 11
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1    if their pharmacies stocked any form of contraception.[16]

2    27.    To date, seven states (besides Washington) have adopted a law or

3    policy limiting conscience-based referrals to some degree or another. However, the

4    only state that has clearly gone as far as Washington in requiring pharmacies to

5    stock Plan B is Illinois. The vast majority of states (42) leave pharmacies

6    essentially complete discretion to decide which drugs to stock and when to refer

7    patients elsewhere. And the only state that has gone as far as Washington—

8    Illinois—had its regulations struck down in state court as unconstitutional. *See*

9    Dkt. #510 at 11-12.

10    28.    One of Defendant-Intervenors' witnesses, Alta Charo, testified that in

11    her opinion, states that have not expressly endorsed referral can be assumed to

12    prohibit it. That testimony is contrary to the position of the Board, which has

13    concluded that Washington law permitted referral until the Regulations were

14    adopted.[17] Ms. Charo's opinion is also contradicted by the testimony of Rod Shafer,

15    who served as the Executive Director of the Washington State Pharmacy

16    Association ("WSPA") for 14 years. Mr. Shafer testified that referral for business

17    and conscience reasons has been the standard of practice nationwide, including in

18    states that do not have laws specifically endorsing or prohibiting referral.[18]

19    29.    Ms. Charo's testimony is also contrary to the position of many

20    professional health care organizations, which endorse referral as an appropriate

21    alternative for pharmacists who assert conscientious objections. This includes the

---

[16] *See Morr-Fitz, Inc. v. Blagojevich*, 2011 WL 1338081, No. 2005-CH-000495 (Ill. Cir. Ct. 7th Jud. Cir., April 5, 2011).

[17] *See e.g.*, PX 348 (Stipulation Dkt. 441), ¶ 1.2.

[18] Tran. Shafer Day 10, 129-131. Mr. Shafer served as the WSPA's Executive Director for nearly 15 years and regularly interacted with pharmacists in similar positions in other states. He left his position in October 2008 and served as the director of the California Pharmacists Association. Mr. Shafer remains licensed in Washington. He has also worked in pharmacy in Texas and Arizona in recent years.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 12
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

American Medical Association, American Society of Health-System Pharmacists, National Community Pharmacists Association, the American Pharmacists Association, and the Washington State Pharmacists Association.

30. Finally, Ms. Charo's assertion conflicts with the State's own research. In 2010, the Board asked the National Association of Boards of Pharmacy to better understand how other states had addressed this issue.[19] Of the 14 states responding to the question, 13 states responded that they permit pharmacies to refer patients to another pharmacy due to a moral or ethical objection. Fifteen of 16 states responded that they do not even require pharmacies to give patients a timely alternative when a drug is not available.

## III. The Development of the 2007 Washington Regulations

### A. Planned Parenthood and the Governor seek a rule prohibiting conscientious objections to Plan B.

31. The events giving rise to Washington's Regulations began in 2005. Shortly after Governor Blagojevich signed his emergency rule, Planned Parenthood and Northwest Women's Law Center (collectively referred to as "Planned Parenthood") contacted the Governor's Office concerning conscientious objections to emergency contraception.[20] Christina Hulet, Governor Gregoire's Senior Health Policy Advisor, began meeting with Planned Parenthood.[21] Planned Parenthood's representative, Elaine Rose, had worked closely with the Governor in the Attorney General's Office for many years.[22] Planned Parenthood sought to enlist the Governor's help to prohibit conscientious referrals for Plan B.

---

[19] PX 460 (2010 survey for Board by National Association of Boards of Pharmacy).
[20] Tran. Hulet Day 3, pp. 73-74.
[21] *Id. See also* PX 19, 473 (meeting notes).
[22] Trans. Hulet, Day 3, p. 78.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 13
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

32.     Ms. Hulet and Planned Parenthood contacted Steven Saxe, the Board's Executive Director, in the spring or summer of 2005.  Planned Parenthood informed Mr. Saxe that they were considering national or state legislation on a "pharmacist's right to refuse to fill a prescription for moral/religious views."[23] Planned Parenthood wrote the Board in August 2005, urging the Board to formally address the issue and prohibit referral.

**B. The Board supports the right of conscience.**

33.     In response, Mr. Saxe and the Board expressed support for the right of conscience. Mr. Saxe raised the issue of conscientious objections to Plan B with the Board several times in 2005. He wanted to ensure that the Board approved of the staff's response.[24] The first time Mr. Saxe addressed the Board was by email in April 2005. He forwarded an article on Governor Blagojevich's order and an editorial that urged pharmacists with objections to "find another line of work."[25] Mr. Saxe advised the Board that staff were telling pharmacists that they were permitted to refer. No Board member disagreed with this approach.

34.     In response to Planned Parenthood's letter, the Board formally addressed the issue at its August 2005 meeting. The Board voted to continue to recommend referral when callers inquired about conscientious objections to Plan B.[26] The Board publicly endorsed this message again in its October 2005 newsletter.[27]

35.     In January 2006, Planned Parenthood met personally with the Governor, warning her that the WSPA would support conscience rights at the Board's January 2006 meeting. The Governor then sent a letter to the Board

---

[23] PX 13 (NWWLC email to Saxe). *See also* Tran. Saxe, Day 2, pp. 26-27.
[24] Trans. Saxe, Day 2, pp. 33-34.
[25] PX 6 (Saxe email).
[26] PX 20 (Board minutes); Tran. Saxe, Day 2, pp. 33-34. *See also* PX 18 (Saxe's memo to Board).
[27] PX 24 (newsletter).

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

opposing referral for personal or conscientious reasons. She also appointed a new member to the Board—Rosemary Duffy, who was a former Planned Parenthood board member whom Planned Parenthood had recommended.

36. As expected, at the January 2006 Board meeting, the WSPA recommended that pharmacists retain the right to refer patients elsewhere for reasons of conscience. It identified unprofessional conduct as lecturing patients, destroying prescriptions, and refusing to return prescriptions.[28] The Board voted to open rulemaking to specifically address the conduct identified by the WSPA. But no Board members expressed opposition to referrals for reasons of conscience.[29]

## C. The Governor considers how to circumvent the Board, and the Human Rights Commission intervenes.

37. In March 2006, Planned Parenthood provided a counter-presentation to the Board. After the presentation, Ms. Hulet advised the Governor that there was a strong possibility the Board would not adopt her "preferred policy." She explained that several board members believed pharmacists should have the same right of conscientious objection as other providers.[30] The Governor then considered terminating existing Board members or issuing an emergency rule or executive order.[31]

38. Seeking to increase pressure on the Board, the Governor's Office then urged the Planned Parenthood to work together with the Human Rights Commission ("HRC"). The HRC and Planned Parenthood met, and within days,

---

[28] The Board was not aware of any incidents involving lecturing or destroying or refusing to return prescriptions in Washington.

[29] PX 37, pp. 5-7 (Board minutes). *See also* Tran. Shafer, Day 1, pp. 96-97, 133.

[30] Tran. Hulet, Day 3, pp. 83-84. *See also* PX 53 (Governor's briefing memo).

[31] Tran. Hulet, Day 3, pp. 83-85; PX 55, p. 2 (Hulet notes, "#2-Emergency Rule"); PX 53.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 15
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

the HRC Executive Director warned Mr. Saxe that the agency believed conscientious objectors who referred patients were illegally discriminating against women.[32] The HRC Executive Director followed up with a letter threatening Board members with personal liability if they passed a regulation permitting referral.[33] Planned Parenthood reviewed drafts and helped shape the message of this inter-governmental warning, which was obviously intended to intimidate the Board.

**D. The Board holds public hearings.**

39.     In April 2006, the Board held two public hearings. Testimony at the hearings focused almost exclusively on conscientious objections to Plan B.

40.     During the hearings, pro-choice participants repeated and discussed four "refusal stories," allegedly involving the denial of access to medication. These stories involved (1) an abortion-related antibiotic at Swedish Medical Center; (2) prenatal vitamins in Yakima; (3) syringes sought by a man with gelled hair and tattoos, and (4) emergency contraception in Redmond. These stories originally surfaced in a March 2006 letter from Planned Parenthood.[34] Nearly all of the alleged refusal stories provided in the rulemaking process were presented at the April 2006 hearings.[35]

**E. The Board rejects the Governor's Rule.**

41.     After the April hearings, Board staff prepared a draft rule that aligned with the Governor's wishes. It prevented pharmacists from referring patients to nearby providers if the drug was in stock and the patient could pay the

---

[32] Tran. Saxe, Day 2, p. 42; Tran. Baros-Friedt, Day 3, pp. 181-82, PX 492 (Friedt email to Planned Parenthood); PX 499 (Friedt email to Governor's office); PX 65 (Friedt email to Planned Parenthood); PX 69 (Planned Parenthood email to Friedt). The HRC sent a second letter to the Board in July 2006.
[33] PX 70 (HRC April 2006 letter).
[34] PX 43 (Planned Parenthood letter).
[35] *See e.g.,* Tran. Saxe, Day 2, 38-39, 46; Tran. Harris, Day 9, pp. 17-18.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 16
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

pharmacy.[36] The Board also asked staff to draft an alternative rule that would permit referral, including for reasons of conscience. The Board scheduled a vote on the two drafts for June 1, 2006.[37]

42.    At the June 1 meeting, the Board rejected the Governor's favored rule. Instead, it voted unanimously in favor of the draft that permitted referrals for business, economic, convenience and conscientious reasons.[38]

**F. The Governor threatens the Board and begins to re-write the rule.**

43.    Governor Gregoire reacted swiftly and forcefully. Hours later, she sent her third letter to the Board, "strongly oppos[ing] the draft pharmacist refusal rules recommended by the Washington State Board of Pharmacy. . . ."[39] Representatives from the Governor's Office also met with Planned Parenthood to discuss rewriting the rule.

44.    Four days later, Governor Gregoire publicly explained that she could remove the Board members when the Legislature returned if need be, but she did not "want this to be done like we're in a dictatorship."[40] She also asked Planned Parenthood to re-evaluate whether an emergency rule or executive order might work.[41] The media widely reported the Governor's threat. Board staff who had worked for DOH for decades testified that this was the first instance in which a Governor had ever threatened the Board, or any DOH agency board, with removal.

---

[36] PX 82 (Governor's staff email about rule).
[37] At the Board's request, staff provided the Board with more information on conscience issues as well. PX 99 (Memo to Board).
[38] *See* PX 102 (Board minutes).
[39] Tran. Hulet, Day 3, pp. 93-94; PX 111 (notes rewriting rule); PX 104 (Hulet email with Governor letter).
[40] Tran. Hulet, Day 3, pp. 98-100; PX 96 (transcript from press conference); PX 117 (news article).
[41] Tran. Hulet, Day 3, pp. 95; PX 118 (Planned Parenthood and National Women's Law Center memo on Blagojevich rule).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 17
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

45.     Local commentators, lawmakers and others roundly criticized the Board in the media. Several Board members asked Board staff to develop a media response to defend the Board's decision. But no response was ever developed. Instead, DOH began to distance itself from the Board's position.[42] DOH then directed Mr. Saxe and Mr. Brian Peyton[43] to meet with Board Chair Asaad Awan to urge him to move the Board to reconsider the June 1 rule.[44]

46.     Within a week of the vote, Planned Parenthood presented a new draft rule to the Governor.[45] After reviewing that rule, the Governor asked Ms. Hulet whether it was "clean enough for the advocates [*i.e.*, Planned Parenthood, NWWLC and NARAL] re: conscious/moral issues."[46]

47.     Similarly, Mr. Saxe, who was intimately involved in the Governor's drafting process explained the Governor's primary issue with the June 1 rule in an email: "[T]he moral issue IS the basis of the concern."[47] "[T]he public, legislators and governor are telling us loud and clear that they expect the rule to protect the public from unwanted intervention based on the moral beliefs [*sic*] of a pharmacist."[48]

48.     Mr. Saxe was also asked to compare the Governor's and WSPA's draft rules in June 2006. He testified that the primary difference between the rules was that the WSPA's rule permitted conscientious objections.[49] After reviewing the Governor's rule, he offered the following suggestion on how to accomplish the Governor's intent: "Would a statement that does not allow a pharmacist/pharmacy

---

[42] Tran. Saxe, Day 2, pp. 64-69; PX 132 (DOH email); PX 472 (DOH talking points).
[43] Mr. Peyton works with DOH and the Governor's Office and directly reports to Secretary Selecky.
[44] Tran. Saxe Day 2, pp. 62-63.
[45] Tran. Hulet, Day 3, p. 100-101; PX 123 (Planned Parenthood email with draft).
[46] Tran. Hulet, Day 2, pp. 104; PX 139 (Governor briefing memo).
[47] Tran. Saxe, Day 2, p. 169; PX 143 (Saxe email).
[48] PX 143; Tran. Saxe, Day 2, p 70.
[49] Tran. Saxe, Day 2, p. 72.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 18
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

the right to refuse for moral or religious judgment be clearer? This would leave intact the ability to decline to dispense (provide alternatives) for most *legitimate* examples raised; clinical, fraud, business, skill, etc."[50] However, Saxe admitted that it was difficult to draft language that would allow referrals for business reasons, but not for reasons of conscience: "[T]he difficulty is trying to draft language to allow facilitating a referral for *only these non-moral or non-religious reasons.*"[51] At trial, Mr. Saxe clarified that these "non-religious reasons" included referral because of a drug's expense, shelf-life, low demand, or a pharmacy's chosen business niche.[52]

**G. The Governor convenes a task force.**

49.    In order to forge a consensus in support of her rule, the Governor convened a taskforce. She invited representatives from Planned Parenthood, Northwest Women's Law Center, the WSPA, Board member Donna Dockter, and Don Downing, a University of Washington Pharmacy Professor. But she did not invite any conscientious objectors, faith-based health care providers, or any other outside organizations besides her "advocates," which were the women's reproductive rights groups. Mr. Shafer represented the WSPA. Mr. Saxe attended from the Board. And Ms. Hulet led the two meetings.

**H. The task force agrees to include business exemptions in the rule.**

50.    The task force roughly divided into two camps. All three pharmacists on the taskforce (not including the Board's Executive Director Saxe) urged the taskforce to revise the Governor's rule to permit referral for both business and conscience reasons.[53] By contrast, the Governor, Planned Parenthood, and the

---

[50] PX 154, 155 (Saxe and Department of Health emails) (emphasis added).
[51] PX 157 (Saxe email) (emphasis added).
[52] Tran. Saxe, Day 1, pp. 72-77; PX 157.
[53] Tran. Hulet, Day 3, pp. 57-58.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 19
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

other "advocates" insisted that referrals for reasons of conscience were off the table.[54]

51.　The taskforce members discussed a variety of circumstances in which pharmacies regularly refer patients due to the business, economic, practical, and clinical realities of modern pharmacy practice. Mr. Shafer and Ms. Dockter insisted that referral should continue to be permitted for the following reasons:

(1) the cost of the drug;

(2) low demand for the drug;

(3) limited shelf space;

(4) the need to order more of the drug than what the patient requested;

(5) an agreement prohibiting the purchase of certain brands of drugs or from certain suppliers under formularies or contracts with buying groups and wholesalers;

(6) a pharmacy's decision that it would take too much time or effort to register to sell the drug, monitor the patient, or prepare the prescription, even though the prescription could be filled without any specialized equipment or expertise;

(7) a pharmacy's decision not to accept certain forms of payment, including rejecting insurance altogether or rejecting specific insurance plans because of low reimbursement rates or hassles with auditing or repayment;

(8) a niche pharmacy's decision to limit its inventory to certain drugs or patient populations;

(9) a pharmacy's decision not to sell certain narcotics because of hassle, fear or burglary or desire not to attract drug seekers;

(10) a pharmacy's decision to offer some narcotics or syringes only by prescription to avoid having to keep a registry or log;

(11) a pharmacy's decision not to offer simple compounding; and

---

[54] Tran. Shafer, Day 1, p. 103.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 20
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

(12) a pharmacy's decision not to offer unit-dosing or blister packing, which doctors may require as a part of some prescriptions.[55]

52.     Ultimately, the members of the taskforce reached a compromise: Mr. Shafer, for the WSPA, agreed to yield on the request to accommodate referrals for reasons of conscience; the Governor, Planned Parenthood, and the advocates agreed to permit referrals for business, economic, and convenience reasons.[56]

53.     Taskforce members also agreed to allow referral for conscientious objections to lethal drugs under Washington's Death With Dignity Act, which had not yet been enacted when the taskforce met.[57] They also confirmed that the Board had not enforced the Stocking Rule, that it lacked a standard by which to do so, and that the Regulations would not change stocking requirements.[58]

54.     To implement the compromise position—which would allow referral for business and convenience reasons, but not for reasons of conscience—the taskforce included a non-exhaustive list of exemptions from the rule, an exemption for customary payment requirements, and a catch-all exemption for any "substantially similar circumstances."[59] The taskforce agreed that the open-ended language in the rule provided ample flexibility to accommodate referrals for business reasons.[60]

55.     Although the State suggested that the task force did not intend to protect referrals for business reasons, the Court finds that the weight of the evidence is to the contrary. Mr. Shafer provided uncontroverted testimony that the taskforce drafted the Regulations to preserve referral for a variety of business,

---

[55] Tran. Shafer, Day 1, pp. 100- 09, 153; Tran. Saxe, Day 3, pp. 31-32; Day 2, pp. 82-83; Tran. Hulet, Day 3, p. 172.
[56] Tran. Shafer, Day 1, p. 103
[57] Tran. Shafer, Day 1, pp. 109-10; Tran. Saxe, Day 1, p. 186-87.
[58] Tran. Shafer, Day 1, p. 115-116; Hulet, Day 3, pp. 61-63.
[59] *See e.g.,* Tran. Shafer, Day 1, pp. 110-11; Tran. Hulet, Day 3, pp. 56-57, 62.
[60] *Id.*

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

economic, convenience, and clinical reasons, but not for reasons of conscience. Ms. Hulet testified that she relied on Mr. Shafer and Ms. Dockter to identify the necessary business exemptions and to explain how the pharmacy business worked. Ms. Hulet also testified that Mr. Shafer was "key" to finalizing the exemptions.[61] Ms. Hulet confirmed that the taskforce intended to capture the examples raised by Mr. Shafer and Ms. Dockter at the taskforce. She also testified that Planned Parenthood agreed to permit the WSPA's business exemptions advocated by Mr. Shafer in exchange for Mr. Shafer capitulating on the WSPA's request for conscience protection.[62]

56.    This account was confirmed by statements from the Board members at the August and December 2006 meetings. At those meetings, Ms. Dockter repeatedly raised business and convenience reasons for referral. In response, Mr. Harris testified that he confirmed at the August Board meeting that he would not discipline pharmacists for these reasons.[63] Mr. Harris also testified that the Board's counsel, Joyce Roper, advised the Board that it had the discretion to make decisions on a case-by-case basis and would not impose discipline if they acted consistently with current pharmacy practice.[64] Ms. Duffy made similar statements at the Board's meetings, specifically referring to the breadth of the non-exhaustive "substantially similar" exemption language.[65] No Board member expressed disagreement with Ms. Duffy or Ms. Roper (although Ms. Dockter urged greater clarity in the Regulations). In short, abundant evidence supports a finding that the

---

[61] Tran. Hulet, Day 3, p. 49-51.  *See also* Tran. Shafer, Day 1, p. 56-57.

[62] Tran. Hulet, Day 3, p. 62.

[63] *See e.g.,* Tran. Harris, Day 10, pp. 48-59, 66-69; Tran. Shafer, Day 1, pp. 102-03; PX 99, Section 5 (Dockter examples); PX 532 (Dockter examples); PX 210 (August 2006 Board minutes); PX 232 (Dec. 2006 Board minutes).

[64] *Id.*

[65] *Id.*

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 22
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

Regulations were intended to permit referrals for business and convenience reasons, but not for reasons of conscience.

**I. The Board approves the Governor's rule.**

57.     The Governor's rule was set for a preliminary vote on August 31, 2006. Just days before the vote, the Governor personally called Board Chair Asaad Awan. She told Awan that he was "to do [his] job" and to "do the right thing" and that she was going to "roll up her sleeves and put on her boxing gloves."[66] According to Ms. Hulet, however, the Governor had previously instructed her not to contact Board members because it would be illegal.[67] The Governor also sent a fourth letter to the Board, urging approval of her rule.

58.     Shortly before the preliminary vote, the FDA announced that Plan B would be available in pharmacies over the counter for restricted distribution. At the urging of Planned Parenthood, Ms. Hulet added a new clause—"to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies"—specifically to ensure that pharmacies would still be required to deliver Plan B under the rules.[68]

59.     At the August meeting, the Board approved the Governor's rule by a preliminary vote of 4-2.

60.     To guarantee final approval of the regulation in 2007, the Governor took another unprecedented step: She involved her "advocates"—Planned Parenthood, NWWLC and NARAL—in the process of interviewing candidates for the Board. Board Chair Awan, who applied for a second term, testified that his interview focused almost exclusively on the pharmacy refusal issue.[69] His

---

[66] Board Chair Awan Dep., 72:6-73:3.
[67] Tran. Hulet, Day 3, pp. 97-98.
[68] Tran. Hulet, Day 3, pp. 109-110; PX 203 (Planned Parenthood email).
[69] Board Chair Awan Dep., 11:5-13:7, 14:20-24.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

reappointment was opposed by the "advocates," and the Governor declined to reappoint him.

