UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STORMANS INCORPORATED, et al., | CASE NO. C07-5374 RBL |
| Plaintiffs, | OPINION |
| v. | |
| MARY SELECKY, Secretary of the Washington State Department of Health, et al., | |
| Defendants, | |
| and | |
| JUDITH BILLINGS, et al., | |
| Intervenors. | |

## I. SUMMARY

This case presents a novel question: can the State compel licensed pharmacies and pharmacists to dispense lawfully prescribed emergency contraceptives over their sincere religious belief that doing so terminates a human life? In 2007, under pressure from the Governor, Planned Parenthood, and the Northwest Women's Law Center, the Washington State Board of Pharmacy enacted regulations designed to do just that.

The rule primarily[1] at issue, commonly known as the "delivery rule," requires pharmacies to timely deliver all lawfully prescribed medications, including the emergency contraceptives Plan B and *ella*.[2]  Under the delivery rule, a pharmacy's refusal to deliver is grounds for discipline, up to and including revocation of its license.  In operation, the delivery rule bars a pharmacy from referring patients seeking Plan B to other pharmacies, meaning they must dispense the drugs.

In violation of the regulations, but in conformity with their religious beliefs, the Plaintiffs refused to dispense Plan B to Planned Parenthood test shoppers and others.  The Board launched a series of investigations, and this suit was the result.  Based on the evidence presented at trial, the Board's regulations, while facially acceptable, are in practice unconstitutional.

## II. BACKGROUND[3]

**A.  The Parties.**

Plaintiffs are two individual pharmacists and a corporate pharmacy.[4]  Each holds the sincere religious belief that life begins at conception, when an egg from the female is fertilized by the sperm from the male. Taken after unprotected sex, emergency contraceptives Plan B and

---

[1] The other new rule (the "pharmacist responsibility rule"), and the pre-existing "stocking rule," are also at issue in this case.  They are discussed below.

[2] Plaintiffs amended their Complaint to add allegations regarding *ella* when it became widely available in 2010.  [Dkt. #s 470 & 474].  For ease of reference, the two are referred to as "Plan B" in this Opinion.

[3] A detailed history of the Rules' promulgation and enforcement is set forth in the Court's Findings of Fact and Conclusions of Law, filed herewith.  Only those facts essential to the Court's opinion are reiterated here.

[4] Plaintiffs are Margo Thelen, Rhonda Mesler, and Stormans, Inc.  Stormans owns and operates two grocery stores, one of which contains a retail pharmacy.

1  *ella* delay ovulation,[5] and can also prevent a fertilized egg from adhering to the wall of the uterus

2  (implanting).  Plan B is most effective if taken within three days, while *ella* is effective for five.

3  Because of their religious beliefs, Plaintiffs refuse to dispense Plan B.

4      The State Defendants are individuals sued in their official capacities, charged with the

5  promulgation, interpretation and enforcement of Board of Pharmacy regulations, including the

6  2007 Rules.  The Defendant-Intervenors are various individuals personally concerned about

7  access to lawful medications in Washington.   Two are HIV-positive individuals concerned that

8  the success of Plaintiffs' claims could result in the denial of lawfully prescribed and medically

9  necessary drugs to combat their condition, based on the asserted religious or moral judgment of

10  the dispensing pharmacist or pharmacy. They do not claim that they have been denied access to

11  lawfully prescribed medications in the past.

12      The remaining Intervenors are women of child-bearing age who have been denied access

13  to Plan B, who have heard that pharmacists in various pharmacies will refuse to dispense Plan B

14  and will judge, intimidate, or harass them, who have engaged in "test shopping" to determine

15  which pharmacies will not deliver Plan B, or who simply want to participate in order to ensure

16  that women have access to Plan B.

17  **B.  The Pharmacy Board Rules and Their Operation.**

18      The Board's 2007 rulemaking resulted in two new rules: the delivery rule and the

19  pharmacist responsibility rule.  The Board also gave a new interpretation to its pre-existing

20

21

22      [5] There may be disagreement about the actual scientific operation of the drugs, or
whether they are in fact abortifacients.   The court did not admit evidence on either side
regarding this issue, and instead accepted Plaintiffs' testimony that their faith precludes them
23  from delivering the drugs.  [*See* Dkt. #458]  This case is about the State's ability to require
Plaintiffs to deliver the drugs in the face of that belief, not about whether the belief is reasonable
24  or scientifically supportable.  No party or witness disputes that Plaintiffs hold the belief.

stocking rule.  The effect of the new rules and the new interpretation is to force religious

objectors to dispense Plan B.

The delivery rule imposes a "duty to deliver" on pharmacies:

(1)     *Pharmacies have a duty to deliver lawfully prescribed drugs* or devices to
patients and to distribute drugs and devices . . . in a timely manner consistent with
reasonable expectations for filling the prescription, except for the following or
substantially similar circumstances:
    (a) Prescriptions containing an obvious or known error . . .
    (b) National or state emergencies or guidelines affecting availability . . .
    (c) Lack of specialized equipment or expertise needed to safely produce,
store, or dispense drugs . . .
    (d) Potentially fraudulent prescriptions; or
    (e) Unavailability of drug or device despite good faith compliance with
WAC 246-869-150.
(2)     Nothing in this section requires pharmacies to deliver a drug or device
without payment of their usual and customary or contracted charge.

Wash. Admin. Code § 246-869-010 (entitled "Pharmacies' Responsibilities").  The delivery rule

operates in tandem with the stocking rule, which requires a pharmacy to stock a "representative

assortment of drugs in order to meet the pharmaceutical needs of its patients." *Id.* § 246-869-150

(entitled "Physical standards for pharmacies—Adequate stock").  The rules, however, do not

apply directly to pharmacists themselves.

Pharmacists have a statutory right to conscientious objection, and thus, may not be

"required by law or contract in any circumstances to participate in the provision of or payment

for a specific service if they object to so doing for reason of conscience or religion."  Wash. Rev.

Code § 48.43.065(2)(a) (applying to "health care providers," including pharmacists).  The

Board's 2007 "pharmacist responsibility rule" recognized this right.  It prohibits a pharmacist

from destroying or refusing to return unfilled a lawful prescription, from violating a patient's

privacy, and from unlawfully discriminating against, intimidating, or harassing a patient.  *See id.*

§ 246-863-095.  A pharmacist may refuse to fill a prescription, but a pharmacy may not.

1   Accordingly, a pharmacy employing a pharmacist with a religious objection to Plan B can

2   discharge its obligation under the delivery rule by having another on-duty pharmacist deliver the

3   medication.  The practical effect of the delivery rule (and the board's current interpretation of the

4   stocking rule) nevertheless directly and adversely impacts pharmacists with a religious objection

5   to dispensing Plan B.

6           Pharmacies without the need or ability to have two pharmacists on duty at all times

7   cannot employ a pharmacist with a religious objection to dispensing Plan B without risking a

8   violation of the delivery rule, if a patient with a valid Plan B prescription seeks to have it filled at

9   that pharmacy.  Nor does the fact that the rules obligate the pharmacy (and not the pharmacist) to

10  timely deliver lawfully prescribed medications permit a pharmacist operating his own pharmacy

11  to comply with the delivery rule without violating his conscience.  Because a pharmacy must fill

12  a prescription for Plan B, if it employs a pharmacist who objects, it must staff a second

13  pharmacist simply to ensure that the pharmacy can comply.  In effect, the conscientious objector

14  costs the pharmacy twice what a single, non-conscientious objector does.  For pharmacies that

15  need only one pharmacist per shift, such a cost is unreasonable, and the pharmacy's only real

16  option is to fire the conscientious objector.  The delivery rule thus renders the pharmacist's right

17  to conscientious objection illusory.

18          In the case of a pharmacy owner with religious objections to Plan B, there is no option

19  other than to leave the business—and the Board was well aware of this result when it designed

20  the rule.[6]

21

22  _____

23      [6] The Board of Pharmacy's own formal analysis of the rules' impact recognized that
    "pharmacy owners [may] close rather than dispense medications that conflict with their beliefs."
    *Final Significant Analysis for Rule Concerning Pharmacists' Professional Responsibilities, WAC
24  246-863-095 & Pharmacies' Responsibilities, WAC 246-869-010* at 12.  [Pl.'s Ex. 434].  But the

In practice, both the stocking rule and delivery rule contain exemptions not present in their text.  While the stocking rule states pharmacies must carry a representative assortment of drugs requested by its patients, in practice, pharmacies refuse to carry drugs for a variety of reasons.  Pharmacies regularly refuse to stock such drugs as oxycodone for fear of robbery; they refuse to dispense syringes because they dislike the clientele they associate with the product.  Pharmacies may decline to stock a drug because it is expensive, because the "return on investment is less than desired, or because of the "hassle factor"—additional paperwork or patient tracking.  Pharmacies may decline to stock drugs because they have contracted with manufacturers of competing drugs or because the pharmacy opts to serve a particular niche market.  None of these exemptions exist in the text of the rules; but in practice, the Board allows pharmacies to shape their stock rather than allowing patients to do so.  Further, the Board has no written policy or procedure about how to enforce the stocking rule.  And in at least 40 years, the Board has *never* enforced the stocking rule against any pharmacy—until the delivery rule required pharmacies to deliver Plan B.

Like the stocking rule, the delivery rule operates far more loosely than its text suggests.  For example, the Board has interpreted the delivery rule to allow pharmacies to refuse to deliver a drug because it does not accept a patient's particular insurance or because it does not accept Medicare or Medicaid.  That leeway exists because the delivery rule exempts a pharmacy from its duty to deliver in not just the five enumerated categories, but in all "substantially similar circumstances."

---

Board found that any disruption in access to medications would be temporary because, "if there is sufficient consumer demand in the area, a pharmacy . . . may be purchased and run by a new operator who will comply with these rules."  *Id.*  In other words, the Board contemplated its rules would result in pharmacies run by religious-objectors being replaced by non-objectors.