61.    The Governor then selected two new candidates recommended by Planned Parenthood, including Vandana Slatter, who was a NARAL Washington board member.[70] The Senate committee chaired by Karen Keiser also scheduled a Board member confirmation hearing for the day immediately following the Board's final vote on the Regulations.

62.    Thus, on April 12, 2007, the Board voted to approve the final Regulations. Three Board members were confirmed the next day.[71] The Regulations became effective in July 2007.

## J. The rulemaking process focused on conscientious objections to Plan B.

63.    The State has argued that, throughout the rulemaking process, the Board was not focused on conscientious objections to Plan B; instead, it was focused on all medications and all forms of objection. In support, the State relies on documents such as the Small Business Economic Impact Statement and Concise Explanatory Statement, which were issued after the Board passed the Regulations.

64.    The Court finds that these documents are not inconsistent with the Board's focus on conscientious objections to Plan B, and that such a focus is supported by the great weight of the evidence, including other documents issued by the Board.

65.    For example, the Board's CR-101, memoranda, newsletters, and emails were dominated by emergency contraception and conscientious objection to

---

[70] Tran. Hulet, Day 3, p. 122; Tran. Saxe, Day 2, pp. 89.
[71] Tran. Hulet, Day 3, p. 121; PX 257 (Governor's Monday alert).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 24
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

Plan B. Board meetings and public testimony also focused almost entirely on emergency contraception and conscientious objections.

66. The Board's primary undertaking to determine the impact of the regulations on the practice of pharmacy was its survey in October 2006 of Washington pharmacies.[72] That survey focused exclusively on Plan B and potential accommodations for conscientious objectors.

67. The formal guidance document on the Regulations, which the Board provided directly to pharmacies and pharmacists, referred to Plan B and no other drug. It also singled out only one reason for referral that was prohibited: conscientious objection.[73]

68. Similarly, Board witnesses testified that the object of the Regulations was to specifically address conscientious objections.[74] In fact, Mr. Harris, who was Vice-Chair in the 2006-07 rulemaking process and Chair in the 2010 process, stated in writing to the Board that Plan B was not an abortifacient, that he would be reluctant to discipline any pharmacy or pharmacist that made a good faith effort to comply with the Stocking Rule, and that he would recommend prosecuting all conscientious objectors who refused to fill prescriptions to the "full extent of the law."[75]

69. In sum, the Court finds that the weight of the evidence supports the conclusion that the Board's regulatory focus was on requiring onsite delivery for Plan B and forbidding referral for reason of conscience—not, as Defendants contend, on access to all drugs and all non-clinical reasons for refusing to deliver them.

---

[72] PX 432 (Survey).
[73] PX 436 (Guidance letter)
[74] *See e.g.,* Tran. Harris, Day 11, p. 50; Tran. Fuller, Day 4, p. 62.
[75] PX 253 (Former Chair Harris letter to the Board)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

**K. The 2010 rulemaking process confirmed that the Regulations protect referrals for business reasons.**

70.     The Board revisited the Delivery Rule in 2010.  This case was initially set for trial on July 28, 2010. Approximately a month before trial, and shortly after their motion for summary judgment had been denied, the State informed Plaintiffs that the Board of Pharmacy wanted to initiate a new rulemaking process and adopt a rule that permitted referrals for all reasons, including referrals for reasons of conscience.

71.     The Board intended to develop a new rule because it was concerned that the Regulations did not allow enough leeway for referrals. On June 29, 2010, the Board unanimously voted to initiate rulemaking. The Board intended to amend the Regulations to allow "all pharmacies and pharmacists" to engage in facilitated referral for "any reason," including when the pharmacy was "unwilling to stock . . . or timely deliver or dispense lawfully prescribed medications . . . for conscientious reasons."[76] Six Board members attended the June 29 meeting, and a majority of the Board Members voiced support for referral before the vote. No Board member spoke against referral.[77]

72.     The State then asked Plaintiffs to join their motion to stay the July 28, 2010, trial. In order to secure Plaintiffs' consent—and this Court's approval—Defendant State entered into a number of binding factual Stipulations regarding the rulemaking process and facilitated referral:

> 1. The Board voted to commence the rule-making process to amend the Rules to permit facilitated referral for "all pharmacies and pharmacists" when a pharmacy or pharmacist is unable or unwilling to stock or deliver a drug on

---

[76] PX 348 (Dkt. #441, Stipulation), ¶ 1.4; *see also* PX 315 (BOP minutes).
[77] PX 315 (Board minutes).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 26
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

site for "any reason," including "for conscientious reasons." (¶1.4)[78]

2. Facilitated referral "is a time-honored practice." (¶1.5)

3. Facilitated referral "continues to occur for many reasons." (¶1.5)

4. Facilitated referral "is often the most effective means to meet the patient's request when the pharmacy or pharmacist is unable or unwilling to provide the requested medication or when the pharmacy is out of stock of medication." (¶1.5)

5. Facilitated referral "improve[s] the delivery of health care in Washington, including when a drug is not cost-effective to order, the drug requires monitoring or follow-up by the pharmacist, and other reasons." (¶1.5)

6. "[P]harmacies and pharmacists should retain the ability to engage in facilitated referrals." (¶1.5)

7. Facilitated referrals "are often in the best interest of patients." (¶1.5)

8. Facilitated referrals "do not pose a threat to timely access to lawfully prescribed medications . . . includ[ing] Plan B." (¶1.5)

9. Facilitated referrals "help assure timely access to lawfully prescribed medications . . . includ[ing] Plan B." (¶1.5)

73.     The Stipulation was not a settlement of claims, but an agreement to stay the trial to permit a change in the rule that the Board asserted would likely accommodate Plaintiffs' constitutional interests. Key State officials reviewed the Stipulation prior to entry on July 12, 2010, including the Secretary of the Department of Health (Mary Selecky), the Assistant Secretary (Karen Jensen), and the current Executive Director of the Board of Pharmacy (Susan Teil Boyer).[79] Ms. Boyer confirmed that the representations in the Stipulations were accurate and neither the Department of Health nor the Board attempted to revoke them at any time.[80]

---

[78] Numerical references are to the numbered sections of the Stipulation, Dkt. #441, PX 348.
[79] PX 347 (DOH timeline)
[80] Board's 30(b)(6) designee, Susan Teil-Boyer, Dep. 22:13-27:22.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 27
(C07-5374)

**131235 (13438.00)

74.     The announcement of the new rulemaking process provoked an immediate outcry from Planned Parenthood and the Governor. Despite the fact that there was no draft amendment or rule, the Governor quickly issued a statement opposing facilitated referral.[81] Although the Department of Health initially supported facilitated referral, Secretary Mary Selecky sent the Board a letter informing it that she "agree[d] with what [they] have heard from Governor Gregoire's office," and that the "rule has served patient safety well in Washington over the three years it's been in place."[82]

75.     At the Board's November 2010 meeting, the Board discussed facilitated referral. At that meeting, Chair Harris suggested that while today the Board might be discussing objections to Plan B, the next issue could be religious conservatives serving gays.[83] Chair Harris also testified that he understood the only instance under the Regulations where a facilitated referral was not permissible was for conscientious objections.[84]  The Board then Board asked its staff to research the meaning of the Stocking Rule and to confirm that pharmacies need not stock expensive drugs; that the Regulations "recognize[] that a drug can be out of stock even when a good faith effort at compliance is made";[85] and that "a representative assortment does not mean every drug needed by a pharmacist's patients."[86] The Board's Executive Director Boyer confirmed this in a PowerPoint presentation, which she provided to the Board at its December 2010 meeting. The

---

[81] PX 329 (Governor's statement).
[82] PX 389 (Selecky letter).
[83] Tran. Harris, Day 10, 101.
[84] Tran. Harris, Day 10, 99. Mr. Harris agreed that the Board was unaware of any personal non-religious objections ever being asserted in either the 2006-07 or 2010 rulemaking processes.
[85] PX 403 (AGO letter).
[86] Id.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 28
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

PowerPoint was written with the Board's assistant attorney general and explains that the Regulations have a carve-out for expensive "specialty" drugs.[87]

76. After Chair Harris confirmed that he would "never" vote to allow "religious as a valid reason for a facilitated referral," Executive Director asked Mr. Harris to take a "more active and verbal role" at the December 2010 meeting.[88] At that meeting, the Board voted 5-1-1 to end the rulemaking process with no changes to the Regulations. The Board's Rule 30(b)(6) designee, Board Chair Al Linggi, explained that there was no need to amend the rules because there was no evidence of a lack of timely access to drugs, even though pharmacies routinely receive requests for drugs that are out of stock and refer patients elsewhere.[89]

77. Board witnesses confirmed that the testimony at the 2010 rulemaking process, just like the 2006-07 process, focused on two conscientious objections to emergency contraception. During the 2010 rulemaking process, the Board repeatedly confirmed that facilitated referrals for business reasons continued to be commonplace even after the 2007 Regulations became effective.[90]

## IV. Access to Medications Before and After the 2007 Regulations

78. Several Board witnesses testified that the purpose of the Regulations is to increase timely access to medication. However, the evidence at trial revealed no problem of access to Plan B or any other drug before, during, or after the rulemaking process.

---

[87] PX 413 (Boyer PowerPoint); Tran. Harris, Day 10, pp. 106-07.
[88] PX 402 (Boyer/Harris email)
[89] Rule 30(b)(6) Board designee, Linggi Dep. 113:14-114:12; 115:2-16; 116:12-118:10; 118:20-110:1; 119:21-120:19; 124:10-124; 130:19-131:1; 137:19-138:19.
[90] *See e.g.,* PX 315 (2010 Board minutes); PX 356 (Board transcript of 2010 meeting); State's Exhibit A-27 (September 2010 public comment from WSPA); PX 348 (2010 Stipulation); PX 343 (email from Board's attorney); PX 359 (letter from Board Chair) ; PX 380 (email from Board Chair); PX 405 (letter from Board's attorney); PX 322 (AAG statement).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 29
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## A. Access to emergency contraception generally

79.     Washington has long been a leader in promoting access to emergency contraception. It was the first state in the nation to permit pharmacists to prescribe Plan B, and its pharmacy schools were the first in the nation to certify students as emergency contraceptive providers.[91] Due in part to these programs, Washington has long had some of the highest sales of Plan B in the nation.

80.     In 2006, Plan B became available to anyone over age sixteen without a prescription. Since then, Plan B's sales have further increased. Currently, Plan B can be purchased at pharmacies, doctors' offices, government health centers, emergency rooms, Planned Parenthood, and a toll-free hotline. It is also available via the Internet for overnight delivery.

81.     Plan B is also widely available in Plaintiffs' communities. Prior to trial, Ms. Mesler confirmed that within one mile of her pharmacy, Plan B is available at four different pharmacies; within five miles, it is available at thirteen pharmacies; and within twenty-five miles, it is available at eighteen pharmacies.[92] Similarly, Ms. Thelen confirmed that within one mile of her former job at Safeway, Plan B is available at two pharmacies; within twenty miles, it is available at twenty-eight pharmacies; and within twenty-five miles, it is available at sixty pharmacies.[93] And within five miles of Ralph's Thriftway, there are over thirty pharmacies that stock Plan B and four that stock *ella*.[94] Plaintiffs have regularly referred patients to these nearby pharmacies, and there is no evidence that any of Plaintiffs' customers have ever been unable to obtain timely access to emergency contraceptives or any other drug.

---

[91]  PX 41(Downing Email); PX 42 (Downing Memo); PX 138 (WSPA Fact Sheet).
[92]  Tran. Mesler, Day 6, p. 178.
[93]  Tran. Thelen, Day 6, p. 127.
[94]  Tran. Stormans, Day 5, p. 21.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## B. Survey Data on Access to Plan B

82.     The Board's survey data confirms that there has been no problem of access to Plan B. In October 2006, after voting to approve the Regulations, the Board commissioned a study of access to Plan B. That survey intentionally over-sampled rural pharmacies to ensure that it would identify any access problems.[95] The total sample size was 540 pharmacies.[96]

83.     According to the survey, 77% of all Washington pharmacies stock Plan B. Of the 23% that do not stock it, only 2% cited religious objections, while 21% cited low demand, an easy alternative source, or the pharmacy's status as a hospital or niche pharmacy. Of the thirty-eight rural pharmacies, only six did not stock Plan B. None of those six cited a religious reason.[97] Thus, the survey confirms that Plan B is widely available, and religious objections do not pose a barrier to access.

84.     In 2006, the Washington State Pharmacy Association also studied access to medication, with a particular focus on time-sensitive medications and rural areas.[98] The WSPA's conclusion, which Mr. Shafer shared with Mr. Saxe, Ms. Hulet, and the Board, was that there was no problem of access to any medication in Washington.[99] The WSPA was also unaware of any instance where a patient failed to receive medication in a timely manner due to a pharmacist's objection or where a pharmacist confiscated or destroyed a prescription or lectured a patient. Mr. Shafer also testified at trial that there was no problem of access to Plan B or any other drug prior to the rulemaking process.[100] The Court finds Mr. Shafer's

---

[95] PX. 432 (DOH Survey); Tran. Fuller, Day 4, p. 49.
[96] Tran. Salmi, Day 8, p. 136.
[97] PX. 219 (Fuller email); Tran. Fuller, Day 4, pp. 50-51.
[98] Tran. Shafer, Day 1, p. 171
[99] Tran. Shafer, Day 1, pp. 144, 171.
[100] PX 432 (DOH Survey); Tran. Shafer, Day 1, p. 171.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 31
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

testimony about access, as the head of the State Pharmacy Association, to be credible.

85.     In 2008 the WSPA conducted an online survey on access to emergency contraceptives. As Mr. Shafer explained, the underlying responses and data demonstrate that 86% of all pharmacies stock emergency contraceptives. Of the 14% that did not stock, only about 3% cited religious beliefs as the sole reason for their decision.[101] The data also revealed that 98.3% of pharmacists reported that they either provide emergency contraception or have an established system to facilitate the immediate needs of their patients. This further confirms that there is no problem of access to Plan B.

**C. Board Testimony on Access to Plan B**

86.     At trial, Board witnesses confirmed that there was no problem of access to Plan B or any other drug, either before or after the rulemaking process. Former Chair Harris, who served on the Board during both rulemaking processes, explained that the Board has never identified a single drug that patients are unable to access in Washington:

> Q. Four years after the rule-making process began and you completed that 2010 process, the board still was not able to identify a single drug that was in Washington that was unable to be obtained due to access issues, right?
> A. As far as I know, we have no cases.[102]

87.     All three former Board Executive Directors, the Board's Pharmacist Consultant and former and current Board members, similarly testified. For example: pharmacy consultant Tim Fuller testified:

---

[101]  Tran. Shafer, Day 10, p. 141.
[102]  Tran. Harris, Day 10, pp. 105, 26 (mentioning DEA restrictions on amphetamines, but no awareness of any other access problems).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 32
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Q. And you are not aware of any area in Washington, rural or nonrural for which there is an access problem for time-sensitive drugs, correct?
A. Correct.[103]

Mr. Saxe testified that he could not recall any complaints to the Board, about access to medication in rural areas. And that the only information before the Board on that issue was from the 2006 survey.[104] Ms. Salmi testified:

Q. At stakeholders meetings, you can't recall, can you, a single community in the State that was identified as a location where one couldn't get their HIV medication, can you?
A. No, but there was concerns about making sure that there's access to medication.[105]

***

Q. [A]nd there's not a single area in the State that was identified where there was an access problem at the stakeholders meetings to Plan B, right?
A. No one came forth and said specifically this community. There was general concern. [106]

After her deposition was read into the record, Ms. Boyer also agreed that she was not aware of any pharmacy refusing access to Plan B patients or of any other access problem.[107]

88.    Similarly, after years of test shopping and litigation, Defendants have not identified even one instance where a pharmacist refused to fill or referred a patient because of a personal, non-conscientious objection.[108] Despite frequent mentions of HIV during the rulemaking process, there is no evidence that any patient has ever been denied HIV drugs due to a conscientious or "personal" objection. Neither one of the two intervenors diagnosed with HIV/AIDS has ever

---

[103] Tran. Fuller, Day 4, pp.46-47.
[104] Tran. Saxe, Day 2, pp. 29-30; PX 432 (DOH Survey).
[105] Tran. Salmi, Day 8, p.90.
[106] Tran. Salmi, Day 8, pp. 96-97.
[107] Tran. Boyer, Day 6, pp. 21-22; *see also* PX 408 (Email from Board Member Connolly), pg. 4.
[108] See e.g., Tran. Schouten, Day 4, p. 124; Tran. Billings, Day 7, p. 171-72, 174; Tran. Harmon, Day 8, pp. 4, 15; PX 527 (Andreini Declaration).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 33
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

been denied medication, nor were they aware of anyone else denied HIV medication due to a personal or conscientious objection.[109] Board witnesses confirmed that no one testified in either the 2006-07 or 2010 rulemaking process to being aware of any HIV denials or access issues.[110]

89. Finally, no Board witness, or any other witness, was able to identify any particular community in Washington—rural or otherwise—that lacked timely access to emergency contraceptives or any other time-sensitive medication.

90. In short, the weight of the testimony at trial strongly supports the conclusion that there was no problem of access to Plan B or any other drug, either before or after the rulemaking process.

**D. Refusal Stories**

91. In the absence of general, empirical, or systematic evidence of an access problem, Defendants introduced evidence several anecdotal "refusal stories" in support of the argument that there is an access problem. For example, during the 2006-07 rulemaking process, the Governor specifically asked Planned Parenthood to collect refusal stories.[111] In response, Planned Parenthood came up with the Four Refusal Stories that were repeated throughout the 2006 rulemaking process: abortion-related antibiotics at Swedish Medical Center, prenatal vitamins in Yakima, syringes for a man with "gelled" hair and tattoos, and emergency contraception in Redmond and a map repeating some of those stories and adding a few new ones.[112] Similarly, during the 2010 rulemaking process, the State and Intervenors sought to supplement the rulemaking record with additional refusal stories. And at trial, Intervenors sought to introduce additional refusal stories that

---

[109] Tran. Schouten, Day 4, p. 124; Tran. Billings, Day 7, p.174.
[110] *Id.*; Tran. Salmi, Day 8, pp. 94.
[111] Tran. Hulet, Day 3, pp. 79-80.
[112] PX. 43 (Planned Parenthood Letter); Ex. B-10 (Map). There was no evidence that the Board reviewed the map prepared by Planned Parenthood.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 34
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

1    never arose during the rulemaking process.

2        92.    After carefully considering the refusal stories in the rulemaking

3    record and at trial, the Court finds that those stories do not demonstrate a

4    problem of access to medication, for several reasons.

5        93.    First, many of the refusal stories involved complaints that a drug was

6    not in stock, without any reference to conscientious or other objections.[113] That

7    does not demonstrate an access problem. As noted above, pharmacies may be out

8    of stock for a wide variety of reasons, many of which are permissible under the

9    Regulations. In fact, the Board's survey found that pharmacies were more than ten

10   times more likely to not stock Plan B for business reasons than for reasons of

11   conscience.[114]

12       94.    Second, many of the refusal stories did not involve refusals at all.

13   Rather, they involved complaints that a pharmacist said something a patient

14   found offensive;[115] that a patient had to wait a short period of time before

15   obtaining a drug;[116] or that the patient received the drug from a different

16   pharmacist who was on duty at the same time.[117] Such incidents are generally

17   permissible under the Regulations.

---

[113] For example, Defendant-Intervenor Rhiannon Andreini testified that a pharmacist told her the pharmacy "did not carry" Plan B. She also testified that the pharmacist did not tell her that he had a religious objection to stocking Plan B and she could only speculate about the reason why he did not carry the drug. Trans. Andreini, Day 9, p. 84. See also PX 527 (Andreini Declaration); Ex. B-41 (Celia Warren letter); Ex. B-39 (Jennifer Crow letter). Ms. Warren test shopped five pharmacies. Two of the pharmacies were "out of stock". Ms. Crow tried to obtain emergency contraception at a pharmacy and was told they did not stock it, with no reference to a conscientious or other objection to the drug.

[114] Ex. 432 (DOH Survey).

[115] For example, Ms. Harmon, an Intervenor and former Planned Parenthood volunteer, testified that she was offended in 2003 when a pharmacist advised her that Plan B was not a form of birth control. But Plan B's labeling specifically notifies patients that it is not a form of birth control. And Ms. Harmon obtained Plan B without delay; Tran. Harmon, Day 8, pp. 12-13, 15, PX 424.

[116] For example, Dr. Kate McLean testified about an incident where one of her patients seeking misoprostol was asked to wait until a pharmacist returned from lunch break, but declined to do so. Tran. McLean Day 8, 178-82.