## C. Development of the Board of Pharmacy Regulations.

The Board's regulations have been aimed at Plan B and conscientious objectors from their inception. The events leading to promulgation began in 2005, when Planned Parenthood and the Northwest Women's Law Center contacted Christina Hulet, Senior Health Policy Advisor to the Governor, who began meeting with the groups. Ms. Hulet then referred the groups to Steven Saxe, the Pharmacy Board's Executive Director, and in doing so, informed Mr. Saxe that Northwest Women's Law Center was "looking into the issue of a pharmacist's right to refuse to fill a prescription for moral/religious views" and that the groups "[were] considering pushing for national or state legislation on the issue." Pl.'s Ex. 13. That cause—barring a pharmacist's right of conscience—played a decisive role in the Board's rulemaking. Indeed, Plaintiffs have presented reams of emails, memoranda, and letters between the Governor's representatives, Pharmacy Board members, and advocacy groups demonstrating that the predominant purpose of the rule was to stamp out the right to refuse.

Negotiations among the Board, the Governor, the Washington State Pharmacy Association, Planned Parenthood, the Northwest Women's Law Center, and other groups, led the Board to adopt a draft rule in June 2006. The draft rule allowed a pharmacist the right to refuse for conscience reasons. The Governor objected: "I strongly oppose the draft pharmacist refusal rules . . . . [N]o one should be denied appropriate prescription drugs based on the personal, religious, or moral objection of individual pharmacists." Pl.'s Ex. 104 (letter from Governor Gregoire to Dr. Asaad Awan, Chair of Board of Pharmacy). Days later, the Governor threatened to replace the entire Board if the draft rule was not changed. Pl.'s Exs. 96 &117.

On June 7, 2006, Planned Parenthood and the Northwest Women's Law Center submitted an alternative rule. Pl.'s Ex. 123. After minor alterations made by the Governor's office and the Washington State Pharmacy Association, the Governor sent handwritten comments to Ms. Hulet,

asking whether "this draft [is] clean enough for the advocates re: conscious/moral issues can't allow pharmacist to refuse?"  Pl.'s Ex. 139 (citing internal Governor's office memorandum).

Mr. Saxe responded to the alternative rule with an honest, and telling, question:

> Would a statement that does not allow a pharmacist/pharmacy the right to refuse for moral or religious judgment be clearer?  This would leave intact the ability to decline to dispense (provide alternatives) for most *legitimate* examples raised; clinical, fraud, business, skill, etc.

Pl.'s Exs. 154 & 155 (emphasis added).  Mr. Saxe was asking, rightfully, why the Board did not simply draft clear language to do exactly what it was attempting to do with vague language—bar pharmacists and pharmacies from conscientiously objecting, while at the same time allowing pharmacies and pharmacists to refuse to dispense for practically any other reason.  Doing so would be easier, of course, than "*trying to draft language to allow facilitating a referral for only . . . non-moral or non-religious reasons,*" the ultimate goal of the proposed draft.  Pl.'s Ex. 157 (email from Mr. Saxe to Ms. Hulet).  Indeed, Mr. Saxe's division of reasons not to dispense into illegitimate (i.e., moral reasons) and legitimate (i.e., any other reason) highlights the goal of the Board, the Governor, and the advocacy groups: to eliminate conscientious objection.  At trial, Mr. Saxe admitted that the rule targeted conscientious objectors:

> Q. And it was your understanding that the intent of the proposed rule was to allow professional judgment and as you've indicated business reasons that are consistent with the time honored practices of pharmacy but not moral or religious reasons, right?
>
> A. I believe so, yes.

Trial Tr. vol. 3 at 32, Nov. 30, 2011.

The Governor then convened a taskforce, consisting of representatives of the WSPA, Planned Parenthood, Northwest Women's Law Center, Board members, and a University of Washington professor.  The group agreed that a pharmacy would be permitted to refer patients

for a broad range of business reasons, but referral for reasons of conscience was objectionable and should not be permitted.

The Board preliminarily approved the Governor's rule in August 2006, and adopted the rule in April 2007.   Following approval, the Board sent a guidance letter to pharmacies and pharmacists on how to comply.  Pl.'s Ex. 436.  The Board's letter explains that facilitated referral is permissible except in cases of conscientious objection to Plan B.[7]

**D.  Procedural History.**

Plaintiffs commenced this action on July 25, 2007, and the rules became effective the following day.  In September 2007, the Court heard oral argument on Plaintiffs' Motion for a Preliminary Injunction.  In a written Order, the Court enjoined enforcement of the rules as to all pharmacists and pharmacies practicing "refuse and refer" pending trial:

> The defendants are enjoined from enforcing WAC 246-863-095 (4)(d) and WAC 246-869-010 (4)(d) (the anti-discrimination provisions) against any pharmacy which, or pharmacist who, refuses to dispense Plan B but instead immediately refers the patient either to the nearest source of Plan B or to a nearby source for Plan B.

*See* Order, Dkt. # 95, November 8, 2007.  The Court's injunction was based on its view that Plaintiffs were likely to succeed on their free exercise claim.  As they did during the rulemaking process and throughout this litigation, Plaintiffs argued that refuse and refer[8] accommodates their

_____

[7] In fact, the Board's July 2007 "Notice to Pharmacists" regarding the Board's new rules was internally titled "<<pharmacy**plnB**103_001.pdf>>."  *See* Pl.'s Ex. 275 (emphasis added).

[8] Prior to the development and implementation of the 2007 Rules, pharmacists and pharmacies with a religious objection to dispensing Plan B engaged in a practice known throughout this litigation as "refuse and refer" or "facilitated referral."  The requesting patient would be referred to a nearby pharmacy which would dispense the medication.  This practice was apparently permitted under the Board of Pharmacy's prior rules.

religious beliefs while ensuring that patients have timely access to lawfully prescribed

medications, including Plan B.

The State and the Intervenors appealed and asked the Ninth Circuit to stay this Court's

injunction.  The Motion to Stay was denied on May 1, 2008.  *See Stormans v. Selecky*, 526 F.3d

406 (9th Cir. 2008).  On March 6, 2009, while the appeal was pending and a trial on the merits

without guidance from the Ninth Circuit was impending, the parties stipulated to a stay of the

case until the Ninth Circuit's decision and, if necessary, the subsequent trial.  *See* Order on

Stipulation [Dkt. #355].  The State agreed not to "take investigative or enforcement action

against Plaintiffs or their employers under WAC 246-863-095(4)(d) or WAC 246-869-010(4)(d)

until a trial on the merits has concluded."

The parties also agreed that, if the Ninth Circuit vacated this Court's injunction, the State

would notify the Court if they received any complaints that a non-party pharmacy or pharmacist

was failing to comply with § 246-869-010(4)(d) or § 246-863-095(4)(d), and that no

investigation of any such complaint would proceed absent the Court's approval.  Though the

State reported the receipt of two such complaints, they did not seek to investigate them from the

date of the Stipulation through the date of trial.

The Ninth Circuit issued an Opinion reversing this Court's injunction on July 8, 2009.

*See Stormans v. Selecky*, 571 F.3d 960 (9th Cir. 2009).  After rehearing by the Ninth Circuit

panel, that Opinion was vacated and superseded by an Opinion dated October 28, 2009.  *See*

*Stormans v. Selecky*, 586 F.3d 1109 (9th Cir. 2009).  The Opinion reversed this Court's

injunction.

In reversing the injunction, the Court of Appeals held that this Court had applied the

wrong preliminary injunction standard in light of the Supreme Court's intervening decision in

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) (invalidating the Ninth Circuit's "possibility of irreparable injury" standard as too lenient).[9]  Further, the Ninth Circuit held that, based on the evidentiary record at the time, the Court should have applied a rational-basis test instead of an "ends/means" test, which it equated to heightened scrutiny.  *See Stormans*, 586 F.3d at 1131 (noting that the evidentiary record was "thin").  In considering the merits, the Court of Appeals held that Plaintiffs were unlikely to succeed, and that the injunction was overly broad because it applied to all pharmacists and pharmacies practicing "refuse and refer."  The Court of Appeals further held that even if an injunction was warranted, it should have been limited to the named Plaintiffs.

The Ninth Circuit remanded the case for evaluation of Plaintiff's Motion for a Preliminary Injunction under the correct standards.  Because the parties had already stipulated to a stay of the litigation and enforcement of the rules against Plaintiffs, this Court did not reevaluate Plaintiff's Motion for a Preliminary Injunction under the guidance of the Ninth Circuit's Opinion.

In 2010, the Board of Pharmacy undertook a new rulemaking process, during which they considered whether to include in the delivery rule an exception for conscience.  At the request of Plaintiffs and the State (and over the objection of the Intervenors), the Court struck the trial date and stayed this litigation pending the outcome of that rulemaking process.  *See* Order on Stipulation [Dkt. #447].   The Board did not change the rules to include a conscience exception.

---

[9] Judge Wardlaw's opinion also held that the Plaintiffs had standing and that, with the exception of their claims against the Human Rights Commission, Plaintiffs' claims were ripe.  On remand, this Court dismissed the Plaintiffs' claims against the Human Rights Commission. *See* Order Granting Mot. to Dismiss [Dkt. #376].

1    The stay was lifted and the case proceeded to an twelve day bench trial.  The full evidentiary

2    record has now been developed.

3                                        **III. DISCUSSION**

4            Plaintiffs assert three constitutional claims, all through the usual vehicle of 42 U.S.C.

5    §1983: that the Board of Pharmacy rules violate (1) their right to substantive due process; (2)

6    their right to free exercise of religion; and (3) their right to equal protection.  *See* Second Am.

7    Compl., at ¶¶ 58–84 [Dkt. #474].  Plaintiffs also assert that the Board's rules violate and are

8    preempted by Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq*.  *Id.* ¶¶ 71–74.  The

9    Court addresses each claim in turn.

10   **A.  Plaintiffs' Fourteenth Amendment Substantive Due Process Claim.**

11           Though it is not the claim that received the most attention in this litigation, Plaintiffs'

12   core position is that they have a fundamental right to refrain from actively participating in the

13   termination of a human life[10] under the Fourteenth Amendment's Substantive Due Process

14   Clause.   They argue that the State cannot force them to violate their right of conscience, absent

15   the application of a rule narrowly tailored to achieve a compelling state interest.