[117] Tran. Harmon, Day 8, p. 15.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

95.     Third, several of the key refusal stories were investigated by the Board and found to be inaccurately reported, unsubstantiated, or not a violation of the rules. For example, the Board investigated the Swedish Medical Center incident, which figured prominently in the 2006 rulemaking process, and found that the pharmacist ultimately did dispense the drug, did not violate any rules, and did not impose a barrier to access.[118] Similarly, the Board investigated the prenatal vitamins complaint, which also figured prominently in the rulemaking process, and found that the patient had refused to pay for the product.[119]

96.     Fourth, many of the refusal stories were uncorroborated or involved mere hypotheticals. One of the most prominent stories involved an alleged denial of syringes for a man with gelled hair and tattoos. But this incident was presented in a letter to the Board as a hypothetical. It has never been corroborated, and no patient has ever filed a complaint related to the denial of syringes.[120] (Pharmacies also have no obligation to deliver a drug if they believe the prescription is fraudulent, WAC 246-869-010(1)(d), and no obligation to deliver syringes if they believe the syringe may be used for an unlawful purpose, RCW 70.115.050.)

97.     Fifth, several of the refusal stories involved prescriptions for misoprostol, which is commonly used in a medical abortion procedure. But pharmacists have a right under state law not to participate in an abortion. RCW 9.02.150. Several witnesses testified about the delicate situations that can arise when a patient is seeking misoprostol for an abortion or a miscarriage as the recommended dosage is similar, and how inquiring into the patient's situation is not advisable.[121] Thus, when a pharmacist is presented with a prescription for

---

[118] PX 98 (DOH Investigation Report).
[119] PX. 217 (DOH letter).
[120]    Tran. Saxe, Day 2, p. 167. This example was also repeated in the HRC's letter. PX. 70 (HRC letter).
[121] Tran. McLean, Day 8, p. 176.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 36
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

misoprostol, and it is unclear whether the prescription is for an abortion or not, referring the patient elsewhere is preferable to having the pharmacist interrogate the patient about what the prescription will be used for. Thus, these stories do not demonstrate a problem of access.

98.     Sixth, many of the refusal stories involved conduct that is permitted under the Regulations. For example, in the story involving emergency contraception in Redmond—the fourth of the prominent refusal stories during the 2006 rulemaking—the patient was seeking Plan B without a prescription.[122] At that time, Plan B was not available for sale without a prescription. Thus, the pharmacy would have been violating the law if it had provided the drug. Instead, it offered to refer the patient to a nearby pharmacy that could write a prescription under a collaborative agreement, but the patient refused. Although Planned Parenthood received this information three months before submitting this story to the Board, it intentionally withheld the information and instead characterized the incident as an example of a pharmacist refusal that posed a risk to patient health.[123]

99.     That brings up another issue with the refusal stories: Many of those stories appear to be distorted, exaggerated, or artificially manufactured in ways that undermine their credibility. In the Redmond incident, for example, Planned Parenthood withheld several key facts that would have given the Board a more complete record, including the fact that the patient lacked a prescription.[124] Similarly, in the incident involving Dr. McLean, Planned Parenthood characterized the conduct as a "denial" that required the patient to have

---

[122] PX 25 (Planned Parenthood letter to pharmacy ), 28 (Letter from pharmacy to Planned Parenthood).
[123] PX. 43 (Planned Parenthood Letter).
[124] PX. 43; 25, 28.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

surgery.[125] But in reality, the patient was merely asked to wait a few minutes, and Dr. McLean did not tell the Board that the incident was the cause of surgery. Thus, Dr. McLean acknowledged that Planned Parenthood's letter to the Board was incomplete.[126]

100.    Similarly, many of the refusal stories were not the result of natural encounters with access problems, but were instead manufactured by an active campaign of test shopping. During the 2006-07 rulemaking process, Planned Parenthood and other pro-choice activists published advertisements on their websites and in fliers soliciting refusal stories; they solicited women to call pharmacies to ask whether they stocked Plan B; and they sent women into pharmacies to test whether the pharmacists would dispense Plan B. They also developed forms to "document" the incidents including asking women to provide their opinions on whether the pharmacist expressed "disapproval" when they requested the drug.[127] Several pharmacists and owners confirmed the test shopping said that they would receive a rash of calls or requests for Plan B within a few days.[128] Both Ms. Thelen and Ms. Mesler were test-shopped by Planned Parenthood.[129]

101.    Having closely examined the refusal stories, including those in the rulemaking record and the testimony and documents submitted at trial, the Court finds that the refusal stories do not demonstrate a problem of access. At best, Defendants have offered a handful of anecdotes that do not cast meaningful light

---

[125] Ex B-216 (Planned Parenthood letter).
[126] Tran. McLean, Day 8, p. 178.
[127] PX 448 (Cover My Pills Ad); PX 490 (Data Collection Form); PX 513 (Data Collection Form); PX 514 (Data Collection Form).
[128] Tran. Stormans, Day 5, p. 17; Tran. Thelen, Day 6, p. 140; Tran. Shafer, Day 1, p. 125.
[129] PX. 490, 514; Trans. Thelen, Day 6, p. 176. Trans. Blackman, Day 5, p. 118. Planned Parenthood used the test shopping incident involving Ms. Thelen in a letter to the Board. Ex. B-21 (Planned Parenthood letter) After hearing testimony from Ms. Thelen and Ms. Dana (Blackman) Gigler, I find that Planned Parenthood's account to the Board was misleading.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 38
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

on the issue of access—most of which involve conduct that is not prohibited by the Regulations. At worst, the refusal stories show a concerted effort to manufacture an alleged problem of access where there isn't one.

## IV. The Text of Washington's Regulations

102. The relevant portions of the Regulations are codified at WAC 246-869-010 (the "Delivery Rule") and WAC 246-869-150(1) (the "Stocking Rule").[130] The Delivery Rule provides, in pertinent part, as follows:

(1) Pharmacies have a duty to deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies, or provide a therapeutically equivalent drug or device in a timely manner consistent with reasonable expectations for filling the prescription, except for the following or substantially similar circumstances:

(a) Prescriptions containing an obvious or known error, inadequacies in the instructions, known contraindications, or incompatible prescriptions, or prescriptions requiring action in accordance with WAC 246-875-040.

(b) National or state emergencies or guidelines affecting availability, usage or supplies of drugs or devices;

(c) Lack of specialized equipment or expertise needed to safely produce, store, or dispense drugs or devices, such as certain drug compounding or storage for nuclear medicine;

(d) Potentially fraudulent prescriptions; or

(e) Unavailability of drug or device despite good faith compliance with WAC 246-869-150.

(2) Nothing in this section requires pharmacies to deliver a drug or device without payment of their usual and customary or contracted charge.

---

[130] Another portion of the Regulations is codified at WAC 246-863-095(4). This portion defines "unprofessional conduct" to include destroying or refusing to return a lawful prescription, violating a patient's privacy, discriminating against a patient, or intimidating or harassing a patient. WAC 246-863-095(4); *see also* WAC 246-869-010(4) (same). This provision, which was uncontroversial, clarifies that pharmacists can be subjected to professional discipline for engaging in unprofessional conduct. No party contends that it applies to Plaintiffs.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 39
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

(3)     If despite good faith compliance with WAC 246-869-150, the lawfully prescribed drug or device is not in stock, or the prescription cannot be filled pursuant to subsection (1)(a) of this section, the pharmacy shall provide the patient or agent a timely alternative for appropriate therapy which, consistent with customary pharmacy practice, may include obtaining the drug or device. These alternatives include but are not limited to:

(a) Contact the prescriber to address concerns such as those identified in subsection (1)(a) of this section or to obtain authorization to provide a therapeutically equivalent product;

(b) If requested by the patient or their agent, return unfilled lawful prescriptions to the patient or agent; or

(c) If requested by the patient or their agent, communicate or transmit, as permitted by law, the original prescription information to a pharmacy of the patient's choice that will fill the prescription in a timely manner.

WAC 246-869-010(1)-(3).

103.    In general, the Delivery Rule imposes on pharmacies "a duty to deliver lawfully prescribed drugs . . . in a timely manner." WAC 246-869-010(1) (emphasis added) (the "Delivery Rule"). This duty is then subject to several exceptions. Five exceptions are enumerated in WAC 246-869-010(1)(a)-(e). A sixth exception says that pharmacies need not dispense a drug "without payment of their usual and customary or contracted charge." WAC 246-869-010(1)(a)-(e). The seventh exception is a catch-all provision applying to any circumstances that are "substantially similar" to the first five exceptions. WAC 246-869-010(1). These exceptions will be discussed in greater detail below.

104.    A key exception is WAC 246-869-010(1)(e). It provides that a pharmacy need not deliver a drug when it is "[u]navailab[le] . . . despite good faith compliance with WAC 246-869-150 [*i.e.*, the Stocking Rule]." *Id.* In other words, pharmacies need not deliver a drug when (a) the drug is "unavailable" (*i.e.*, out of stock), and (b) the pharmacy is in "good faith compliance with [the Stocking Rule]." Thus, the Delivery Rule must be read together with the Stocking Rule.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 40
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

1       105. The Stocking Rule has been on the books for over forty years. It

2 provides, in pertinent part: "The pharmacy must maintain at all times a

3 representative assortment of drugs in order to meet the pharmaceutical needs of its

4 patients." WAC 246-869-150(1). The terms "representative assortment,"

5 "pharmaceutical needs," and "patients" have never been defined. Until the events

6 giving rise to this litigation, the Board had never attempted to enforce the Stocking

7 Rule against any pharmacy in over forty years.

8 **V.    The Operation of the Regulations**

9       106. The Stocking Rule has now been in force for over forty years, and the

10 Delivery Rule has been in force for over four years. Much of the evidence at trial

11 focused on the effect of these rules in their actual operation. In general, the

12 evidence showed that these Regulations have not restricted the stocking or referral

13 practices of most pharmacies.

14 **A.  Stocking in Practice**

15       107. Since the enactment of the Regulations, pharmacies have continued

16 to exercise broad discretion over which drugs to stock. As several witnesses

17 testified, pharmacies routinely decline to stock drugs for a wide variety of

18 business, economic, and convenience reasons:

19

20 • Pharmacies decline to stock a drug when it falls outside the pharmacy's
    business niche;[131]

21

22

23

---

24 [131] Pharmacies specialize in HIV drugs, pediatric drugs, fertility drugs, diabetes drugs, mental
health drugs, or long-term care drugs. So, for example, pediatric pharmacies typically do not stock

25 drugs for the elderly; HIV pharmacies typically do not stock cancer drugs; and mental-health
pharmacies typically do not stock fertility drugs. *See e.g.,* Tran. Saxe, Day 1, 75:19-20, 87:4-10,

26 Shafer, Day 1, 152:18-153:14; Fuller, Day 4, 66:12-67:9; Stormans, Day 5, 101:18-102:6; Tiel-Boyer,
Day 5, 186:13-22; PX 142, PX 157 (Saxe email); PX 403 (AAG Letter); PX 404 (Harris email).

27

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

- Pharmacies decline to stock drugs when they have insufficient demand;[132]

- Pharmacies decline to stock drugs when they do not want to obtain the equipment or expertise necessary to dispense them;[133]

- Pharmacies decline to stock drugs when they are forbidden to do so by contracts with their suppliers;[134]

- Pharmacies decline to stock drugs when they are too expensive to be profitable;[135]

- Pharmacies decline to stock drugs when they would have to order a larger quantity than the patient requires;[136]

- Pharmacies decline to stock drugs when they have an inadequate shelf life given the pharmacy's demand;[137]

- Pharmacies decline to stock drugs when they lack adequate shelf space;[138]

- Pharmacies decline to stock certain expensive "specialty drugs" for complex conditions;[139]

- Pharmacies decline to stock some drugs unless the patient calls to request the drug in advance;[140]

---

[132] *See e.g.,* Board Chair Awan Dep. 17:16-20; Board's 30(b)(6) designee, Chair Linggi Dep. 18-19, 40, 55-56; Tran. Shafer, Day 1, 99:6-12, 100:24-101:1, 109:2-5; Saxe, Day 2, 163:2-10; Fuller, Day 4, pp. 51-5; Hodgson, Day 8, p. 133-34; Harris, Day 9, p. 40; PX 142, 157, 432; PX 157 (Saxe email).

[133] *See e.g.,* Harris, Day 10, 41:4-25; Shafer, Day 1, 33:11-22; Saxe, Day 1, p. 81, Day 2, 113:4-21; PX 141 (Governor's memo); PX 142 (Saxe email).

[134] *See e.g.,* Tran. Doll, Day 4, 185:9-24; Mesler, Day 6, 190:15-25; Harris, Day 10, 45; Shafer, Day 1; Tran. Mesler, Day 6, p. 189-190.

[135] *See e.g.,* PX 297 (Linggi memo); Tran. Hulet, Day 3, 59:23-60:19; Fuller, Day 4, 15:9-12; Shafer, Day 1, 62:19-24; Boyer, Day 5, 196:13-197:8; Harris, Day 10, 40:11-18; PX 405 (AAG Letter to McDonald); PX 142 (Saxe email); PX 157 (Saxe email); PX 176 (Saxe email re Governor's concern); Tran. Thelen, Day 6, p. 145.

[136] *See e.g.,* Shafer, Day 1, 101:16-25; Hulet Day 3, 141-42; Fuller, Day 4, 27:4-5; Doll, Day 4, 147, 204-05; Board's 30(b)(6) designee Boyer Dep. 18-19; Board's 30(b)(6) designee Salmi Dep. 98-100; PX 405 (AAG letter); Tran. Thelen, Day 6, p. 145.

[137] *See e.g.,* Fuller, Day 4, 24:2-25:6; Saxe, Day 1, 61; Day 3, p. 31, 77; Mesler, Day 6, p. 185; Hulet, Day 3, p. 172; Harris, Day 8, p. 44; PX 397.

[138] *See e.g.,* Fuller, Day 4, 31:13-19; Board Chair Awan Dep. 21-22; PX 343 (AAG email); Shafer, Day 1, p. 100; Harris, Day 9, p. 44, Day 10, 91; PX 157 (Saxe email).

[139] *See e.g.,* PX 297 (Linggi memo); PX 142 (Saxe email); PX 413 (PowerPoint); Fuller, Day 4, 30:19-31:1; Harris, Day 7, p. 36; Day 10, p. 107; PX 356, p. 3 (Board meeting transcript).

[140] *See e.g.,* PX 404 (Harris email).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 42
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

- Pharmacy does not stock the drug because the pharmacist would have to monitor the patient or register with the drug company (e.g., Accutane, Clozapine/Clozaril);[141]

- Pharmacy does not stock Schedule V cough syrup or Schedule V pain-management drugs because of recordkeeping or clientele concerns;[142]

- Pharmacy does not stock the drug because it would attract criminals (e.g., Oxycontin);[143]

- Pharmacy does not stock a drug because it is not on the pharmacy's formulary list;[144]

- Pharmacy does not stock a drug because it is part of a larger chain, which concentrates all of that drug in one pharmacy in the region;[145]

- Pharmacy does not stock a name-brand drug because most insurance plans pay only for the generic.[146]

108.    These stocking decisions were common both before and after enactment of the Regulations. Board witnesses agreed that many of these practices are well-known. But in over forty years, none of these stocking practices has ever been restricted by the Stocking Rule.

**B. Referral in Practice**

109.    Since the enactment of the Regulations, pharmacies have also continued to exercise broad discretion over when to refer patients elsewhere. As the Board has stipulated: "[R]eferral is a time-honored pharmacy practice, it continues to occur for many reasons, and is often the most effective means to meet

---

[141] *See e.g.,* Harris, Day 10, 35:24-36:10, 54:12-55:7; PX 532 (Dockter memo); Tran. Mesler, Day 7, p. 156; Tran. Thelen, Day 6, p. 144.
[142] *See e.g.,* PX 532; Harris, Day 10, 55:8-25; Shafer, Day 1, 107:23-108:5, 105:18-106:5; PX Ex. 532 (Dockter memo) p.2.
[143] *See e.g.,* Doll, Day 4, 172:17-25; Teil-Boyer, Day 5, 180:12-182:20; Saxe, Day 1, p. 82; PX 90 (Board Memo).
[144] *See e.g.,* Tran. Saxe, Day 1, 87:20-88:20; Tran. Mesler, Day 6, p. 189; Tran. Shafer, Day 1, p. 102, Day 10-, p. 158; Tran. Harris, Day 7, p. 116-117, Day, p. 45; Ex. B-44 (Shafer letter to Governor).
[145] *See e.g.,* Harris, Day 10, 41:4-25; PX 435 (SBEIS) p.6; Board 30(b)(6) designee, Linggi Dep. 19-20.
[146] *See e.g.,* Shafer, Day 1, 102:5-20; Fuller, Day 4, 11:3-12.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 43
(C07-5374)

**ELLIS, LI & MCKINSTRY** PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

the patient's request when the pharmacy or pharmacist is unable or unwilling to provide the requested medication." Dkt. #441 ¶ 1.5.

110.    Board witnesses confirmed this stipulation, testifying that referral is a time-honored, routine, and vital means of securing access to medication. They also testified that referral should typically be left to the discretion of the pharmacist, and that referral continues to occur today for a wide variety of reasons.[147]

111.    One of the most common reasons for referral is that a drug is out-of-stock. This may occur when a pharmacy declines to stock a drug for one of the reasons discussed above. But it also may occur when a pharmacy typically stocks a drug but temporarily runs out—for example, because the pharmacy experiences an unexpected spike in demand; a pharmacy is trying to reduce its inventory to become more profitable; or a pharmacy simply makes a mistake and does not order enough of the drug. In either case, as the Board has stipulated, referral "is often the most effective means to meet the patient's request." Dkt. #441 ¶ 1.5.

112.    Even when a pharmacy has a drug in stock, there are a wide variety of business, economic, or convenience reasons why a pharmacy may refer patients elsewhere. Examples include:

- Pharmacy does not deliver the drug because it is temporarily out of stock for business reasons;[148]

- Pharmacy does not deliver the drug because it does not accept the patient's insurance;[149]

---

[147] *See e.g.,* Fuller, Day 4, 33:21-34:18, 65:4-7; PX 157 Teil-Boyer, Day 5, 151:13-20; PX 297 (Linggi memo); Teil-Boyer, Day 6, 13:15-18, 28:5-8; Harris, Day 9, 39:5-24, Day 10 8:7-20, Day 10, 91:7-11, 92:1-3; Day 11, 50:10-12; PX 380.

[148] *See e.g.,* Saxe, Day 2, 22:5-10; Doll, Day 4, 142:6-144:13; Ex. 322 (AAG Statement).

[149] *See e.g.,* Saxe, Day 3, 20:8-21; Fuller, Day 4, 10:23-11:1; Hulet, Day 3, 158:13-16; PX 504, p. 8 (CES); PX 99 (Board Memo); Harris, Day 10, pp. 51, 53.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 44
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

- Pharmacy does not deliver the drug because it does not accept Medicaid/Medicare;[150]

- Pharmacy does not deliver Plan B because the patient is under 17 and the pharmacist on duty is not part of a Collaborative Agreement Program;[151]

- Pharmacy does not deliver the drug because the pharmacist believes the patient might be a drug abuser;[152]

- Pharmacy does not deliver lethal drugs (assisted suicide) for reasons of conscience;[153]

- Pharmacy does not deliver the drug because the pharmacist would have to perform simple compounding;[154]

- Pharmacy does not deliver the drug because it declines to do unit dosing;[155]

- Pharmacy does not deliver the drug over the counter because it requires extra recordkeeping (e.g., Sudafed);[156]

- Pharmacy does not deliver syringes over the counter because of recordkeeping or clientele concerns;[157]

- Pharmacy does not deliver the drug because the patient violates the store's dress code;[158]

- Pharmacy does not deliver the drug because the patient is disruptive;[159]

- Pharmacy does not deliver the drug because it believes the patient may be a shoplifter;[160]

---

[150] *See e.g.,* Saxe, Day 1, 185:5-186:18; Fuller, Day 4, 11:13-12:11; Tran. Shafer, Day 1, p. 102; Tran. Harris, Day 10, p. 52; Tran. Mesler, Day 6, p. 187.

[151] *See e.g.,* Fuller, Day 4, 37:6-19.

[152] *See e.g.,* Hulet, Day 3, 156:5-12; Saxe, Day 3, 28:13-25; WAC § 246-875-010(1)(d); Tran. Fuller, Day 4, p. 13-14.

[153] *See e.g.,* Saxe, Day 1, 186:19-188:19; Fuller, Day 4, 17:22-19:4; Teil-Boyer, Day 6, 109-119.

[154] *See e.g.,* Fuller, Day 4, 19:5-21:22; Harris, Day 10, 42:10-43:6; PX 532; PX 142 (Saxe email); Tran. Mesler, Day 6, p. 190; Tran. Stormans, Day 5, p. 14-15; Tran. Thelen, Day 6, p. 144.

[155] *See e.g.,* Doll, Day 4, 181:15-183:4; Teil-Boyer, Day 5, 190:7-191:22; PX 90 (Board Memo); Tran. Mesler, Day 6, p. 190.

[156] *See e.g.,* Fuller, Day 4, 17:3-21, 23:5-24:1.

[157] *See e.g.,* Teil-Boyer, Day 5, 179:11-180:11, Day 6, 14:12-16; PX 532 (Donna Dockter memo) p.2.

[158] *See e.g.,* Fuller, Day 4, 15:13-16:3; PX 90 (Board Memo).

[159] *See e.g.,* Fuller, Day 4, 16:8-15; PX 90 (Board Memo).