16

17   _____

18           [10] Plaintiffs draw a bright line between pharmacies and pharmacists with a sincere
     religious objection to dispensing emergency contraceptives, and those who might claim the right
19   to refuse to deliver lawfully prescribed medications for reasons of common bigotry.
             The Intervenors, for example, are concerned that recognizing an exception to the delivery
20   rule for "moral" objections or judgments would permit a pharmacy or pharmacist to refuse to
     dispense time-sensitive HIV drugs because it or she claimed to be religiously or morally opposed
21   to the lifestyle of the patient requesting them.
             If the Plaintiffs are permitted to refuse to deliver Plan B because they have fundamental
22   right not to do so (in the absence of a rule narrowly tailored to achieve a compelling state
     interest), the Intervenors' concerns on this point would vanish.  If it exists at all, the fundamental
23   right at stake is the limited and narrowly defined right to refuse to actively participate in
     terminating a life.

24

Plaintiffs' sincerely-held religious belief precludes them from dispensing Plan B, which they view as active participation in the destruction of a human life. The religious right of conscience they assert (and seek to defend) in this case is qualitatively different than the sincerely held beliefs at issue in countless opinions discussing a State's regulatory impact on religious practices in the free exercise context.[11]

The Due Process Clause guarantees more than fair process, and the "liberty" it protects includes more than the absence of physical restraint. Due Process also provides heightened protection against government interference with certain fundamental rights and liberty interests. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted).

The substantive due process analysis has two primary features. First, in order to warrant this heightened protection, a right or interest must be, objectively, "deeply rooted in this Nation's history and tradition." It must be "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if [it was] sacrificed." *Id.* (quoting *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) and *Palko v. Connecticut*, 302 U.S. 319 (1937)).

---

[11] An incomplete but representative list: *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (sacrificing animals); *Lee v. Weisman,* 505 U.S. 577 (1992) (school prayer); *Employment Div. v. Smith*, 494 U.S. 872 (1990) (ingesting illegal drugs); *U.S. v. Lee*, 455 U.S. 252 (1982) (payment of taxes); *Wisconsin v. Yoder,* 406 U.S. 205 (1972) (school attendance); *Sherbert v. Verner*, 374 U.S. 398 (1963) (refusal to work on the Sabbath); *Reynolds v. U.S.*, 98 U.S. 145 (1878) (polygamy); *Ward v. Polite*, ___ F.3d ___, 2012 WL 251939 (6th Cir. 2012) (counseling homosexuals); *Grayson v Schuler*, ___F.3d ___, 2012 WL 130454, (7th Cir. 2012) (hair length); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3rd Cir. 2007) (zoning restrictions); *Tenafly Eruv Ass'n Inc. v. Borough of Tenafly*, 309 F.3d 144 (3rd Cir. 2002) (placement of *lechis* on public property); *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999) (facial hair); *Adams v. Comm'r of Internal Revenue*, 170 F.3d 173 (3rd Cir. 1999) (refusing to pay taxes); *May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997) (dreadlocks); *Mitchell County v Zimmerman*, ___ N.W.2d ___, 2012 WL 333777 (Iowa 2012) (steel cleats on tractor tires).

Second, the fundamental liberty interest at stake must also be subject to a "careful description." *Id.* at 721 (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  The "crucial guideposts for responsible decision-making" in evaluating the existence of a fundamental right are the nation's "history, legal traditions, and practices." *Id.* (internal quotations and citations omitted).  The question is whether the right is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Commonwealth*, 291 U.S. 97, 105 (1934). If so, the right may not be infringed "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Flores*, 507 U.S. at 302).  In short, if a right is deemed fundamental, any law infringing that right must pass strict scrutiny.

The Supreme Court has cautioned that "because guide posts for responsible decision making in this unchartered area are scarce and open-ended," courts should be "reluctant to expand the concept of substantive due process." *Glucksberg*, 521 U.S. at 720.  In *Glucksberg*, the Supreme Court held that Washington's (then) ban on assisted suicide was constitutional, because the "right to determine the time and manner of one's death" was not a fundamental one as measured against the nation's history, legal traditions, and practices.  Instead, the list of fundamental rights (beyond those enumerated in the Bill of Rights) recognized by the Supreme Court was, and is, a short one.[12]  It includes:

> [T]he rights to marry, *Loving v. Virginia*, 388 U.S. (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the

_____

[12] The Supreme Court is demonstrably and understandably reticent to recognize new "fundamental" rights, even when it determines that long-standing laws are unconstitutional.  The most recent example of this is the Court's decision in *Lawrence v. Texas,* 539 U.S. 558 (2003) (striking down Texas' sodomy statute on Fourteenth Amendment grounds but stopping short of calling the right to engage in homosexual behavior "fundamental").

education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390
(1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); to marital privacy,
*Griswold v. Connecticut*, 381 U.S. 479 (1965); to use contraception, *ibid*;
*Eisenstadt v. Baird*, 405 U.S. 438 (1972); to bodily integrity, *Rochin v.
California*, 342 U.S. 165 (1952), and to abortion, [*Planned Parenthood v.*] *Casey*,
[505 U.S. 833 (1992)].

*Glucksberg*, 521 U.S. at 720. The Supreme Court also noted that it had "assumed, and strongly

suggested" that one had a fundamental right to refuse unwanted lifesaving medical treatment. *Id.*,

(citing *Cruzan v. Dir.*, *Mo. Dep't of Health*, 497 U.S. 261, 278 (1990)).

But the *Glucksberg* Court refused to extend *Cruzan*'s recognition of the fundamental

right to refuse unwanted end-of-life medical care to a fundamental right to receive the assistance

of another in proactively seeking suicide. The nation's historical legal tradition was precisely the

opposite; almost every state had made a policy choice against assisted suicide from each state's

founding. "If a thing has been practiced for two hundred years by common consent, it will need

a strong case for the Fourteenth Amendment to affect it." *Id.* (quoting *Flores*, 507 U.S. at 303).

The Court held the state's ban on assisted suicide was constitutional, on its face and as applied.

*Id.*

Less than 15 years after *Glucksberg*, Washington made a policy decision to permit (and

to regulate, rather than ban) assisted suicide. *See* Washington's "Death with Dignity" Act, Rev.

Code of Wash. § 70.245. In support of their claim that the right to refrain from taking a life is

fundamental, Plaintiffs emphasize that that Act specifically allows medical providers—including

pharmacists—to refuse to participate in an assisted suicide.

Plaintiffs argue that this is only the latest example of the nation's tradition recognizing

the fundamental right to refuse to take a human life over a sincere religious or moral objection.

They cite the long history of conscientious objectors to military service, which goes back to

colonial times.  The right has also been consistently protected for health care practitioners in the context of abortion, abortifacient drugs, assisted suicide, and capital punishment.

In the wake of *Glucksberg* and the Death with Dignity Act, it is clear that Washington State can *bar* medical providers from assisting in taking life, and it can *allow* them to participate in taking a life.  But can the state *compel* medical providers to participate in taking a life?  If the Death with Dignity Act had required medical providers to participate in assisted suicide, there is little doubt that the medical providers would have the right to refuse to do so.  The only difference between this difficult case and that presumably easy one is that here, the parties do not agree that a life is at stake.  There is no doubt about the consequences of assisted suicide; here, there is doubt.

It is unlikely that there would ever be the political will to mandate that a doctor participate in an assisted suicide, a capital punishment, or an abortion.  While the right of conscience in the abortion context has been recognized as constitutionally *permissible* (see, for example, *Doe v. Bolton*, 410 U.S. 179 (1973)), the Supreme Court has not yet had to address the corollary question of whether a doctor has a fundamental, constitutionally-protected right of conscience.

Neither the State nor the Intervenors directly dispute that there is a long national tradition and practice of recognizing the right to refrain from taking a life.  Instead, they appear to honestly believe that there is a significant, qualitative difference between administering a lethal injection to a terminally ill patient or a convicted murderer, or killing an enemy combatant, on the one hand, and dispensing an over the counter emergency contraceptive hours after unprotected sex, on the other.  Indeed, they describe the rules' requirement that Catholic-

affiliated pharmacies stock and dispense Plan B as a "technical" violation of the Church's directives against doing so.[13]  [*See* Dkt. #523, at 5].

But for Plaintiffs, there is no doubt—these acts are the same. It is not this Court's "business to evaluat[e] the relative merits" of differing religious beliefs, and it is not "within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Emp. Div., Dep't of Human Res. of Ore. v.*

---

[13] The State argues that it is constitutionally prohibited from recognizing a "right of conscience" exception to the delivery rule.  It claims "an accommodation specific to Plaintiffs' religious beliefs and objections would implicate the prohibitions in the First Amendment's Establishment Clause," and would violate its First Amendment obligation to maintain "governmental neutrality between religion and religion, and between religion and nonreligion." *See* Dkt. #534, at 2 & 4, *Citing McCreary v. ACLU,* 545 U.S. 844, 860 (2005) (internal citations omitted).

This position is flawed for at least two reasons.  First, the Supreme Court has never held that statutes giving special consideration to religious groups are *per se* invalid.  That would run contrary to the teaching of its cases that there is "ample room for accommodation of religion under the Establishment Clause."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987) (internal references omitted).  The *Amos* Court certainly did not so hold; to the contrary, it upheld §702 of the Civil Rights Act of 1964 (which creates an exception for religious employers) against an Establishment Clause challenge.  *Id*. at 330.  *See also Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, __S. Ct. __, 2012 WL 75047 (2012).  The Supreme Court has repeatedly "recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Amos*, 438 U.S. at 334 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)).

Secondly, the State's own argument acknowledges that whether or not exceptions for conscience are constitutionally *required*, no case has ever held that they are not constitutionally *permitted*.  *See* Dkt. #534 at 5, n. 1, arguing that governmental recognition of a right of conscience is "a matter of legislative grace."  Indeed, the State affirmatively sought a stay of this litigation in July 2010, so that the Board of Pharmacy could revisit the rulemaking process to consider incorporating a conscience exception into the delivery rule.  That effort resulted in no change, but a rule recognizing the right asserted by Plaintiffs here would not violate the Establishment Clause.

The evidence is undisputed that the Board twice considered and rejected a conscience exception, for reasons that had nothing to do with the State's now-claimed fear of violating the Establishment Clause.  If anything, an Establishment Clause issue is raised by the Board's failure to enforce its delivery and stocking rules against Catholic-affiliated pharmacies.   This failure is discussed below.