[160] *See e.g.,* Fuller, Day 4, 16:16-25; PX 532 p.2; PX 90 (Board Memo).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 45
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

113.    Referrals for these reasons have been common both before and after enactment of the Regulations. Board witnesses agreed that many of these practices are well-known. But in the four years since the Delivery Rule was enacted, none has ever been the subject of enforcement.

## C. Conscientious Objection in Practice

114.    Thus far, the only conduct that has been actively investigated and treated as a violation of the Regulations is Plaintiffs' conscientious objections to Plan B. As explained in more detail below, Ralph's has been subject to multiple complaints under the Stocking and Delivery Rules. The Board has actively investigated those complaints, and has also initiated a complaint of its own, while dropping analogous complaints against other pharmacies that were temporarily out of stock for business reasons. Several complaints against Ralph's have been stayed pending this litigation. The Board has never dismissed a complaint against Ralph's because it found a Stocking or Delivery Rules violation.

115.    At trial, State's counsel took the position that Ralph's is operating in "outright defiance" of the Stocking Rule. Several Board witnesses agreed that Ralph's is in violation of the rule and faces significant penalties, up to and including the revocation of its license, if it continues to refuse to stock Plan B for reasons of conscience.

## VI.    The Interpretation of the Regulations

116.    While the practical effect of the Regulations is largely undisputed, the interpretation of the Regulations is not. Witnesses offered conflicting testimony on whether the Regulations are intended to prohibit some of the common stocking and referral practices discussed above.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 46
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## A. Interpretation of the Delivery Rule

117. Witnesses also offered conflicting testimony on the scope of the Delivery Rule, and particularly the exceptions to that rule. The Delivery Rule contains five enumerated exemptions, for the following circumstances: (a) erroneous, inadequate, or contraindicated prescriptions; (b) national emergencies affecting availability of a drug; (c) drugs requiring specialized equipment or expertise; (d) potentially fraudulent prescriptions; and (e) drugs that are out of stock. WAC § 246-869-010(1)(a)-(e). In addition to these five exemptions, there is also a catch-all exemption for any "substantially similar circumstances." WAC § 246-869-010(1). And there is an exemption that says no pharmacy can be required to deliver a drug without payment of its "usual and customary or contracted charge." WAC § 246-869-010(2).

118. As noted above, the Delivery Rule has been on the books for over four years, and no pharmacy has ever been found to be in violation of it. Pharmacies continue to decline to deliver drugs, and to refer patients elsewhere, for a wide variety of business, economic, and convenience reasons. Nevertheless, at trial, the State took the position that many common referral practices technically violate the Delivery Rule.

119. Some Board witnesses, including Susan Boyer and Lisa Hodgson,[161] took the position that the exemptions to the Delivery Rule apply only in very narrow circumstances involving threats to patient safety. According to these witnesses, the Delivery Rule includes no "business exemptions"; thus, it is unlawful to refer patients elsewhere for simple compounds, for unit dosing, for over-the-counter drugs involving extra recordkeeping, or for patients who violate store policies.

---

[161] Day 6:15-25; 30(b)(6)Board's 30(b)(6) designee (Salmi) Hodgson Dep., pp 105-09, 116.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 47
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

120.   Other witnesses, including Steve Saxe, Christina Hulet and Rod Shafer,[162] testified that the exemptions in the Delivery Rule were specifically designed not only to protect patient safety, but also to protect standard business reasons for referring patients elsewhere. According to these witnesses, terms like "specialized equipment or expertise," "good faith compliance," "usual and customary [charge]," and "substantially similar circumstances" were included in the Delivery Rule precisely to preserve flexibility for common business practices.

121.   The Court finds the testimony that the Delivery Rule was designed to protect common business practices to be more credible, for several reasons. First, it is consistent with how the Delivery Rule has operated in the four years since it was enacted. In the last four years, the Board has never publicly interpreted or applied the Delivery Rule to prohibit these common business referrals. It has never announced a narrow interpretation of the exemptions in any guidance documents, internal correspondence or newsletters. And it has never attempted to inform pharmacies that these common business referrals are now unlawful. To the contrary, the Board's public statements on the Delivery Rule, have indicated that the rule's primary, if not exclusive, effect is to prohibit conscientious objections to dispensing a drug.

122.   Second, internal Board correspondence strongly indicates that the Delivery Rule was designed to protect referrals for business reasons.

a.   Similarly, in December 2010 Ms. Boyer presented to the Board a definition of specialized drugs for purposes of interpreting the exemption for "specialized equipment or expertise." [163] According to her definition, the Delivery Rule exempts "specialty medications" proscribed for complex or chronic medical

---

[162] Day 1, 72:24-73:4; Day 3, 51:1-52:12, 177:10-24;
[163] PX 413

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 48
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

conditions, including "drugs that are injected or infused," and "drugs that are usually not available at retail pharmacies." She concluded that such medications are "Called out in the Pharmacy Responsibility Rule."

b.   Board Chair, Al Linggi, described these specialty drugs in greater detail in 2009 memorandum to the Board. These, he said, were "examples where directed referrals are most frequently utilized in the practice of pharmacy." Consistent with Ms. Boyer's interpretation, Mr. Linggi's examples included injectable drugs (Lovenox) and other expensive drugs that Mr. Shafer testified are not available in most pharmacies but do not require specialized training or equipment, such as Humira, Norditopin, Ribavirin, and certain immunosuppressants.[164]

123.   Third, this understanding is consistent with every witness's account of the stakeholder meetings that resulted in the Regulations. As Rod Shafer, Christina Hulet, and Steve Saxe agreed, the stakeholder meetings included two opposing camps: the State Pharmacy Association, which wanted to preserve referrals for conscience reasons *and* business reasons; and Planned Parenthood and the other advocates, which strongly opposed referrals for reasons of conscience. The compromise solution was to prohibit referrals for reasons of conscience, but to exempt referrals for business reasons.

124.   Fourth, several Board witnesses testified at trial that the Delivery Rule exemptions protected referrals for business reasons. For example:

a.   Mr. Fuller testified that the "specialized expertise" exemption permits a pharmacy to refer a patient when the pharmacist on duty is not comfortable dispensing a simple compound, even though that is a

---

[164] PX 297; Shafer, Day 10, 136:22-137:25.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 49
(C07-5374)

**ELLIS, LI & MCKINSTRY** PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

skill that all pharmacists are required to learn in pharmacy school.[165]

b. Board witnesses offered conflicting testimony on what level of "equipment" or "expertise" qualified as "specialized equipment or expertise" under WAC § 246-869-010(c). Some witnesses agreed that the Board had discretion under this provision to permit referrals for simple compounding, Tim Fuller and Susan Boyer, or for drugs requiring monitoring (such as Accutane and Clozeril), Gary Harris.[166]

125. Finally, this understanding of the Delivery Rule is consistent with the text of the exemptions. To be sure, some of the exemptions are limited to concerns about patient safety. But the exemption for drugs that are "unavailable despite good faith compliance" with the Stocking Rule is not primarily about patient safety; it is an accommodation of the business reality that pharmacies frequently run out of drugs. And if additional exemptions are permitted in "substantially similar circumstances," it is reasonable to infer that the Board has discretion to make exemptions for other business realities.

126. To the extent that the exemptions in the Delivery Rule could be interpreted more strictly to prohibit some referrals for business reasons, State witnesses Susan Boyer, Jim Doll and Christina Hulet consistently testified that the exemptions would have to be interpreted on a case-by-case basis, depending on the reasons for the relevant conduct. Questions that must be decided on a case-by-case basis would include the definition of "specialized equipment or expertise," "good faith compliance," "usual and customary or contracted charge," and "substantially similar circumstances."[167]

127. Even under a narrow interpretation of the exemptions, there were

---

[165] Day 4, 38:12-20, 20:22-21:4
[166] Day 4, 19:5-8; Tiel-Boyer, Day 5, 172:5-173:11; Day 10, 35:24-36:10, 54:12-55:7
[167] Day 8, 104:11-18, Day 4, 180:13-20; Day 3, 59:16-22

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

several common business referrals that all witnesses agreed were permissible under the Delivery Rule. For example, there is no dispute that pharmacies are permitted to refer patients elsewhere when a drug is temporarily out of stock for business reasons;[168] when the pharmacy does not accept the patient's insurance;[169] when the pharmacy does not accept Medicaid or Medicare; when the pharmacist is reasonably concerned (even incorrectly) that the prescription is fraudulent or the patient is a drug seeker; or when the pharmacy has a conscientious objection to participating in assisted suicide.

128. In sum, the Court finds that, both as a matter of the Board's interpretation and in practice, the Delivery Rule was designed to preserve pharmacies' flexibility to refer patients elsewhere for a wide variety of business, economic, and convenience reasons.

### B. Complaint-Driven Enforcement

129. When questioned about widespread referrals for business reasons, several Board witnesses testified that the Board has never enforced the Regulations against those referrals because the Board is "complaint-driven."[170] According to these witnesses, many common referrals are unlawful, but the Board is unable to enforce the Regulations or otherwise promote compliance until it receives a citizen complaint.[171]

130. The Court finds this testimony to be implausible and not credible. As several witnesses testified, the Board is not limited to citizen complaints, but

---

[168] This can occur for a wide variety of reasons.

[169] Walgreens, for example, which is the largest pharmacy chain in the state, no longer accepts payments from certain insurance plans. Thus, thousands of patients who rely on those insurance plans are barred from accessing any drug from a Walgreens pharmacy. Board witnesses testified to being aware of Walgreens' policy, and several confirmed that it is permissible under the Regulations.

[170] Day 4, 74:18-23; Day 9, 8:1-3; see also Dkt. 522, p.5

[171] Day 1, 83:1-7; Day 5, 177:13-22; Day 8, 146:19-24

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

instead has a wide variety of mechanisms available for promoting compliance.

131.    For example, the Board inspects pharmacies every two years; it can initiate its own complaints; it can send out its own test-shoppers when it reasonably suspects violations; it publishes regular newsletters flagging important compliance issues for pharmacies; and it works with the State Pharmacy Association to raise compliance issues with individual pharmacists.[172]

132.    Responding to complaints is only a small fraction of how the Board ensures compliance with its regulations. As Gary Harris testified, less than one percent of pharmacies ever have a complaint filed against them, while every pharmacy is subject to inspection every two years. An as Jim Doll (791-92) testified, the more common method of ensuring compliance is through inspection and education.

133.    When the Board inspects pharmacies, it routinely checks for compliance with every subsection of WAC § 246-869-150 *except* the Stocking Rule. That is, inspectors check for expired drugs under WAC § 246-869-150(2); they check for contaminated drugs under WAC § 246-869-150(3); they check for proper labeling under WAC § 246-869-150(4); they check for unapproved drugs under WAC § 246-869-150(5); and they check for proper storage under WAC § 246-869-150(6). But they do not check for a "representative assortment" of drugs under WAC § 246-869-150(1).

134.    Several witnesses testified that it would not be difficult to check for a representative assortment of drugs. For example, Steve Saxe, James Doll, Gary Harris, and Rhonda Mesler  agreed that the Board could spot check compliance by looking at a pharmacy's sales records and checking which drugs were on the

---

[172]  Day 7, 49:11-15; Day 8, 61:13-16, 98:13-15); Day 8, 98:23-99:22; Day 10, 15:13-16:23

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

shelf.[173] Saxe, Doll and Harris also agreed that the Board could require pharmacies to keep a log of patients who are referred elsewhere and compare that log with the drugs on the shelf.[174] This would allow inspectors to determine with precision whether a pharmacy was maintaining a representative assortment of requested drugs. Several Board witnesses also testified that the Board can enact regulations prophylactically; thus, it is well within the Board's authority to impose these requirements. But in practice, the Board has made no effort to promote compliance with a strict interpretation of the Stocking Rule.

135.    In addition to inspections, the Board can initiate its own complaints. In fact, the Board initiated a complaint under the Stocking Rule against Ralph's.[175] But despite widely known refusals to stock drugs for business reasons, the Board has never initiated a complaint under the Stocking Rule against any other pharmacy in over forty years.

136.    Finally, the Board publishes newsletters, and holds annual joint conferences with the WSPA throughout the state to inform licensees on compliance issues    But the evidence at trial demonstrated that in over forty years, the Board made no effort to use these channels to promote compliance with a strict version of the Stocking Rule.[176]

137.    The same is true of the Delivery Rule. The Board has made no effort to uncover referrals for business reasons in the inspection process; it has initiated no complaints involving referrals for business reasons; and it has published no newsletters addressing referrals for business reasons.[177]

138.    In sum, the Court finds that the Board need not wait for citizen

---

[173]Day 2, 175:2-24; Day 3, 7:23-9:8, Day 4, 167:25-169:23, Day 10, 20:22-21:1 ;Day 6: 1197-98.
[174]Day 3, 9:9-10:11, Day 4, 172:5-13; Day 10, 21:2-22.
[175] Day 1, 83:8-14; Day 4, 112:24-113:4;  Day 8, 115:9:14.
[176] Day 10,116:11-119:3.
[177] Day 10, 119:10-15.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

complaints to promote compliance with its Regulations; rather, it has a variety of tools available to promote compliance. But in the case of the Delivery Rule and the Stocking Rule, the Board has made no effort to curtail widespread referrals for business reasons.

139. To the extent that the Board relies on citizen complaints, the evidence at trial demonstrated that the enforcement process is potentially subject to manipulation. In the vast majority of cases, a referral for business reasons is never going to generate a complaint. But as shown at trial, Planned Parenthood and other pro-choice groups have conducted an active campaign to seek out pharmacies and pharmacists with religious objections to Plan B and to file complaints with the Board. This has resulted in a disproportionate number of investigations directed at religious objections to Plan B.

140. For example, from 2006 to 2008, complaints involving Plan B accounted for 46% of all refusal complaints filed with the Board. Ralph's alone accounted for one-third of all complaints, making it over 700 times more likely to be the subject of a complaint than the average pharmacy.[178] Complaints involving Plan B were also investigated at a higher rate than complaints involving other drugs. The result was disproportionate enforcement efforts focused on conscientious objections to Plan B.

**C. Accommodations**

141. The Regulations have also prohibited many pharmacies from accommodating their employee's conscientious objections to Plan B or *ella*. Before enactment of the Regulations, pharmacies typically accommodated conscientious objectors by allowing referral. But under the new Regulations, a pharmacy cannot refer patients to other pharmacies for reasons of conscience. Thus, if a pharmacy

---

[178]  Day 8, 115:25-116:22, 119:10-120:7.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

has only one pharmacist on duty—as do most Washington pharmacies—that pharmacist must dispense the drug regardless of her conscientious objections to doing so.

142. During the rulemaking process, the Board discussed only three options for dealing with lone pharmacists who conscientiously object to Plan B: (1) hiring a second pharmacist for each shift, (2) arranging for an on-call pharmacist for each shift, or (3) firing the conscientious objector.

143. The evidence at trial revealed that the first two options are typically unworkable. As Mr. Fuller explained, the cost of hiring a second pharmacist ($80,000 per year) and the cost of an on-call pharmacist are both unrealistic and unaffordable options for most employers. Ms. Boyer also testified that an on-call pharmacist would expect to be paid more than a regular employee, would expect to be paid for a minimum of half a day, and would need several hours of lead time before her shift. Thus, it would typically be faster to refer a patient elsewhere than to wait for an on-call pharmacist to arrive. Similarly, during the trial, Mr. Harris had to return several times to complete his testimony because of his work schedule. When he was asked if his chain pharmacy in the Seattle-area could find a floater or on-call pharmacist for the following day, he responded that his employer could not locate an on-call pharmacist on such short notice.

144. In light of these difficulties, Mr. Fuller opined that firing the conscientious objector was the most likely option for employers that have only one pharmacist on shift at a time. The Court finds this testimony to be credible. [179]

145. Some witnesses suggested that conscientious objectors might be accommodated via telepharmacy. Mr. Fuller, the Board official designated by the

---

[179] Day 4, pp. 40:13-42:14.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Board as the person most knowledgeable regarding telepharmacy,[180] testified that telepharmacy involves a pharmacist at a remote location interacting with patients via an audio and visual link.[181] The remote pharmacist counsels the patient and oversees the technician when dispensing prescription or behind the counter medications such as Plan B.[182]

146. But the evidence at trial demonstrated that telepharmacy is not a viable accommodation, for several reasons. First, state law requires a pharmacist to be responsible for all activity taking place within a pharmacy, which includes supervising pharmacy personnel. Pharmacy technicians are prohibited from filling a prescription unless and until a licensed pharmacist has visually verified it. RCW 18.64.250(2); RCW 18.64A.030(1). This is equally true for a behind-the-counter sale of Plan B. Pharmacists must counsel all patients with a new prescription and be available to respond to questions about refills and behind the counter drugs, such as Plan B for patients over the age of 16. An audio link alone between the pharmacist and the patient has not been approved by the Board and would not satisfy the requirement that the pharmacist oversee pharmacy personnel.[183]

147. Second, Mr. Fuller, testified that the Board has rejected applications for telepharmacy when pharmacies are located nearby.[184]This is because the Board regards in-person patient contact to provide better care to patients than telepharmacy. Thus, it is unlikely that the Board would approve telepharmacy as an accommodation for conscientious objectors when there are nearby pharmacies that offer in-person contact with willing pharmacists—as is the case for each of

---

[180] Day 4, 69:2-5.
[181] Day 4, 93:20-24.
[182] Day 4, 44:5-45:21.
[183] Day 4, 105:19-106:11
[184] Day 4, 101:17-102:25.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 56
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Plaintiffs' pharmacies, and the vast majority of pharmacies in the state.[185]

148.    Thus, it is no surprise that no applicant has ever sought approval for a telepharmacy arrangement to accommodate a conscientious objector. Nor has any applicant sought approval to use telepharmacy when a pharmacist is ill or otherwise unavailable on short notice. In short, given the uncertain cost and approval process for telepharmacy, and the limited nature of its availability , for an employer it is not  a viable option to accommodate  a conscientious objectors. Mr. Fuller agreed   conceding that if he were an employer with the only option of hiring a conscientious objector and accommodating her by telepharmacy, he would not hire the conscientious objector.[186]

## VIII.    The Effect of the 2007 Regulations on the Plaintiffs

149.    The evidence at trial demonstrated that the Regulations have had a direct impact on Plaintiffs' livelihood and families. Plaintiffs are Christians who believe that all of human life is uniquely and inherently precious because it is created by God in His image. Plaintiffs believe that dispensing Plan B or *ella* constitutes direct participation in the destruction of human life. Thus, their religious beliefs prevent them from stocking or delivering Plan B or *ella*.

### A. Impact on the Stormans' family.

150.    Based on the Stormans' religious beliefs, Ralph's does not stock emergency contraceptives. Ralph's has had multiple requests for Plan B and *ella* from new and existing patients. When Ralph's receives requests for those drugs, it informs customers of the nearby pharmacies where they can purchase the drug and offers to call those pharmacies on the customer's behalf. There are over thirty pharmacies within five miles of Ralph's that stock and dispense Plan B.

---

[185] Day 4, 104:2-7.
[186] Day 4, 107:2-9.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 57
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

151.    After the rulemaking process began, pro-choice activists targeted Ralph's. On July 31, 2006, at least nine women filed complaints alleging Ralph's does not stock Plan B. They also filed complaints against Walgreen's, Sav-On and Albertson's in Olympia. All four pharmacies referred patients to nearby providers. As with many of the alleged "refusal" stories in evidence, these women were activists who test shopped these pharmacies, even giving advance notice to Ms. Hulet and the Department of Health that they intended to file complaints against the stores.

152.    In response to the complaints, the Board initiated investigations. Walgreen's, Sav-On, and Albertson's informed the Board that they had referred Plan B customers elsewhere because the drug was temporarily out-of-stock. The investigations of those pharmacies were closed. Ralph's, however, informed the Board that it had a conscientious objection to dispensing Plan B. The investigations remain open.

153.    When Ralph's position became public, pro-choice groups organized a boycott and staged regular and ongoing protests against both of the Stormans' grocery stores. The Governor's office joined in the boycott, informing Ralph's that after 16 years of doing business with it, the Governor's Mansion would no longer purchase groceries there. Other state officials and agencies similarly participated in the picketing and boycott. Each time the Board takes new action on the issue or in this case, the picketing, boycott, and media attention again focuses on Ralph's.

154.    During the pickets, protestors stood in the streets, yelling at Ralph's customers and urging customers to sign-up for the boycott. The Stormans had to hire security to patrol the grounds. One activist created a website specifically targeting Ralph's because of its decision to refer patients for religious reasons.

155.    A pharmacy has been in Ralph's grocery store for nearly 70 years.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 58
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Ralph's relies heavily on the income and customer traffic generated by the pharmacy. Losing the pharmacy would jeopardize the financial viability of the store. While Ralph's has a compounding and closed-door pharmacy inside its building, the retail pharmacy generates far more profit than any other division owned by the Stormans. Kevin Stormans testified that if the State requires them to stock Plan B or *ella*, the Stormans will be forced to close the pharmacy.