*Smith*, 494 U.S. 872, 887 (1990) (quoting *U.S. v. Lee*, 455 U.S. 252, 263 n. 2 (1982); *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)).

In the initial rulemaking process and throughout this litigation, the State and the Intervenors have dismissed Plaintiffs' religious beliefs about the implications of dispensing emergency contraceptives as unworthy of the same sorts of protections they would, presumably, freely recognize in another context. Indeed, they view the decision that confronts people of faith as minor, even quaint, burdens on religious practices like regulations on facial hair, dreadlocks, drug use, land use regulation, taxation, and the like. They argue that Plaintiffs' sincere belief about an issue at the core of their religion is not entitled to constitutional protection, but is instead granted (or not) as a matter of legislative grace.

In *Roe v. Wade,* the Supreme Court acknowledged that experts in medicine, philosophy, and theology could not agree upon when life begins. It therefore refused to adopt its own definition of the beginning of life. Thirty years later, we are perhaps no closer to definitively answering that question as a society. But, whether or not they are correct, the Plaintiffs sincerely believe they know the answer, and are compelled to act accordingly.

Because the beginning of life has not been defined for purposes of constitutional law, it is unclear whether the Supreme Court would apply abortion or contraception precedent to emergency contraceptives. When the Supreme Court addressed the murky question of when life begins, it recognized a constitutional right for women to choose to terminate a pregnancy in some circumstances. The question in this case is whether a corollary to that fundamental freedom to choose is a similar constitutional protection of an honest, good faith belief that life begins at the moment of conception.

In this Court's view, the answer is clear. However, the Supreme Court has never taken the opportunity to add "the right to refuse to participate in the taking of a life" to the limited list of constitutionally-protected fundamental rights it has recognized. Given the Supreme Court's prudent warning on the extension of fundamental rights, and the novel circumstances this case presents, this Court will not extend the scope of existing substantive due process. The Supreme Court will have to answer that question in the affirmative before this Court can recognize the fundamental right the Plaintiffs assert.

**B. Plaintiffs' First Amendment Free Exercise of Religion Claim.**

**1. Free Exercise Claims under *Smith* and *Lukumi*.**

The heart of this case lies in the Free Exercise Clause. Plaintiffs contend that the stocking and delivery rules, as applied, violate their right to free exercise of their religion. In effect, the rules force them to choose between their religious beliefs and their livelihood.

The First Amendment provides in part that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*." U.S. Const., amend. I. (emphasis added). These clauses are the Establishment Clause and the Free Exercise Clause, respectively. They are made applicable to the States through the Fourteenth Amendment. *See Cantwell v. State of Conn.* 310 U.S. 296, 303 (1940).

Under the Free Exercise Clause, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In short, if a law is neutral and generally applicable, it need only be rationally related to a legitimate government interest; if not, it must meet strict scrutiny. *See Stormans Inc. v. Selecky*, 586 F.3d 1109, 1129–30 (9th Cir. 2009).

Any free-exercise analysis must begin with two cases: *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) and *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). *Smith* and *Lukumi* represent the outer markers on the free exercise spectrum, delineating the range of permissible regulations.

*Smith* illustrates a law that burdens religious conduct but is constitutionally permissible. There, plaintiffs sought and were denied unemployment compensation after they were fired for using peyote. *Smith*, 494 U.S. at 874. Plaintiffs argued that they had taken the drug as part of a religious ceremony at their Native American Church, and thus, the state law barring peyote use was unconstitutional under the Free Exercise Clause (as it applied to them). *Id.* The Supreme Court disagreed. *Id.* at 890.

Justice Scalia explained that the Free Exercise Clause protects, "first and foremost, the right to believe and profess whatever religious doctrine one desires." *Id.* at 877 (noting that the government cannot regulate, punish, or compel a religious belief as such). Beyond belief itself, the Free Exercise Clause also protects "the performance (or abstention from performance) of various physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Id.* at 878. It is well established that the state cannot prohibit such acts:

> It would be true, we think (though no case of ours has involved the point), that a State would be [impermissibly] "prohibiting the free exercise of religion" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.* at 877–78.

While the Free Exercise Clause immunizes religious beliefs themselves, the Clause obviously cannot and does not bar regulation of all religiously-based conduct. Indeed, the Supreme Court has "never held that an individual's religious beliefs excuse him from complying

with an otherwise valid law prohibiting conduct that a State is free to regulate." *Id.* at 878–79.

To do otherwise would "permit every citizen to become a law unto himself." *Id.* at 879 (quoting

*Reynolds v. United States*, 98 U. S. 145, 166–167 (1879)). Recognizing that Oregon's law

barring peyote was neutral (it did not target religious conduct), and it was generally applicable (it

applied to all citizens regardless of religious affiliation), the Supreme Court determined that the

law was constitutionally applied. *Id.* at 890.

At the other end of the spectrum, *Lukumi* illustrates a government regulation that burdens

religious conduct but is not constitutionally permissible. In *Lukumi*, the City of Hialeah passed a

series of ordinances prohibiting the ritual sacrifice of animals after a Santeria church, which

practices animal sacrifice, announced plans to open in the City. *Lukumi*, 508 U.S. at 526–28.

The City's residents were "distressed" at the news, and in response, the city council passed an

ordinance making it "unlawful for any person, persons, corporations or associations to sacrifice

any animal within the corporate limits of the City of Hialeah, Florida." *Id.* at 528. The

ordinance defined "sacrifice" as "to unnecessarily kill, torment, torture, or mutilate an animal in

a public or private ritual or ceremony not for the primary purpose of food consumption." *Id.* at

527. The ordinances, according to the City, were necessary to protect "the public health, safety,

welfare and morals of the community." *Id.* at 528. The ordinance exempted, however, the

slaughter or processing for sale of "small numbers of hogs and/or cattle per week," as well as

hunting, euthanasia, and the eradication of pests. *Id.* at 528, 537.

The Supreme Court found that the ordinances allowed the killing of animals for a wide

range of secular reasons but barred the same conduct when religiously-motivated, and thus, the

ordinances were unconstitutionally targeted. *Id.* at 536 ("careful drafting ensured that, although

Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other

circumstances are unpunished"). The Hialeah ordinances fell well short of the constitutional minimum because they were substantially underinclusive to meet the City's stated interests in protecting the public health and preventing cruelty to animals. *Id.*

Plaintiffs emphasize that the rules in *Lukumi* were "well beyond" what is permissible under the Free Exercise Clause, and argue that the rules at issue here resemble those rules more than the peyote prohibition at issue in *Smith*. The State argues that the case bears a greater resemblance to *Smith*. The evidence at trial demonstrates that the Plaintiffs are correct. The Board of Pharmacy's rules are neither neutral nor generally applicable, as is discussed below.

**2. Law of the Case.**

Having articulated the legal standards against which the State's 2007 rules and the Plaintiffs' claims must be evaluated, the Court must here detour to address Defendants' argument that the Ninth Circuit has already conclusively established that the rules are neutral and generally applicable, and that they are therefore subject only to rational basis review as a matter of law.

The State and the Intervenors rely on the statement in the Ninth Circuit's Opinion that "[b]ecause the rules are neutral and generally applicable, the district court should have subjected the rules to the rational basis standard of review." *Stormans*, 586 F.3d at 1137. They argue that the sole question on remand is whether the rules can withstand that deferential level of scrutiny—an issue upon which the Defendants sought summary judgment. [*See* Dkt. #s 391 & 393]. Because the Opinion "signaled that the rules survive rational basis review but properly left the final determination to this Court," the trial was largely for show. [Dkt. #391 at 11]. They continue to assert that because the Plaintiffs could not "negate every conceivable rational basis for the rules" their Free Exercise claim, it must be rejected.

Plaintiffs argue that Orders reviewing Preliminary Injunctions have traditionally not been accorded law of the case preclusive effect in later proceedings (*see*, for example, *Golden State*

1   *Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 (9th Cir. 1985), in part because they are

2   necessarily decided on less than a complete record.  They argue that the factual record in this

3   case was not then, but is now, complete, which changes the Court's analysis, and that the Ninth

4   Circuit did not purport to establish the law of the case.

5       It is true that the Opinion more than once stated that the 2007 rules were neutral and

6   generally applicable.  But it also acknowledged repeatedly[14] that the factual record was "thin,"

7   "sparse," or otherwise incomplete, which it was.  Because the Opinion also relied on *Smith* and

8   *Lukumi*, it is clear that it recognized that a regulation's neutrality and general applicability

9   requires more than a review of the text used, and must be based on review of a complete factual

10  record.  There are "many ways of demonstrating that the object or purpose of a law is the

11  suppression of religion or religious conduct," and evidence of the effect of a law is "strong

12  evidence of its object."  *Lukumi*, 508 U.S. at 535.  It would be curious indeed if, after doing so,

13  the Ninth Circuit actually intended that its determination on an admittedly incomplete record was

14  determinative of the issues in the case.  The Defendants' argument that the core question is

15  settled as a matter of law is rejected.

16  **3.  Neutrality.**

17      *a.  Facial Neutrality.*

18      As the Ninth Circuit opined, the rules at issue are facially neutral.  On its face, the

19  delivery rule requires all pharmacies to timely deliver all lawfully-prescribed medications (with

20  certain enumerated exemptions).  The stocking rule similarly requires all pharmacies to

21  "maintain at all times a representative assortment of drugs in order to meet the pharmaceutical

22  needs of [their] patients."  Wash. Admin. Code § 246-869-150(1) (emphasis added).  Neither rule

23  _____

24      [14] By Plaintiffs' count, the Ninth Circuit's Opinion made seven such references.

contains any reference to religious practice, conduct, or motivation.  *See Stormans*, 586 F.3d at 1130.  The rules are facially neutral, and if the Board of Pharmacy applied those rules to all pharmacies as written, there is little doubt that the rules would pass constitutional muster.

The test of neutrality is not, however, limited to a mechanical review of text.  Indeed, the Free Exercise Clause "protects against government hostility which is masked as well as overt." *Lukumi*, 508 U.S. at 534.  Thus, the Court "must meticulously survey" how the rule functions in practice in order to eliminate "religious gerrymanders"—laws tailored to regulate religiously-motivated, but not similar secularly-motivated, conduct.  *See id.* at 534.