156.   For the Stormans family, the loss of their fourth-generation business, ending the opportunity to pass it on to the next-generation, would carry with it a significant emotional impact, in addition to the severe cannot monetary consequences.[187]

157.   Defendants suggested that the outcome of the investigation against Ralph's is unknown and that the Board may close the investigation against Ralph's without discipline. The Court finds this suggestion unpersuasive. It begs the question of why the State hasn't already dismissed the complaints if it had any intention of doing so. The Board has completed two separate investigations against Ralph's. The final investigation reports both concluded that Ralph's had customers who requested Plan B and that the store refuses to stock it for conscientious reasons. Kevin Stormans testified that Ralph's has had requests for Plan B and *ella* from new and existing patients. No evidence suggests the circumstances have changed since the Board completed its investigations.

158.   At trial, the State's counsel repeatedly referred to Ralph's as acting in "outright defiance" of the Stocking and Delivery Rules. Several of the Board witnesses including Chair Gary Harris, former Board member and current Executive Director Susan Teil Boyer, and former Executive Director Lisa Hodgson

---

[187] Day 5, 40:13-22, 106:1-22.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

testified that they believe Ralph's has violated the Stocking and Delivery Rules.[188] Mr. Harris has publicly stated that he will recommend prosecuting religious objectors to the "full extent of the law," and he sits on two of the three investigations that the State admits are pending against Ralph's. Mr. Harris testified that the only disciplinary measure available against pharmacies is revocation. The sanction guidelines suggest this as well, particularly when all of the aggravating factors would apply to Ralph's including Ralph's unwillingness to be "rehabilitated" and the intentional nature of its violation. In sum, Ralph's likely faces eventual revocation of its pharmacy license if the investigations against it are permitted to proceed.

**B. Impact on Ms. Mesler and Ms. Thelen.**

159.   Ms. Mesler and Ms. Thelen have also been harmed by the Regulations.  Both unequivocally testified that their religious beliefs prevent them from dispensing or supervising the sale of Plan B or *ella*.

160.   Ms. Mesler has practiced in Washington State for over 20 years and currently serves as a pharmacy manager. Ms. Thelen has worked as a licensed pharmacist for nearly 40 years. Both have spent thousands of dollars earning their degrees and have completed additional pharmacy courses including learning Spanish to better serve their customers. Both thoroughly enjoy their professions.

161.   Ms. Mesler and Ms. Thelen have informed all of their employers of their conscientious objection to Plan B. All of these employers have permitted referral, and at each place of employment Ms. Mesler and Ms. Thelen worked primarily alone during their shifts.

162.   After the Regulations were passed, both employers told Ms. Mesler

---

[188] Day 1, 34:25-35:8; 34:Day 6, 182: 21-25; Day 8, 109:3-6.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 60
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

and Ms. Thelen that they would not be able to accommodate them. They declined for financial reasons to hire a second, on-call, or floater pharmacist to work at the same time. Mesler's employer reiterated in December that she would need to transfer to Oregon or Idaho to remain employed if the Court lifts the injunction. Ms. Thelen has already been constructively discharged as a direct result of the Regulations. While she found another position, that position requires her to work later hours, denies her benefit options that she needed, required her to take a $16,000 pay cut and significantly lengthened her commute.[189]

## IX. The Effect of the 2007 Regulations on Catholic pharmacies

163. Plaintiffs are not the only pharmacies or pharmacists with conscientious objections to Plan B and *ella*. The three largest Catholic health systems in this State testified by declarations in this case.[190] Catholic hospitals, like all hospitals, provide an increasing amount of primary care through their emergency rooms—particularly to the poor. Catholic hospitals play an integral role in Washington's health care system. Three in ten of the State's hospital beds are in a Catholic hospital. Together, these three health systems are responsible for 18 hospitals, 17 inpatient pharmacies, and 15 outpatient or retail pharmacies in Washington.

164. The three largest systems—the Franciscan, Providence, and PeaceHealth Systems—have a religious objection to dispensing Plan B or *ella*. The only exception is that the Catholic Ethical and Religious Directives permit Catholic inpatient pharmacies to dispense Plan B for the treatment of sexual assault victims after appropriate testing. Mr. Shafer testified that it was widely known in the pharmaceutical community at the time of the 2006-07 rulemaking

---

[189] Day 6, 135:11
[190] Dkt #531

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 61
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

that Catholic pharmacies did not stock Plan B.

165.    Despite the widely known fact that Catholic outpatient pharmacies do not stock Plan B or *ella*, the Board has made no effort to enforce the Regulations against those pharmacies, nor has it informed those pharmacies that they must begin stocking those drugs.

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 331 1343, 1367, 2201 and 2202, and under 42 U.S.C. §§ 1983 and 1988.

2.    At trial, the parties have raised four main legal issues: (1) whether the Ninth Circuit's preliminary injunction ruling on Plaintiffs' free exercise claim constitutes the "law of the case"; (2) whether the Regulations violate the Free Exercise Clause; (3) whether the Regulations violate the Supremacy Clause; and (4) whether the Regulations violate Due Process Clause. The Court addresses each legal issue in turn.

## I.  Law of the Case

3.    Defendants' primary argument on remand has been that the Ninth Circuit definitively resolved most of the factual and legal issues in this case, and that the only question at trial is whether the rules satisfy the rational basis test. Specifically, they argue that the Ninth Circuit held the Regulations to be "neutral and generally applicable," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1137 (9th Cir. 2009), and that this preliminary-injunction opinion is now the "law of the case."

4.    This argument fails for several reasons. First, the Ninth Circuit has repeatedly held that "decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits." *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n.3 (9th Cir. 1985) (emphasis added; internal quotation omitted); *see also* 18B Charles Alan Wright, Arthur R. Miller &

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 62
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Edward H. Cooper § 4478.5 (2d ed. 2002) (preliminary injunction rulings "do not establish law of the case"). This is because preliminary injunction rulings are merely a predication about "the plaintiff's *likelihood* of success on the merits," not a decision on "whether the plaintiff has *actually* succeeded on the merits." *S. Or. Barter Fair v. Jackson Cnty., Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004) (emphasis added). It is also because preliminary injunction rulings are made "on less than a full record." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007). Thus, upon remand after a preliminary injunction ruling, the lower court is free to make "findings and conclusions to the contrary based upon evidence which may be received at the trial on the merits." *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969) (emphasis added).

5.     The reasons for this rule are fully applicable here. First, the question of whether the Regulations are neutral and generally applicable is highly fact-intensive. The answer turns not just on the text of the Regulations, but on "the effect of a law in its real operation." *Lukumi*, 508 U.S. at 535. As the Ninth Circuit noted, this includes factual questions such as: whether the Regulations are "substantially underinclusive" in practice, *Stormans*, 586 F.3d at 1134; whether the Regulations "actually increase access to medications" in practice; *id.* at 1135; whether the exemptions in the Regulations "are narrow" in practice, *id.*; and whether the Regulations have been "fairly and evenly applied" in practice, *id.* Under *Lukumirl*, this Court must also consider whether the Regulations create "a system of . . . individualized exemptions" based on "the reasons for the relevant conduct." 508 U.S. at 537. And, although the law on this point is "unsettled," the Court might also need to consider "the historical background" of the Regulations and the "legislative history." *Stormans*, 586 F.3d at 1131-32. All of these questions

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

1  involve factual issues, which make the decision about whether a law is neutral and

2  generally applicable a mixed question of law and fact.

3      6.    The factual record on these issues is dramatically different now than

4  it was at the preliminary injunction stage. At the preliminary injunction stage,

5  this Court and the Ninth Circuit were limited to the text of the Regulations, the

6  Board's survey on access to Plan B, a handful of public letters and meeting

7  minutes, and some newspaper articles. There was no evidence on how the

8  Regulations or the exemptions applied in practice; there was no evidence on the

9  Board's discretion to interpret and enforce the Regulations; and there was no

10  evidence on how the Regulations have been enforced in practice.

11      7.    There has now been a twelve-day bench trial with 22 witnesses

12  including deposition testimony and hundreds of trial exhibits. There is voluminous

13  new evidence on the scope and application of the Regulations; the effect of the

14  Regulations; the Board's discretion to interpret and enforce the Regulations; the

15  historical background of the regulations; and the enforcement of the Regulations

16  in practice. The parties have also entered binding factual stipulations on key

17  issues, including access to medication. All of this evidence is relevant to the

18  question of whether the regulations are constitutional. None of it was previously

19  before this court or the Ninth Circuit. Accordingly, the Ninth Circuit's ruling does

20  not foreclose "findings and conclusions to the contrary based upon evidence which

21  may be received at the trial on the merits." *Washington Capitols Basketball Club,*

22  *Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969).

23      8.    Beyond the new facts, Plaintiffs have also raised new legal arguments

24  that were not before the Ninth Circuit. For example, Plaintiffs have raised new

25  arguments based on how the exemptions to the Regulations are applied in

26  practice; how the Board has broad discretion to grant individualized exemptions

27

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 64
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

from the Regulations; and how the Regulations have been enforced in practice. None of these legal claims were before the Ninth Circuit; thus, this Court must consider them in the first instance.

9.      Finally, the Ninth Circuit's opinion confirms that it had no intention of foreclosing a full trial on the merits. At least seven times, the Court highlighted the unique procedural posture of the case and the "sparse" preliminary-injunction record.[191] The Court also said it expected this Court to receive "more recent and comprehensive data" on access to Plan B. *Id.* at 1115 n.2 (emphasis added). And it said it expected this Court to conduct "a trial on the merits" to determine whether "compell[ing] [Plaintiffs] to stock and distribute Plan B . . . violates [Plaintiffs'] constitutional rights." *Id.* at 1138.

10.     In short, given the significantly different procedural posture, factual record, and legal arguments, the parties "are free to litigate the merits." *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3 (9th Cir. 1985).

## II. Free Exercise Clause

11.     On the merits, Plaintiffs' primary claim is that the Regulations violate the Free Exercise Clause because they burden Plaintiffs' religious beliefs, are not neutral or generally applicable, and cannot satisfy strict scrutiny.

---

[191] *See*:

- *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1123 (9th Cir. 2009) ("Given the procedural posture of the case, . . . the record with respect to Mesler and Thelen is sparse.");
- *id.* at 1126 ("Here, the record is admittedly sparse . . .");
- *id.* (noting "the preliminary nature of the record");
- *id.* at 1131 ("The evidentiary record . . . [is] thin given the procedural posture of this case . . .");
- *id.* at 1133 (questioning whether "the record indicates anything about the Board's motivation in adopting the final rules");
- *id.* at 1135 ("Based on the sparse record before it, the district court erred in finding that access to Plan B was not a problem.");
- *id.* at 1141 ("While we have the discretion to affirm the district court on any ground supported by the . . . record, in light of the undeveloped record, we decline to do so.") (internal citations and quotations marks omitted).

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

## A. Overview of governing legal principles

12.    The Free Exercise Clause of the First Amendment provides: "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof . . . .*" U.S. Const. amend. I (emphasis added). The Free Exercise Clause has been applied to the States through the Fourteenth Amendment. *Lukumi*, 508 U.S. at 531.

13.    Under Supreme Court precedent, a law burdening religious exercise generally does not violate the Free Exercise Clause if it is "neutral and generally applicable." *Employment Division* v. *Smith*, 494 U.S. 872, 880 (1990). But if the law is "not neutral or not of general application," it is subject to strict scrutiny; that is, it is unconstitutional unless it is narrowly tailored to advance a compelling governmental interest. *Lukumi*, 508 U.S. at 546. Thus, the key question on the merits is whether the Regulations are "neutral and generally applicable."

14.    As the Ninth Circuit has pointed out, two key Supreme Court cases define that phrase—*Smith* and *Lukumi*. *Stormans*, 586 F.3d at 1130. *Smith* involved a blanket criminal ban on possession of peyote. Two Native Americans lost their jobs and were denied unemployment compensation because they ingested peyote at a religious ceremony. *Id.* at 874. The question before the Supreme Court was "whether that [criminal] prohibition [on possession of peyote] is permissible under the Free Exercise Clause." 494 U.S. at 876. In a 6–3 decision, the Supreme Court upheld the law. According to the Court, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" *Id.* at 879. Because the law was "an across-the-board criminal prohibition on a particular form of conduct," it was both neutral and generally applicable, and the Court upheld the law. *Id.* at 884.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

15.     *Lukumi* involved four municipal ordinances that restricted the killing of animals. A Santeria priest challenged the ordinances under the Free Exercise Clause, and the key question was whether the ordinances were "neutral and of general applicability." 508 U.S. at 531. In a 9–0 decision, the Supreme Court struck down the ordinances.

16.     The first half of the Court's analysis (Part II.A.1) dealt with the requirement of "neutrality." As the Court explained, when determining whether a law is neutral, "[f]acial neutrality is not determinative." *Id.* at 534. Rather, the Free Exercise Clause forbids even "covert" hostility to religion and "subtle departures from neutrality." *Id.* (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)). Thus, the courts "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* Because the "effect of [the] law in its real operation" was to accomplish a religious gerrymander, the Court held that it was not neutral. *Id.* at 535-38.

17.     The second half of the Court's analysis (Part II.B) dealt with the requirement of "general applicability." As the Court explained, the ordinances fell "well below the minimum standard" of general applicability, because they were substantially "underinclusive" with respect to their stated ends. *Id.* at 543. That is, they "fail[ed] to prohibit nonreligious conduct that endanger[ed] [the government's] interest in a similar or greater degree than Santeria sacrifice d[id]." *Id.*

18.     Although the requirements of neutrality and general applicability are "interrelated," they must be addressed separately. *Stormans*, 586, F.3d at 1130 (quoting *Lukumi*, 508 U.S. at 531). Plaintiffs offer six arguments for why the Regulations are not neutral or generally applicable—three involving the

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 67
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

requirement of general applicability, and three involving the requirement of neutrality:

    a. *Categorical Exemptions:* The Regulations are not generally applicable because they provide categorical exemptions for secular refusals to stock or dispense a drug, but not for conscientious objections.

    b. *Individualized Exemptions:* The Regulations are not generally applicable because they give the government discretion to make individualized exemptions depending on the reasons why a pharmacy does not stock or dispense a drug.

    c. *Selective Enforcement:* The Regulations are not generally applicable because they have been selectively enforced against conscientious objections to Plan B.

    d. *Religious Gerrymandering:* The Regulations are not neutral because they have been gerrymandered to apply almost exclusively to conscientious objections to Plan B.

    e. *Discriminatory Intent:* The Regulations are not neutral because they were enacted with discriminatory intent.

    f. *Differential Treatment:* The Regulations are not neutral because they provide differential treatment among religions.

19.    This Court will address the requirement of general applicability first, since that is where Plaintiffs place the most emphasis.

## B. General Applicability – Categorical Exemptions

20.    Under the general applicability requirement, this Court must evaluate whether the Regulations are "substantially underinclusive." *Stormans*, 586 F.3d at 1134. One way to prove that a law is substantially underinclusive is to show that the law "creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection." *Fraternal Order of Police*, 170 F.3d at 365 (Alito, J.); *accord Lukumi*, 508 U.S. at 542; *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1035 (9th Cir. 2009) (Noonan, J., concurring); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 68
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

(3d Cir. 2004) (Alito, J.); *Rader v. Johnston*, 924 F.Supp. 1540, 1551-53 (D. Neb. 1996)

21.     In *Fraternal Order of Police*, for example, a police department adopted a regulation prohibiting officers from growing beards. The regulation granted an exemption for beards grown for medical reasons, but refused an exemption for beards grown for religious reasons. Because this represented a "value judgment in favor of secular motivations, but not religious motivations," the law was not neutral and generally applicable. *Id.* at 366.

22.     Thus, the key question under *Fraternal Order of Police* and *Lukumi* is whether the law exempts "nonreligious conduct that endangers [the government's] interests in a similar or greater degree than [the prohibited religious conduct]." *Lukumi*, 508 U.S. at 543; *accord Fraternal Order of Police*, 170 F.3d at 366. So, for example, if a law prohibits animal killing for religious reasons, but exempts similar animal killing for nonreligious reasons, the law is not generally applicable. *Lukumi*, 508 U.S. at 543. And if a law prohibits beards grown for religious reasons, but exempts similar beards grown for medical reasons, the law is not generally applicable. *Fraternal Order of Police*, 170 F.3d at 366.

23.     Here, the relevant religious conduct is providing a facilitated referral when a patient requests Plan B—either because the pharmacy does not stock Plan B as a matter of conscience, or because an individual pharmacist cannot dispense it for reasons of conscience. The question is whether the Regulations permit nonreligious referrals that undermine timely access to medication just as much as these religiously motivated referrals would.

24.     At the preliminary injunction stage, when the only relevant evidence consisted of the text of the Regulations, the Ninth Circuit concluded that all of the

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 69
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

exemptions in the Regulations "are narrow," and that none permits secular conduct that undermines "access to medications." 586 F.3d at 1135.

25. But after twelve days of trial, including voluminous testimony and documentary evidence on the scope and application of the exemptions, it is clear that the exemptions are not as "narrow" as they may once have appeared, and that they permit a wide variety of nonreligious referrals "that endanger[] [the government's] interests in a similar or greater degree than" Plaintiffs religiously motivated referrals. *Lukumi*, 508 U.S. at 543.

26. The following chart summarizes the evidence on what types of referrals are permitted under the Regulations:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 70
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

| | Reason for Referral | Prohibited by the Regulations | Permitted Categorically | Permitted in Practice |
|---|---|---|---|---|
| 1 | Pharmacy does not stock or deliver Plan B or *ella* for reasons of conscience | X | | |
| 2 | Pharmacy does not deliver the drug because it is temporarily out of stock for business or convenience reasons | | X | |
| 3 | Pharmacy does not deliver the drug because it chooses not to accept the patient's insurance due to low reimbursement rates or administrative challenges | | X | |
| 4 | Pharmacy does not deliver the drug because it does not accept Medicaid or Medicare | | X | |
| 5 | Pharmacy does not deliver Plan B because the patient is under 17 and the pharmacist on duty is not part of a Collaborative Agreement Program | | X | |
| 6 | Pharmacy does not deliver the drug because the pharmacist believes the patient might be a drug seeker | | X | |
| 7 | Pharmacy does not deliver lethal drugs (assisted suicide) for reasons of conscience. RCW 70.245.190(1)(d). | | X | |
| 8 | Pharmacy does not deliver syringes because pharmacist was unable to satisfy herself that it is intended for legal use. RCW 70.115.150. | | X | |
| 9 | Pharmacy does not stock the drug because it falls outside the pharmacy's chosen business niche | | X | |
| 10 | Pharmacy does not stock the drug because it determines that it has insufficient demand to trigger the Stocking Rule | | X | |
| 11 | Pharmacy does not stock the drug because it does not want to obtain specialized equipment or expertise | | X | |
| 12 | Pharmacy does not stock the drug because it is forbidden to do so by a contract with its supplier | | X | |
| 13 | Pharmacy does not deliver the drug because the pharmacist would have to perform simple compounding | | | X |

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 71
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

| | | Reason for Referral | Prohibited by the Regulations | Permitted Categorically | Permitted in Practice |
|---|---|---|---|---|---|
| | 14 | Pharmacy does not deliver the drug because it declines to do unit dosing or blister packing | | | X |
| | 15 | Pharmacy does not deliver the drug over the counter because it requires extra recordkeeping (e.g., Sudafed) | | | X |
| | 16 | Pharmacy does not deliver syringes over the counter because of clientele concerns | | | X |
| | 17 | Pharmacy does not deliver the drug because the patient is disruptive, violates the store's dress code, or the pharmacy believes the patient may be a shoplifter | | | X |
| | 18 | Pharmacy does not stock the drug because in the discretion of the pharmacy there is low demand | | | X |
| | 19 | Pharmacy does not stock the drug because of its carrying costs (e.g., the pharmacy must order more of the drug than the patient requires) | | | X |
| | 20 | Pharmacy does not stock the drug because it has a short shelf-life | | | X |
| | 21 | Pharmacy does not stock the drug because it lacks adequate shelf space to carry all drugs needed by patients | | | X |
| | 22 | Pharmacy does not stock the drug because it is an expensive drug | | | X |
| | 23 | Pharmacy does not stock the drug unless the patient calls to request the drug in advance | | | X |
| | 24 | Pharmacy does not stock the drug because the pharmacist would have to monitor the patient (e.g., Accutane) | | | X |
| | 25 | Pharmacy does not stock Schedule V cough syrup or Schedule V pain-management drugs because of recordkeeping or clientele concerns | | | X |
| | 26 | Pharmacy does not stock the drug because it would attract crime (e.g., Oxycontin) | | | X |
| | 27 | Pharmacy does not stock a drug because it is not on the formulary list of the insurers primarily used by the pharmacy's patients | | | X |
| | 28 | Pharmacy does not stock a drug because it is part of a larger chain, which concentrates all of that drug in one pharmacy in the region | | | X |

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

27.    The Regulations contain several exemptions—some written in the text of the Regulations, some unwritten. Most obvious are the five written exemptions from the Delivery Rule:

    a. *Erroneous prescription:* The prescription contains "an obvious or known error, inadequacies in the instructions, known contraindications," etc.;

    b. *National emergency:* "National or state emergencies or guidelines" limit availability of the drug;

    c. *Specialized equipment or expertise:* The pharmacy lacks "specialized equipment or expertise needed to safely produce, store, or dispense drugs or devices";

    d. *Fraudulent prescription:* The prescription is "potentially fraudulent";
    e. *Out of stock:* The drug is out of stock despite "good faith compliance" with the Stocking Rule.