### b.  Operational Neutrality

The effect of a law in its real operation is strong evidence of its object.  *Lukumi*, 508 U.S. at 535.  A law "targeting religious beliefs as such is never permissible."  In other words, "[i]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral," and it is "invalid unless it can withstand strict scrutiny."  *Lukumi*, 508 U.S. at 533 (internal citations omitted).  Thus, a court must ask whether a law's impact on religious practices is merely incidental (in which case the regulation is neutral) or intentional and targeted (in which case it is not).

A law is not neutral if, in practice, it accomplishes a "religious gerrymander."  *Lukumi* 508 U.S. at 535.  In *Lukumi*, the Supreme Court addressed three related questions in determining whether the City of Hialeh's ban on animal sacrifice impermissibly did so: (1) whether the regulation's burden falls, in practical terms, on religious objectors but almost no others; (2) whether the government's interpretation of the law favors secular conduct; and (3) whether the law proscribes more religious conduct than is necessary to achieve its stated ends.  *See Lukumi*, 508 U.S. at 536–38.  Here, the answers to these inquiries show that the Board of Pharmacy's rules similarly accomplish a religious gerrymander.

The burden of the delivery and stocking rules falls "almost exclusively" on those with religious objections to dispensing Plan B. The most compelling evidence that the rules target religious conduct is the fact the rules contain numerous secular exemptions. In sum, the rules exempt pharmacies and pharmacists from stocking and delivering lawfully prescribed drugs for an almost unlimited variety of secular reasons, but fail to provide exemptions for reasons of conscience.

In free exercise challenges, courts consistently find unconstitutional those regulations that exempt secular conduct but do not exempt similar religious conduct. In *Lukumi*, the Supreme Court held that Hialeh's ordinance banning sacrificial killing was not neutral, in part, because the ordinance exempted killing for food, hunting, euthanasia, and eradication of pests. *Lukumi*, 508 U.S. at 537. The Court noted that Hialeh enforced the rules and exemptions "on what seems to be a *per se* basis." *Id.* The Board of Pharmacy enforces the stocking and delivery rules in the same manner.

The Third Circuit followed *Lukumi*'s reasoning in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999). There, a police department regulation prohibited officers from wearing beards, ostensibly to ensure that the officers presented a uniform appearance. The "no beard" rule contained only two narrow exceptions: undercover officers were permitted to wear beards, and officers were permitted to wear beards for medical reasons (e.g., due to a skin condition that made shaving difficult). The plaintiffs, both Sunni Muslim officers who wore beards for religious reasons, were disciplined for violating the no-beard rule. The Third Circuit found no fault with the exemption for undercover officers; they were not presented to the public at all, and thus, the undercover exemption did not undermine the purpose of the no-beard rule. *Id.* at 366.

But the medical exemption "undoubtedly undermine[d] the Department's interest in fostering a uniform appearance." *Id.* The court concluded that "there is no apparent reason why permitting officers to wear beards for religious reasons should create any greater difficulties" than officers who wore beards for medical reasons. *Id.*

The Board's enforcement of its rules in this case presents the same constitutional problem. Permitting pharmacies to refuse and refer for religious reasons does not create any greater difficulties in terms of patient access than permitting pharmacies to refuse and refer for secular reasons.

Three years after *Fraternal Order*, the Third Circuit reiterated these principles in *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, 309 F.3d 144, 169 (3rd Cir. 2002): "[G]overnment cannot discriminate between religiously motivated conduct and comparable secularly motivated conduct in a manner that devalues religious reasons for acting." In *Tenafly*, Orthodox Jews in the Borough of Tenafly asked the mayor and borough council for permission to place "*lechis*" on utility poles to extend their "*eruvs*." *Id.* at 152. The *lechis* were strips of black plastic tubing, largely indistinguishable from tubing already placed there by the utilities themselves. *Id.* The *lechis* extended the ceremonial demarcation area in which Orthodox Jews could engage in otherwise prohibited activities (such as pushing a stroller or wheelchair) on the Sabbath. *Id.*

After residents "expressed vehement objections," prompted by "their fear that an *eruv* would encourage Orthodox Jews to move to Tenafly," the borough council essentially took no action to approve the creation of an *eruv*. *Id.* at 153. In response, Jewish leaders and a local utility company constructed the *eruv* themselves. *Id.* After learning that the *eruv* had been constructed, the Borough ordered the utility company to remove the *lechis* pursuant to a

longstanding ordinance that prohibited the placement of "signs, advertisements, or any other matter" on utility poles in public streets. *Id.* at 154.

The Third Circuit held that, although the ordinance was facially neutral, the Borough had not applied the ordinance in a neutral manner. *Id.* at 167. "From the drab house numbers and lost animal signs to the more obtrusive holiday displays . . . the Borough has allowed private citizens to affix various materials to its utility poles." *Id.* The Borough's "discretionary application of [the ordinance] against *lechis*" thus violated the neutrality principle, making the regulation unconstitutional. *Id.* at 168.

Like the ordinances in *Lukumi*, *Fraternal Order*, and *Tenafly*, Plaintiffs have shown that the rules at issue here are riddled with exemptions for secular conduct, but contain no such exemptions for identical religiously-motivated conduct. As the Board of Pharmacy now interprets the stocking rule (a rule that was enforced for the first time in 40 years against Plaintiffs here), a pharmacy can decline to stock a drug for a host of secular reasons: because the drug falls outside the pharmacies' chosen business niche (i.e, it is a pediatric, diabetic, or fertility pharmacy);[15] the drug has a short shelf life; the drug is expensive; the drug requires specialized training or equipment; the drug requires compounding; the drug is difficult to store; the drug requires the pharmacy to monitor the patient or register with the manufacturer; the drug has an additional paperwork burden; or simply that the pharmacy has a contract with the supplier of a competing drug. Pharmacies regularly decline to stock oxycodone, cough medicine, and Sudafed due to concerns that such drugs would make the pharmacy a target for crime.

---

[15] Indeed, Steve Saxe (former Executive Director of the Board of Pharmacy) agreed that the stocking rule allows pharmacies the "leeway" to stock drugs based on whatever "type of pharmacy they have chosen to open." Tr. Trans. vol. 1 at 59:1–4, Nov. 28, 2011.

Pharmacies can refuse to deliver syringes based on "clientele concerns." Pharmacies can refuse to stock for any of these secular reasons—*even when there is patient demand.*[16] Those pharmacies then can (but are not required to) refer customers to where they can obtain the drugs they seek.

Like the stocking rule, the delivery rule is, in operation, undermined by secular exceptions. A pharmacy can, for instance, decline to accept Medicare or Medicaid or the patient's particular insurance, and on that basis, refuse to deliver a drug that is actually on the shelf.

Though given ample opportunity to do so, the State failed to explain why a refuse and refer policy creates greater difficulties when a pharmacy declines to stock a drug for religious reasons, rather than for secular reasons. A pharmacy is permitted to refuse to stock oxycodone because it fears robbery, but the same pharmacy cannot refuse to stock Plan B because it objects on religious grounds. Why are these reasons treated differently under the rules? Both pharmacies refuse and refer, both refusals inhibit patient access, yet the secular refusal is permitted and the religious refusal is not.

---

[16] The Court further notes that if the Board of Pharmacy applied the stocking rule as written, the rule would produce absurd results. The rule requires a pharmacy to "maintain at all times a representative assortment of drugs in order to meet the pharmaceutical needs of its patients." Wash. Admin. Code § 246-869-150(1). With respect to Plan B, the Board has interpreted the rule to mean that if "patients" request the drug, then the pharmacy must stock Plan B. If applied to all drugs, a pharmacy's stock would be subject to the arbitrary requests of patients, and no specialized pharmacies could exist. For example, a pediatric pharmacy would have to stock geriatric-specific drugs if a minimum number of elderly patients happened to request them (although the State was unable to identify what number of customer requests triggers the stocking rule). *See* Tr. Trans. vol. 1 at 59:23; 60:2, Nov. 28, 2011 (testimony of Steve Saxe) (noting that the stocking rule grants the "leeway" for pharmacies to self-define; giving as an example, pediatric pharmacies).

1    In sum, while the Board allows pharmacies to refuse to stock drugs for countless secular

2    reasons, the Board will investigate if a religious objector refuses to stock Plan B for a religious

3    reason.  The Board of Pharmacy has interpreted the rules to ensure that the burden falls squarely

4    and almost exclusively on religious objectors—accomplishing an impermissible religious

5    gerrymander under *Lukumi*.

6        Defendants respond with three arguments: (1) the exemptions in the Board's rules are

7    categorical rather than individualized; (2) the exemptions further the stated goal of the rule,

8    increasing patient access; and (3) the stocking and delivery rules bar all personal objections to

9    dispensing drugs, not just religiously-motivated ones.  *See* Intervenors' Post Tr. Br. at 2, 3, 5

10   [Dkt. # 543].  Defendants are incorrect on all points.

11       First, the exemptions to the stocking rule and delivery rules are largely individualized.

12   Where an exemption "requires an evaluation of the particular justification for the [conduct] . . .

13   [it] represents a system of individualized governmental assessment of the reasons for the relevant

14   conduct."  *Lukumi*, 508 U.S. at 537.  The stocking rule itself requires the Board to make an

15   individualized determination of who is a "patient" before it can determine whether a pharmacy

16   has violated the rule.  Moreover, the stocking rule's unwritten exemptions are entirely

17   individualized.[17]  The unwritten exemptions are *ad hoc* creations that allow pharmacies to shape

18

19   _____

20       [17] For example, Mr. Saxe testified that in determining whether a pharmacy had violated
     the stocking rule by refusing to stock an expensive drug, the Board would consider "their
     *individual* financial situation."  Tr. Trans. vol. 1 at 60:25, Nov. 28, 2011.