WAC 246-869-010(1)(a)-(e).

28.    In addition to these five exemptions, there is also a "catch-all" exemption and a "customary payment" exemption:

    a. *Catch-all:* Any circumstances that are "substantially similar" to the first five exemptions; and

    b. *Customary payment:* The customer does not pay the "usual and customary or contracted charge."

WAC 246-869-010(1)-(2).

29.    Plaintiffs do not contest three of these exemptions, and with good reason. The "erroneous prescription" exemption simply protects patients' health; the "national emergency" exemption covers situations beyond the control of the pharmacy; and the "fraudulent prescription" exemption prevents fraud and drug

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 73
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

abuse. As the Ninth Circuit pointed out, none of these exemptions permits conduct that would interfere with timely, safe access to lawful medication. *Stormans*, 586 F.3d at 1135.

30.    By contrast, the other four exemptions, in practice, exempt a wide variety of referrals that undermine the government's alleged interest in ensuring timely access to lawful medication.

31.    *First* is the "specialized equipment or expertise" exemption. WAC 246-869-010(1)(c). This exemption ensures that pharmacies are under no obligation to *stock* drugs that require specialized equipment or expertise. So, for example, even though a pharmacy might receive numerous requests for a particular drug, and even though it might be the only pharmacy in a rural area, it has no obligation to purchase the specialized equipment and begin stocking the drug. Thus, a pharmacy may refer such patients elsewhere even when such a referral would undermine access to medication. This exemption also arguably permits pharmacies to refer patients elsewhere for simple compounding, to avoid having to register with the manufacturer for a drug or monitor the patient's blood work

32.    *Second* is the "customary payment" exemption. WAC 246-869-010(2). As the Ninth Circuit pointed out, "[n]obody could seriously question a refusal to fill a prescription because the customer did not pay for it." *Stormans*, 586 F.3d at 1135. But the evidence at trial demonstrated that this exemption is far broader than just protecting against non-payment. Rather, the Board interprets this exemption broadly to allow referrals for all sorts of business decisions that have nothing to do with non-payment.

   a. For example, pharmacies are categorically permitted to decline to accept insurance plans for any reason at all, even when the pharmacy

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

wishes to avoid the insurer's onerous audit requirements, or the reimbursement rates are just as high as those of other insurance plans. Thus, a customer who is effectively offering full payment can be referred elsewhere, even when such a referral would undermine timely access to medication.

b. The same is true for pharmacies that refuse to accept Medicare Part B, State Labor and Industries or Medicaid. This imposes a significant barrier to access for patients who rely on these programs.

c. Many compounding pharmacies refuse to accept insurance at all. Thus, patients who cannot afford to pay cash, but do have insurance, can be completely denied access to essential drug compounds.

33. All of these practices are categorically permitted under the Regulations. And as several Board members conceded, they can impose a far more serious barrier to access than Plaintiffs' religiously motivated referrals for Plan B. At trial, for example, Board witnesses considered two hypothetical scenarios. In one scenario, a woman is referred elsewhere for Plan B because she offers to pay with unacceptable insurance. The pharmacy is in a rural area with no other pharmacies nearby, and the woman is unable to obtain Plan B and becomes pregnant. Both Board witnesses agreed that this represents a serious problem of access, and both agreed it is categorically permitted under the Regulations.

34. In the other scenario, a woman is given a facilitated referral for Plan B because of a conscientious objection. There are dozens of nearby pharmacies that stock Plan B, and she obtains it without delay. Both Board witnesses agreed that this sort of a facilitated referral is not a barrier to access, yet both agreed it is prohibited under the Regulations.. In short, this is a straightforward concession that the Regulations permit nonreligious referrals "that endanger[] [the

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

government's] interests in a similar or greater degree" Plaintiffs religiously motivated referrals. *Lukumi*, 508 U.S. at 543.

35. Moreover, under the "customary payment" exemption, pharmacies are not even required to refer patients to another pharmacy. Under subsection (3) of the Delivery Rule, when a pharmacy does not deliver a drug, the pharmacy must provide a "timely alternative." WAC 246-869-010(3). But this duty applies only if the drug is "not in stock" or "the prescription cannot be filled" under subsection (1)(a) (*i.e.*, a prescription with a known error, inadequate instructions, or contraindications). *Id.* The duty to provide a timely alternative does not apply if the patient is unable to pay the "usual and customary or contracted charge." WAC 246-869-010(2). Thus, a patient who presents unacceptable insurance need not even be referred to another pharmacy. That is a far more serious barrier to access than the facilitated referrals provided by Plaintiffs.

36. The *third* major exemption to the Delivery Rule is the "catch-all" exemption. It applies in any circumstances that are "substantially similar" to the enumerated list. WAC 246-869-010(1). It will be addressed in more detail below.

37. *Fourth* is the "out of stock" exemption. WAC 246-869-010(1)(e). It broadly allows pharmacies to refuse to deliver a drug whenever the drug is out of stock—as long as the pharmacy is in "good faith compliance" with the Stocking Rule. *Id.*; WAC 246-869-150(1). Thus, the scope of this exemption depends on the scope of the Stocking Rule.

38. The evidence at trial demonstrated that the Stocking Rule, together with the "out of stock" exemption, allows pharmacies to refer patients elsewhere for a wide variety of nonreligious reasons. For example, niche pharmacies are categorically permitted to decline to stock drugs that fall outside their chosen business niche. Pharmacies are also categorically permitted to decline to stock a

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 76
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

drug if they have not had any patients request it, if their supplier contractually excludes a drug from their formulary, or if the drug would require specialized training or equipment that the pharmacy does not wish to purchase. In all of these situations, pharmacies are permitted to refer patients elsewhere, regardless of the effect on access to medication.

39.     Similarly, even when a pharmacy typically stocks a drug, it is permitted to refer patients elsewhere when a drug is temporarily out of stock. This can occur for any number of reasons: *e.g.*, a pharmacy experiences an unexpected spike in demand; a pharmacy is trying to reduce its inventory to become more profitable; an inexperienced pharmacy manager does a poor job of managing inventory. In all of these situations, pharmacies are categorically permitted to refer patients elsewhere, regardless of the effect on access to medication.

40.     Again, Board witnesses considered two scenarios at trial that illustrate the breadth of this exemption. In one scenario, a woman is referred elsewhere for Plan B because the drug is temporarily out of stock due to poor inventory management. The pharmacy is in a rural area with no other pharmacies nearby, and the woman is unable to obtain Plan B and becomes pregnant. Board witnesses agreed that this represents a serious problem of access and that it is categorically permitted under the Regulations.

41.     In the other scenario, a woman is referred elsewhere for Plan B because of a conscientious objection and obtains the drug immediately thereafter. Board witnesses agreed that this does not present an access problem, but agreed that it is prohibited under the Regulations. . Again, this is a straightforward concession that the Regulations permit nonreligious referrals "that endanger[] [the government's] interests in a similar or greater degree" Plaintiffs religiously motivated referrals. *Lukumi*, 508 U.S. at 543.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 77
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

42.     At the preliminary injunction stage, the Ninth Circuit suggested that eliminating these categorical exemptions "would likely drive pharmacies out of business . . . . Therefore, the exemptions actually increase access to medications by making it possible for pharmacies to . . . maintain their business." *Stormans*, 586 F.3d at 1135. The Defendants did not assert this argument at trial. If they had, they would face two obstacles.

43.     First, Defendants offered no evidence that the categorical exemptions are necessary to keep pharmacies in business. It is quite possible that narrowing or eliminating some of the exemptions would be fully compatible with keeping pharmacies in business *and* expanding access to medication. For example, requiring all pharmacies to accept Medicaid as many do, could significantly increase access to medication for the poor without driving pharmacies out of business.

44.     Second, even assuming Defendants had offered evidence on this point, the same "out of business" argument applies to exemptions for reasons of conscience. Specifically, it is undisputed that if Ralph's is forced to stock Plan B, it will have to close its pharmacy. And it is undisputed that if Thelen and Mesler are forced to dispense Plan B, they have to leave the profession or move to another state. Indeed, the Board conceded in the Final Signficant Analysis that some pharmacy owners would close their business rather than violate their conscience.[192] Thus, it is undisputed that the Regulations will force at least some pharmacies and pharmacists out of business, further reducing access to medication.

45.     In short, the State cannot have it both ways. It cannot provide secular exemptions on the ground that they will help keep pharmacies in business, while

_____

[192] PX 434, pp. 11-12.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 78
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

denying parallel religious exemptions that are just as necessary to keep pharmacies in business. That would represent an impermissible "value judgment in favor of secular motivations, but not religious motivations." *Fraternal Order of Police*, 170 F.3d at 366.

46.    In light of the vast range of secular conduct exempted from the Regulations, this case is significantly stronger than *Fraternal Order of Police*. There, the Third Circuit held that the beard prohibition was not neutral and generally applicable because there was *one* secular exemption for a *narrow slice* of secular conduct—beards worn for medical reasons. Here, there are *numerous* secular exemptions for a *wide variety* of secular conduct—everything from business reasons for not stocking a drug, to convenience reasons for not wanting to deal with a particular insurer, to practical reasons for wanting to serve a particular niche market. These secular exemptions routinely result in patients being unable to obtain a drug on demand from the pharmacy of their choice. Thus, they "endanger[] [the government's] interests" just as much as a narrow exemption for conscience would. *Lukumi*, 508 U.S. at 543.

47.    Several other cases support the same result. *See Blackhawk v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004) (Alito, J.) (fee requirement for keeping wildlife was not generally applicable where it included categorical exemptions for zoos and circuses, but not for Native American religious adherents); *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1035 (9th Cir. 2009) (Noonan, J., concurring) (campaign finance requirements were not generally applicable where they included categorical exemptions for newspapers and media, but not for churches); *Rader v. Johnston*, 924 F.Supp. 1540, 1551-53 (D. Neb. 1996) (rule requiring freshmen to live on campus was not generally applicable where it included categorical exemptions for

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 79
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1  students with certain secular objections, but not religious objections); *Morr-Fitz,*
2  *Inc. v. Blagojevich*, 2011 WL 1338081, No. 2005-CH-000495 (Ill. Cir. Ct. 7th Jud.
3  Cir. 04/05/11) (striking down pharmacy rule modeled on Washington's
4  Regulations).

5       48.    Finally, in addition to the broad categorical exemptions for business
6  and convenience reasons, the Washington Death with Dignity Act, RCW 70.425
7  ("DWDA"), creates another categorical exemption to the Regulations. The DWDA
8  provides that "[o]nly willing health care providers [defined to include pharmacists]
9  shall participate in the provision to a qualified patient of medication to end his or
10  her life in a humane and dignified manner." RCWA 70.245.190(1)(d). Thus,
11  notwithstanding the Regulations, any pharmacy or pharmacist may refuse to
12  dispense lethal drugs on any ground, secular or religious. And there appears to be
13  no referral obligation. This exemption undermines the government's stated
14  interest in assuring timely access to lethal drugs at least as much as conscientious
15  objections to Plan B. Thus, it provides an additional ground for finding the
16  Regulations not generally applicable.

17  **C. General Applicability – Individualized Exemptions**

18       49.    In addition to categorical exemptions, another way that a law might
19  fail to be generally applicable is if "creates a regime of individualized,
20  discretionary exemptions. *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir.
21  2004) (Alito, J.); *see also Lukumi*, 520 U.S. at 537. A law allowing "individualized
22  exemptions" requires strict scrutiny because it "creates the opportunity for a
23  facially neutral and generally applicable standard to be applied in practice in a
24  way that discriminates against religiously motivated conduct." *Blackhawk*, 381
25  F.3d at 209 (citing *Smith*).

26
27  
PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 80
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

50.     Three cases illustrate the "individualized exemptions" rule. In *Blackhawk*, the government required any person wishing to keep wildlife in captivity to pay a permitting fee; but it allowed the government to waive the fee if a waiver would be "consistent with sound game or wildlife management activities or the intent of [the Game and Wildlife Code]." *Id.* at 205. The Third Circuit held that this provision was "sufficiently open-ended" to give the government discretion in granting exemptions, thus "bring[ing] the regulation within the individualized exemption rule" and requiring strict scrutiny. *Id.* at 210. Thus, it held that the denial of a waiver to a Native American who wanted to keep a bear for religious reasons violated the Free Exercise Clause. *Id.* at 213-14.

51.     Similarly, in *Lukumi*, one of the ordinances punished any person who "*unnecessarily* . . . kills any animal." 508 U.S. at 537 (emphasis added). This provision, the Court said, "requires an evaluation of the particular justification for the killing" to determine whether it was "necessary" or not. *Id.* Because the government must look at "the reasons for the relevant conduct" and create "individualized exemptions" on a case-by-case basis, the ordinance was subject to strict scrutiny. *Id.*

52.     Third, in *Sherbert v. Verner*, 374 U.S. 398, 401 (1963), the government denied unemployment compensation to any person who quit or refused work "without good cause." The Supreme Court struck down the denial of unemployment compensation under this provision to a plaintiff who refused to work on the Sabbath. *Id.* at 408-09. As the Supreme Court explained in *Smith*, the "good cause" language triggered strict scrutiny because it "lent itself to individualized governmental assessment of the reasons for the relevant conduct," and it "created a mechanism for individualized exemptions." 494 U.S. at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 81
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

53.     In short, when a law permits the government to make "individualized exemptions" on a case-by-case basis, the law is subject to strict scrutiny. This is because, when the government applies an "across-the-board" prohibition, there is little risk that it is discriminating against religious conduct. *Smith*, 494 U.S. at 884. But when an open-ended law gives the government discretion to grant exemptions on a case-by-case basis, it creates a serious risk that it will be "applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk*, 381 F.3d at 209 (citing *Smith*). Such a risk justifies strict scrutiny. *Id.*

54.     Here, the Regulations include several open-ended provisions that allow the Board to grant individualized exemptions on a case-by-case basis. First, the Delivery Rule, after enumerating five specific exemptions, provides an open-ended exemption for any circumstances that are "substantially similar." WAC 246-869-010(1). When a pharmacy claims this open-ended exception, the Board must examine the underlying reasons for the pharmacy's conduct on a case-by-case basis to determine whether it qualifies for an exemption. This is a quintessential "individualized . . . assessment of the reasons for the relevant conduct." *Lukumi*, 508 U.S. at 537 (quoting *Smith*).

55.     State Defendants argue that this exemption is narrow, because four of the enumerated exemptions are limited to patient safety concerns, such as "fraudulent prescriptions," "contraindications," and "[l]ack of specialized equipment." WAC 246-869-010(1) But this ignores the *fifth* enumerated exemption, which applies any time a drug is out of stock "despite good faith compliance with" the Stocking Rule. WAC 246-869-010(1)(e). This exemption is not about patient safety; it is about giving pharmacies flexibility to "maintain their business" by deciding which drugs to keep in stock. *Stormans*, 586 F.3d at 1135. Thus, when a pharmacy claims the open-ended exemption, the Board must

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 82
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

consider on a case-by-case basis whether the relevant conduct is "substantially similar" to the many stocking decisions that are currently permitted under the Regulations.

56.     For example, if Plaintiffs were to claim the open-ended exemption, the Board would have to consider on a case-by-case basis whether a religious refusal to stock a drug is "substantially similar" to a niche pharmacy's refusal to stock a drug. Such an inquiry creates a significant risk that the Regulations will be "applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk*, 381 F.3d at 209 (citing *Smith*).

57.     Second, in addition to the open-ended exemption, there is an exemption for "good faith" compliance with the Stocking Rule. No Board witness was able to give a definition of "good faith." In fact, Board witnesses consistently testified that that "good faith" compliance must be assessed on a case-by-case basis depending on the reasons for the relevant conduct. That, too, is a quintessential "individualized assessment" under *Lukumi*.

58.     Finally, the Stocking Rule itself is extraordinarily vague and open-ended. It provides that a pharmacy must maintain "at all times" a "representative assortment" of drugs to meet the needs of its "patients." WAC 246-869-150(1). Neither "all times," nor "representative assortment," nor "patients" is defined. Board witnesses repeatedly emphasized that these terms must be interpreted on a case-by-case basis depending on the reasons for the relevant conduct. Thus, in practice, the Board has broad discretion to allow pharmacies to refuse to stock drugs for business, economic, and convenience reasons, but to punish pharmacies for refusing to stock drugs for religious reasons. And in practice, that is precisely how the Stocking Rule has been enforced.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 83
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

59.    In light of these individualized exemptions, this case is significantly more problematic than *Blackhawk*. There, the government had discretion to waive the wildlife permitting fee if a waiver would be "consistent with sound game or wildlife management activities or the intent of [the Game and Wildlife Code]." *Id.* at 205. The Third Circuit held that this provision was "sufficiently open-ended" to require strict scrutiny. *Id.* at 210. Here, there are at least three provisions that are equally open-ended, and the Board has allowed pharmacies to refer patients elsewhere for a wide variety of business, economic, and convenience reasons.

60.    This case is also similar to *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004). There, the plaintiff was a Mormon theater student who wished to be exempt from the requirement to recite portions of a script that were offensive to her religious beliefs. *Id.* 1281-83. The state university refused, claiming that it had a neutral rule requiring all theater students to adhere to all curricular requirements, including performing scripts as written. The Tenth Circuit, however, disagreed. It pointed out that the university had granted an exemption to a Jewish student who wanted to miss an assignment for Yom Kippur, *id.* at 1298, and it had sometimes granted the plaintiff herself an exemption from reciting every portion of a script, *id.* This "pattern of ad hoc discretionary decisions," said the Court, amounted to a "system of individualized exemptions" requiring strict scrutiny. *Id.* at 1299. The same is true here. The Board exercises broad discretion under the Regulations to permit a wide variety of secular referrals on an *ad hoc*, case-by-case basis. Such a system of individualized exemptions requires strict scrutiny.

61.    This case is also like the system of individualized exemptions in *Sherbert* and *Lukumi*. In those cases, the government had authority to deny unemployment compensation for "good cause," *Sherbert*, 374 U.S. at 401, and had

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 84
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

authority to punish animal killing that was "unnecessar[y]," *Lukumi*, 508 U.S. at 537. Here, the Board has authority to regulate religious conduct based on whether it is "substantially similar" to other conduct, WAC 246-869-010(1), whether it was undertaken in "good faith," 246-869-010(1)(e), and whether it complies with an open-ended Stocking Rule that has never been enforced against any other pharmacy. The Board's discretion under the Regulations is far broader than any discretion at issue in *Sherbert* or *Lukumi*.

62. Finally, this case is similar to *Rader v. Johnston*, 924 F. Supp. 1540 (D. Neb. 1996). There, a state university required all full-time freshmen to live on-campus their freshman year, subject to three enumerated exceptions. *Id.* at 1544. But in practice, the university administrators "grant[ed] exceptions to the policy, at their discretion, in a broad range of circumstances not enumerated in the rule and not well defined or limited." *Id.* at 1552. Thus, the court held that the policy "cannot be viewed as generally applicable." *Id.* at 1553. Here, too, the Board has discretion to grant exemptions in a broad range of circumstances not enumerated in the Regulations and not well defined. And, in fact, pharmacies across the state continue to refer patients elsewhere every day for a wide variety of business, economic, and convenience reasons, and the Board has shown no interest in prohibiting those referrals.

### D. General Applicability – Selective Enforcement

63. Aside from categorical exemptions and individualized exemptions, a law is also not generally applicable when it has "been enforced in a discriminatory manner." *Blackhawk*, 381 F.3d at 209 (Alito, J.) (citing *Tenafly*, 309 F.3d at 167-72). In *Tenafly*, for example, a local ordinance broadly banned the placement of any "sign or advertisement, or other matter upon any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place . . . ." 309 F.3d at 151. In

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

practice, the local government permitted the placement on utility poles of a variety of signs and symbols, such as house number signs, lost animal signs, and the like; but it refused to permit Orthodox Jews to do the same with religiously significant items called *lechis* (thin black strips of plastic demarcating the area within which Orthodox Jews may carry objects on the Sabbath). *Id.* at 151-52. Although the ordinance was plainly neutral and generally applicable on its face, the Court struck it down because the government's "selective, discretionary application" of an "often-dormant [o]rdinance" was "sufficiently suggestive of discriminatory intent" to require strict scrutiny. *Id.* at 168.

64. Similarly, in *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011), a state university required all registered student groups to abide by a nondiscrimination policy. Under this policy, the university denied recognition to a Christian fraternity and sorority because they required all members to be Christians. *Id.* at 795-96. Although the Ninth Circuit concluded that the nondiscrimination policy was neutral and generally applicable on its face, it held that it would be unconstitutional if it had been applied selectively—for example, by "grant[ing] certain groups exemptions from the policy" but denying an exemption to religious groups. *Id.* at 804-05.