21       Thus, a large pharmacy might violate the stocking rule because it could better afford the
     expensive drug, but a small pharmacy might not violate the rule because it could not.  In any

22   event, the Board would be applying the rule on an ad hoc basis, considering the individual
     justification offered by the pharmacy.  *See also id* at 64:22–65:2 ("Q. You would agree that the

23   Board has to look at the issue on a case-by-case basis, right? A. More than likely they would,
     yes. Q. Considering all the circumstances involved that we just talked about? A. Correct.");

24   66:17–19 ("Q. . . .[W]hether a drug is filled in a timely manner [under the delivery rule], you

1 their own business. In fact, there are no guidelines for when the Board might actually enforce

2 the stocking rule outside of Plan B.[18]

3       Unlike the stocking rule, the delivery rule expressly mandates individualized exemptions.

4 The regulation itself says that a pharmacy will be exempt from its duty to deliver in *any*

5 *circumstances substantially similar* to the five enumerated exemptions. By necessity, the Board

6 must compare a pharmacy's stated justification for refusing to dispense with the five enumerated

7 exemptions. In short, the stocking rule appears to be nothing but individualized exemptions, and

8 the delivery rule mandates individualized exemptions on its face.

9       Furthermore, even if the exemptions were entirely categorical, the Court would still find

10 them indicative of impermissible targeting. As the Third Circuit explained in *Fraternal Order*, a

11 court's concern should be "the prospect of the government's deciding that secular motivations

12 are more important than religious motivations," and that concern is "only further implicated

13 when the government does not merely create a mechanism for individualized exemptions . . . but

14 actually creates a categorical exemption [.]" *Fraternal Order*, 170 F.3d at 365. Thus, the

15 categorical medical-exemption from the no-beard rule was "sufficiently suggestive of

16 discriminatory intent so as to trigger heightened scrutiny." *Id.* In other words, a categorical

17 exemption may be just as indicative of targeting as an individualized one. In this case, the Board

18 of Pharmacy appears to have unfettered discretion to apply the stocking and delivery rules on a

19 *per se* basis, and it has exercised that discretion only against religious objectors to Plan B.

20

21   concluded that that would be determined on an *individualized basis*, right? A. Yes. Q. So like the

22 stocking rule, pharmacists need leeway to be able to decide whether and when a drug needs to be filled, right? A. Yeah, it could depend again on the drug, the patient, the situation.").

23     [18] Tr. Trans. vol. 1 at 65:6–10 (testimony of Steve Saxe) (the Board has no written policy

24 or procedure for determining a violation of the stocking rule).

Second, the exemptions discussed above do not further the stated goal of the rule.  The evidence at trial demonstrated that both the stocking and delivery rules have numerous unwritten (but commonly recognized) exemptions.  Many of those exemptions do not further patient access.  Patient access is not increased when a pharmacy is exempted from the stocking rule because it made an advantageous contract with a competing drug manufacturer.  Patient access is not increased when a pharmacy is exempted from the delivery rule because it chooses not to accept certain insurance, or in any of the other instances where a pharmacy is free to ignore the stocking and delivery rules for secular reasons.

Third, the argument that the delivery and stocking rules seek to bar "personal objection of all kinds" is unpersuasive.  Intervenors' Br. at 3 [Dkt. #543].  Intervenors argue that the rules would ensure that, for example, a pharmacist could not refuse to stock and dispense HIV drugs because they associated them with a lifestyle of which they disapproved.  Luckily, common bigots do not lurk amongst the rank-and-file pharmacists of Washington.  Perhaps due to the absence of bigots, the State was unable to present any evidence that pharmacists in Washington have ever, even once, refused to stock or dispense drugs for personal reasons other than religious.  If common bigotry was the evil the Board sought to defeat, then including an exception for conscientious objectors would hardly have been an issue.  Finally, Defendants cannot explain why the stocking and delivery rules are necessary to combat non-religious personal objections (if they exist).  The Board could take action against a pharmacist under the rules governing professional responsibilities, Wash. Admin. Code § 246-863-095, if a pharmacist intimidated, harassed, or discriminated against a patient.  In this sense, the rules are overinclusive.

The Court concludes, therefore, that the onus of the rules falls almost exclusively on religious objectors to Plan B. And in the discussion above, the answer to the *Lukumi* Court's other concerns becomes apparent. The Board of Pharmacy has interpreted the stocking and delivery rules in a way that favors secular conduct over religiously-motivated conduct. The Board has never enforced the stocking rule against anyone but religious objectors to Plan B; rather, the Board allows widespread *ad hoc* exemptions for secular purposes.

Further, the Board's application of the rules proscribes more religious conduct than is necessary to achieve patient access. The State has compelled pharmacies (and, effectively, pharmacists) to dispense Plan B where it might have simply compelled them to refer patients to nearby pharmacies that do dispense the drug. Defendants have not shown why a continuation of the pre-rule refuse and refer policy, used daily by most pharmacies for a wide variety of other drugs, fails to ensure that patients will have the access they need. To the contrary, in the pre-trial stipulation to stay, the State admitted that "facilitated referrals do not pose a threat to timely access to lawfully prescribed medications"; rather, facilitated referrals "help assure timely access," including to Plan B specifically. Pl.'s & State Def.'s Stip. & Agreed Or. ¶ 1.5 [Dkt. #441].

In sum, the evidence demonstrates that the burden of the rules falls almost exclusively on religious objectors to Plan B, the Board of Pharmacy has interpreted the rules in favor of secular conduct over similar religiously-motivated conduct, and the rules themselves proscribe more religious conduct than necessary to achieve patient access. The rules are not neutral and are therefore subject to strict scrutiny.

This conclusion is buttressed by the history of the rules' development, which demonstrates that they were intended to target religious objectors.

*c. Legislative History.*

From the start, the drafters sought to create rules that would permit refusal for almost any secular reason while prohibiting refusal for religious reasons. Except for post-lawsuit testimony by State witnesses, literally all of the evidence demonstrates that the 2007 rulemaking was undertaken primarily (if not solely) to ensure that religious objectors would be required to stock and dispense Plan B. The Governor's office worked actively with the Board and interest groups to ensure that religious or moral objections to Plan B would not allow a pharmacy to refuse and refer a patient. The Governor herself threatened to replace Board members who supported a draft rule that included a conscience exception.

Mr. Saxe acknowledged at trial that the rulemakers sought to accomplish a religious gerrymander.[19] Indeed, Mr. Saxe candidly asked how they might achieve this goal without actually *saying* that only facilitated referrals "for non-moral or non-religious reasons" were permissible. He recognized the difficulty in crafting a rule that would distinguish "legitimate" reasons for failing to dispense ("clinical, fraud, business, skill, etc.") and illegitimate "moral or religious judgment" reasons.[20]

While Defendants argued that the Board's rules intended to prohibit personal objections generally, it is telling that the Board's "Notice to Pharmacists," instructing pharmacists on the Board's new rules' operation, was internally titled "<<pharmacy**plnB**103_001.pdf>>." The title highlights the document's unstated focus.

---

[19] Tr. Trans. vol. 1 at 72:24–73:4, Nov. 28, 2011 (Q. You understood the goal of the final regulations was to permit clinical, professional, and business reasons for not stocking, right? A. [Mr. Saxe] Yes. Q. But not conscience reasons, correct? A. Correct.").

[20] *See* Pl.'s Exs. 155 &157.

These rules were drafted for the primary—perhaps *sole*—purpose of forcing pharmacies (and, in turn, pharmacists) to dispense Plan B over their sincerely held religious beliefs. The rules were adopted "because of" religious objections to dispensing Plan B, not "in spite" of their incidental suppression of those beliefs. *Lukumi*, 508 U.S. at 540. Accordingly, the rules are not neutral in their operation, and they are not valid unless they were narrowly tailored to achieve a compelling state interest. Whether they meet this strict scrutiny is discussed below.

### 4. General Applicability.

The second inquiry in the Court's *Smith/Lukumi* Free Exercise analysis is whether the regulation is generally applicable. A regulation is not generally applicable when it applies to or is enforced against only religiously-motivated conduct.

The Free Exercise Clause "protect[s] religious observers against unequal treatment, and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi* at 543-43. A facially neutral and generally applicable regulation violates the Free Exercise Clause when it has been enforced in a discriminatory manner. A law is not generally applicable if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated, and which undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated. *Blackhawk*, 381 F.3d at 209 (*citing Lukumi* and *Fraternal Order*).

A regulation is not constitutional when the government applies it in a selective, discriminatory manner, thus singling out the plaintiffs' religiously motivated conduct. When the government enforces a law against religious conduct but not similar secular conduct, it devalues religious reasons by judging them to be of lesser import than nonreligious reasons. *See Tenafly*, 309 F.3d at 167–168. This is exactly what has occurred here.

In addition to the effectively unlimited categorical and individualized exceptions to the delivery rule's requirement that all pharmacies timely deliver all lawfully prescribed medications (discussed above), the Board's rules are not neutral or generally applicable because they have been selectively enforced, in two ways.

First, neither the State nor the Defendant-Intervenors produced any evidence that the delivery rule had been enforced against any pharmacy except those refusing to dispense Plan B. To the contrary, the delivery rule has been enforced only against the Plaintiff pharmacy, which holds a religious objection to dispensing Plan B. And it has only been enforced[21] with respect to the failure to deliver that one drug—Plan B. Furthermore, for 40 years, the stocking rule has never been enforced against any pharmacy, even though it too is intended to ensure access to all medications by requiring all pharmacies to stock a representative supply of medications to serve its patients.

Plaintiffs demonstrated that since 1997 there have been at least nine complaints to the Board regarding a pharmacy's refusal (or failure) to dispense drugs other than Plan B, and that the Board declined to investigate any of them. On the other hand, Plaintiff Stormans was the subject of seven complaints in the immediate aftermath of the 2007 rules' implementation, and

---

[21] This fact only reinforces the Court's conclusion, above, that the 2007 rules were adopted primarily to force religious objectors to stock and dispense Plan B.

The Ninth Circuit's Opinion acknowledged this possibility, when it discussed the rules' general effect of increasing access in terms of overcoming pre-rule religious or moral objections to dispensing medication: "How much the new rules actually increase access to medications depends on how many people are able to get medication that they might previously have been denied *based on religious or general moral opposition* by a pharmacist or pharmacy to the given medication." *Stormans*, 586 F.3d at 1135 (emphasis added).

The only "given medication" that has been the subject of a complaint or a Board of Pharmacy investigation since the rules' effective date is Plan B.

two more in following months.  The Board investigated and closed seven of those without

disciplinary action, but two remain open[22].