65. Here, the evidence at trial establishes that the Regulations have been selectively enforced. Specifically, it is undisputed that in the four years since the Delivery Rule went into effect, no pharmacy has ever been cited for violating it. And in the *forty* years since the Stocking Rule went into effect, no pharmacy has even been *investigated* for violating it, other than Ralph's and three other nearby pharmacies because of complaints filed by Plan B test-shoppers. The investigations against the three pharmacies were promptly closed when they informed the Board they were temporarily out of Plan B and would order it, but

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 86
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

investigations against Ralph's remain open to this day. Thus, pharmacies across the state have enjoyed broad discretion to decline to stock drugs and to refer patients elsewhere for a wide variety of nonreligious reasons; but Ralph's alone faces punishment for declining to stock Plan B for religious reasons.

66. Defendants offer two arguments in response. First, they argue that there can be no selective enforcement because the Board has not yet enforced the Regulations against Ralph's. In support, they point to several complaints against Ralph's that have been dismissed.

67. This is unconvincing. Most, if not all, of those complaints were dismissed on technicalities—not because the Board has decided that Ralph's has complied with the Regulations. To the contrary, it is undisputed that Ralph's is in violation of the Stocking Rule and has several pending complaints against it that have been stayed by this litigation. Thus, the Board must either ignore outright defiance of the Regulations (which suggests that they are not generally applicable), or enforce the Regulations against Ralph's.

68. Second, as discussed above, the State argues that the reason the Board has never enforced the Regulations against any other pharmacy is because the Board's enforcement is "complaint-driven"—*i.e.*, it enforces the Regulations only in response to citizen complaints..

69. This argument fails for three reasons. First, enforcement of the Board's Regulations is not exclusively complaint-driven. It is not even primarily complaint-driven. Rather, the Board ensures compliance with its Regulations through a wide variety of channels. For example, it conducts inspections every two years; it publishes regular newsletters informing pharmacies of their duties under the Board's regulations; it publishes guidance on its regulations; it works with the WSPA to promote compliance; and it can even initiate its own complaints. As

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 87
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Gary Harris testified, less than one percent of pharmacies ever have a complaint filed against them at all. Thus, responding to citizen complaints is only a very small part of how the Board ensures compliance with its regulations.

70.     When considering the broad range of enforcement tools available to the Board, it is clear that the Board has made no effort to enforce the Stocking Rule against pharmacies that decline to stock drugs for business reasons. It makes no effort to check for compliance with the Stocking Rule during inspections, even though it could do so; it has never mentioned compliance with the Stocking Rule in its quarterly newsletters; it has never issued guidance so that pharmacies can understand their obligations under the Stocking Rule; and it has never initiated its own complaint based on a violation of the Stocking Rule (except against Ralph's). In short, the Board has never shown any interest in enforcing the Stocking Rule, until it invoked that rule against Ralph's. As in *Tenafly*, "the [Board's] invocation of the often-dormant [Stocking Rule] against conduct motivated by [religious] beliefs is 'sufficiently suggestive of discriminatory intent,' . . . that we must apply strict scrutiny." 309 F.3d at 168.

71.     Second, even assuming the Board were complaint-driven, that would not solve the selective enforcement problem. In this case, relying on citizen complaints has only made the selective enforcement problem worse. For the vast majority of patients and pharmacies, a referral is never going to generate a complaint. But the evidence at trial demonstrated that Planned Parenthood and other pro-choice groups have conducted an active campaign to seek out pharmacies and pharmacists with religious objections to Plan B and to file complaints. This has resulted in a severely disproportionate number of investigations directed at religious objections to Plan B.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 88
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

72. The Supreme Court condemned a similar arrangement in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), which the Ninth Circuit has expressly relied on in the Free Exercise context, *Alpha Delta Chi-Delta*, 648 F.3d at 804. There, a home for the mentally retarded sought a special use permit under a zoning ordinance. But the city denied the permit in response to the "negative attitudes" and "fear" of neighbors. *Id.* at 448. The Supreme Court struck down the enforcement of the ordinance as unconstitutional: "Private biases may be outside the reach of the law," the Court said, "but the law cannot, directly or indirectly, give them effect." *Id.* (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)). That, unfortunately, is how the Regulations have operated here. By relying on citizen complaints, the Board ensures that secular referrals are protected, while unpopular conscience-based referrals are prohibited. That is selective enforcement.

73. Finally, Defendants' reliance on *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142 (9th Cir. 2007) is misplaced for several reasons. First, *Rosenbaum* involved a selective enforcement challenge under the Equal Protection Clause, not the Free Exercise Clause. The legal standards under each clause are different. To prevail under the Equal Protection Clause, the plaintiff must demonstrate *both* (1) that the government's enforcement "had a discriminatory effect" *and* (2) that "the [government was] motivated by a discriminatory purpose." *Rosenbaum*, 484 U.S. at 1152-53. Once this has been shown, the government is held strictly liable; the government gets no opportunity to show that it satisfies strict scrutiny.

74. Under the Free Exercise Clause, by contrast, the plaintiff need only show that the government enforced the law against religious conduct while exempting similarly situated nonreligious conduct. *Tenafly*, 309 F.3d at 167. That

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 89
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

is enough to infer a discriminatory purpose, without regard to "the subjective motivations of the [government officials]" who enforced the law. *Id.* at 168 n.30; *see also Alpha Delta Chi-Delta*, 648 F.3d at 805-04. The government then has an opportunity to show that its actions satisfy strict scrutiny. *Tenafly*, 309 F.3d at 172.

75.     Here, the appropriate analysis is set forth in *Tenafly*, not *Rosenbaum*. Plaintiffs have adequately shown that the Regulations are enforced against their conduct, but not similarly situated nonreligious conduct.

76.     Second, even assuming the equal protection analysis in *Rosenbaum* applied, this case is distinguishable from *Rosenbaum* in numerous ways. For example:

a.  There, the noise ordinance had been enforced against numerous citizens in the past, both religious and nonreligious. Here, neither the Delivery Rule nor the Stocking Rule has ever been enforced against any pharmacy except Stormans'.

b.  There, there had been complaints under the noise ordinance based on a wide variety of religious and nonreligious speech.. Here, there has never been a complaint under the Stocking Rule except with respect to Plan B.

c.  There, plaintiffs identified "only two incidents" where citizen complaints may have been based on disagreement with the plaintiffs' religious message. *Id.* at 1158. Here, Plaintiffs' pharmacy faced a boycott, picketing, and an organized campaign that filed dozens of complaints based on opposition to Plaintiffs' conscientious objections to Plan B.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

d. There, plaintiffs were allowed to continue to engage in their religious conduct as long as they lowered the volume of their preaching. *Id.* at 1159. Here, Plaintiffs' refusal to stock Plan B is completely prohibited.

e. There, plaintiffs offered no evidence that the officials responding to the complaints "knew about, agreed with or adopted any views of the complainants." *Id.* at 1159. Here, at least one Board member is on record as stating that he disagrees with conscientious objections to Plan B, and that he intends to prosecute conscientious objectors to Plan B to the full extent of the law.

f. There, the ordinance included guidelines that limited the government's discretion in issuing permits. *Id.* at 1160-61. Here, there are no guidelines governing the interpretation or enforcement of the Stocking Rule, and the Board has complete discretion to enforce it as it sees fit.

77. In short, plaintiffs in *Rosenbaum* failed to show that the government enforced the noise ordinance against religious conduct, but ignored similarly situated nonreligious conduct. Here, by contrast, the evidence shows that the government has enforced the Regulations against Plaintiffs' pharmacy—and only against Plaintiffs' pharmacy—while making no effort to enforce the Regulations against widespread, widely known, nonreligious conduct that threatens access to medication just as much as, or more than, Plaintiffs' conduct. That is enough to distinguish *Rosenbaum* and to establish selective enforcement under *Tenafly*. Thus, the Regulations are not generally applicable.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 91
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1    **E. Neutrality – Religious Gerrymandering**

2        78.    Next, the Court must consider whether the Regulations are neutral.

3    At a minimum, a law is not neutral if it discriminates against religion on its face.

4    *Lukumi*, 508 U.S. at 533. But "[f]acial neutrality is not determinative." *Id.* at 534.

5    Rather, the Free Exercise Clause also forbids "covert" hostility to religion and

6    "subtle departures from neutrality." *Id.* (quoting *Gillette v. United States*, 401 U.S.

7    437, 452 (1971)). Thus, the courts "must survey meticulously the circumstances of

8    governmental categories to eliminate, as it were, religious gerrymanders." *Id.*

9        79.    In *Lukumi*, to determine whether the law accomplished a religious

10   gerrymander, the Court examined three primary factors: (a) whether "the burden

11   of the [law], in practical terms, falls on [religious objectors] but almost no others"

12   (*id.* at 536); (b) whether "the interpretation given to the [law] by [the government]"

13   favors secular conduct (*id.* at 537); and (c) whether the laws "proscribe more

14   religious conduct than is necessary to achieve their stated ends" (*id.* at 538). The

15   Court will examine each factor in turn.

16                **1. The practical burden of the Regulations**

17       80.    The evidence at trial established that "the burden of the

18   [Regulations], in practical terms, falls on [religious objectors] but almost no

19   others." *Id.* at 536. As noted above, there are a host of business, economic, and

20   convenience reasons why pharmacies refer patients elsewhere. Table 1 lists over

21   twenty-seven examples, all of which remain common to this day. But in practice,

22   none of these secular referrals has been burdened by the Regulations. They are

23   either exempt from the Regulations or tolerated by the Board in practice. In other

24   words, the burden of the Regulations, "in practical terms," does not fall on

25   business objections; it falls on religious objections.

26

27

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

81.     Relying on the "thin" preliminary injunction record, the Ninth Circuit concluded that the burden of the Regulations also falls on "personal" objections. *Stormans*, 586 F.3d at 1131. Similarly, throughout trial, the State emphasized that the Regulations prohibit not just conscientious objections, but also "personal" objections—such as when a pharmacist refuses to serve a patient because she "shows up . . . wearing an Oregon Ducks hat." [Nov 30 at 173]

82.     At trial, however, Defendants were unable to adduce any evidence of "personal" objections—aside from religious objections—that have actually served as a basis for a pharmacy's refusal to dispense a drug. Board witnesses testified that they were not aware of any personal refusals to dispense a drug. Nor did the rulemaking process produce such evidence. In short, the issue of "personal" refusals is speculative.

83.     The same is true of nonreligious "moral" objections to dispensing a drug. *Stormans*, 586 F.3d at 1131. While one can imagine a pharmacist with a nonreligious "moral" objection to dispensing a drug, Defendants offered no evidence of any pharmacies or pharmacists that have such an objection, nor did they offer any evidence that "moral" objections have ever served as a basis for refusing to dispense a drug.

84.     Even if defendants could identify a handful of real "personal" or "moral" objections that were subject to the Regulations, that would not defeat a claim of targeting under *Lukumi. Lukumi* found the ordinances non-neutral because "*almost* the only conduct subject to [the ordinances] is the religious exercise of Santeria." 508 U.S. at 535 (emphasis added). The burden does not have to fall *exclusively* on religious conduct; it is enough that "the burden of the ordinance, in practical terms, falls on [religious] adherents but *almost* no others." *Id.* at 536 (emphasis added).

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

85.     That is largely undisputed here. In contrast with hypothetical "personal" objections, there is overwhelming evidence that the Regulations burden real-world pharmacies and pharmacists with conscientious objections to Plan B. Nearly all of the testimony before the Board dealt with conscientious objections to Plan B. And the only real-world conduct that has ever been subject to the Regulations is Plaintiffs' conscientious objections to Plan B.

86.     In short, "the burden of the [Regulations], in practical terms, falls on [conscientious objectors] but almost no others." 508 U.S. at 536. Defendants cannot sanitize the Regulations by positing hypothetical secular conduct that might also be prohibited under the Regulations—any more than the government in *Lukumi* could sanitize its ordinances by positing hypothetical secular animal killings that might have been prohibited under its ordinances.

## 2. The interpretation of the Regulations

87.     Similar evidence shows that, as in *Lukumi*, "the interpretation given to the [Regulations] by [the government]" favors secular conduct over religious conduct. 508 U.S. at 537. As noted above, several open-ended provisions give the Board broad discretion to interpret the Regulations on a case-by-case basis. For example, the Board has discretion to punish conduct—or not—based on whether it is "substantially similar" to other conduct, WAC 246-869-010(1), whether it is undertaken in "good faith," 246-869-010(1)(e), and whether it complies with the open-ended Stocking Rule.

88.     In practice, these provisions have never been interpreted to prohibit widespread business, economic, and convenience reasons for referring patients elsewhere. But they have been interpreted to prohibit Plaintiffs' conscientious objections to Plan B.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 94
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

### 3. The overbreadth of the Regulations

89.     Finally, as in *Lukumi*, the Regulations "proscribe more religious conduct than is necessary to achieve their stated ends." 508 U.S. at 538. That is, they prohibit Plaintiffs' religious conduct even when it poses no threat to timely access to Plan B.

90.     First, there is no evidence that Plaintiffs' conscience-based referrals have ever impeded timely access to Plan B. In fact, the government has stipulated the opposite: "[R]eferrals help assure timely access to lawfully prescribed medications . . . includ[ing] Plan B."[193]

91.     Second, conscience-based referrals have been permitted in Washington for decades, and the State has offered no evidence that they have impeded timely access to medication. To the contrary, the State argues that it is acting prophylactically—preventing a problem that has not yet arisen.. But that is the essence of overbreadth.

92.     Third, the Regulations are overbroad in light of the laws of other states. As noted above, the vast majority of states *do not* obligate pharmacies to stock and dispense Plan B; rather, they permit facilitated referral. These states have no less interest in ensuring timely access to medication than does Washington; yet they achieve their interest without forcing pharmacies and pharmacists to violate their consciences.

93.     Fourth, the Regulations are overbroad in light of the available alternatives. The State claims that, as an alternative to referral, pharmacies can accommodate the conscience of their employees by hiring a second pharmacist, applying for Board approval of a telepharmacy program or using an on-call pharmacist or hiring a second full-time pharmacist.  But in many (if not most)

---

[193] Dkt #441, ¶ 1.5.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 95
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1    cases, the first two options are prohibitively expensive and, in the case of

2    telepharmacy, it is a speculative option given the Board has never and would like

3    never approve a telepharmacy application for the purpose of  covering for an

4    absent pharmacist when another nearby pharmacy can provide a clinically

5    superior,  in-person consultation with a pharmacist.As to the on-call pharmacist,

6    it is more timely to refer a patient to a nearby pharmacy than to wait for an on-call

7    pharmacist to arrive. Banning conscience-based referrals thus *slows* access to

8    medication.

9        94.    Finally, if the Stormans are forced to stock and deliver Plan B in

10   violation of conscience, it is undisputed that they will be forced to close their

11   pharmacy. Similarly, if individual pharmacists like Ms. Mesler and Ms. Thelen

12   cannot be accommodated, they will be forced to find a different job, leave the state,

13   or leave the profession. Shutting down pharmacies and driving conscientious

14   pharmacists from the profession does not enhance timely access to medication; it

15   undermines it. This is further evidence of the Regulations' overbreadth.

16       95.    In sum, because the burden of the Regulations falls almost

17   exclusively on conscientious objectors, because the Regulations have been

18   interpreted to disfavor conscientious objections, and because the Regulations

19   prohibit conscientious objections even when they do not threaten access to

20   medication, the Regulations are not neutral under *Lukumi*.

21       96.    This conclusion is not based merely on the fact that "pharmacists

22   with religious objections to Plan B will disproportionately require accommodation

23   under the rules." *Stormans*, 586 F.3d at 1131. Rather, it is based on the conclusion

24   that the "design of these [Regulations] accomplishes instead a 'religious

25   gerrymander[.]'" *Lukumi*, 508 U.S. at 535 (quoting *Walz v. Tax Comm'n*, 397 U.S.

26   at 696).

27

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 96
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## F. Neutrality – Discriminatory Intent

97.     A law also fails the neutrality requirement if it was enacted with discriminatory intent—in other words, if the law was "enacted 'because of,' not merely 'in spite of,' [its] suppression of" religious conduct. *Lukumi*, 508 U.S. at 540. As the Ninth Circuit pointed out, "the law is unsettled" on how a plaintiff can attempt to prove discriminatory intent—and in particular, whether a plaintiff may offer evidence of the "historical background" of the regulations and their "legislative history." *Stormans*, 586 F.3d at 1131-32.

98.     In *Lukumi*, two justices (Justices Kennedy and Stevens) joined Part II.A.2 of the opinion, which examined "both direct and circumstantial evidence" of the law's intent. 508 U.S. at 540. According to these justices, "[r]elevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body." *Id.* Two justices (Chief Justice Rehnquist and Justice Scalia) disagreed with that approach. *Id.* at 558-59. Five justices expressed no opinion.

99.     This Court is of the opinion that cautiously considering the historical background of a law is the best approach, for several reasons. First, the Ninth Circuit, in dictum, has suggested that the use of equal protection jurisprudence in the free exercise context is appropriate, citing the portion of *Lukumi* that relied on legislative history. *See San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1030 n.4 (9th Cir. 2004) ("The Supreme Court has approved reference to equal protection jurisprudence.").

100.    Second, every other circuit to address the issue has considered historical background to be relevant in free exercise challenges. *See, e.g., St. John's*

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

1   *United Church of Christ v. City of Chicago*, 502 F.3d 616, 633 (7th Cir. 2007) (court

2   must examine "the 'historical background of the decision under challenge, the

3   specific series of events leading to the enactment . . . and the [act's] legislative or

4   administrative history'") (quoting *Lukumi*); *Prater v. City of Burnside*, 289 F.3d

5   417, 429-30 (6th Cir. 2002) (relying on historical allegations and legislative

6   history); *CHILD, Inc. v. Min De Parle*, 212 F.3d 1084, 1090 (8th Cir. 2000) ("the

7   law's legislative history" is relevant); *Wirzburger v. Galvin*, 412 F.3d 271, 281-82

8   (1st Cir. 2005) (considering, on free exercise challenge, "evidence of animus against

9   Catholics in Massachusetts in 1855 when the [law] was passed," "the wide margin

10   by which the [law] passed," and the convention's "significant Catholic

11   representation"). No circuit has ruled historical background off limits.

12        101. Third, both the Supreme Court and the Ninth Circuit routinely

13   consider the historical background of a law when assessing the law's purpose

14   under the Establishment Clause—which requires that all laws have a secular

15   purpose. Relevant evidence includes the "contemporaneous legislative history

16   [and] the historical context of the statute, . . . and the specific sequence of events

17   leading to [its] passage." *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987); *see*

18   *also Cammack* v. *Waihee*, 932 F.2d 765, 774 (9th Cir. 1991) ("In determining the

19   legislative purpose, courts may consider the statute on its face, its legislative

20   history, or . . . the historical context of the statute and the specific sequence of

21   events leading to the passage of the statute."). It would make little sense to allow

22   courts to consider a law's historical background under the Establishment Clause,

23   but forbid courts to consider the same evidence under the Free Exercise Clause.[194]

---

[194] Courts also consider a law's historical background under the Equal Protection Clause and the Free Speech Clause. *See, e.g., Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) ("[C]onsiderations relevant to the purpose inquiry [under the Equal Protection Clause] include … the historical background of the [jurisdiction's] decision; [t]he specific sequence of events leading up to the challenged decision[;] … and [t]he legislative or administrative history."); *NEA v. Finley*, 524

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 98
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

102. In short, *Lukumi* requires this Court to determine whether a law was enacted with discriminatory "purpose." 508 U.S. at 533. And courts routinely determine a law's purpose based at least in part on the law's historical background. Accordingly, this Court will carefully consider the historical background of the Regulations, taking into account the inherent limitations in legislative history.

103. At the preliminary injunction stage, the Ninth Circuit concluded that the history of the Regulations "provides no meaningful guidance on the object or neutrality of the final rules adopted by the Board," because that history revealed "a patchwork quilt of concerns, ideas, and motivations." *Stormans*, 586 F.3d at 1133. However, four years of discovery and twelve days of trial have revealed voluminous evidence that was unavailable at the preliminary injunction stage. Thus, this Court will consider the evidence anew.

104. In *Lukumi*, the portion of the opinion addressing discriminatory intent focused on three types of evidence. First, the Court relied on "the events preceding [the ordinances'] enactment"—in particular, the fact that "the city council made no attempt to address the supposed problem" until "just weeks after the Church announced plans to open." *Id.* at 540-41. Second, the Court relied on "statements by members of the city council" expressing opposition to Santeria. *Id.* at 541. Third, the Court relied on "hostility exhibited by residents" during the legislative process, and comments by unrelated city officials (such as a police chaplain, a city attorney, and a deputy city attorney). *Id.* at 541-42. Taken together, the events and comments showed that the purpose of the ordinances was to target Santeria sacrifice. *Id.* at 542.

U.S. 569, 581 (1998) (determining whether a law was viewpoint discriminatory based in part on "the political context surrounding the adoption of the [law]").

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

105. Here, a much larger body of evidence adduced at trial shows that the purpose of the Regulations was to target conscientious objections to Plan B. Although some of the Board members, the Governor, and the "stakeholders" were careful not to make obviously inflammatory comments like the city officials in *Lukumi*, the record of their correspondence and actions demonstrates that there were no "personal" objections, and the primary purpose of the Regulations was to prohibit conscientious objections to Plan B.