Secondly, and more problematically, neither the delivery rule nor the stocking rule has

ever been enforced against any of the state's numerous Catholic-affiliated outpatient (or retail)

pharmacies, every one of which similarly refuses to stock or dispense Plan B for reasons of

conscience.  The Free Exercise Clause prohibits the government from selectively enforcing

otherwise generally applicable regulations against one group of religious objectors, but not

another.  *See Lukumi*, 508 U.S. at 536 ("One religious denomination cannot be officially

preferred over another.").

Catholic-affiliated hospitals provide more than 15% of all U.S. hospital beds, and they

account for more than 120 million hospital visits per year.  There are four Catholic-affiliated

health care systems[23] in Washington, operating at least eighteen hospitals, and they provide

approximately 30% of the state's hospital beds.  Three of these hospitals are certified as "critical

need," a Congressional designation designed to ensure access to health care in rural areas.

Catholic hospitals emphasize social services, providing treatment for drug and alcohol abuse,

community outreach, social work, HIV/AIDS services, and breast cancer prevention screening,

and they do so at a rate higher than their government, for-profit, and non-profit peers.  They are a

major component of Washington's overall health care system.

---

[22]The State appears to argue that the stipulated Stay prevents it from closing these
investigations.  If that is its position, it makes no sense.  It did not seek permission to close them,
and the Stay was not in any event intended to preclude it from doing so.  The Stay was intended
to ensure that the State did not pursue further enforcement of the rules against the Plaintiffs
pending trial.

[23] These are: Ascension Health, Franciscan Health System, PeaceHealth, and Providence
Health & Services.

Because many primary care physicians do not accept Medicaid, the poor increasingly use the Emergency Room for their primary care needs. Each Catholic-affiliated hospital in the state includes an Emergency Room, and each ER utilizes its hospital's in patient pharmacy. RCW 70.41.350 requires every hospital providing emergency care to sexual assault victims to stock emergency contraception and to dispense it to those victims requesting it. As a result, each Catholic Emergency Room (or in patient) pharmacy does in fact stock Plan B, and will dispense it (only) to sexual assault victims. They will not dispense the drug to a patient presenting herself at the Emergency Room after unprotected, consensual sex, even though it is in stock. These pharmacies appear to be in violation of the delivery rule (though they may be exempted from it under Rev. Code of Wash. § 48.43.065).

Fifteen of the state's Catholic hospitals also contain an outpatient, or retail, pharmacy. Because the Catholic Church's official, traditional moral position[24] is that life begins at conception, these pharmacies do not stock, and will not dispense, Plan B. Each such pharmacy is therefore in violation of the stocking and delivery rules.

The State's response to the Court's inquiries[25] about the effect of the 2007 delivery rule (and the State's current interpretation of the stocking rule) on these Catholic health care providers has been inconsistent and evolving, but none of its positions permit it to defend the rules as generally applicable.

At trial, the State's witnesses claimed that they "did not know" what the Catholic pharmacies did. When pressed, they conceded that the rules did require Catholic pharmacies to

---

[24] *See* Ethical and Religious Directives for Catholic Health Care Services, referenced in Dkt. # 531. These Directives do permit the dispensation of Plan B to rape victims.

[25] The Court first asked the parties about this issue in the oral argument on Plaintiff's Motion for a Temporary Restraining Order in September, 2007.

1  stock and dispense Plan B, and that they did not do so.  But, they claimed, the Board's

2  investigation process was necessarily "complaint driven," and that there was no demand for Plan

3  B at Catholic pharmacies (probably because patients knew that they would not dispense Plan B).

4  They made this argument even though the Catholic hospitals' in patient pharmacies uniformly

5  stocked the drug, and they refused to dispense except in cases of sexual assault.

6        The State then argued that, although the rules required the Catholic pharmacies to stock

7  and dispense Plan B, and although it was aware that they refused to do so except in cases of

8  sexual assault, it was unable to enforce the rules against these pharmacies absent a formal

9  complaint, under the Fourth Amendment.  [*See* Dkt. #522].

10        The State then essentially conceded that it had not even attempted to enforce the rules

11  against Catholic pharmacies.  But, it claimed—despite the clear holdings of *Lukumi* and its

12  progeny—that its passive, selective enforcement of the rules against only some religious

13  objectors is constitutionally permitted under *Wayte v. United States*, 470 U.S. 589 (1985).  [*See*

14  Dkt. #544].

15        Finally, at closing argument, the State claimed that Catholic pharmacies are and always

16  have been statutorily exempted from stocking or delivering Plan B.  Each of these proffered

17  excuses for the Board's selective enforcement of its rules is discussed in turn.

18        First, it is clear that the Board of Pharmacy has been aware since before its 2007

19  rulemaking that Catholic pharmacies do not and will not stock or deliver Plan B (or, for that

20  matter, contraceptives).  Susan Boyer, the Board's current Executive Director and the State's

21  Rule 30(b)(6) designee in this case, admitted as much at trial.  Nevertheless, she testified the

22  Board "did not discuss or contemplate" the rules' impact on Catholic pharmacies and their

23  position on Plan B in its lengthy development of the rules.  [*See* Dkt. #531, at Ex. G].  In April

24

1    2008, the Washington State Catholic Conference of Bishops filed an amicus brief in the Ninth

2    Circuit, explaining its position on Plan B and the rules' impact on Catholic health care providers.

3    Dkt. # 531, Ex. H.  Yet at trial, Boyer testified that she still does not know what impact the rules

4    will have on Catholic pharmacies.

5            Boyer's (and the State's) primary claim is that patients know that a Catholic pharmacy

6    will not dispense Plan B, and that there is therefore no demand for Plan B at Catholic

7    pharmacies.  This position is not persuasive.  It might explain why there have not yet been any

8    patient complaints about the Catholic pharmacies' failure to stock or deliver, but it is not

9    evidence that there is no demand for the drug.  Demand in the economic context means a

10   "willingness and ability to purchase a commodity or service" or "the quantity of a commodity or

11   service wanted at a specified price and time."  The fact that no patient has formally complained

12   to the Board about a Catholic pharmacy's refusal to stock or deliver Plan B is not even

13   circumstantial evidence that there is no demand for the drug at that pharmacy.  Many Catholic

14   hospitals (such as St. Joseph's in Tacoma) are located in areas of modest incomes, with large

15   populations of women of child bearing age.  These potential patients are more likely than

16   average to use the Emergency Room for their primary health care needs, and are less likely to

17   have access to transportation to travel to a distant pharmacy to obtain Plan B.   There is demand

18   for Plan B, and the fact that a Catholic pharmacy does not meet it does not support the

19   conclusion that there is not.

20           The Board itself recognized that demand exists even in the absence of a supplier willing

21   to meet it in its 2007 "Final Significant Analysis" of the rules' impact.  [Pl.'s Ex. 434].  In

22   discussing the "possible costs of the rule," the Board acknowledged that the rules might cause

23   some pharmacies to close, rather than dispense drugs in conflict with their religious beliefs.  It

24

explained that any adverse impact on patients was likely to be short lived, however, because "if there is sufficient consumer demand in the area, a pharmacy that is being closed may be purchased and run by a new operator who will comply with these rules, or another pharmacy company may locate in the area to serve that market." *Id*. at p. 12. The Board's analysis[26] recognized that demand exists in the absence of a pharmacy willing to meet it.

The State's "no demand" argument is also undermined by its claim that the rules were proactively enacted to ensure patient access in the future, even though it concedes that there was no evidence of a problem with access to Plan B prior to its 2007 rules.

The State next claims that, even though the rules apply to Catholic pharmacies, and even if they are failing to meet patient demand for Plan B, its investigative power is necessarily "complaint driven" and the Fourth Amendment prohibits it from enforcing the rules in the absence of a formal complaint. Thus, it argues, because it has received no such complaints, its failure to enforce the rules against Catholic pharmacies is not evidence that the rules are not generally applicable.

The State's position is based on its reading of *Client A v. Yoshinaka*, 128 Wn. App. 833 (2005), and *Seymour, DDS. v. Washington State Department of Health, Dental Quality Assurance Commission*, 152 Wn. App. 156 (2009). [*See* Dkt. #522]. These cases suggest that evidence obtained outside a formal investigation may be excluded, in some circumstances, under the Fourth Amendment. Neither case addresses the fact that the Board of Pharmacy is authorized to inspect every pharmacy every two years, and neither defeats the conclusion that the Board is

---

[26] The Board's analysis did not otherwise address the cost to pharmacies driven out of business as a result of its 2007 rules. It certainly did not address the fact that the state's Catholic pharmacies—and, logically, their associated hospitals—would suffer this same fate, if the rules were enforced against them.

authorized to initiate the complaint and investigation process in the absence of a formal

complaint filed by patient.

It is also clear that the Board has not previously adhered to this position. Its witnesses

did not claim that it could not enforce its rules in the absence of a formal, public complaint; to

the contrary, Ms. (Salmi) Hodgson (in the Department of Health's office of facilities and services

licensing) acknowledged that the Board is authorized to, and does, conduct biannual inspections

of every pharmacy in the state, to monitor compliance with the Board's regulations. [*See* Tr.

Trans., vol. 8 at 23:10–17, Dec. 20, 2011]. She and other witnesses[27] admitted that the Board

has previously initiated investigations as the result of these biannual inspections.

State witnesses also admitted that Board members, employees, and inspectors can and do

file their own complaints to begin the investigation and enforcement process. In fact, one of the

investigations of Plaintiff Stormans' pharmacy was initiated by the Board itself. Board members

and employees have done so because of media reports or information received from insurance

companies. Ms. Salmi even conceded that the Board is authorized to use "test shoppers" to test

pharmacies' compliance with Board of Pharmacy regulations, if there is reason to believe a

violation is occurring. [*See* Tr. Trans., vol. 8 at 99:10–15, Dec. 20, 2011; *see also* Dkt. # 551.]

---

[27] Rod Shafer, the former executive director of the Washington State Pharmacy
Association, similarly testified that the biannual inspections are conducted "to make sure the
pharmacists are following the rules and ensure public safety." Tr. Trans. December 22, 2011, at
122. He also freely admitted that it was common knowledge that Catholic pharmacies would not
stock or dispense Plan B: "You would have to have been in a very dark place for a long time not
to understand what the Catholic policy was on birth control. . . . [I]t was common knowledge,
they did not stock those products." Tr. Trans. December 22, 2011, at 139.