106. First, as detailed in the Findings of Fact above, the focus of the regulatory process, from beginning to end, was on conscientious objections to Plan B:

    a. Before the regulatory process began, prominent events focused the Board's attention specifically on conscientious objections to Plan B—not any other objections or any other drug.

    b. Public comments during the rulemaking process focused overwhelmingly on conscientious objections to Plan B.

    c. The Governor and her advocates, in internal discussions and when pressuring the Board, focused overwhelmingly on conscientious objections to Plan B.

    d. Internal Department of Health and Board staff discussions over the draft rules focused on conscientious objections to Plan B.

    e. After the Regulations were finalized, the Board's October 2006 survey on access dealt almost exclusively with conscientious objections to Plan B.

    f. The Regulations, in practice, have been enforced only against conscientious objections to Plan B.

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

1      107. Second, additional evidence at trial demonstrated that, unlike most of
2 the Board's regulations, these Regulations were not the product of a neutral,
3 bureaucratic process based solely on pharmaceutical expertise. Rather, they were
4 a highly political affair, driven largely by the Governor and Planned Parenthood—
5 both outspoken opponents of conscientious objections to Plan B:

a. In accordance with both the National and State Pharmacy Association, the Board originally voted in favor of accommodating conscientious objections.

b. Within hours of the Board's pro-conscience vote, the Governor and Planned Parenthood set in motion a plan to reverse the Board's decision. The Governor publicly threatened to replace members of the Board, and the Governor, based on the unprecedented participation of Planned Parenthood and other pro-choice advocates in the Board interview process, did, in fact, refuse to reappoint Board Chair Awan.

c. The Governor's own handwritten notes indicate her primary concern was ensuring the Regulations were "clean enough for the advocates [*i.e.*, Planned Parenthood] re: conscious/moral issues."

d. The Governor ultimately advocated a draft regulation that prohibited conscience-based referrals.

e. To ensure her victory, the Governor personally called the Board Chair to pressure him to do pass her Regulations, after she had advised her staff that calling Board members was unlawful.

f. When the Chair resisted, the Governor replaced him with appointees recommended by Planned Parenthood.

g. Neither the Board nor the Governor never researched access to Plan B (or any other drug) before passing the Regulations. The Board

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 101
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

never identified a single incident in which a patient was unable to gain timely access to Plan B. And its post hoc survey of access to Plan B showed that there was no problem of access.

108. Third, the record of the stakeholder meetings, which ultimately produced the text of the Regulations, shows that the purpose of the Regulations was to protect referrals for business reasons while prohibiting referrals for reasons of conscience:

109. Finally, the 2010 rulemaking process further confirmed that the primary goal of the process was to ensure that pharmacies retained broad discretion to refer patients elsewhere for business reasons, but not for reasons of conscience.

110. In sum, the record consists of abundant evidence that the regulatory process was initiated in response to conscientious objections to Plan B; that the process focused almost exclusively on conscientious objections to Plan B; that the process was driven by powerful political opposition to conscientious objections to Plan B; that the Board never identified any problem of access to Plan B; and that the only result of the Regulations has been to prohibit conscientious objections to Plan B. In short, the Regulations were adopted "because of" conscientious objections to Plan B, not merely "in spite of" them. *Lukumi*, 508 U.S. at 540.

**G. Neutrality – Differential Treatment of Two Religions**

111. A law can also fail the neutrality requirement when it produces "differential treatment of two religions." *Lukumi*, 508 U.S. at 536. As the Supreme Court has repeatedly said, the "clearest command" of the religion clauses is that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 102
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

112.    In *Lukumi*, for example, the ordinances prohibited Santeria sacrifice, but included an exemption for kosher slaughter. 508 U.S. at 536. The Supreme Court suggested that this "differential treatment of two religions" might be "an independent constitutional violation." *Id*. Similarly, in *Larson v. Valente*, 456 U.S. 228, 230 (1982), the Supreme Court struck down a state law that imposed registration and reporting requirements upon only those religious organizations that solicited more than fifty per cent of their funds from nonmembers. According to the Court, these requirements impermissibly distinguished between "well-established churches," which had strong support from their members, and "churches which are new and lacking in a constituency," which had to rely on solicitation from nonmembers. *Id*. at 246 n.23.

113.    Here, the evidence at trial revealed two different types of "differential treatment" among religions. First, as noted above, the Death With Dignity Act categorically exempts pharmacists who have a conscientious objection to participating in assisted suicide. Thus, one religious belief is protected (conscientious objections to assisted suicide), but another is forbidden (conscientious objections to Plan B). Several Board witnesses supported this result simply because they personally disagree with Plaintiffs about when life begins.

114.    Second, the evidence at trial revealed that Roman Catholic institutions operate numerous hospitals in Washington, which include outpatient pharmacies serving the general public. These pharmacies, like Ralph's, refuse to stock or dispense Plan B or *ella*. Thus, like Ralph's, Catholic pharmacies are operating in "outright defiance" of the Stocking Rule.

115.    The evidence at trial also revealed that the Board is aware of the practices of Catholic pharmacies, but has made no effort to enforce the Regulations against them.

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

116.  Board witnesses were unable to provide a reasoned explanation for why it would enforce the Regulations against Plaintiffs' small, independent pharmacy, but would ignore known violations of the same Regulations by Catholic pharmacies. Some witnesses had no explanation. Others stated that the Board would not enforce the Regulations until it received a complaint.

117.  The more plausible explanation is that the Board does not object to shutting down a small, independent pharmacy like Ralph's, which was the object of a boycott honored by the Governor and was picketed and demonized by the local media. But the Board recognizes that shutting down Catholic pharmacies would have a devastating impact on access to health care. Thus, in practice, the Regulations are enforced against small, independent conscientious objectors "lacking in a constituency," but not against "well-established churches" that are a pillar of health care within the state. *Larson*, 456 U.S. at 246 n.23. That constitutes "differential treatment of two religions," rendering the Regulations non-neutral under *Lukumi*. 508 U.S. at 536.

## H. Hybrid Rights

118.  Because this Court finds that the Regulations are not neutral or generally applicable, it need not consider Plaintiffs argument that the Regulations are subject to strict scrutiny because they involve "hybrid rights."

## I. Strict Scrutiny

119.  Because the Regulations are not neutral or generally applicable, they are subject to strict scrutiny. This requires Defendants to show that the Regulations (1) "advance interests of the highest order" and (2) are "narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (quotations omitted). This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). It requires the courts to "look[] beyond

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

broadly formulated interests justifying [the law]" and instead "scrutinize[] the asserted harm of granting *specific* exemptions to *particular* religious claimants." *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (emphasis added). For several reasons, Defendants have not satisfied this test.

## 1. Over-Inclusivity

120.　First, the Regulations are not narrowly tailored because they are "overbroad," prohibiting significantly more religious conduct than necessary to achieve the government's stated end. *Lukumi*, 508 U.S. at 546. Here, the stated end is timely access to medication; but by the government's own stipulation, Plaintiffs' conscientious objections to Plan B do not undermine that interest.

121.　The government has stipulated that "referral is a time-honored pharmacy practice, it continues to occur for many reasons, and is often the most effective means to meet the patient's request."[195]. With respect to Plaintiffs' conduct, the government further stipulated that "facilitated referrals *do not pose a threat to timely access to lawfully prescribed medications*[,] . . . includ[ing] Plan B." *Id.* ¶ 1.6 (emphasis added). In other words, Defendants *agree* that Plaintiffs' conduct does not threaten timely access to Plan B. Thus, as applied to Plaintiffs' conduct, the Regulations are "overbroad"—not narrowly tailored. *Lukumi*, 508 U.S. at 546.

122.　Even aside from the stipulations, the evidence at trial has shown that Plaintiffs' conduct does not pose a threat to timely access to medication. First, Defendants have not identified any problem of access to Plan B. Indeed, all evidence is to the contrary. Plan B is available without a prescription to anyone over age sixteen, and it is widely available at pharmacies, doctors' offices,

---

[195] Dkt. #441, ¶ 1.5

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

government health centers, emergency rooms, Planned Parenthood, and a toll-free hotline. It is also available for overnight delivery via the Internet. According to the Board's own survey, there is no problem of access to Plan B. And throughout the rulemaking process, Defendants were unable to identify any significant problem of timely access to Plan B.

123.    More importantly, strict scrutiny focuses on whether the law furthers the government's interest *as applied to the particular Plaintiffs*. *See O Centro*, 546 U.S. at 431 (Government must show with "particularity" that its interest "would be adversely affected by granting an exemption.") (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972)); Here, it is undisputed that Plaintiffs' practices pose no access problem. Plaintiffs can and do refer patients to dozens of nearby pharmacies that willingly stock and dispense Plan B. Plaintiffs regularly refer patients to those nearby locations for any number of drugs, and there is no evidence that Plaintiffs' practices have ever denied a patient timely access to Plan B.

### 2. Under-Inclusivity

124.    The Regulations also fail strict scrutiny because they are "underinclusive in substantial respects"—*i.e.*, "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct." *Lukumi*, 508 U.S. at 546. Although the government asserts, in the case of Plaintiffs, that it has an interest in promoting immediate, on-site delivery of time-sensitive medication, it permits pharmacies to undermine that alleged interest for a wide variety of business, convenience, and personal reasons. For example, pharmacies can refuse to stock Plan B if it does not fall within their business niche; they can refuse to stock time-sensitive insulin medication because they want extra shelf space; and

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

they can refuse to accept payment for Plan B if they do not want the hassle of dealing with the patient's insurance plan.

125. Beyond that, the obligation to stock a drug does not commence unless a regular patient demands it (if ever), meaning that travelers or those who visit a pharmacy for the first time can be denied medication. And the State allows doctors to refuse to write prescriptions for Plan B, thus preventing patients who are under the age of seventeen from accessing the drug. All of these actions, and many more, prevent immediate, on-site delivery of time-sensitive medication. Thus, "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct," and the Regulations are not narrowly tailored. *Lukumi*, 508 U.S. at 546.

126. The broad exemptions for secular conduct also prevent the government from demonstrating that the Regulations further a compelling interest. As the Court explained in *Lukumi*: "[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." 508 U.S. at 547 (alteration omitted). Just as permitting a wide variety of secular killing undermined the alleged governmental interest in *Lukumi*, permitting a wide variety of secular refusals to stock or deliver drugs undermines the alleged interest here. Moreover, the government has failed to adduce any evidence, either before or after passing the Regulations, of a problem of access to Plan B or any other drug. Thus, the government has failed to demonstrate that the Regulations further a compelling governmental interest.

### 3. Undermining the Interest

127. Finally, the Regulations are not narrowly tailored because, as applied to Plaintiffs, they actually *undermine* the government's alleged interest. As noted above, if the owners of Ralph's are forced to stock and deliver Plan B in violation of

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 107
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565 Fax: 206•625•1052

**131235 (13438.00)

conscience, they will be forced to shut down. And if pharmacies are forbidden from accommodating pharmacists like Ms. Thelen and Ms. Mesler, such pharmacists will be driven from the profession. Shutting down pharmacies and reducing the number of practicing pharmacists will not increase access for anyone. Thus, applying the Regulations here ultimately reduces, rather than increases, access to drugs.

**J. Rational Basis**

128. Because the Regulations are not neutral or generally applicable, they are subject to strict scrutiny. This Court need not assess whether the Regulations satisfy rational basis review.

## III. Supremacy Clause

129. Under the Supremacy Clause of Article VI of the U.S. Constitution, federal law preempts state law in three scenarios: (1) an express statement of preemption, (2) occupation of the field, or (3) conflict between state and federal law. *Malabed v. No. Slope Borough*, 335 F.3d 864, 869 (9th Cir. 2003); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). Here, the Regulations are preempted under the first and third scenarios because they prohibit employers from accommodating the religious beliefs of their employees.

130. The first basis for preemption is Title VII's express statement of preemption. Title VII provides that it preempts "any provision of State law" that is "inconsistent with any of the purposes of this Act, or any provision thereof." 42 U.S.C. § 2000h-4. Similarly, 42 U.S.C. § 2000e-7 provides an exemption from any state law that "require[s] or permit[s] the doing of any act which would be an unlawful employment practice" under Title VII. In light of these provisions, any state law that requires or permits a violation of Title VII is preempted. *Malabed*,

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 108
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

1   335 F.3d at 870, 871; *see also Sosa v. Hiraoka*, 920 F.2d 1451 (9th Cir. 1990);
2   *Rosenfeld v. So. Pac. Co.*, 444 F.2d 1219 (9th Cir. 1971).

3       131.   Here, the Regulations are preempted because they permit, and in
4   many cases require, a violation of Title VII. Specifically, Title VII requires
5   employers to make reasonable accommodations for their employee's religious
6   beliefs. 42 U.S.C. § 200e(j); *American Postal Workers Union v. Postmaster Gen.*,
7   781 F.2d 772, 776 (9th Cir. 1986). Prior to the Regulations, pharmacies routinely
8   complied with Title VII by allowing pharmacists with conscientious objections to
9   refer patients to a nearby pharmacy for timely access to Plan B. But the
10  Regulations make this form of accommodation illegal. Thus, they directly conflict
11  with Title VII.

12      132.   The second basis for preemption is the conflict between the
13  Regulations and Title VII. Conflicts occur when the state law makes "compliance
14  with both federal and state regulations a physical impossibility" and when it
15  "stands as an obstacle to the accomplishment and execution of the full purposes
16  and objectives of Congress." *Cal. Fed. Savings & Loan Assoc. v. Guerra*, 479 U.S.
17  272, 281 (1987) (citations omitted)). Congress passed Title VII "to prohibit all
18  practices in whatever form which create inequality in employment due to
19  discrimination on the basis of race, religion, sex, or national origin, and ordained
20  that its policy of outlawing such discrimination should have the 'highest priority."
21  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (citations omitted).

22      133.   Here, the Regulations prevent a pharmacy from offering reasonable
23  accommodations to conscientious objectors, making compliance with Title VII and
24  the Regulations in many cases impossible. This conflict overcomes any
25  presumption asserted by Defendants that the Regulations are valid.

26

27

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 109
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

## IV. Fourteenth Amendment

134.    The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). To receive protection under the Due Process Clause, a right must be, "objectively, 'deeply rooted in this Nation's history and tradition, . . . and 'implicit in the concept of ordered liberty' such that 'neither liberty nor justice would exist if [it was] sacrificed.'" *Id.* (quoting *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) and *Palko v. Connecticut*, 302 U.S. 319 (1937)). It must also be subject to a "careful description" of the asserted fundamental liberty interest at stake. *Id.* at 721 (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

135.    When analyzing a due process claim, the "crucial guideposts for responsible decisionmaking" are the nation's "history, legal traditions, and practices." *Id.* (internal quotations and citations omitted). The question is whether the right is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Commonwealth*, 291 U.S. 97, 105 (1934). If so, the right may not be infringed "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721. (quoting *Flores*, 507 U.S. at 302).

136.    Here, the fundamental liberty interest at stake is the right to refrain from taking human life. This right is deeply rooted in our nation's "history, legal traditions, and practices." *Id.* It was first protected in the colonial era in the context of compulsory military service. It has also been consistently protected for health care practitioners in the context of abortion, abortifacient drugs, assisted suicide, and capital punishment. It is widely recognized in the U.S. medical community, and it is recognized in foreign and international law. *See generally*

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 110
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Mark Rienzi, *The Constitutional Right to Refuse:* Roe, Casey, *and the Fourteenth Amendment Rights of Healthcare Providers*, *forthcoming* 87 Notre Dame L. Rev __ (2011).[196]

137.    The Regulations violate Plaintiffs right to refrain from taking human life. Plaintiffs believe, as a matter of sincere religious faith, that human life begins at conception, and that participating in the destruction of a fertilized egg by dispensing Plan B or *ella* takes human life. The Regulations force Plaintiffs to choose between participating in taking human life or losing their pharmacy licenses and their livelihoods. That is more than enough to require strict scrutiny under the Due Process Clause. *Glucksberg*, 521 U.S. at 721. As explained above, the Regulations cannot satisfy strict scrutiny.

## V.    Permanent Injunction

138.    Because the Regulations violate the Constitution, they should be permanently enjoined so that the government cannot enforce them against Plaintiffs. This Court has broad discretion to fashion appropriate equitable relief. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A permanent injunction is appropriate when the plaintiff demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1174 (9th Cir. 2010) (quoting eBay, 547 U.S. at 391).

139.    Here, all four factors favor a permanent injunction.

---

[196] *Available at: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1749788.*

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

140. *Irreparable Injury.* First, Plaintiffs have suffered an irreparable injury because the Regulations deprive them of their right to the free exercise of religion under the First Amendment. Both the Ninth Circuit and the Supreme Court "have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the Ninth Circuit stated in its preliminary-injunction ruling: "If [Plaintiffs] are compelled to stock and distribute Plan B . . . , and a trial on the merits shows that such compulsion violates their constitutional rights, *[Plaintiffs] will have suffered irreparable injury*, since unlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (emphasis added; internal quotations omitted). Beyond the loss of First Amendment freedoms, Plaintiffs face severe emotional harms if they are forced to choose between following their religious beliefs, which forbid them from participating in the destruction of human life, and continuing to provide for their families. *See American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("[T]he loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses].") (alterations in original; internal quotations omitted).

141. *Inadequate Remedy at Law.* For similar reasons, Plaintiffs have no adequate remedy at law—"since unlike monetary injuries, constitutional violations *cannot be adequately remedied through damages.*" *Id.* (emphasis added; internal quotations omitted). Beyond emotional harms and the loss of First Amendment rights, Plaintiffs also face the loss of their job, their business, and their livelihood.

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 112
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

Although such financial losses might ordinarily be remedied through damages, "the Eleventh Amendment sovereign immunity of the [State Defendant] bars the [Plaintiffs] from ever recovering damages in federal court." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009). Thus, an injunction is particularly appropriate because Plaintiffs have *no remedy* available at law. *Id.*

142. *Balance of Hardships.* The balance of hardships also tips overwhelmingly in Plaintiffs favor. Absent an injunction, Plaintiffs will be forced to choose between their First Amendment rights and their ability to provide for their families. Such a "stark choice" tips "sharply" in favor of granting an injunction. *Nelson v. National Aeronautics and Space Admin*, 530 F.3d 865, 881-82 (9th Cir. 2008), *rev'd on other grounds, National Aeronautics and Space Admin. v. Nelson*, 131 S.Ct. 746 (2011). On the other side of the scale, Defendants offer *no evidence* of hardship. There is no evidence that Plaintiffs' referrals have ever impeded timely access to Plan B. In fact, Defendants have stipulated precisely the opposite: "that facilitated referrals help assure timely access to lawfully prescribed medications . . . includ[ing] Plan B."[197].

143. *Public Interest.* For the same reasons, the public interest weighs heavily in favor of a permanent injunction. The Ninth Circuit has recognized a "significant public interest" in upholding First Amendment principles. *Klein*, 584 F.3d at 1208. Here, the Regulations infringe "not only the [First Amendment] interest of [Plaintiffs], but also the interests of other people subjected to the same restrictions." *Id.* (internal quotations omitted). On the other hand, enforcing the Regulations against Plaintiffs serves no public interest, as Plaintiffs' conduct undisputedly does not threaten any alleged interest in timely access to medication.

---

[197] Dkt. #441, ¶ 1.5

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 113
(C07-5374)

ELLIS, LI & MCKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

# JUDGMENT

144. As prevailing parties, Plaintiffs are entitled to their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§1983, 1988.

145. The Court has entered a Judgment enjoining the Regulations as applied to Plaintiffs in a separate order.

Done in open court this __ day of _____, 2012

_____
United States District Judge
Ronald B. Leighton

Respectfully submitted this 10th day of November, 2012.

By: /s/  Kristen K. Waggoner
    Kristen K. Waggoner, WSBA # 27790
    kwaggoner@elmlaw.com
    Steven T. O'Ban, WSBA # 17265
    soban@elmlaw.com
    ELLIS, LI & McKINSTRY PLLC
    2025 First Avenue, Penthouse A
    Seattle, WA 98121-3125
    (206) 682-0565
    Fax:  (206) 625-1052

    THE BECKET FUND FOR
    RELIGIOUS LIBERTY
    Luke W. Goodrich, D.C. Bar # 977736
    Eric Kniffin, D.C. Bar # 999473
    3000 K Street, NW, Suite 220
    Washington, DC 20036
    (202) 955-0095

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 114
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

ALLIANCE DEFENSE FUND
Benjamin W. Bull (Of Counsel),
Arizona Bar # 009940
Steven H. Aden, Virginia Bar # 48036
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)

# CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2012, I electronically filed the foregoing Plaintiffs' Proposed Findings of Fact and Conclusions of Law with the Clerk of the Court using the CM/ECF System, which will send notification of the filing to all counsel of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 10th day of November, 2012.

s/    Kristen K. Waggoner
Steven T. O'Ban, WSBA No. 17265
soban@elmlaw.com
Kristen K. Waggoner, WSBA No. 27790
kwaggoner@elmlaw.com
ELLIS, LI & McKINSTRY PLLC
2025 First Ave., Penthouse A
Seattle, WA 98121
(206) 682-0565
Fax: (206) 625-1025

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 116
(C07-5374)

ELLIS, LI & McKINSTRY PLLC
Attorneys at Law
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
206•682•0565  Fax: 206•625•1052

**131235 (13438.00)