It is therefore clear that the Board could enforce its stocking and delivery rules against the state's many non-compliant Catholic pharmacies, and that it has consciously chosen[28] not to do so. Its refusal is not excused by its attorneys' current claim that the Fourth Amendment prohibits such investigations, or by the claim that investigations are "complaint-driven" and there have been no patient complaints about Catholic pharmacies.

The next iteration of the State's defense of its differential treatment of Catholic pharmacies is that selective enforcement is constitutionally permissible under *Wayte v. United States,* 470 U.S. 589 (1985). *Wayte* involved mandatory registration for the Selective Service. Plaintiff refused, and repeatedly boasted about his decision to the Selective Service. He was indicted, and sought dismissal by arguing that the law was being enforced against only vocal opponents to registration. The Supreme Court rejected his claim, holding that prosecutorial discretion enhanced efficiency and that enforcement against only vocal violators had a valuable deterrent effect. It recognized the "critical distinction" between the government's *awareness* that its passive enforcement policy would punish only a subset of non-compliant individuals, and the choice to use such an enforcement mechanism *because* it would do so. Plaintiff could not prove

---

[28] The State suggests that its failure to enforce the rules is the result of the "chilling effect" of this Court's stay. This position is not compelling, for at least three reasons. First, the stay was not intended to, and did not purport to, prevent additional investigations under the rules. Second, during the 2010 rulemaking, the Secretary of Health and interest groups like the Northwest Women's Law Center advocated against amending the rules to include a right of conscience. Secretary Selecky wrote to the Board of Pharmacy's Chair, urging him not to do so: "I agree with what you have heard from Governor Gregoire's office—the current rule strikes the correct balance between patient access to medication and valid reasons why a pharmacist might not fill a prescription. The rule has served patient safety well in Washington over the three years it's been in place….The rule should stand as adopted in 2007." [Pl.'s Ex. 389].

Finally, to the extent the Board claims it will enforce the rules against Catholic pharmacies, that position is undermined by its simultaneous claim that it cannot do so absent a complaint—particularly where the evidence establishes that the Board could initiate a complaint itself, and has failed to do so in the almost five years the rules have been in effect.

that his indictment was "*because of* his protest," and his selective enforcement claim failed. *Wayte*, 470 U.S. at 610.

*Wayte* is not helpful.  First, it is not a free exercise case.  *Smith* and *Lukumi* unambiguously hold that a regulation is not neutral or generally applicable if it treats religious conduct in a discriminatory manner.  The Free Exercise Clause protects against unequal treatment, and "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi* at 543-43.  Furthermore, and in any event, the evidence clearly demonstrates that the Board's 2007 rules do target religious objectors "because of"—and not "in spite of"—their religious objection.

The State's final position, that the stocking and delivery rules do not apply to in-patient Catholic pharmacies, is also unavailing, and perhaps counterproductive.  Earlier in the litigation, the State and the Intervenors had emphasized that the rules applied to all Catholic pharmacies because, if it were otherwise, the rules would be drastically and inexplicably underinclusive. The rules facially apply to outpatient, retail Catholic pharmacies, and every witness addressing the subject so testified.  Indeed, the State emphasized this fact in its Supplemental Trial Brief on selective enforcement:  "It is undisputed that the stocking rule and the 2007 rules apply to [Catholic] pharmacies.  There is no evidence to support a finding that the rules are not generally applicable due to a carve-out having been granted to Catholic out-patient pharmacies." [*See* Dkt. #544 at 9].  The Intervenors took the same position in response to the Court's inquiries about the rules' impact on Catholic pharmacies: "The rules at issue in this case do not exempt the outpatient pharmacies operated by Catholic health systems for the stocking rule or the delivery rule[.] . . . [I]f a Catholic-owned pharmacy serves a community that needs emergency

contraceptives, that pharmacy must stock and deliver emergency contraceptives." [*See* Dkt. #523 at 5].

In fact, the Board's rules apply to Catholic pharmacies, and Catholic pharmacies are not complying (and will not comply) with them. But there is no evidence whatsoever that the Board has enforced or will enforce its rules against them. This is exactly the sort of unequal treatment prohibited by the Free Exercise clause under *Lukumi*. The rules are not generally applicable because the State does not enforce them against all pharmacies, or even to all pharmacies with religious objections to dispensing Plan B. Accordingly, they are unconstitutional unless they are narrowly tailored to achieve a compelling state interest.

**5. Application of Strict Scrutiny.**

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "interests of the highest order" and must be narrowly tailored in pursuit of those interests. A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases. *Lukumi*, 508 U.S. at 546 (internal citations omitted).

As was the case in *Lukumi*, the Court's analysis of the rules demonstrates why they cannot survive strict scrutiny. The rules are not at all narrowly tailored; they are instead riddled with secular exemptions that undermine their stated goal of increasing patient access to all medications. The rules operate primarily to force (some) religious objectors to dispense plan B, while permitting other pharmacies to refrain from dispensing other medications for virtually any reason. They permit Catholic pharmacies to ignore the rules altogether. Nor has the state

1   demonstrated or argued that it has a compelling interest in reaching this result.  The rules cannot

2   survive strict scrutiny, and they are not constitutional.

3   **C.  Plaintiffs' Equal Protection Claim.**

4          Plaintiffs assert that the stocking and delivery rules, in operation, violate the Equal

5   Protection Clause of the Fourteenth Amendment, which provides that no State shall "deny to any

6   person within its jurisdiction the equal protection of the laws."  *See* Second Am. Compl. ¶ 61;

7   U.S. Const. amend. XIV.   This is "essentially a direction that all persons similarly situated

8   should be treated alike."  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439

9   (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  When "social or economic legislation is

10  at issue," the Equal Protection Clause allows the States "wide latitude," and thus, laws "will be

11  sustained if the classification drawn by the statute is rationally related to a legitimate state

12  interest."  *Id.* at 440 (citing *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174 (1980);

13  *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981)).  When a statute classifies by race, alienage, or

14  national origin or impinges a fundamental right, however, the law will be subjected to strict

15  scrutiny.  *Id.*; *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  Classifications based on

16  gender and illegitimacy "also call for a heightened standard of review" and must meet

17  intermediate scrutiny.  *Id.* at 440–41 (citing *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718

18  (1982); *Mills v. Habluetzel*, 456 U.S. 91, 99 (1982)).  Where a law is facially neutral, like the

19  stocking and delivery rules, a plaintiff must show both discriminatory intent and impact.  *See Lee

20  v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001).  As Justice Kennedy noted in *Lukumi*,

21  the free-exercise and equal-protection analyses are analogous, *see Lukumi*, 508 U.S. at 540, and

22  thus, the Court unsurprisingly concludes that the stocking and delivery rules, as applied to the

23  Plaintiffs, violate the Equal Protection Clause.

24

1    The facts of this case lead to the inescapable conclusion that the Board's rules

2    discriminate intentionally and impinge Plaintiffs' fundamental right to free exercise of religion.

3    Thus, the Court must apply strict scrutiny, a threshold the rules cannot pass. In practice, the

4    Board of Pharmacy has classified pharmacies and pharmacists into those that refer patients for

5    religious reasons and those that refer patients for secular reasons.  That classification does

6    nothing to increase patient access.  Indeed, if the Board applied their exemptions as they have in

7    the past, a pharmacy could refuse to stock Plan B because it made an advantageous contract with

8    the manufacturer of *ella*, but a pharmacy could not refuse to stock Plan B because of moral

9    objection.  In both cases, the conduct is the same: the patient is referred.  But in the latter

10   situation, the pharmacy is disciplined.  Persons similarly situated are not treated alike.

11   To survive strict scrutiny, the stocking and delivery rules must be narrowly tailored.

12   Given that Defendants have stipulated that a facilitated referral does not undermine access, the

13   rules could be more narrowly tailored to allow religious objectors to refer patients seeking Plan

14   B.  The rules thus fail strict scrutiny.

15   Even if the Court applied a rational basis standard, the rules would still fail.  The

16   classification of pharmacies and pharmacists by religious motivation is not rationally related to

17   furthering patient access.  Moreover, the rules are vastly underinclusive.  Defendants provided no

18   rational basis for failing to apply the stocking and delivery rules to Catholic hospitals.  That

19   division between Catholic conscientious objectors and non-conscientious objectors fails to

20   further patient access in any manner.  In short, the stocking and delivery rules fail under even the

21   most deferential standard.

22   **D.  Plaintiffs' Title VII Claim.**

23   Plaintiffs assert that the delivery and stocking rules "permit (if not require) Washington

24   employers such as Stormans to take adverse employment action against individual pharmacists

such as the plaintiff pharmacists based on their religious beliefs and practices," thus violating Title VII, 42 U.S.C. § 2000. Second Am. Compl. ¶ 74. Title VII bars employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Further, any state law "which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter" is preempted by Title VII. *See id.* § 2000e-7. However, Title VII preempts only those state laws that "*expressly sanction* a practice unlawful under Title VII; the term does not pre-empt state laws that are silent on the practice." *Calif. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 297 n. 29 (1987) (emphasis added).

While the Board of Pharmacy's rules unconstitutionally target religious conduct, the Court cannot say that the rules expressly "require or permit" a pharmacy to take discriminatory action against a pharmacist in such a direct manner as to violate Title VII. As noted above, the rules are facially constitutional—they do not on their face require or permit discriminatory conduct. It is in their operation that the rules force a pharmacy to choose between compliance with the delivery and stocking rules and employing a conscientious objector as a pharmacist. Because the rules do not expressly permit a pharmacy to discriminate, Title VII does not preempt them.

## IV. CONCLUSION

The Board of Pharmacy's 2007 rules are not neutral, and they are not generally applicable. They were designed instead to force religious objectors to dispense Plan B, and they sought to do so despite the fact that refusals to deliver for all sorts of secular reasons were

permitted. The rules are unconstitutional as applied to Plaintiffs. The Court will therefore

permanently enjoin their enforcement against Plaintiffs.

IT IS SO ORDERED.

DATED this 22nd day of February, 2012

_____
Ronald B. Leighton
United States District Judge